# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02733-STV

BIONCA CHARMAINE ROGERS,
CATHY BEGANO,
JENNIFER SAUGAUSE,
ANDREW ATKINS, and
MARC TREVITHICK,

      Plaintiffs,

v.

COLORADO DEPARTMENT OF CORRECTIONS,
RICK RAEMISCH, in his official capacity as Executive Director of the Colorado Department of
Corrections,
RYAN LONG, in his official capacity as Warden of the Denver Women's Correctional Facility,
and
MIKE ROMERO, in his official capacity as Warden of the Colorado Territorial Correctional
Facility,

      Defendants.

---

## FOURTH AMENDED COMPLAINT

---

Plaintiffs Bionca Charmaine Rogers, Cathy Begano, Jennifer Saugause, Andrew Atkins,

and Marc Trevithick, by and through counsel, hereby file this Fourth Amended Complaint

against the Colorado Department of Corrections, Rick Raemisch in his official capacity as

Executive Director of the Colorado Department of Corrections, Ryan Long in his official

capacity as Warden of the Denver Women's Correctional Facility, and Mike Romero in his

official capacity as Warden of the Colorado Territorial Correctional Facility.

## INTRODUCTION

1.      Plaintiff Bionca Charmaine Rogers is a prisoner at the Denver Women's Correctional Facility. While Ms. Rogers is able to hear, both of her parents are deaf. Ms. Rogers communicates with her parents using American Sign Language ("ASL").

2.      Ms. Rogers has requested that she be permitted to communicate with her parents using a videophone ("VP"), which would permit them to communicate directly, as hearing prisoners communicate directly by telephone with members of their families who are also hearing.

3.      Defendants have refused to permit Ms. Rogers to communicate with her mother and father by VP, insisting that she use a teletypewriter ("TTY"), which, as the name suggests, requires users to type their conversation back and forth, and requires the individuals at both ends of the conversation to have specialized equipment to participate.

4.      Ms. Rogers's parents do not have TTY equipment so it is impossible for Ms. Rogers to communicate with her parents using a TTY.  Defendants are thus not providing effective communication to either Ms. Rogers or her parents.

5.      Plaintiffs Cathy Begano and Jennifer Saugause are prisoners at the Denver Women's Correctional Facility. Both are Deaf and both have requested to be able to use a videophone to communicate with friends and family. All requests have been refused.

6.      Plaintiffs Andrew Atkins and Marc Trevithick are prisoners at the Colorado Territorial Correctional Facility. Both are Deaf and have requested to be able to use a videophone to communicate with friends and family. All requests have been refused.

7.     Plaintiffs bring these claims under the First Amendment to the United States Constitution, title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA" or "Title II"), and section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), to challenge this infringement of their right to free speech and the discrimination against them and by which they have been injured.

## JURISDICTION AND VENUE

8.     This action arises under the Constitution and laws of the United States. Jurisdiction is conferred upon this court pursuant to 28 U.S.C. §§ 1331 and 1343.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as all of the events giving rise to the claims occurred in the District of Colorado.

## PARTIES

10.     Plaintiff Bionca Charmaine Rogers is a prisoner at the Denver Women's Correctional Facility ("DWCF") in Denver, Colorado. Ms. Rogers is able to hear. Her mother, Teresa Jordan, and her father, Charles Buddy Rogers, are both deaf, unable to hear, and communicate using ASL. Ms. Rogers is thus an individual who has a known relationship or association with persons with known disabilities. *See* 28 C.F.R. § 35.130(g).

11.     Plaintiff Cathy Begano is a prisoner at DWCF. Ms. Begano is Deaf, and as such a qualified individual with a disability as that term is used in Title II and Section 504. Plaintiff Begano has been deaf since she was a young child and ASL is her primary language.

12.     Plaintiff Jennifer Saguause is a prisoner at DWCF. Ms. Saguause is Deaf, and as such is a qualified individual with a disability as that term is used in Title II and Section 504. Plaintiff Saugause has been deaf since she was a young child and ASL is her primary language.

13.     Plaintiff Andrew Atkins is a prisoner at the Colorado Territorial Correctional Facility ("CTCF") in Cañon City, Colorado. Mr. Atkins is Deaf, and as such is a qualified individual with a disability as that term is used in Title II and Section 504. Plaintiff Atkins was born deaf and ASL is his primary language.

14.     Plaintiff Marc Trevithick is a prisoner at CTCF. Mr. Trevithick is Deaf, and as such is a qualified individual with a disability as that term is used in Title II and Section 504. Plaintiff Trevithick has been deaf since he was a young child and ASL is his primary language.

15.     Defendant Colorado Department of Corrections ("CDOC") is a department of the State of Colorado. CDOC has custody of all Plaintiffs.

16.     Defendant Rick Raemisch is the Executive Director of the Colorado Department of Corrections. Director Raemisch is sued in his official capacity.

17.     Defendant Ryan Long is the Warden of the DWCF. Warden Long is sued in his official capacity.

18.     Defendant Mike Romero is the Warden of CTCF. Warden Romero is sued in his official capacity.

## FACTS

19.     ASL is a visual language. It is "a complete, complex language that employs signs made by moving the hands combined with facial expressions and postures of the body."  For example, "English speakers ask a question by raising the pitch of their voice; ASL users ask a question by raising their eyebrows, widening their eyes, and tilting their bodies forward."

https://www.nidcd.nih.gov/health/american-sign-language

20.     ASL is not just English in gestures. It has grammar and syntax that are completely different from English. When deaf people are raised using ASL as their first or primary language, written English is a foreign language, which is often acquired incompletely and imperfectly.

21.     Because deaf people cannot use a conventional telephone, technology has developed to permit them to communicate at a distance.

22.     The earliest such technology, the teletypewriter or TTY, was invented in approximately 1964. It involved placing a standard telephone handset into an "acoustic coupler" connected to a teleprinter machine. Over time, the device evolved into a single piece of equipment that included a QWERTY keyboard and was connected to a phone jack.

23.     A TTY requires that individuals at both ends of the communication have specific TTY equipment.

24.     In a TTY communication, each participant types out his or her side of the conversation, then waits while the other person types back.

25.     As such, it is a more cumbersome form of communication than a telephone conversation between hearing people.

26.     For the same reason, it is a more cumbersome form of communication than a videophone conversation between deaf people or a deaf person and a hearing person who knows ASL.

27.     As technology has evolved, fewer and fewer deaf people own or use TTYs.

28.     It is more and more common for deaf people to use videophones rather than TTYs.

29.     As the name suggests, a videophone has a camera and a screen and transmits a video signal, permitting deaf people -- or a deaf person and a hearing person who signs -- to see each other and communicate directly with one another in ASL.

30.     Ms. Rogers's father and mother both have videophone service, and that is the way they communicate telephonically with others.

31.     Plaintiff Rogers was arrested in February, 2014, and detained in the El Paso County Jail from that time until her conviction in August, 2015.

32.     At the El Paso County Jail, Ms. Rogers was able to communicate with her parents using a videophone.

33.     Ms. Rogers was convicted in August, 2015, and sentenced to life without parole. Since that time, she has been housed at the DWCF.

34.     CDOC permits prisoners to make phone calls to individuals who are on their phone list. Administrative Regulation ("AR") 850-12 ¶ IV(B)(1). Calls are limited to 20 minutes each; the number of calls permitted is governed by the policies of each facility. *Id*. ¶ IV(B)(2).

35.     The telephones at DWCF are available at any time from 6:00 a.m. to 12:00 midnight. *Id*. ¶ IV(C)(2).

36.     Hearing prisoners who wish to contact hearing family members are permitted to walk up to the phones at any time they are available and place a call, provided they have paid for the time (or are calling collect) and are calling someone on their phone list.

37.     AR 850-12 provides that "[o]ffenders with hearing and/or speech disabilities, and offenders who wish to communicate with parties who have such disabilities, are afforded access to a [TTY] or comparable equipment." *Id*. ¶ IV(A)(4)

38.     Almost as soon as she arrived at DWCF, Ms. Rogers began requesting access to a videophone so that she could communicate with her parents and her children.

39.     Ms. Rogers has two children, ages seven and two. Ms. Jordan, Ms. Rogers's mother, has guardianship of Ms. Rogers's children. Although the children are hearing, it is essential that Ms. Rogers be able to communicate with Ms. Jordan about matters relating to the care and upbringing of her children.

40.     On August 28, 2015, Ms. Rogers asked for access to a videophone, "due to sign language being a visual language where I, and my family are able to effectively communicate through expressions, demeanor, and facials as sign language uses such to understand one another. It is equal to a telephone that a hearing family uses because the ability to determine moods etc. is easily heard through vocal language and having a deaf family, I am at a disadvantage because I cannot vocally commune with my parents."

41.     Ms. Rogers first grieved the lack of a videophone on or about September 9, 2015.

42.     On or about September 17, 2015, CDOC responded that "[a] videophone pilot plan is being considered for [Colorado Territorial Correctional Facility] where the majority of the DOC's deaf offenders reside. Eventually this will be available in all of the DOC's facilities. You have been approved for TTY access."

43.     Neither of Ms. Rogers's parents has a TTY, so this solution does not permit her to communicate with them.

44.     Nevertheless, at or about this time, Ms. Rogers attempted to use the TTY but was unable to do so because the TTY was broken.

45.     On or about September 24, 2015, Ms. Rogers submitted her Step 2 grievance, requesting access to a videophone and again explaining in detail why it was necessary.

46.     On or about October 19, 2015, CDOC responded (among other things), "You have been authorized to utilize the TTY and the TTY is an effective alternate means of communication."

47.     On or about October 28, 2015, Ms. Rogers submitted her Step 3 grievance, again explaining in detail why a videophone was necessary and why the TTY was not sufficient.

48.     On or about November 16, 2015, CDOC responded, stating that it could not "improve upon the information provided by the Step 1 and Step 2 Responders," and that Ms. Rogers had "provided no verifiable documentation which requires CDOC to provide you with the use of a videophone. . . . It is your burden to prove your allegations stated in your Step 3 grievance. I have reviewed the facts of this case and determine that you did not meet this burden. There was no corroborating evidence to provide proof of your allegations."

49.     On or about January 2, 2016, Ms. Rogers submitted a kite asking for clarification of the November, 2015, denial and providing contact information for an individual at "Sorenson Video Phone" who would be able to confirm that her parents are deaf and have videophones, and provide confirmation of their videophone numbers.

50.     This kite was returned to Ms. Rogers with a note stuck to the front reading, "[s]he needs to have this sent to HQ through proper channels. This does not go through the grievance coordinator."

51.     On or about February 9, 2016, Ms. Rogers submitted a grievance form asking that the November 16, 2015 letter be explained.

52.     In that form, Ms. Rogers again provided contact information for an individual at "Sorenson Video Phone" who would be able to confirm that her parents are deaf and have videophones, and provide confirmation of their videophone numbers.

53.     Because "Sorenson Communications provides videophones and software exclusively to deaf individuals who require Video Relay Service (VRS) to place and receive calls," https://apply.sorensonvrs.com/secured_ntouch_apply_form (last visited 6/11/2017), Ms. Rogers was, in her January 2 and February 9, 2016 communications, substantiating the fact that her parents were deaf and providing information concerning the communications technology they used.

54.     On or about February 12, 2016, CDOC responded, "Grievance previously went to Step 3 and denied. Denied."

55.     On or about February 23, 2016, CDOC sent a letter to Ms. Rogers, once again denying her grievance.

56.     On or about November 3, 2016, Ms. Rogers filed the present lawsuit *pro se*.

57.     On or about March 24, 2017, Ms. Rogers sent a "kite" stating that she was unable to access the TTY.

58.     On or about March 31, 2017, CDOC sent a memo to Ms. Rogers titled "TTY Access Denied," and stating that the CDOC "require[d] that all people with a TTY must submit in writing proof to headquarters in order to be able to put Colorado relay on their offender's phone list. This means that your parents must submit in writing that they are deaf and have a TTY as well as the model of the TTY. . . . In addition, you are not an ADA offender and you are

not deaf so you have been denied access to the TTY. If headquarters approves for you to use the TTY then you will be granted access."

59.    Again, however, neither of Ms. Rogers's parents has a TTY and she had previously submitted proof that they were deaf.

60.    On several occasions prior to April, 2017, Ms. Rogers attempted to reach her mother using "video relay service" or "VRS."

61.    VRS permits a deaf person and a hearing person who does not sign to communicate. Using VRS, a hearing caller uses a conventional telephone to call the deaf person's VP number. The call is answered by a sign language interpreter, who then connects to the deaf person's VP. As the hearing caller speaks, the interpreter interprets for the deaf recipient through VP; as the deaf person signs, the interpreter interprets into spoken English.

62.    Starting in April, Ms. Rogers has been able to call her mother using VRS.

63.    For Ms. Rogers, VRS does not constitute communication that is in any way equivalent to a phone call between a hearing prisoner and her hearing family members, as the entire conversation is mediated by the interpreter. Participants in a VRS call do not speak with each other directly, and still cannot perceive emotion, tone, and other "non-spoken" features of a conversation between family members. Thus although VRS is a convenient solution for conversations between deaf people and non-signing hearing people, it is by definition indirect. As such, it is an inferior way for a deaf and hearing person to communicate when both know ASL.

64.    In investigating this matter prior to entering an appearance, on May 28, 2017, counsel for Ms. Rogers submitted a Colorado Open Records Act request to the CDOC to attempt

to learn more about the "videophone pilot plan . . . being considered for [Colorado Territorial Correctional Facility]," as mentioned in the CDOC's September 17, 2015 grievance response.

65.     A representative of CDOC responded, on May 1, 2017, that "[t]here is no pilot program at CTCF. Two years ago, there was an attempt to do so. Unfortunately, the technology available did not work from a security standpoint and the pilot did not start," and that "[t]here are currently no plans to install sign language specific video phones; we do have tablets for offenders now and we have plans to look into how we can expand their use."

66.     Plaintiffs Begano and Saugause have both made requests to their case managers for videophones on a number of occasions during their time at DWCF.

67.     Ms. Begano was detained at the El Paso County Jail and was able to us the VP there.

68.     Plaintiffs Begano and Saugause have each attempted to use a TTY at DWCF on a number of occasions. The people with whom they communicate are largely hearing, rather than deaf. These individuals do not have TTYs. Plaintiffs Begano and Saugause have thus used TTY relay, a system in which they type their half of the conversation into the TTY, while an operator reads the text to the hearing person at the other end. When the hearing person responds, the operator types the response back to the DWCF TTY.

69.     Even when it works properly, this process is far more cumbersome and time consuming than a phone call or VP or VRS call. As explained below, it is even more cumbersome when both parties to the call are deaf.

70.     When Plaintiffs Begano and Saugause use the TTY, it has not worked properly. The TTY often skips words and when there is background noise or interference, the words are

garbled. On many occasions when one of them wanted to use the TTY, it was broken and they were asked to wait until it was fixed to place their call. This is in stark contrast to hearing inmates, who are able to use the phone at any time between 6:00 a.m. and midnight.

71.     Plaintiffs Atkins and Trevithick have each attempted to use a TTY at CTCF on a number of occasions. The people with whom they communicate include both hearing and deaf individuals. Since Plaintiffs Atkins and Trevithick arrived at CTCF, they have not been able to communicate effectively telephonically with friends and family. Both have lost contact with friends and family members due to the lack of effective communication.

72.     Similarly to Plaintiffs Begano and Saugause, Plaintiffs Atkins and Trevithick have attempted to use TTY relay, a system in which they type their half of the conversation into the TTY, while a TTY operator reads the text to a hearing person at the other end. However, when Plaintiffs Atkins and Trevithick communicate with deaf family members and friends, TTY relay involves an additional step. After the deaf caller types into the TTY, the TTY operator reads the text to a hearing VRS interpreter who signs to the deaf individual receiving the call. When the deaf called-party responds, they sign back to the VRS interpreter who speaks to the TTY operator who types the response back to the deaf caller. This process thus adds two intermediaries to a conversation between two people and can cause extreme delays and miscommunication in the communication.

73.     When Plaintiffs Atkins and Trevithick use the TTY at CTCF, it regularly freezes or disconnects and its keys are extremely sensitive, causing typographical errors. When the TTY is broken, it often takes the CDOC an unreasonable time to fix it. Occasionally, Plaintiffs have

specific dates or times that they have scheduled to call their family and friends, but when they get to the TTY, it is broken. This has led to strained relationships between friends and family.

74.     Additionally, Plaintiffs Atkins and Trevithick pay for their TTY calls using the debit system, but these TTY calls are apparently presented to the called party as collect calls. This creates problems for friends and family members who cannot afford to accept collect calls.

75.     The policy limiting Plaintiffs to communicating through a TTY essentially limits them to writing letters -- some on paper, some on the TTY -- while prisoners with hearing family are permitted two different modes of communication: letters; and the more direct and intimate communication of a phone call.

76.     Plaintiffs are not able to communicate effectively telephonically with friends and family. This has caused Plaintiffs emotional and psychological distress, inconvenience, frustration, depression, and heartache.

77.     Defendants' actions in refusing to provide a videophone to Plaintiffs are and have been intentional and/or constituted deliberate indifference to the strong likelihood that pursuit of this policy will likely result in a violation of Plaintiffs' federally protected rights. Plaintiffs have alerted Defendants to the need for a videophone and that need is obvious. Defendants have knowingly and intentionally refused to provide the requested videophone

### FIRST CLAIM FOR RELIEF:
### 42 U.S.C. § 1983/VIOLATION OF THE FIRST AMENDMENT TO THE
### CONSTITUTION OF THE UNITED STATES
### (against all Defendants)

78.     Plaintiffs incorporate the allegations set forth in the remainder of this Fourth Amended Complaint as if fully set forth herein.

79.     Defendants have impermissibly deprived, and continue to deprive, Plaintiffs of their First Amendment right to freedom of speech by failing to provide them with telecommunication equipment necessary for them to communicate with their family and friends.

80.     Defendants' refusal to provide Plaintiffs with access to a videophone serves no legitimate or compelling need and is not rationally related or narrowly tailored to any identified penological or rehabilitative need.

81.     Provision of appropriate telecommunication equipment to Plaintiffs would have negligible effects, if any, on other prisoners and prison employees at CDOC facilities.

82.     Defendants' failure to comply with the First Amendment of the United States Constitution has resulted and will continue to result in harm to Plaintiffs, as more fully described above.

83.     As a direct and proximate result of Defendants' acts, omissions, and violations alleged above, Plaintiffs have suffered damages, as more fully described above.

84.     Plaintiffs have been injured and aggrieved by and will continue to be injured and aggrieved by Defendants' violation of the First Amendment.

### SECOND CLAIM FOR RELIEF:
### VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. § 12131 *et seq.*
### (against Defendant CDOC)

85.     Plaintiffs incorporate the allegations set forth in the remainder of this Fourth Amended Complaint as if fully set forth herein.

86.     Title II prohibits public entities such as Defendant CDOC from excluding individuals with disabilities from participation in or denying them the benefits of their services,

programs or activities, or otherwise subjecting such individuals to discrimination. 42 U.S.C. § 12132.

87.    Because they are deaf and are parents of an inmate at DWCF, Ms. Rogers's parents are qualified individuals with disabilities within the meaning of the Americans with Disabilities Act. 42 U.S.C. § 12102.

88.    Defendant CDOC knows that Ms. Rogers's parents are deaf, and knows that she has a relationship or association with them, as described in 28 C.F.R. § 35.130(g).

89.    Because they are deaf and are prisoners in the custody of the CDOC, Plaintiffs Begano, Saugause, Atkins, and Trevithick are qualified individuals with disabilities within the meaning of the Americans with Disabilities Act. 42 U.S.C. § 12102.

90.    Defendant CDOC excluded Plaintiffs and Ms. Rogers's parents from participation in and/or denied them the benefits of it services, programs, and/or activities and/or subjected them to discrimination on the basis of disability and, in the case of Ms. Rogers, on the basis of her relationship or association with her deaf parents, in violation of Title II and its implementing regulations as more fully described in this Fourth Amended Complaint.

91.    Such discrimination includes but is not limited to:

a.    denying Plaintiffs and Ms. Rogers's parents the opportunity to participate in or benefit from an aid, benefit, or service, 28 C.F.R. § 35.130(b)(1)(i);

b.    affording Plaintiffs and Ms. Rogers's parents the opportunity to participate in or benefit from an aid, benefit, or service that is not equal to that afforded others, *see id.* § 35.130(b)(1)(ii);

c.  providing Plaintiffs and Ms. Rogers's parents with aids, benefits, and services that are not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others, *see id.* § 35.130(b)(1)(iii);

d.  using criteria and methods of administration that have the effect of subjecting Plaintiffs and Ms. Rogers's parents to discrimination on the basis of disability, *see id.* § 35.130(b)(3)(i);

e.  using criteria and methods of administration have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of CDOC's program with respect to Plaintiffs and Ms. Rogers's parents, *see id.* § 35.130(b)(3)(ii);

f.  failing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination against Plaintiffs and Ms. Rogers's parents on the basis of disability, *see id.* § 35.130(b)(7);

g.  failing to ensure that communications with Plaintiffs and Ms. Rogers's parents are as effective as communications with others, *see id.* § 35.160(a)(1);

h.  failing to furnish appropriate auxiliary aids and services where necessary to afford Plaintiffs and Ms. Rogers's parents an equal opportunity to participate in, and enjoy the benefits of, CDOC's services, programs, or activities, *see id.* § 35.160(b)(1); and/or

i. failing to give primary consideration to the requests of Plaintiffs and Ms. Rogers's

parents concerning the types of auxiliary aids and services necessary, *see id.*

§ 35.160(b)(2).

92. Plaintiffs and Ms. Rogers's parents are qualified to participate in CDOC services,

programs, and activities within the meaning of Title II.

93. Defendant CDOC's actions described in this Fourth Amended Complaint were

intentional and/or were taken with deliberate indifference to the strong likelihood that pursuit of

its questioned policies would likely result in a violation of the Title II rights of Plaintiffs and Ms.

Rogers's parents.

94. As a direct and proximate result of Defendant CDOC's acts, omissions, and

violations alleged above, Plaintiffs have suffered damages as more fully described above.

95. Plaintiffs have been injured and aggrieved by and will continue to be injured and

aggrieved by Defendant CDOC's discrimination against Plaintiffs and Ms. Rogers's parents.

96. Defendant CDOC's actions that violate Title II also violate the First Amendment

to the United States Constitution.

<u>**THRID CLAIM FOR RELIEF:**</u>
<u>**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT**</u>
<u>**49 U.S.C. § 794**</u>
<u>**(against Defendant CDOC)**</u>

97. Plaintiffs incorporate the allegations set forth in the remainder of this Fourth

Amended Complaint as if fully set forth herein.

98. Section 504 prohibits discrimination on the basis of disability by recipients of

federal financial assistance. 29 U.S.C. § 794.

99.     Defendant CDOC receives federal financial assistance as that term is used in Section 504.

100.     Because they are deaf and are prisoners in the custody of the CDOC, Plaintiffs Begano, Saugause, Atkins, and Trevithick are qualified individuals with disabilities within the meaning of Section 504. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. § 12102).

101.     Because they are deaf and are parents of an inmate at DWCF, Ms. Rogers's parents are qualified individuals with disabilities within the meaning of Section 504. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. § 12102).

102.     Defendant CDOC excluded Plaintiffs and Ms. Rogers's parents from participation in and/or denied them the benefits of it programs and/or activities and/or subjected them to discrimination on the basis of disability and, in the case of Ms. Rogers, on the basis of her relationship or association with her deaf parents, in violation of Section 504 and its implementing regulations as more fully described in this Fourth Amended Complaint.

103.     Such discrimination includes but is not limited to:

    a.   denying Plaintiffs and Ms. Rogers's parents the opportunity to participate in CDOC's programs and activities, *see* 28 C.F.R. § 42.503(b)(1)(i);

    b.   denying Plaintiffs and Ms. Rogers's parents an equal opportunity to achieve the same benefits that others achieve in CDOC's programs and activities, *id.* § 42.503(b)(1)(ii);

    c.   using criteria or methods of administration that either purposely or in effect discriminate on the basis of disability or defeat or substantially impair

18

accomplishment of the objectives of CDOC's programs or activities with respect

Plaintiffs and Ms. Rogers's parents; *id.* § 42.503(b)(3);

d.   failing to provide appropriate auxiliary aids to Plaintiffs and Ms. Rogers's

parents, there by discriminatorily impairing or excluding them from participation

in CDOC's programs and activities, *see id.* § 42.503(f); and/or

e.   failing to provide reasonable accommodations to Plaintiffs and Ms. Rogers's

parents as necessary to ensure that they have meaningful access to CDOC's

programs, activities, or benefits, *see Alexander v. Choate*, 469 U.S. 287, 301

(1985).

104.   Plaintiffs and Ms. Rogers's parents are qualified to participate in CDOC services,

programs, and activities within the meaning of Section 504.

105.   Defendant CDOC's actions described in this Fourth Amended Complaint were

intentional and/or were taken with deliberate indifference to the strong likelihood that pursuit of

its questioned policies would likely result in a violation of the Section 504 rights of Plaintiffs and

Ms. Rogers's parents.

106.   As a direct and proximate result of Defendant CDOC's acts, omissions, and

violations alleged above, Plaintiffs have suffered damages, as more fully described above.

107.   Plaintiffs have been injured and aggrieved by and will continue to be injured and

aggrieved by Defendant CDOC's discrimination against Plaintiffs and Ms. Rogers's parents.

108.   Defendant CDOC's actions that violate Section 504 also violate the First

Amendment to the United States Constitution.

**WHEREFORE, Plaintiff respectfully requests:**

1.     That this Court assume jurisdiction;

2.     That this Court declare the actions of all Defendants described in this Fourth Amended Complaint to be in violation of the First Amendment to the United States Constitution (and therefore 42 U.S.C. § 1983), and the actions of Defendant CDOC to be in violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act;

3.     That this Court enter an injunction ordering Defendants to cease violating Plaintiffs' rights under the First Amendment, Title II, and Section 504, and to cease discriminating against them and against Ms. Rogers's parents on the basis of disability;

4.     That this Court award Plaintiffs compensatory damages pursuant to Title II, and Section 504;

5.     That this Court award Plaintiffs and/or their attorneys their reasonable attorneys' fees and costs; and

6.     That this Court award such additional or alternative relief as may be just, proper, and equitable.


Respectfully submitted,

*s/ Amy F. Robertson*
Amy F. Robertson
Civil Rights Education and Enforcement Center
104 Broadway, Suite 400
Denver, CO 80203
303.757.7901
arobertson@creeclaw.org

Attorney for Plaintiffs

Dated: January 22, 2018

**CERTIFICATE OF SERVICE**

I hereby certify that on January 22, 2018 I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will provide electronic service to the following:

Chris Alber
Chris.Alber@coag.gov

*Counsel for Defendant*

*/s/ Jean Peterson*

Jean Peterson, Paralegal
Civil Rights Education and Enforcement Center