# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

|  |  |  |
|---|---|---|
| BIONCA CHARMAINE ROGERS, | ) | |
| CATHY BEGANO, | ) | |
| JENNIFER SAUGAUSE, | ) | |
| ANDREW ATKINS, and | ) | |
| MARC TREVITHICK, | ) | |
|  | ) | |
| Plaintiffs, | ) | |
|  | ) | |
| vs. | ) | |
|  | ) | |
| COLORADO DEPARTMENT OF | ) | |
| CORRECTIONS, | ) Case No. 16-cv-02733-STV (D. Colo.) |
| RICK RAEMISCH, in his official capacity as | ) | |
| Executive Director of the Colorado Department of | ) | |
| Corrections, | ) | |
| RYAN LONG, in his official capacity as Warden of the | ) | |
| Denver Women's Correctional Facility, and | ) | |
| MIKE ROMERO, in his official capacity as Warden | ) | |
| of the Colorado Territorial Correctional Facility, | ) | |
|  | ) | |
| Defendants. | ) | |
|  | ) | |

My opinion as stated in this report is subject to change based on additional information obtained in discovery or other developments in this case, or any future development of telecommunication technologies.

## EXPERT REPORT OF RICHARD LORENZO RAY

June 12, 2018

**EXHIBIT 1**

**TABLE OF CONTENT**

I.     INTRODUCTION ........................................................................................... 1
II.    QUALIFICATIONS, PREVIOUS TESTIMONY, AND COMPENSATION ................... 1
       A.   Qualifications ........................................................................................ 1
       B.   Previous Testimony ............................................................................... 3
       C.   Compensation ....................................................................................... 4
III.   MATERIALS CONSIDERED ............................................................................. 4
IV.    SUMMARY OF OPINIONS ............................................................................... 4
V.     SUMMARY INFORMATION ON DEAF AND HARD-OF-HEARING INDIVIDUALS 5
VI.    OPINIONS .................................................................................................... 6
       A.   Auxiliary Aides and Services .................................................................. 6
       B.   Access to Communications and Telecommunication Technologies .............. 6
            1.   Voice Communications ................................................................... 7
            2.   Teletypewriter for the Deaf ............................................................ 7
            3.   Analog-to-Digital Telephone Network Transition ............................. 10
       C.   Traditional and Internet-based Telecommunications Relay Services ............ 11
            1.   Video-Based Services ..................................................................... 12
            2.   Videophone .................................................................................. 12
            3.   Video Relay Services ..................................................................... 13
       D.   Implementation of Video-Based Services .................................................. 14
            1.   Contract Vendors .......................................................................... 15
            2.   Kiosks ......................................................................................... 16
            3.   Enterprise Tablets ......................................................................... 16
            4.   Monitoring, Recording, and Storing of Calls .................................... 17
       E.   Status of Implementing Video-Based Services Within the Government ........ 18
            1.   TRS, VRS, and the Federal Communications Commission ................ 18
            2.   Federal Government ....................................................................... 19
            3.   State Prison Systems ..................................................................... 19
VII.   CONCLUSION AND RECOMMENDATIONS ...................................................... 21

Expert Report of
Richard Lorenzo Ray

## I.   INTRODUCTION

I have been retained by the Civil Rights Education and Enforcement Center ("CREEC") to provide analysis and testify as an independent expert on behalf of the Plaintiffs – Ms. Bionca Charmaine Rogers, Ms. Cathy Begano, Ms. Jennifer Saugause, Mr. Andrew Atkins, and Mr. Marc Trevithick – concerning effective communication and equal access to telephone services for the deaf and hard-of-hearing while incarcerated by the State of Colorado Department of Corrections (hereinafter "CDOC").

I have been asked to provide my expert opinion on (1) whether CDOC provides appropriate telecommunication accommodations and effective communication for inmates who are deaf and hard-of-hearing in CDOC's custody, including Plaintiffs, that is as effective as that provided others; (2) the means by which CDOC could provide appropriate telecommunication technologies for the deaf and hard-of-hearing inmates in its custody; and (3) and whether implementation of such means is feasible, practical, cost-effective, and secure.

The opinions I have formed are introduced in Section IV below and addressed in more detail in Section VI.  In forming my opinions, I considered facts disclosed in interrogatory responses, document productions, and depositions in this litigation that relate to the deaf and hard-of-hearing inmates in CDOC's custody, a site visit to the Colorado Territorial Correctional Facility ("CTCF"), and my knowledge and experience regarding reasonable accommodations for the deaf and hard-of-hearing to ensure effective communication and equal access to programs and services.

In doing so, I have concluded that CDOC has failed to provide Plaintiffs and all other deaf and hard-of-hearing inmates in the custody of CDOC with the means to effectively communicate with individuals outside of CDOC and to have an equal opportunity to participate in programs, services, and activities, in CDOC and its facilities.  Further, I have determined that CDOC could have provided such means in a reasonable, cost-effective, and secure manner.

I expect to be called to provide expert testimony at trial regarding the opinions I formed on the issues discussed in this report.  This report, including the exhibits and attachments, summarizes my opinions as of this time.  I reserve the right to supplement this report to address any issues raised by Defendants' experts or resulting from further discovery—including depositions, interrogatories, document requests, and requests for admission—relating to any of the opinions disclosed herein.  Additionally, if any information absent from the record is newly disclosed in any expert report(s) from Defendants, I reserve the right to supplement my analysis based on such information.

## II.   QUALIFICATIONS, PREVIOUS TESTIMONY, AND COMPENSATION

### A.   Qualifications

I have been employed by the City of Los Angeles Department on Disability for over 26 years to assess, monitor, and ensure the city's compliance with the Americans with Disabilities Act of 1990 (hereinafter "ADA"), the Rehabilitation Act of 1973 (hereinafter "the Rehabilitation Act"), and other applicable federal, state, and local disability laws.  Currently, I am the ADA Technology Access Coordinator.  Prior to that, I was the Deputy ADA Compliance Officer and

Expert Report of
Richard Lorenzo Ray

ADA Compliance Officer.  In these capacities, I have advised the city, including its law enforcement agencies and detention centers, on accommodations in compliance with applicable disability law; provided technological and technical assistance to city departments to improve access to and communication with the deaf and hard-of-hearing; and coordinated access to city facilities, programs, services and activities for deaf and hard-of-hearing individuals.  Having held these positions, I am knowledgeable about the requirements of the ADA, the Rehabilitation Act, and other disability laws, and reasonable accommodations under those laws.  Through my employment I am also well-versed in various technologies and methods for improving communication and access for the deaf and hard-of-hearing.

As an example of my experience, I advised and oversaw the implementation of a system permitting access to 9-1-1 emergency services for individuals with disabilities, among other telecommunications systems.  Additionally, I am currently assisting in the implementation of a new telecommunications system designed to accommodate deaf individuals at the Los Angeles Police Department ("LAPD") Metropolitan Detention Center and at all city police stations' public counters, booking, housing, medical, and health care areas.  The system includes (1) Video Remote Interpreting ("VRI") services, (2) public access videophones, and (3) a visual notification system.  Additional examples of my job responsibilities include:

- Assisting city departments in obtaining and providing communication accommodations and auxiliary services such as telephone access, Teletypewriter for the Deaf (hereinafter "TTY"), videophones, text telephones, public TTY-equipped payphones, sign language interpreter services, computer aide transcriptions, assistive listening systems, videotext display, note-takers, captioning and real-captioning services as well as any other effective communication system to allow individuals who are deaf, deaf-blind, hard-of-hearing and individuals who have speech disabilities access to city programs and services;
- Providing training to more than 50,000 city employees for over twenty-four years;
- Providing technical assistance and in-service training to Detention Officers and Law Enforcement Officers at Police Academy as well as providing roll call training at Police Headquarters, its twenty-two Community Police Stations, and Detention Centers;
- Evaluating, analyzing, and providing recommendations to the LAPD on various policy issues, including procedures for obtaining sign language interpreters in compliance with ADA Title II and Rehabilitation Act of 1973;
- Providing recommendations to the Los Angeles Police Commission's Professional Advisory Committee and its subcommittees, which include, *inter alia*, the Language-Culture Task Force and Diversity Training Redesign Committee.
- Provide recommendations to the Los Angeles Fire Department Community Emergency Response Team and the Mayor's Crisis Response Team regarding the interaction with individuals with disabilities as well as individuals who are deaf, deaf-blind, and hard-of-hearing;
- Providing assistance and support to city, state, and local entities during natural disasters and crises through emerging telecommunications technologies including videophone and current state-of-the-art systems as well as the latest technologies available for effective communications and services to meet the needs of people with disabilities before, during, and after emergencies (these entities include, *inter alia*, the Emergency Management Department, the LAPD, and Los Angeles World Airports);

Expert Report of
Richard Lorenzo Ray

- Conducting research on text messaging system to interface with the 9-1-1 system for all levels of government to provide direct access to 9-1-1 emergency services;
- Researching, updating, and maintaining emerging telecommunication technology for city programs and facilities (these programs and facilities include, *inter alia*, 9-1-1 and 3-1-1 services, police stations, libraries, and airports); and
- Developing ADA training programs for ADA Coordinators in all city departments. These trainings include instruction on ADA terminology, equipment utilization, and ensuring that all coordinators are aware of current law and emerging technologies.

For additional information on my job responsibilities and past employment experience, please see **Exhibit A** for my complete curriculum vitae.

In addition to my job responsibilities, I am the current co-chair of the National Emergency Number Association Accessibility Committee and Federal Communications Commission ("FCC") Emergency Communication Subcommittee. I am currently a member of the FCC's Disability Advisory Committee and the California Commission on Disability Access Education and Outreach Committee. In the past, I have served as a co-chair of the FCC's Emergency Access Advisory Committee ("EAAC"), FCC's Task Force on Optimal Public Safety Answering Points ("PSAPs") Architecture and as president of the California Association of the Deaf. I have also served as a member of the National Advisory Board of Preparedness and Emergency Response Research Center, the University of Berkeley and California Public Utilities Commission Equipment Program Advisory Committee, Deaf and Disabled Telecommunications Programs Administrative Committee, TDD Placement Interim Committees, the Los Angeles County Metropolitan Transportation Authority, Service Authority for Freeway Emergency Hearing and Speech Impaired Task Force, the County of Los Angeles Commission on Human Relations, and the Media Image Coalition.

I have made several presentations to various federal agencies. For example, I have given a presentation on "Five Years of ADA Implementation: 9-1-1 Emergency Access for Deaf and Hard of Hearing" to the Federal Emergency Management Agency. I have also given several times presentations to the National Emergency Number Association on emerging technologies, emergency notification, and emergency communications as they relate to the deaf and hard-of-hearing. Among other organizations, I have also presented to the FCC on emergency calling for the deaf and hard-of-hearing and to the Centers for Disease Control and Prevention on policies and regulations on accessibility to programs and services before, during, and after disasters.

For my contributions to my field, I have received various awards and recognitions. A list of these honors is provided in my curriculum vitae, attached hereto as **Exhibit A**.

In 2000, I earned a Disability Rights Masters Certificate from Loyola Law School in Los Angeles, California.

I was born with severe hearing loss and wore hearing aids during childhood and into adult life. In 2000, I lost my remaining residual hearing and became completely deaf. Since April 2001, I have utilized a Cochlear Implant for environmental sound recognition.

        B.     Previous Testimony

Expert Report of
Richard Lorenzo Ray

I have been engaged as an expert consultant and witness in other cases, as disclosed on my curriculum vitae at **Exhibit A**. In *David Bryant v. United States Bureau of Prisons*, No. 06704-016 for instance, I testified on general access to prison programs, services, and activities as well as effective communications utilizing current technologies for deaf and hard-of-hearing inmates. I also testified for the *Larry Berke v. United States Bureau of Prison*, No. 1:12-cv-01347-ESH (D.D.C) case on effective communications for deaf and hard-of-hearing inmates as well as *Thomas Heyer v. United States Bureau of Prisions*, No. 5:11-CT-3118-D on telecommunication technologies for inmates who are deaf and hard of hearing.

In addition, I conducted research and provided expert reports in ten additional court cases involving state departments of rehabilitation and correction regarding telecommunication technology in prison systems for inmates who are deaf, deaf-blind, and hard-of-hearing. The ten additional cases include: *Heyer v. U.S. Bureau of Prisons, North Carolina, et al., 5:11-CT-3118-D; Mary Ann McBride v. Michigan Department of Corrections, State of Michigan, et. al., Case No. 2:15-cv-11222; Disability Rights Florida, Inc. v. Julie Jones, Florida Department of Corrections, et. al., Case No.4:16-cv-47-RH-CAS; Charles Brian Bearden v. Clark County, State of Washington, et. al., Case No. 3:14-cv-05318-BHS; Adams v. Kentucky Department of Correction, et al., Case No. 3:14-cv-00001-GFVT; William Pierce v. District of Columbia Department of Corrections, et. al., Case No. 1:13-cv-00134- JEB; Heyer & Boyd v. U.S. Bureau of Prisons, et al., 5:11-CT-3118-D; Smith v. Idaho Department of Correction, et al., CV-12-00030-BLW; Berke v. U.S. Bureau of Prisons, Washington, District of Columbia, et al., CV 1:12-cv-01347-ESH; and Bryant v. U.S. Bureau of Prisons, Tucson, Arizona, et al., Case No. 06704-016.*

        C.     Compensation

I have been retained by the Civil Rights Education and Enforcement Center as an expert consultant in this case at the rate of $150.00 per hour. My compensation is not dependent on the outcome of this case or the opinions and conclusions I offer.

## III.    MATERIALS CONSIDERED

I have been provided with, reviewed, and used the materials listed in **Exhibit B** in developing my report. Additionally, I have reviewed and I am relying on the materials cited in my report.

## IV.    SUMMARY OF OPINIONS

It is my opinion, based on my experience, my understanding of reasonable accommodations and effective communication under relevant laws, and analysis of the factual record and all materials cited in my report, that the CDOC has failed to provide Plaintiffs, as well as all other deaf and hard-of-hearing inmates in the custody of CDOC, with the means to communicate effectively with individuals outside of CDOC, and to have equal access to jail facilities, programs, and services.

It is important to recognize and defer to the preferences of deaf and hard-of-hearing individuals to ensure their effective communication. It is my opinion that CDOC has failed to do so effectively.

Expert Report of
Richard Lorenzo Ray

Further, a site tour of the Colorado Territorial Correctional Facility in Canon City was
conducted and an evaluation on existing technology including GTL Kiosks and Teletypewriters
for the Deaf (TTYs) was performed on May 4, 2018.

CDOC continues to fail provide reasonable accommodations and access in three (3)
areas: (1) Functional TTYs and Kiosks; (2) Videophone technology; and (3)
Telecommunications Relay Services including Video Relay Services Internet Protocol (IP) Relay
Services, and Traditional Relay Services.

Due to technological changes in the industry and expansion of videophone systems,
implementation of technology, programs, and services to meet their communication needs,
CDOC should be kept abreast to ensure communication accessibility.  Furthermore, it is
important to recognize and defer to the preferences of deaf and hard-of-hearing individuals to
ensure their effective communication utilizing emerging technologies.  It is my opinion that
CDOC has failed to do so effectively.

It is further my opinion that CDOC should provide the following accommodations to
ensure effective communication and equal access for Plaintiffs and all deaf and hard-of-hearing
individuals in custody: (1) Videophone technology; (2) Video Relay Service ("VRS"); (3)
Teletypewriter for the Deaf ("TTY"); and (4) CDOC staff training concerning deaf and hard-of-
hearing inmates and relevant technology.

There were and are no insurmountable technological, cost, or security impediments to
implementing such accommodations at CDOC and its facilities such as Colorado Territorial
Correctional Facility and Denver Women's Correctional Facility.  Indeed, other prison systems
and government agencies have already implemented similar telecommunication technologies.[1]

## V.   SUMMARY INFORMATION ON DEAF AND HARD-OF-HEARING
INDIVIDUALS

Hearing loss affects all levels of society, every age, race, education level, and occupation.
Some individuals are born deaf and some become deaf later in life.  Deafness is caused by a wide
range of factors, including but not limited to heredity, illness, disease, accident, medication,
violence, and aging. [2]

In most, but not all cases, hearing loss may also cause speech difficulties while deafness
almost always does.  People who are born deaf have never heard speech sounds.  As a result,
they often are unable to speak clearly, and many do not speak at all.  There are literacy level
differences among the deaf community.  Further, while some individuals have English literacy
skills, many individuals do not have a written form of a language by which to communicate.

Also, individuals usually do not have expertise in reading lips.  Even for those who can

---

[1] These include, *inter alia*, the Powhatan Correctional Center in Virginia, Vermont's state prison system,
Wisconsin's state prison system, all federal government agencies, the U.S. Department of Defense, and portions of
the U.S. military.
[2] *Basic Facts About Hearing Loss*, Hearing Loss Association of America, https://www.hearingloss.org/hearing-help/hearing-loss-basics/ (last visited June 8, 2018); *Questions and Answers for Health Care Providers*, National Association of the
Deaf, http://nad.org/issues/health-care/providers/questions-and-answers (last visited January 6, 2018).

Expert Report of
Richard Lorenzo Ray

lip-read, numerous factors can inhibit an individual's ability to rely on lip reading.  Only approximately 25-30 percent of words can be visually recognized by an expert lip-reader; the rest is left to guess work.[3]

The majority of deaf individuals in the United States utilize American Sign Language (ASL) as their primary language.[4]  ASL has its own structure, syntax, and grammar.  Persons who use sign language are very expressive with their hand movements and may also use speech, fingerspelling, writing, body language, and facial expressions.  While ASL is not a written English language, it is a visual manual language with its own unique structure, syntax, and grammar.  It is based on the movement of the signs, other body movements, and non-manual grammatical markers, which are known as "facial grammar."  The setting is established not by words, but by visual-based perceptions.  Accompanying facial expressions and body language indicate the intensity of emotion.

## VI.    OPINIONS

Currently, CDOC fails to provide inmates with adequate accommodations such as telecommunications for deaf and hard-of-hearing inmates, which thus denies them the means to communicate effectively with those outside the facility and denies them access to the telecommunications program.  Inmates who are deaf or hard-of-hearing must have the same access to effective communication as do hearing inmates and must have an equal opportunity to participate in and access the benefits of CDOC's services, programs, and activities, including the use of its facilities and services.

A.    Auxiliary Aides and Services

Based on my 24 years of experience working with state and local governments, I strongly recommend that CDOC evaluate its programs and services for effective communications access for deaf and hard-of-hearing inmates.  In my opinion, CDOC must: a) re-assess, re-evaluate, re-analyze, and make reasonable modifications in policies, practices, and procedures; b) remove barriers to access; and c) provide auxiliary aids and services to ensure effective communication for all inmates who are deaf, deaf-blind, and hard-of-hearing.

CDOC must strive to make its programs, services, activities, and facilities -- specifically telecommunications -- accessible to inmates with disabilities through the provision of auxiliary aids and services.

Auxiliary aids and services that provide effective communication and equal access are widely available and easy to implement.  Many are already being used in prisons and correctional centers across the United States.

B.    Access to Communications and Telecommunication Technologies

---

[3] *Questions and Answers for Health Care Providers, supra.*
[4] *American Sign Language*, National Association of the Deaf, http://www.nad.org/issues/american-sign-language (last visited June 8, 2018).

Expert Report of
Richard Lorenzo Ray

1.   Voice Communications

Telephone communication is one of the most important forms of communication in society today.

In addition, telecommunication technologies help people to connect directly to each other even when in distant locations.  The increasing methods for establishing communication connections instantly are digital, broadband, and Voice over Internet Protocol (VoIP).  Since deaf and hard-of-hearing individuals cannot communicate telephonically, alternative modes of telecommunication technology have been developed over time.  With the rapid evolution of technology, the communication choices for persons with disabilities are changing.  The expansion of services such as captioned telephone services, Internet Protocol Relay Services, Speech-to-Speech Relay Services, as well as Video Relay Services and devices including personal computers, laptops, mobile phones, and tablets offer more mainstream possibilities.

Due to advancements in technology, telephone devices have evolved with new services and capabilities.  The development of digital data communication methods, such as the protocols used for the internet, have made it possible to digitize voice and transmit it as real-time data across computer networks, giving rise to the field of Internet Protocol ("IP") telephony that is rapidly replacing traditional telephone network infrastructure. Since 2006, many VoIP companies, such as Vonage Business, Nextiva, RingCentral, and JIVE Communications offer services to consumers and businesses.

Technological changes in the industry and expansion of telecommunications now provide people many communication options.  Individuals who are deaf and hard-of-hearing, and individuals with a speech disability are also following these trends and are rapidly migrating to more advanced telecommunications methods, both for peer-to-peer and third party telecommunication relay service ("TRS") communications.  Internet-based equipment includes, but is not limited to, wireless devices, videophones/videocams, computers, and tablets.

2.   Teletypewriter for the Deaf

TTY is a 60-year-old technology that enables remote communications between deaf individuals and between deaf and hearing individuals.  In a conversation between two deaf individuals, both parties type and read responses using the teletypewriter device, and their typed conversation is transmitted back and forth across the standard telephone network.  In a conversation between a deaf individual and a hearing individual, the deaf party uses the TTY while the hearing party uses a standard telephone.  An operator then dictates the deaf individual's typed messages to the hearing party and types the hearing individual's spoken messages to the deaf party.[5]

TTYs offer limited effectiveness compared to sign language communication and VRS translation and the other auxiliary aids and services.[6]  Most fundamentally, a TTY's capacity to

---

[5] TTY is not the only communication device for the deaf that utilizes operators.  Video-based services discussed later in this report also utilize operators.
[6] Gunnar Hellström, *EAAC TTY Transition*, FCC, (Sept. 14, 2012), https://apps.fcc.gov/edocs_public/attachmatch/DOC-316316A1.pdf.

Expert Report of
Richard Lorenzo Ray

facilitate communication is completely dependent on deaf users' often limited reading and writing skills.  In addition, most deaf individuals no longer use TTY devices (relying instead on videophones) and, as a result, deaf inmates who can only access TTYs are often unable to contact deaf friends and family members with the device.  According to an FCC report, TTY use has declined by 10% per year.   Of all operator-assisted calls involving deaf individuals, the FCC estimates that today only 12% are TTY calls.  The majority (75%) are video-based calls.[7]

Whereas an average typing rate is 40 words per minute and a professional typist can type as many as 80-100 words per minute, in the U.S. most TTYs use a communication code that is limited to transmitting text over telephone lines between the rate 30[8] to 60 words per minute.[9] Consequently, a TTY conversation takes much longer than a signed conversation and longer than the average, real-time typed conversation.[10]  Due to TTY equipment limitations, it transmits tones at the rate of 10 characters per second.

Generally, TTYs do not have high-speed transmission capability; additional time is needed when using a TTY due to its equipment limitation as well as user limited typing skill. The maximum transmission rate is about ten characters per second, which is slower than many people type;[11] therefore, users must also be allowed sufficient time to use the device.[12]  CDOC, however, allows 20 additional minutes – a total of 40 minutes at the same rate as 20 minutes for TTY users.  TTY calls placed through TRS take quite a bit longer than direct TTY connections because the Communication Assistant (CA) has to wait until two or three sentences are read before translating from American Sign Language to standard English for accuracy.  The entire message is then relayed to the calling party.[13]

Colorado Territorial Correctional Facility (CTCF) has nine (9) TTY kiosks.  When we began our tour of the facility, the Major conducting the tour informed us that the facility had no standalone (portable) TTYs.  On the contrary, when we later met with Ms. Amy Bradley, she stated that they should have two portable TTYs at the facility.  This is important, as the TTY kiosks do not permit direct point-to-point communication with between parties both of whom are using TTYs.  It only permits TTY relay calls.

TTYs in the Infirmary, Cellhouse 3 Restrictive Housing/Dementia A1R, Cellhouse 1-1/2 Left, and Cellhouse 7-1/2 Right, are not functional.  In the infirmary, there is no operational TTY in the kiosk; the shell was empty. The TTY that was supposed to be in Cellhouse 7-3/4 Right was missing.

---

[7] *Emergency Access Advisory Committee (EAAC) Report on TTY Transition*, FCC EAAC, https://apps.fcc.gov/edocs_public/attachmatch/DOC-319386A1.pdf (Mar. 2013) ("FCC EAAC Report on TTY Transition").

[8] *Id.*

[9] TRS Rules, 47 C.F.R. §§ 64.601-64.606, 64.611, & 64.613.

[10] *Report on Text to 9-1-1*, California Governor's Office of Emergency Services, (Apr. 15, 2014), http://www.caloes.ca.gov/PublicSafetyCommunicationsSite/Documents/0001-SMSText-to-9-1-1PilotReport145-2-14.pdf.

[11] FCC EAAC Report on TTY Transition, *supra*.

[12] *Rights of Deaf and Hard of Hearing Inmates*," National Association of the Deaf, http://nad.org/issues/justice/jails-and-prisons/rights-deaf-inmates (last visited June 8, 2018).

[13] *Telecommunications Recommendations*, U.S. Department of Justice, Civil Rights Division, http://www.justice.gov/crt/508/report/telecom.htm (updated Aug. 6, 2015).

Expert Report of
Richard Lorenzo Ray

TTYs in Cellhouse 3 B1R, Cellhouse 1-1/2 Right, Cellhouse 7-1/2 Left, and Cellhouse 7-3/4 Left are operational.

A series of test calls using Kiosk TTYs were conducted, which only allow for the utilization of traditional relay service. Amy Bradley confirmed my assessment that all Kiosk TTY calls are routed to Colorado Relay Services (CRS) and it does not allow for direct point-to-point TTY communication.

A test call was performed in Cellhouse 3 B1R, the call was routed to Colorado Inmate Phone System (CIPS), which required target number on a prisoner's "CIPS" list of permitted call, so the call was not completed.

Another test was performed in Cellhouse 3 B1R, the call was connected with CRS, the Communication Assistant (CA) claimed that text was garbled. Consequently, I retyped my request a call to the voice telephone number provided; however, in the midst of my typing my request, the text, "Auto msg: hang up now, or you will be charged for this call. GA GA GA" appeared on the screen and the call was terminated.

At the Cellhouse 7-1/2 Right, a call to a party who can hear was attempted. It appeared that the call was connected to the called party; however, the CA typed, "Diali (Person Hung Up)." Another attempt was made which was not completed; however, the CA typed back, "I am sorry but the Relay is not able to make a call to anyone not on ur authorized phone list. Relay can only dial the first number that is entered and it has gone to sips and cannot call another number unless u hang up and call back ga." [sic] Then the following message, "Auto msg: hang up now, or you will be charged for this call. GA GA GA" appeared on the screen and the call was terminated. At the end of the tour, I texted the called party and asked if any calls were received from CTCF. The called party confirmed that no call was received from CTCF.

Based on my assessment, the utilization of TTY equipment at CTFC has been dysfunctional. This substantiates inmates' grievances, for example:

Mr. Andrews, in his grievances, expressed that he experienced difficulty using TTY and was unable to communicate with his family for over two months.[14] Furthermore, he also complained that TTYs were often inoperable; thus making it difficult for him to rely on it.[15]

Mr. Trevithick expressed that his friends have video phone more than TTY, and they don't like to talk through a third party on the TTY; even his mother does not like relay. It is hard to understand words on the TTY and explain "over, over, over on TTY."[16]

Ms. Saugause stated that the use of TTY does not provide effective communication. She asserted that when using TTY, words were missing, text was garbled, and misunderstanding often occurred.[17]

---

[14] CDOC/Rogers-004386.
[15] CDOC/Rogers-004389.
[16] P_000500.
[17] CDOC/Rogers-001905, CDOC/Rogers-001907.

Expert Report of
Richard Lorenzo Ray

Ms. Begano, who utilizes sign language as a primary mode of communication, does not often use TTY as a mode of communication.  When she does, the results are garbled and cut-off.[18] She asserted that she utilizes American Sign Language, which has its own structure, syntax, and grammar.

CDOC failed to provide Ms. Begano and the other plaintiffs with effective communication and proper telecommunication technology such as Videophone.

A short tour was made to the Office for Criminal Investigation Division (OID).  It was observed that there were approximately 6 new Superprint TTYs with Turbo code capability Model 4425 on a shelf and one TTY in Ms. Bradley's office.  Turbo code is a feature allows TTY user to send information at the same speed at which it is typed.

All TTY calls are recorded and stored on data files.  According Ms. Bradley, TTY calls have not been monitored since 2010.[19]

3.   Analog-to-Digital Telephone Network Transition

The analog system is expensive to maintain, relies on switches and other parts that may not even be manufactured anymore, and doesn't always play well with the newer technologies that still use the old wires, especially in rural areas. Consequently, it is problematic in many VoIP implementations; as most voice digitization and compression codecs are optimized for the representation of the human voice and the proper timing of the modem signals cannot be guaranteed in a packet-based, connection-less network.

The incompatibility between analog and VoIP network may have an adverse impact on the usage of analog equipment such as TTY; a packet loss may occur during transmission.  This means that one can expect to exceed the one percent character error rate threshold recommended by the FCC when the packet loss rate is only 0.12%, an amount far below what is often regarded as acceptable for voice communication.  Voice-optimized packet loss concealment algorithms are not able to trick a TTY into "hearing" a TTY tone (data bit) that was not received.  If any one of the audio packets containing a TTY tone is lost, the receiving TTY will be unable to decode and display that character properly.[20]  There appears to be no effort from TTY manufacturing companies to update TTYs to accommodate VoIP or digital phone systems.

The FCC is working on the biggest transformation in over a century of profound technological progress in communications: shutting down the analog telephone network.  The big carriers have already started to sunset the Public Switched Telephone Network (PSTN) with reduction of support, increase in costs, and elimination of a replacement.  These changes are a technological revolution.[21]

For all of the above reasons, CDOC's provision of limited TTY access to deaf and hard-

---

[18] CDOC/Rogers-2163-64.
[19] Deposition of Amy Bradley ("Bradley Dep."), 52:20-23.
[20] FCC EAAC Report on TTY Transition, *supra*.
[21] Tom Wheeler, *The IP Transition: Starting Now,* FCC Blog (Nov. 19, 2013, 12:05 p.m.), https://www.fcc.gov/news-events/blog/2013/11/19/ip-transition-starting-now.

Expert Report of
Richard Lorenzo Ray

of-hearing inmates fails to provide them with the means to effectively communicate with deaf, hard-of-hearing, and hearing individuals outside the correctional center. CDOC needs to replace and supplement these TTY devices along with other telecommunication technologies (described below) to provide deaf and hard-of-hearing inmates with remote communications technology comparable to that used by their hearing peers.

C.     Traditional and Internet-based Telecommunications Relay Services

Title IV of the ADA amended the landmark Communications Act of 1934 to require all telecommunications companies in the United States to take steps to ensure functionally equivalent services for consumers with disabilities, notably individuals who are deaf, deaf-blind, hard-of-hearing and individuals with speech disabilities through the provision of traditional relay services.[22]

A third party TRS is a telephone service that allows persons with hearing or speech disabilities to place and receive telephone calls. TRS is available in all 50 states, the District of Columbia, Puerto Rico, and the U.S. territories for local and/or long distance calls. TRS providers – generally telephone companies – are compensated for the costs of providing TRS from either a state or a federal fund. There is no cost to the TRS user. There are several forms of TRS, depending on the particular needs of the user and the equipment available.

The FCC adopted internet-based TRS, which in 2002 began to include other services which are made over the internet by consumers who use broadband connections: text-to-voice TTY-based TRS, voice carry over, hearing carry over, speech-to-speech relay service, shared non-English language relay services, captioned telephone service, IP captioned telephone service, IP relay service, and video relay service. TRS providers must also offer the service 24 hours a day, seven days a week.

To use TRS services, just like telephone, each piece of telecommunication equipment such as a videophone or captioned telephone is assigned a 10-digit number and it is not interchangeable with other devices or applications.

On July 1, 2006, the FCC required VRS providers to answer 80 percent of calls within two and a half minutes. On January 1, 2007, the FCC rules changed and VRS providers were required to answer 80 percent of all VRS calls within two minutes.

The FCC has continued to adopt various rules to improve VRS service. One of the recent rulings that the FCC has issued requires VRS providers to answer (*i.e.*, provide the equivalent of a dial tone) 85 percent of all VRS calls within 30 seconds. The new rulings were commenced on July 1, 2014.

In 2010, President Obama signed into law the Twenty-First Century Communications and Video Accessibility Act (CVAA). The CVAA modified the definition of TRS in order to allow

---

[22] 47 U.S.C. § 225; Report and Order and Further Notice of Proposed Rulemaking, *In Re Speech-to-Speech and Internet Protocol (IP) Speech-to-Speech Telecommunications Relay Services & In re Telecommunications Relay Services And Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 08-15 & 03-123 (July 19, 2013), https://apps.fcc.gov/edocs_public/attachmatch/FCC-13-101A1.doc.

Expert Report of
Richard Lorenzo Ray

TRS providers to be compensated for additional types of calls. The current, post-CVAA definition of TRS is as follows:

> The term [TRS] means telephone transmission services that provide the ability for an individual who is deaf, hard of hearing, deaf-blind, or who has a speech disability to engage in communication by wire or radio with one or more individuals, in a manner that is functionally equivalent to the ability of a hearing individual who does not have a speech disability to communicate using voice communication services by wire or radio.[23]

On October 19, 2017, the FCC released a public notice announcing October 17, 2017 as the effective date for rules adopted in the 2017 Video Relay Services Improvement Order implementing:[24]

- the at-home calling handling pilot program; and

- the option for VRS providers to assign iTRS numbers to hearing individuals for point-to-point video communications with VRS users.

- Providers are permitted, but are not required, to assign iTRS numbers to hearing individuals that submit signed self-certifications stating that such individual:

- Is proficient in sign language;

- Understands that the iTRS number may only be used for communicating via point-to-point with registered VRS users; and

- Understands that such iTRS number may not be used to access VRS or 911.

### 1. Video-Based Services

Deaf individuals are increasingly using video-based communications devices instead of TTYs for phone calls. All of these devices and services are preferable to TTYs due to the fact that they are not reliant on deaf individuals' often limited reading and writing skills and permit such individuals to communication in their primary language.

### 2. Videophone

Videophones are telephones with a high-definition video display, capable of simultaneous two-way interactive video and audio for communication between people in real-time using separate internal high-speed bandwidth Internet telecommunication services.

---

[23] 47 U.S.C. § 225(a)(3).

[24] *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities; Structure and Practices of the Video Relay Service Program*, Report and Order, Notice of Inquiry, Further Notice of Proposed Rulemaking, and Order, 32 FCC Rcd 2436 (2011 version) https://www.federalregister.gov/documents/2011/07/25/2011-18744/telecommunications-relay-services-and-speech-to-speech-services-for-individuals-with-hearing-and (retrieved May 12, 2018).

Expert Report of
Richard Lorenzo Ray

Since 2000, videophones have become widely available at a reasonable cost.[25]  In addition, they are particularly useful to individuals who are deaf, deaf-blind, hard-of-hearing or have speech disabilities, who can use them with their natural sign language, which has its own structure, syntax, and grammar.  They can use fingerspelling, body language, and facial expressions to indicate the intensity of emotion.

Videophones are provided in various major brands and models listed in **Exhibit C**. These include: Purple P70. ZVRS Z-150, Z-170, or Z5; Sorensen nTouch; Sorenson nTouch VP2; Cisco IP Video Phone E20; or a desktop computer with built-in webcam or a laptop with a built-in webcam using desktop videoconferencing as well as mobile devices such as a tablet with apps.

These video technologies are available and interchangeable for individuals who are deaf and hard of hearing including various features such point-to-point video calling between deaf users and also to some hearing users who can communicate using sign language.  This video technology may be utilized for point-to-point video communications, Video Relay Services (VRS), and Video Remote Interpreting (VRI) Services.

Any deaf individual can apply for a free videophone through a vendor of his or her choice.[26]  Deaf users also do not incur per-minute usage costs, which are instead paid for by the FCC's Telecommunications Relay Services Fund.  For those not eligible to receive a free videophone, the device ranges in price but typically can be purchased for between $75 and $150. Likewise, the high-speed internet service which powers videophones can generally be procured at the modest cost of approximately $30.00-$50.00 per month per household.

Defendants continue to have a number of GTL Flex-Link units installed at CTCF; these units can be used to provide videophone service.[27]

Video communication is popular for immediate communication and the volume of calls has increased to 150 million per year.[28]

The Defendants should provide videophone service to inmates in their facilities, and should re-assess suitability of video conferencing equipment such as kiosks, tablets, videophones, or other webcam solutions provided by major manufacturers of video conferencing devices.  Additionally, several options exist to monitor in real time and record videophone use, as described in Section D. 4.

3.  Video Relay Services

VRS uses high-speed internet to enable remote communications between deaf and hearing individuals.  The deaf individual signs to an intermediary sign language interpreter via video monitor.  The interpreter, in turn, relays the deaf person's message to the hearing

---

[25] In some cases, Video Relay Service Providers offer videophone equipment at no cost to customers.
[26] Application Form for Deaf and Hard of Hearing Individuals for all VRS providers including Sorenson Communications, ZVRS, Purple, Convo, CAAG, and Global are available online.
[27] Deposition of Brian Deuster ("Deuster Dep.") (draft transcript) 20, 25.
[28] *See* FCC EAAC Report on TTY Transition, *supra.*

Expert Report of
Richard Lorenzo Ray

individual in spoken English and vice versa.  In a VRS conversation, the hearing party speaks into a standard telephone as he or she normally would.  VRS has been widely available in the U.S. since at least the mid-2000s.

VRS is free of charge to all users, deaf or hearing.  VRS is not intended for parties in the same physical location (*e.g.*, same room), and VRS interpreters are trained to refuse calls if they conclude the parties are in the same physical location.



**Video Relay Service (VRS)**

VRS is the only form of remote communication that allows both deaf and hearing individuals to communicate using their preferred method of communication.  This is the closest form of communication to a communication between two deaf persons signing over videophone or two hearing persons having a voice-to-voice conversation over the phone.  Consequently, Plaintiffs, as well as other similarly-situated deaf and hard-of-hearing inmates, require VRS to be able to contact their hearing associates outside of the correctional center in a manner comparable to hearing inmates contacting hearing associates over a standard telephone.  The Defendants' failure to provide Plaintiffs, and other deaf and hard-of-hearing inmates who rely on signing for communication with VRS access denied them effective communication and equal access.

D.      Implementation of Video-Based Services

The communication needs of the deaf in jails and prisons are frequently confusing to correctional officers, sheriff's deputies and facility administrators.  Deaf inmates have constitutional and statutory rights to equal access to services, including communication.

Video technologies are increasingly becoming popular and it is expected that they will establish a common mode of communication for everyone.  As a result, it is also likely that Deaf individuals will be most familiar with video technology as the primary means of keeping in touch with their families and friends, who may not even own TTYs.

Videophone technology can enable the Plaintiffs to effectively communicate with family, friends, attorneys, advocates, and other parties outside of the CDOC facilities in which they are housed to the same degree as prisoners without hearing disabilities.

Based on my experience, there is no significant technological barrier preventing or that

14

Expert Report of
Richard Lorenzo Ray

would have prevented CDOC's implementation of the above-discussed video-based accommodations. Moreover, any security concerns with these services are either unfounded or easily addressed.

On or about February 9, 2016, Ms. Rogers submitted a grievance form that provided contact information for an individual at "Sorenson Video Phone" who would be able to confirm that her parents are deaf and have videophones, and provide confirmation of their videophone numbers. Because "Sorenson Communications provides videophones and software exclusively to deaf individuals who require Video Relay Service (VRS) to place and receive calls,"[29] Ms. Rogers was, in this grievance, substantiating the fact that her parents were deaf and providing information concerning the communications technology they used.

Ms. Rogers's parents are deaf and they do not have a TTY; thus, making it impossible for her to communicate with her parents using a TTY. Defendants have failed to provide effective communication to either Ms. Rogers or her parents. Ms. Rogers should be allowed to use videophone technology to communicate directly with her parents as their primary mode of communications.

The other plaintiffs' experiences and grievances, considered in light of their communications preferences and skills -- the subject of a report by Dennis Cokely -- demonstrate that Defendants have also failed to provide effective communication to them and that they should be allowed to use videophone technology to communicate with friends and family outside their respective facilities.

1. Contract Vendors

CDOC has been considering whether to implement VP/VRS off and on since late 2013. In a Project Request Form dated December 9, 2013, Keith Nordell proposed a pilot program "to implement modern technology for the use of Video Relay Services (VRS)," based in part on the fact that "TTY machines are no longer 'main stream' equipment. The general public, specifically hearing impaired persons, do not widely utilize TTY equipment as VRS has become the more common place technology for communication between people who utilize sign language interpreter relay services and/or telephonic communication with other hearing impaired persons." CDOCRogers 02132.

On February 24, 2014, Colorado entered a contract with its then-phone provider that included a provision for a "TTY Video Relay Trial." That contract stated, "Contractor shall provide the TTY video relay solution at no cost to the State."[30]

On November 1, 2014, CDOC issued an Implementation/Adjustment (IA) to Administrative Regulations (AR) regarding the implementation of Video Relay Service in Cellhouse 1-1/2 and 1-3/4 at CTCF, stating that the service would commence beginning June 1,

---

[29] *SVRS Products and Service Application,* https://apply.sorensonvrs.com/secured_ntouch_apply_form (last visited June 8, 2018).
[30] GTL_000010.

Expert Report of
Richard Lorenzo Ray

2015.[31]

In 2016, however, just before the VP pilot program was set to begin, CDOC called it off. The VP kiosks installed for the pilot program remain in place at CTCF.

More recently, CDOC has had communication with Sorenson Communications concerning provision of videophones and VRS at select CDOC facilities; however, the Defendants have yet to provide evidence of these devices and services at any of the DOC facilities throughout CDOC.

Videophone technology would enable the Plaintiffs and other class members to effectively communicate with family, friends, attorneys, advocates, and other parties outside of the CDOC facilities in which they are housed to the same degree as prisoners without hearing disabilities.

At this time, however, CDOC continues to fail to make videophone technology available to Plaintiffs and other deaf and hard of hearing prisoners who use ASL as their mode of communication.

On May 1, 2018, GTL unveiled integrated Video Relay Service to improve experience for inmates and increase security in Correctional facilities.[32]  Brian Deuster, Product Manager for Video Initiatives at GTL, testified that this integrated videophone service is currently available for only one prison phone platform, but will likely be available for testing on the platform in use by the CDOC within the next two months.[33]

However, due to the Defendants' continuing failure to make videophone technology available, Plaintiffs and other deaf and hard of hearing inmates who use ASL continue to suffer and to be unable to communicate with their friends and family as effectively as hearing inmates can. For instance, Ms. Rogers has been unable to effectively communicate with her parents who are deaf.

## 2.  Kiosks

CTCF has five (5) kiosks to allow inmates to use email, telephone system, and video visitation, which are located at Cellhouse 1-1/2 Left Common Area and De-escalation Room; Cellhouse 1-3/4 Right Common Area and Office; and Cellhouse 1-3/4 Office.  The video visitation system has not been operated since 2016.

## 3.  Enterprise Tablets

CDOC provides tablets to inmates from which they can place telephone calls.[34]  Based on information obtained during the site visit, videophone service is not available on these tablets.

---

[31] CDOC/Rogers-002108.
[32] *GTL Unveils Integrated Video Relay Service to Improve Experience for Hearing-Impaired Inmates and Increase Security in Correctional Facilities,* (May 1, 2018), http://www.gtl.net/news/gtl-unveils-integrated-video-relay-service-to-improve-experience-for-hearing-impaired-inmates-and-increase-security-in-correctional-facilities/.
[33] Deuster Dep. 27 (draft transcript).
[34] Bradley Dep. 30:23-25; 35:14-16.

Expert Report of
Richard Lorenzo Ray

Enterprise tablets with motion sensors are increasingly being sold to prisons and correctional centers for use by inmates to ensure as well as maintain the prison's security, protect its network and may utilize Virtual Private Network (VPN) as a new tactic to ease inmates' return to society where technology is taking on an increasing role. The enterprise tablet has a built-in sensor to prevent inmates from moving the tablet in attempt to show the calling party any area inside the prison or correctional center. If the tablet moves, the video will shut down and the screen turns black.

Purple Videophone using Android, an enterprise device with Purple App interfaces with the J-pay system and would allow inmates to have access to videophone technology to communicate with family members while the video communication is being monitored, recorded and stored.

On March 31, 2015 GTL announced that it had developed and released VisMobile Add-On, an addition to its VisMobile video visitation application for Android smartphone and tablet users. VisMobile app allows users to register for and schedule video visits from Android devices. GTL tablets have built-in camera for video visitation;[35] however, GTL tablets for CTFC do not have built-in camera allow for video visitation. CTCF only offers inmates GTL tablets to allow them to communicate with family members and friends via email and telephone. In addition to these features, music and games are also available to inmates.

Some vendors are now providing video visitation systems equipped with a downloadable videophone app for computers, tablets, and smartphones to allow inmates to communicate effectively with family and friends using FCC-administered videophone technology.

### 4.   Monitoring, Recording, and Storing of Calls

Based on my experiences, many prisons, correctional centers, and jails may wish to monitor, interrupt, and record hearing inmates' phone calls. In the event the prison, correctional center, or jail monitors, interrupts, records, and stores calls, this policy may also apply to inmates utilizing video telecommunication technology. Some of the vendors who provide service for monitoring, recording, and storing VRS calls are identified in **Exhibit D**.

VRS providers believe that videophone technology is safe and easy to use with network security features like firewalls. At this time, some Federal agencies are using a secure VRS system that is compatible with their firewalls. A private encrypted VPN (virtual private network) can also be used specifically for videophones for video conferencing, VRS and VRI services. This VPN would not intermingle with the Internet that is used by the general public.

The Bureau of Prisons and State Departments of Corrections can choose to use their existing network or without decreasing security have the videophone system on an encrypted circuit with direct "pipes". CDOC can follow any of these methods and offer video visitation to make point-to-point and VRS calls.

TRS and VRS providers do not keep records of the contents of any conversation to

---

[35] *GTL Releases Industry-Leading Video Visitation App for Handheld Device* (Mar. 31, 2015), http://www.gtl.net/gtl-releases-industry-leading-video-visitation-app-for-handheld-device/.

Expert Report of
Richard Lorenzo Ray

ensure that confidentiality of VRS and TRS users is maintained.  However, just as there are companies that record hearing inmates for all of their calls for safety and security, there are also companies that can record VRS and point-to-point calls.

There are various methods for monitoring and recording video-based communications between a deaf inmate and the calling party to ensure functional equivalency.  Like other languages, video calls permitted for individuals who communicate using ASL can be translated and conveyed to a monitor through third party language translation services.  Like non-English speaking people, if an existing monitor is not able to determine the language, he or she may transfer the call to contracted language services for assistance.

GTL's Brian Deuster testified that the videophone pilot program at CTCF had been set up to use Tidal Wave's Periscope system to record and monitor videophone calls. Tidal Wave Telecom uses SecureVRS system which allows deaf inmates to connect to FCC-administered video relay providers and point-to-point video calls via a highly secure system and uses Periscope Recording that records all types of calls as illustrated in **Exhibit E**.

E.      Status of Implementing Video-Based Services Within the Government

1.  TRS, VRS, and the Federal Communications Commission

The FCC has taken several steps to ensure that VRS will continue as a vibrant service. Title IV of the ADA requires the FCC to ensure that: (1) Telecommunications Relay Services (TRS) are available to the greatest extent possible to persons with hearing or speech disabilities;[36] and (2) TRS offers persons with hearing and speech disabilities access to a telephone system that is "functionally equivalent" to voice telephone service.[37]  In March 2000, the Commission recognized several new forms of TRS, including VRS.[38]

On November 5, 2015, the FCC released Rules and Order regarding rates for telecommunications services utilized by inmates. This order addresses the needs of inmates with disabilities and advanced form of communication technologies and TRS.[39]

The FCC reaffirmed in this order their existing policy of strongly encouraging correctional facilities to provide inmates with communication disabilities access to TTYs, as well as equipment used for advanced forms of TRS, such as videophones and captioned telephones.  Access to more advanced forms of TRS, including VRS, IP Relay, CTS, and IP CTS, may be necessary to ensure equally effective telephone services for these inmates.  The FCC recognizes that many facilities have already begun providing access to alternative forms of TRS and strongly encourages other facilities to continue this trend.

---

[36] 47 U.S.C. § 225(b)(1).

[37] 47 U.S.C. § 225(a)(3).

[38] *See* Report and Order and Further Notice of Proposed Rulemaking ¶ 21-27, *In re Telecommunications Relay Services for Individuals with Hearing and Speech Disabilities*, CC Docket No. 98-67 (Mar. 6, 2000), https://apps.fcc.gov/edocs_public/attachmatch/FCC-00-56A1.pdf.

[39] Rates for Interstate Inmate Calling Services, 47 CFR § 64, https://www.federalregister.gov/documents/2015/12/18/2015-31252/rates-for-interstate-inmate-calling-services (last visited June 11, 2018).

Expert Report of
Richard Lorenzo Ray

On October 19, 2017, the FCC released a public notice announcing October 17, 2017 as the effective date for rules adopted in the 2017 Video Relay Services Improvement Order implementing the option for VRS providers to assign iTRS numbers to hearing individuals for point-to-point video communications with VRS users.[40]

Further, as stated in Section IV, the FCC has ruled that VRS through a TTY relay service is not permitted.[41]  Federal VRS handles only video-to-voice calls or voice-to-video relay calls.

## 2.  Federal Government

The United States General Services Administration ("GSA") contracted with Sprint Relay to provide the federal relay interpreting services, which offers instantaneous video interpreting for one-on-one meetings and appointments with managers, supervisors, peers, co-workers, and customers.[42]  Federal employees who are deaf or hard-of-hearing received and utilized videophone technologies which are funded through Computer/Electronic Accommodations program ("CAP"), a federal program to help the federal government make their work and military home environments accessible to people with disabilities.  For example, the Department of Defense, Edwards Air Force Base employees received and utilized videophone equipment to use video interpreting services in spring of 2012 as part of a reasonable accommodation under Section 501 of the Rehabilitation Act of 1973.[43]

## 3.  State Prison Systems

In recent years, more and more prison systems have begun providing videophone, Video Relay Services and point-to-point video communications to deaf inmates.

In fall 2010, Plaintiffs Gary Minnis, Larry More, David Richardson, Ronald Roman, Delonte Tinsley, and Wolfjunge Wolfsburger and Virginia Powhatan Correctional Center ("Powhatan") entered into a settlement agreement which provides Powhatan's deaf inmates with access to videophones, VRS, and VRI.[44]  See **Exhibit F**.  As part of the settlement, the Virginia Department of Corrections also implemented new policies and procedures regarding the use of these devices and TTY.  These policies provide for the monitoring, recording, and storing of video- and text-based communications with exceptions for attorney-client communications. Since this settlement agreement was reached, the Kentucky, Maryland, Ohio, Oregon, Vermont, Virginia, and Wisconsin state prison systems have granted deaf inmates videophone access as

---

[40] *Video Relay Service Improvements Order – Effective Date for Rules Subject to the Paperwork Reduction Act*, CG Docket No. 10-51; 03-123 (Oct. 19, 2017), https://apps.fcc.gov/edocs_public/attachmatch/DA-17-1031A1.docx.
[41] *Frequently Asked Questions about VRS and/or VRI*. https://www.federalrelay.us/faq (last visited June 11, 2018).
[42] *Internet and Telecommunications Relay Services for the Federal Government*, https://www.federalrelay.us/ (last visited June 11, 2018).
[43] Darcy Painter, *DOD's CAP videophones brings deaf employees closer to Team Edwards*, Edwards Air Force Base, (Oct. 15, 2012), http://www.edwards.af.mil/News/Article/394263/dods-cap-videophones-brings-deaf-employees-closer-to-team-edwards/.
[44] Dena Potter, *Virginia Deaf inmates settle lawsuit, are provided videophones Settlement also provides interpreters*, Detroit Legal News, (Nov. 19, 2010), http://www.legalnews.com/detroit/795635.

Expert Report of
Richard Lorenzo Ray

well.[45]

On April 5, 2011, the Texas Court of Appeals for the Third District issued a preliminary injunction ordering the Texas Department of Criminal Justice ("TDCJ") to provide telecommunications access to deaf prisoners via the Texas relay service.  The court also ordered TDCJ to "investigate ways to implement the use of videophone technology to accommodate inmates with disabilities."[46]

In addition, the Department of Justice has entered settlement agreements between the United States of America and these entities (among others), requiring implementation of videophones in jails and detention facilities under the Americans with Disabilities Act: Erie County, The Erie County Holding Center and the Erie County Correctional Facility[47]; Pennington County, South Dakota[48]; Merced County, California[49]; and Nueces County, Texas.[50]

Prison systems have also implemented video-based communication systems voluntarily. For instance, during the month of May 2013, the Hall County Sheriff's Office Jail Division in Georgia installed and began using Sorenson nTouch videophone technology to accommodate the communication needs of inmates who are deaf and hard-of-hearing.  This also enables inmates at the Hall County Detention Center to take advantage of the latest technology when communicating with family and friends on their visitation list.[51]

On July 7, 2017, Disability Rights Florida settled a federal lawsuit against the Florida Department of Corrections ("FDC") over its systemic failure to comply with federal measures intended to protect individuals with physical disabilities incarcerated throughout Florida Department of Corrections.[52]

---

[45] Letter from Talila A. Lewis, Founder & President, Helping Educate to Advance the Rights of the Deaf, to Marlene H. Dortch, Commission Secretary, FCC (Mar. 25, 2013), https://ecfsapi.fcc.gov/file/7022134808.pdf; *Landmark Settlements Reached in Maryland and Kentucky for Deaf Prisoners*, Washington Lawyer's Committee for Civil Rights & Urban Affairs, (June 8, 2015), http://www.washlaw.org/news-a-media/423-deaf-inmates-md-ky-settlement.

[46] *Texas Court Orders TDCJ to Provide Hearing Impaired Telecommunications*, Prison Legal News (Sept. 15, 2012), https://www.prisonlegalnews.org/news/2012/sep/15/texas-court-orders-tdcj-to-provide-hearing-impaired-telecommunications/.

[47] Settlement Agreement between the United States of America & Erie County, New York Regarding the Erie County Holding Center & the Erie County Correctional Facility Under the Americans with Disabilities Act, DJ No. 204-53-125 (Dec. 17, 2014), https://www.ada.gov/erie_county/erie_county_sa.htm.

[48] Settlement Agreement between the United States of America & Pennington County, South Dakota Under the Americans with Disabilities Act ¶ 18, DJ No. 204-69-49 (June 1, 2015), http://www.ada.gov/pennington_co/pennington_sa.html.

[49] Settlement Agreement between the United States of America & Merced County, California Under the Americans with Disabilities Act ¶ 22, DJ No. 204-11E-383 (June 23, 2015), http://www.ada.gov/merced_co/merced_sa.html.

[50] Settlement Agreement between the United States of America & Nueces County, Texas Under the Americans with Disabilities Act ¶ 22, DJ No. 204-74-348 (Jan. 30, 2015), http://www.ada.gov/nueces_co_tx_pca/nueces_co_tx_sa.html.

[51] *Hall County Jail Utilizes New Technology for Hearing Impaired Inmates*, (May 8, 2013), http://www.hallcounty.org/ArchiveCenter/ViewFile/Item/175.

[52] *Disability Rights Florida Settles Landmark Lawsuit Against Florida Department of Corrections for Systemic Violations of Disability Laws*, (July 12, 2017),

Expert Report of
Richard Lorenzo Ray

On February 8, 2018, in *McBride v. Michigan Department of Corrections* (Case No. 15-11222, E.D. Mich.), a Michigan federal court granted in part and denied in part Plaintiffs' Motion for Summary Judgment, and denied Defendants' Motion for Summary Judgment relating to many similar issues concerning access to programming and services by deaf and hard of hearing prisoners in the custody of the Michigan Department of Corrections  In a Report and Recommendation, later adopted by the district court,[53] the Magistrate Judge ordered that the Michigan Department of Corrections make videophones available to all deaf and hard of hearing prisoners; provide necessary auxiliary aids for all deaf and hard of hearing prisoners to participate equally in prison programs and services, including consistent access to ASL interpreters for all "high stakes" interactions and programs, including religious services; institute mandatory training for Michigan Department of Corrections' correctional officers and staff on how to identify and appropriately interact with deaf and hard of hearing prisoners; and adopt effective and comprehensive policies and procedures in the aforementioned areas.  See **Exhibit G** for the court's order.

A list of video communication technology in various state department of corrections and bureau of prisons is attached as **Exhibit H**.

## VII.     CONCLUSION AND RECOMMENDATIONS

Colorado Department of Corrections failed and continues to fail to provide Plaintiffs and potentially other inmates who are deaf and hard-of-hearing as well as Ms. Bionca Charmaine Rogers and other inmates with friends or family who are Deaf or hard of hearing, with the means to communicate effectively and access CDOC's programs, services, and facilities.  In particular, the Defendants should provide the following accommodations to ensure effective communication and meaningful access for said Plaintiffs and all other deaf and hard-of-hearing inmates in CDOC's custody: (1) Functional TTYs and Kiosks; (2) Videophone technology; (3) Captioned Telephone; and (4) Telecommunications Relay Services including Video Relay Services Internet Protocol (IP) Relay Services, and Traditional Relay Services.

With today's expanding technology, individuals have many communication options. People who are deaf, deaf-blind, or hard-of-hearing and individuals with a speech disability are following these trends and are rapidly migrating to more advanced telecommunications methods, for instance, for peer-to-peer communications, video remote interpreting services, and videophone conferencing.  Internet-based equipment includes, but is not limited to, wireless devices, videophones/videocams, computers, and tablets.  Due to technological changes in the industry and expansion of videophone systems, implementation of technology, programs, and services to meet their communication needs, CDOC should be kept abreast to ensure communication accessibility.  By utilizing current device interfaces with network connections, an individual is able to experience video communication that is more functionally equivalent to that enjoyed by people who can hear and speak.

CDOC developed and uses an "Initial ADA Screening Form"; however, they have failed

---

www.disabilityrightsflorida.org/newsroom/story/disability_rights_florida_settles_landmark_lawsuit_against_florida_departme.

[53] *McBride v. Mich. Dep't of Corrections*, 2018 WL 1224783, No. 15-11222 (E.D. Mich.), Dkt. 99 (Filed Mar. 9, 2018).

Expert Report of
Richard Lorenzo Ray

to provide a clear identification of deaf and hard-of-hearing inmates as well as inmates who can hear whose families are deaf or hard of hearing and their communication needs. As indicated in the Screening Form, the Medical Practitioner will evaluate all prisoners for hearing impairment during admission, intake, and booking, as needed, and order special accommodations for prisoners with a documented hearing impairment. This Screening Form should not be relied on as an exclusive determinant of the type of accommodation needed for inmates.

The expressed choice of the individual with the disability, who is in the best position to know his or her needs, , should be given primary consideration in determining which communication aid to provide to ensure equal access to CDOC and its facilities, programs, activities, and services for all deaf and hard-of-hearing prisoners as well as inmates who can hear whose families are deaf or hard of hearing.[54]

Date:   June 12, 2018

Richard Lorenzo Ray

---

[54] *Model Policy for Law Enforcement on Communicating with People Who Are Deaf or Hard of Hearing*, U.S. Department of Justice, Civil Rights Division (Jan. 2006), http://www.ada.gov/lawenfmodpolicy.pdf.

**RICHARD LORENZO RAY**
**2223 Silver Ridge Avenue**
**Los Angeles, California 90039**
**(213) 785-2934**
**E-mail Address: RichardLorenzoRay@gmail.com**

## PROFESSIONAL EXPERIENCE

Expert Witness (Consultant)                                                  March 2010 to Present

- Conduct research and provide expert reports on various court cases involving Federal Bureau of Prisonsl and Department of Rehabilitation and Corrections for several states regarding telecommunication technologies in prison systems for inmates who are deaf, deaf-blind, and hard of hearing.

City of Los Angeles, Department on Disability
ADA and Technology Access Coordinator
Los Angeles, California 90013                                            January 2003 to Present

- Assist, monitor, and oversee Citwide implementation of the 1973 Rehabilitation Act and the 1990 Americans with Disabilities Act (ADA) Self-Evaluation and Transition Plan including facilitating access for individuals with disabilities to City programs, services, activities, and public meetings.
- Collaborate with other City Departments including Los Angeles Police Department, Fire Department, Emergency Management Department, Los Angeles World Airports, and other City departments in the implementation of City-wide emergency preparedness program for people with disabilities.
- Provide technical expertise regarding telecommunications technology to meet the needs of people with disabilities before, during and after emergencies.
- Provide technical assistance and resources to Information Technology Agency to ensure that the City websites, documents, and products are accessible and usable by persons with disabilities in compliance with Section 508 of the Rehabilitation Act.
- Conduct outreach to community with disabilities, including individuals who are deaf, deaf-blind and hard-of hearing conducting routine City business through the provisions of auxiliary aids and services such as Sign Language interpreting services, assistive listening devices, video remote interpreting services, computer assisted real-time captioning services to ensure effective communication.
- Conduct research and implement various adaptive technologies, including, but not limited to, software programs, adaptive equipment, assistive technologies, provision of work site modifications, training programs, as well as programs to enhance occupational skills.
- Update and maintain emerging technology to provide telecommunication access to individuals with disabilities in City programs, which includes 9-1-1, 3-1-1, 1-888-ASK-LAPD, Police Stations, Building and Safety, Public Library, Los Angeles World Airports, and other City public points of contact.
- Administer contracts with agencies that provide auxiliary aids and communication services.
- Coordinate recruitment and placement of 504 ADA assistants and sign language interpreter services, as well as evaluate for recommendation on worksite modifications.
- Develop in-service training programs for City employees, which include instruction with using the TTY, Telecommunication Relay Services, American Sign Language and orientation to Deaf and hard-of-hearing cultures.  The in-service training programs also include Sections 501, 503, 504, and 508 of the Rehabilitation Act of 1973, Telecommunications Act of 1996, Titles I, II, III and IV of the ADA, as amended and Architectural Barriers Act (ABA), and Title 24 of the California laws.
- Coordinate investigation and complaint follow up on public allegations and violations of ADA



Title II regulations, ADAAG (ADA Accessibility Guidelines) and related architectural access building codes.

County of Los Angeles, Office of Affirmative Action Compliance
Deputy ADA Compliance Officer
Los Angeles, California 90012                                     July 2002 – January 2003

- Assisted in the implementation of the 1973 Rehabilitation Act and the 1990 Americans with Disabilities Act (ADA) including facilitating access for individuals with disabilities to County of Los Angeles services, activities, and public meetings.
- Coordinated and monitored County departmental compliance with disability civil rights laws and regulations.
- Assisted County departments with effective implementation of the ADA mandates.
- Investigated public allegations and violations of ADA Title II regulations, ADAAG and related architectural access building codes.
- Developed and conducted disability training programs for County departments, County contractors and community groups.

City of Los Angeles, Department on Disability
ADA Compliance Officer
(Deaf and Hard-of-Hearing Services Coordinator)
Los Angeles, California 90013                                       June 1992 – June 2002

- Assisted in the implementation of the 1973 Rehabilitation Act and the 1990 Americans with Disabilities Act (ADA) including facilitating access for individuals with disabilities to City services, activities, and public meetings.
- Conducted outreach activities to the community members who are deaf and hard-of-hearing on the availability of programs and services accessible through Teletypewriter for the Deaf (TTY) and/or sign language interpreter.
- Developed in-service training programs, which include instruction of using TTY, Telecommunication Relay Services, American Sign Language and orientation to Deaf and hard-of-hearing cultures.  The in-service training programs also include Section 504 of the Rehabilitation Act of 1973, the Titles I, II, III and IV of the ADA and Title 24 of the California laws.
- Conducted research on various technologies to implement the ADA such as purchase of software programs, adaptive equipment, provision of work site modifications, training programs, as well as programs to enhance occupational skills.
- Provided assistance to individuals with disabilities during natural and emergency situations.
- Coordinated investigation and complaint follow up.

Greater Los Angeles Council on Deafness
Outreach Coordinator
Los Angeles, California 90041                                       July 1990 - May 1992

- Planned and supervised the day-to-day activities of the Outreach Office.
- Provided direct counseling, personal advocacy and other assistance to program participants.
- Developed and implemented education, advocacy and resource development efforts in the Outreach Office.

Mayor's Office for the Disabled
Project Coordinator
Los Angeles, California 90012                                    January 1988 - June 1990

- Worked with the State of California Department of Rehabilitation and community-based organizations. Facilitated access for individuals who are Deaf and hard-of-hearing to city services, activities and public meetings.
- Worked with individuals on obtaining interpreters to conduct routine City business; developed in-service training programs which included instruction in the use of Telecommunication Devices for the Deaf (TDD); Telecommunications Relay Services; California Relay Services; American Sign Language and orientation to the deaf and hard-of-hearing cultures.
- Represented the City on issues concerning all communities with disabilities.

Mayor's Office for the Handicapped
Vocational Placement Counselor
Los Angeles, California 90012                                    May 1986 - December 1987

- Provided vocational counseling to program participants, which included: assessment, preparation of individual employability, preparation of development plans, identifying placement opportunities, monitored client progress on the job.

Self Actualization Institute for the Deaf
Educational Therapist
Los Angeles, California 90028                                    November 1985 – May 1986

- Instructed low-functioning adults with hearing impairments in developing pre-vocational skills, as well as independent living skills.
- Supervised students' interactions with peers, other professional support personnel, family members and the public.

**EDUCATION**

Loyola Law School
Western Law Center for Disability Rights
Los Angeles, California
Disability Rights Masters Certificate                            September 2000

City of Los Angeles, Personnel Department
Team to Win and Human Relations Skills Program                   February 1999

University of California, Los Angeles
UCLA Extension Program
Los Angeles, California
Leadership for the 21st Century Certificate                      November 1998

California State University, Northridge
Northridge, California
Liberal Studies                                                 June 1984

## PROFESSIONAL AFFILIATION

Federal Communications Commission, Disability Advisory Committee, February 2015 to Present

Federal Communications Commission, Disability Advisory Committee Emergency Communications Subcommittee, Co-Chair, February 2015 to Present

Federal Communications Commission, Optimal Public Safety Answering Point Architecture Task Force, January 2015 to December 2016

Federal Communications Commission, Text-to-9-1-1 Public Education and Outreach Planning Committee, November 2014 to June 2016

California Commission on Disability Access, Education and Outreach Committee, Committee Member, October 2013 to Present

Federal Communications Commission, Emergency Access Advisory Committee, Co-Chair, January 2011 to June 2013

National Advisory Board of Preparedness and Emergency Response Research Center, University of Berkeley, May 2010 to June 2013

National Emergency Number Association, Accessibility Committee, Chair, June 2005 to Present

California Association for the Deaf, President, July 2005 to August 2009

California Public Utilities Commission, Deaf and Disabled Telecommunications Program - Equipment Program Advisory Committee, November 2004 to October 2012

City of Pasadena Mayor's Committee for the Employment of Persons with Disabilities, March 2003 to June 2008

Autry Museum of Western Heritage – Encounters/Overland Exhibition Advisory Committee, March 2002 to April 2005

Payphone Service Providers - Enforcement, TTY Interim Placement Committee, Vice-Chair, February 1999 to August 2001

Greater Los Angeles Agency on Deafness, Council of Organization Advisory Board, President, January 1999 to October 2000

National Association for the Deaf, 9-1-1 Emergency/Warning Systems Standard Committee, Chair, November 1998 to July 2002

California Public Utilities Commission, Deaf and Disabled Telecommunication Program Administrative Committee, Vice-Chair, September 1995 to 2001

National Emergency Number Association, 9-1-1, Accessibility Committee, June 1994 to June 2005

Los Angeles County Metropolitan Transportation Authority, Service Authority for Freeway Emergencies, 1994 to 2004

County of Los Angeles, Commission on Human Relations, Media Image Coalition, 1992 to 2000

Los Angeles Commission on Assaults Against Women, Deaf Services Program, 1989 to 1997

KABC Television Advisory Board, 1989 to 1992

California State University, Los Angeles, Advisory Committee, 1988 to 1990

**MEDIA**

Actor and Technical Advisor, Training Video, Run, Hide, Fight, City of Los Angeles Department on Disability, Los Angeles Police Department, Emergency Mangement Department, and Information Technology Agency, December 2017

Actor, Public Service Announcement, Your Voice Your Vote: Accessibility for Voters with Disabilities, County Los Angeles Registrar-Recorder/County Clerk, October 2016

Guest, NBC Nightly News, Some States Allow Texts to 9-1-1, May 18, 2014

Technical Advisor, Public Services Announcement, "It's the Right Things to Do", Dodgervision, Los Angeles, 2001

Technical Advisor, Documentary, "A Fine Day With Spare Parts", Los Angeles, 2000

Technical Advisor, Training Video, "Interacting with the Deaf and Hard of Hearing", Los Angeles Police Department, Los Angeles, 2000

Technical Advisor, Training Video, "Using your TDD", Los Angeles Police Department, Los Angeles, 1999

Writer, Producer, and Director, Video, "9-1-1 TTY Emergency Response", Los Angeles, 1995

Guest Presenter, "Disabilities and Disasters: Five Years of ADA Implementation", Broadcast, Federal Emergency Management Agency, Washington, D.C., 1995

Host, Documentary Video, "Understanding Deafness", House Ear Institute, Los Angeles, 1988

**AWARDS AND RECOGNITIONS**

Doers, Dreamers and Drivers Award, Government Technology, March 2018

Bill McMurray Award for Excellence, National Emergency Number Association California Chapter, February 2018

Certificate of Recognition, Federal Communications Commission, December 2016

Presidential Award of Advocacy, National Emergency Number Association, June 2016

Robert H. Weitbrecht Telecommunications Access Award, TDI, August 2015

Dr. Lawrence R. Fleischer Distinguished Service Awards, CSUN, November 2014

Certificate of Recognition, City of Los Angeles, September 2014

Certificate of Recognition, California Public Utilities Commission, October 2012

Certificate of Recognition, Federal Communications Commission, February 2012

Resolution of Commendation, City Council of the City of Los Angeles, September 2011

Jane Small Leadership Awards, Los Angeles County Commission on Disability, October 2010

Certificate of Recognition, Disability Rights Legal Center, October 2009

Certificate of Recognition, Office of the Mayor and City Council of the City of Los Angeles, September 2009

Certificate of Appreciation, California Public Utilities Commission, March 2006

Lou Fant Distinguished Service Award, Registry of Interpreters for the Deaf, May 2003

Certificate of Appreciation, Office of the Mayor, Crisis Response Team (CRT), November 2003

Resolution of Commendation, Office of the Mayor and City Council of the City of Los Angeles, June 2002

Certificate of Commendation, Office of the Mayor Richard Riordan and Councilmember Nick Pacheco, City of Los Angeles, May 2001

Certificate of Commendation, Office of Chief of Police Bernard C. Parks, Los Angeles Police Department, City of Los Angeles, May 2001

Outstanding Service Award, Greater Los Angeles Agency on Deafness, May 2001 Golden Poppies Awards, California Association for the Deaf, July 1999

Certificate of Appreciation, California Association for the Deaf, August 1999

Certificate of Commendation, Office of the Councilmember Richard Alatorre, City of Los Angeles, May 1994

Man of the Year, Greater Los Angeles Agency on Deafness, May 1994

Certificate of Commendation, Office of the Mayor Tom Bradley, City of Los Angeles, June 1993

Certificate of Commendation, City of Los Angeles Department of Recreation and Parks, 1993

Outstanding Contributions, Los Angeles Times, May 1993

Certification of Appreciation, United States Department of Transportation, Federal Aviation Administration, October 1992

Commendation, United States Air Force, Space Division, October 1989

Outstanding Contributions, Los Angeles Times, 1993

**SEMINARS AND WORKSHOP PRESENTATIONS**

February 7, 2018
Government Technology
Los Angeles CIO (Chief Information Officer) Academy
**Accessible and Inclusive Government – Meeting the Needs of Each and Every Citizen**

September 12, 2017
Telecommunications Equipment Distribution Programs Association
Annual Conference
**Emergency Telecommunication Technologies for People who are Deaf, Deaf-Blind or Hard of Hearing**

July 27, 2017
Telecommunications Device for the Deaf, Inc. (TDI)
Biennial Conference
**Emergency Communications for People who are Deaf or Hard of Hearing**

August 20, 2015
Telecommunications Device for the Deaf, Inc. (TDI)
Biennial Conference
**Roll-Out Text to 9-1-1 in USA:  What Is Really Happening Now? and**
**Two Steps Forward, Two Steps Forward: Advancements in Wireless Location Accuracy**

June 13, 2015
Montana Association of the Deaf
Biennial Conference
**21st Century Communications and Video Accessibility Act**

November 14, 2014
California Public Utilities Commission
Telecommunications Access for the Deaf and Disabled Administrative and Equipment Program
Advisory Joint Committees Meeting
**Text-to-9-1-1 Update**

November 7, 2014
Federal Communications Commission
Forum: **Accessible Wireless Emergency Communications Initiatives for People with Disabilities**
**Government Strategies to Ensure Accessible Alert and Communications**

July 3, 2014
National Association of the Deaf
National Conference
**Text to 9-1-1: Ready Now?**

June 27, 2014
California Public Utilities Commission
Telecommunications Access for the Deaf and Disabled Administrative and Equipment Program
Advisory Joint Committees Meeting
**Text-to-9-1-1**

June 17, 2014
National Emergency Number Association

Annual Conference
**Federal Overview of Accessibility and Text-to-9-1-1**

June 17, 2014
National Emergency Number Association
Annual Conference
**What NG9-1-1 Means for Accessibility**

March 13-14, 2014
The 9-1-1 Emergency Service Governing Board of Puerto Rico
**Understanding Deafness & 9-1-1 Communication Accessibility**
**Access to Emergency Services**

June 3, 2013
International Telecommunication Union (ITU)
**Accessibility to Multi-Media Systems and Services**
**Access to Emergency Services**

October 2012
APCO/NENA Pacific Chapter[1]
**NG9-1-1 Technology Forum**
**Next Generation 9-1-1: Accommodating Special Needs**

June 2012
National Emergency Number Association
Annual Conference
**Federal Communications Commission (FCC) Accessibility Updates**
**21st Century Communication and Video Programming Act - What will it mean for 9-1-1?**
**Video Relay Services Providers in Frontline and Stress Management**
**A National Agenda for All-Hazards Preparedness Communication Access for Deaf & Hard of Hearing**

March 2012
National Emergency Number Association
9-1-1 Goes to Washington Conference
**Emergency Access Advisory Committee Update**

September 2011
Intrado
Mobility Summit
**Federal Communications Commission: Emergency Access Advisory Committee**

September 2011
APCO/NENA Pacific Chapter
NG9-1-1 Technology Forum
**Federal Communications Commission: Emergency Access Advisory Committee**

June 2011
National Emergency Number Association
Annual Conference
**Trends of Deaf Using Mobile Devices & National 911 SMS Relay Center Update**

---

[1] Association of Public-Safety Communications Officials International (APCO) & National Emergency Number Association (NENA)

**Video/IP (text) Relay Centers – Changes Impacting emergency calling & PSAPs**
January 2011
Federal Communications Commission: Emergency Access Advisory Committee
**Telecommunications Relay Services (TRS) Emergency Call Handling**

November 2010
Centers for Disease Control and Prevention's Global Communications Center
**Policies and Regulations**

June 2010
National Emergency Number Association
Annual Conference
**ADA & Federal Law Compliance**
**PSAP TTY Requirements: Comply or Else!**

September 2009
Wireless Emergency Communications
State of Technology Conference
**Wireless Alert Accessibility: Technical Challenges and Opportunities**

June 2009
National Emergency Number Association
Annual Conference
**What's New with VRS & IP Relay Services & Emergency Handling Call?**
**Registry & Personal Callers Information**

June 2008
National Emergency Number Association
Annual Conference
**Emergency Mass Notification through Technologies**
**Sign Language Interpreter and Telecommunicators**

June 2007
National Emergency Number Association
Annual Conference
**Emerging Technologies, Accessibility and Impact on PSAPs &**
**Video Relay and IP Relay Centers – PSAP Interaction**

June 1995
Federal Emergency Management Agency, Washington, D.C.
Disabilities and Disasters: Five Years of ADA Implementation
(Broadcast)
**Featured Speaker**

**EXPERT WITNESS REPORTS AND TESTIMONIES**

McBride v. Massachusetts Department of Correction, Case No. 1:15-cv-40162-GAO
April 20, 2018

Heyer v. U.S. Bureau of Prisons, North Carolina, et al., 5:11-CT-3118-D
November 7, 2017

Mary Ann McBride v. Michigan Department of Corrections, State of Michigan, et. al., Case No. 2:15-cv-11222
March 9, 2018

Disability Rights Florida, Inc. v. Julie Jones, Florida Department of Corrections, et. al., Case No.4:16-cv-47-RH-CAS
July 7, 2017

Charles Brian Bearden v. Clark County, State of Washington, et. al., Case No. 3:14-cv-05318-BHS
March 24, 2016

Adams v. Kentucky Department of Correction, et al., Case No. 3:14-cv-00001-GFVT
July 17, 2014

William Pierce v. District of Columbia Department of Corrections, et. al., Case No. 1:13-cv-00134-JEB
May 26, 2014

Heyer & Boyd v. U.S. Bureau of Prisons, et al., 5:11-CT-3118-D
December 11, 2014

Smith v. Idaho Department of Correction, et al., CV-12-00030-BLW
February 27, 2013

Berke v. U.S. Bureau of Prisons, Washington, District of Columbia, et al., CV 1:12-cv-01347-ESH
September 25, 2012

Bryant v. U.S. Bureau of Prisons, Tuscon, Arizona, et al., Case No. 06704-016
August 1, 2012

Bass v. City of Alhambra, et al., CV 08-07660 ABC (JWJx)
March 25, 2010

**PUBLICATIONS**

Rehabilitation Engineering Research Center (RERC) on Telecommunications Access, Some New Developments in Accessible Emergency Alerts, February 2009

Wireless Emergency Communications - Wireless Alert Accessibility: Technical Challenges and Opportunities, September 2009

# EXHIBIT B

**List of Materials provided to Expert Richard Lorenzo Ray**

Smith, Janet -- deposition transcript (04/09/18)
Jacobson, Adrienne -- deposition transcript (04/09/18)
Bradley, Amy -- deposition transcript (04/06/18)
Deuster, Brian -- draft deposition transcript (06/04/18)


2018-01-04 Defendant's Final Revised Responses to RFP – Supplement
2018-01-04 Defendant's Final Signed Responses to Interrogatories – Supplement
2018-01-17 Final Revised Responses to RFP – Supplement
2017-06-15 [34] THIRD AMENDED COMPLAINT
2017-09-29 [52] ORDER [37] Motion to Dismiss DENIED and [44] Motion to Stay DENIED AS MOOT

AR 850-12 Telephone Regs March 2018
CDOC/Rogers-000052 - 52-54 - IA - DWCF - 0850-012_20170801
CDOC/Rogers-004409 - IA 850-12 08.23.17
CDOC/Rogers-002108 - CTCF IA

CDOC/Rogers-001473 - Begano ITS Call Records Query
CDOC/Rogers-001573 - Video Relay Form for offender
CDOC/Rogers-001600 - Rogers ITS Call Records Query
CDOC/Rogers 001838 - Rogers TTY request/denial
CDOC/Rogers 001841 - Saugause ITS Call Records Query
CDOC/Rogers 001865 - DWCF Trouble log
CDOC/Rogers-001870 - Instructions on Using Portable TTY
CDOC/Rogers-001872 - CIPS Kiosk TTY Dialing Instructions
CDOC/Rogers-001874 - CIPS Kiosk TTY Dialing Instructions
CDOC/Rogers-002101 - 3-21-14- follow up
CDOC/Rogers-002111 - email correspondence between Julie and I
CDOC/Rogers-002113 - email correspondence of my concerns
CDOC/Rogers-002114 - email correspondence regarding installation of units
CDOC/Rogers-002162 - list of qualified TTY users in 2016 at CTCF

CDOC/Rogers-001912 - CDOC contract with Access 2 Sign Language
CDOC/Rogers-001942 - Access 2 Sign Language option letter
CDOC/Rogers-001943 - Global Tel* Link contract amendment with CDOC
CDOC/Rogers-001958 - Global Tel* Link contract amendment with CDOC
CDOC/Rogers-001962 - CDOC contract with Global Tel* Link

CDOC/Rogers-001597 - Begano 112149 request 3
CDOC/Rogers-001876 - Begano Grievances-Begano 112149
CDOC/Rogers-001880 - Begano 112149 informal resolution attachment 1
CDOC/Rogers-001881 - Begano 112149 informal resolution
CDOC/Rogers-001882 - Begano Offender Begano 112149

2

CDOC/Rogers-001902 - Saugause 173905 informal resolution attachment 1
CDOC/Rogers-001903 - Saugause 173905 informal resolution attachment 2
CDOC/Rogers-001904 - Saugause 173905 informal resolution
CDOC/Rogers-001907 - Saugause Grievances-Saugause 173905
CDOC/Rogers-001888 - Rogers Grievances-Rogers 169704
CDOC/Rogers-001892 - Rogers Offender Rogers 169704
CDOC/Rogers-003224 - Atkins Grievance
CDOC/Rogers-004216 - Trevithick D-CT0910-270
CDOC/Rogers-004218 - Trevithick D-CT0910-270 S2
CDOC/Rogers-004220 - Trevithick D-CT0910-270 S2.1
CDOC/Rogers-004226 - Trevithick D-CT0910-398 S1
CDOC/Rogers-004228 - Trevithick D-CT0910-398 S2
CDOC/Rogers-004234 - Trevithick D-CT0910-398 S3
CDOC/Rogers-004240 - Trevithick D-CT0910-435 S2.3
CDOC/Rogers-004249 - Trevithick file part 3
CDOC/Rogers-004384 - Atkins 34864 – 1
CDOC/Rogers-004385 - Atkins, 34864 – 2
CDOC/Rogers-004386 - Atkins 34864 – 3
CDOC/Rogers-004388 - Atkins TTY informal grievance
CDOC/Rogers-004389 - Atkins, 82587 – 1
CDOC/Rogers-004391 - Trevithick, 16380-1

CDOC/Rogers-002163 - TTY Transcripts - Begano - Bates 2163 – 2164
CDOC/Rogers-004426 - Atkins TTY transcript
CDOC/Rogers-004425 - Atkins TTY transcript
CDOC/Rogers-004430 - Begano TTY transcript
CDOC/Rogers-004436 - Rogers TTY transcript
CDOC/Rogers-004437 - Rogers TTY transcript
CDOC/Rogers-004443 - Saugause TTY transcript
CDOC/Rogers-004445 - Trevithick TTY transcript

P_000045 CSDB - JBS Dox
P_000158 Jeffco Public Schools - CAB Dox
P_000164 Poudre Request – JBS
P_000166 Poudre School District - JBS Dox
P_000251 Thomson R2-J - JBS Dox
P_000300 - Documents from Illinois School for the Deaf
P_000375-490 - photos from CTCF visit
P_000491-94 - videos from CTCF visit
P_000495 - Atkins Step 1-3 Grievances & Responses
P_000499 - Begano TTY transcript
P_000500 - Trevithick informal grievance

GTL_000001 - GTL description of VRS
GTL_000003 - Tidal Wave Telecomm Periscope product description
GTL_000008 - GTL contract amendment with CDOC

3

GTL_000017-34 - GTL CDs of recorded audio from Rabinkov, Trevithick, Begano, & Rogers

SORENSON_000005
SORENSON_000055

# Videophones





VRS Z-150



ZVRS Z5 Application



P70



ZVRS i3



Purple VRS P-3



Purple VRS P-3



Sorenson nTouch



Sorenson VP-nTouch II

EXHIBIT C

**Vendors for Monitoring, Recording and Storing**
June 12, 2018

**Cisco Systems, Inc.**
Corporate Headquarters
170 West Tasman Dr.
San Jose, CA 95134
1-800-553-6387
Dennis Felts - dfelts@cisco.com

**Global Tel Link (GTL)**
1-877-856-3184
http://www.gtl.net
http://www.gtl.net/correctional-facility-services/inmate-communication-solutions/inmatetelephone-systems/

**GreenTec-USA, Inc.**
22375 Broderick Dr., Suite 155,
Sterling, VA 20166
(703) 880-8332
https://greentec-usa.com/

**Innovisit**
Rob Genin
info@innovisit.com
Phone: 1-800-475-0964
www.innovisit.com

**Integrio Technologies**
2355 Dulles Corner Boulevard, Suite 600
Herndon, VA 20171
800.929.3871
http://integrio.com/

**Inpixon**
2479 E. Bayshore Rd, Ste 195
Palo Alto, CA 94303
(408) 702-2167
https://inpixon.com/

**J-Pay, Inc.**
12864 Biscayne Blvd. Suite 243
Miami, FL 33181
(800) 574-5729
http://www.jpay.com


EXHIBIT D

**Norment Trentech**
Allan Bandy
(334) 286-4309, Ext 1309
Norment Security (Acquired by The Gores Group)
Southwest Regional Office
Howard Pearsall - Regional General Manager
446 North Austin Dr., Suite #1
Chandler, AZ 85226-2634
Phone: 480-940-6970
Fax: 480-753-3533
norment.southwest@normentsecurity.com
http://www.normentsecurity.com/Contact-Us.aspx

**Polycom**
Primonics
52 Cornelia St., Suite 2 Plattsburgh
New York USA, 12901
1-(888) 201-0210
http://www.primonics.com
sales@primonics.com

**RenovoSoftware, Inc. (Acquired by GTL)**
www.renovosoftware.com
Brian Baird, Territory Manager
bbaird@renovosoftware.com
Tim Eickhoff, Co-owner
TEickhoff@renovosoftware.com
Brian Peters
bpeters@renovosoftware.com
1-952-933-2409
sales@renovosoftware.com

**SecureVRS**
Secure Video Relay (SecureVRS)
www.securevrs.com
Sales@securevrs.com
(855) 732-8771
http://securevrs.com/

**Securus Technologies**
Princeton, Texas
972-734-1111
1-800-844-6591
https://securustech.net

**Telmate (Acquired by GTL)**
655 Montgomery St
San Francisco, CA 94111
Vance A Johnson, President
 (415) 300-4314
www.telmate.com

**Tidal Wave Telecom**
855-732-8771
Chris Talbot, President
sales@tidalwavetelecom.com
www.tidalwavetelecom.com

**The Gores Group**
9800 Wilshire Blvd
Beverly Hills, CA 90212
(310) 209-3010
http://www.gores.com

**Vugate**
4830 Research Drive
San Antonio, Texas 78240
www.vugate.com
1-210-699-7000



**Exhibit E**

# Monitoring, Recording, and Storing of Call Flow

# Recording and Storing
# of Call





**Settlement Agreement**

## I. DEFINITIONS

1. "Auxiliary Aids and Services" include, but are not limited to, "Qualified Interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments," 42 U.S.C. § 12103, such as hearing aids, computer-aided transcription services, assistive listening systems, closed caption decoders, open and close captioning, TDDs, TTYs, videotext displays, written materials, 28 C.F.R. § 35.104, as well as Videophones, access to telephone relay services, and visual alert or alarm systems. For purposes of this agreement, Auxiliary Aids and Services does not include vibrating clocks or in-line amplifiers meaning VDOC will not automatically provide or pay for such devices.

2. "Deaf" persons means individuals who are unable to hear well enough to rely on their hearing as a means of processing information and who rely on Auxiliary Aids and Services to Effectively Communicate and who qualify as individuals with disabilities under the Americans with Disabilities Act as amended by the ADA Amendments Act of 2008. *See* 42 U.S.C. § 12102(4); P.L. 110-325. All inmates listed in Ex. A are Deaf persons. Inmates whose hearing is corrected by hearing aids so that they can understand the spoken word and communicate orally are not covered by this Agreement.

3. "Direct Threat" means a significant risk to the health or safety of the Deaf Inmate or others that cannot be reduced or eliminated by reasonable accommodation. A finding of Direct Threat must be based on and supported by objective evidence.

4. "Effective Communication" means communication with Deaf inmates that is substantially as effective as communication with the general inmate population, 28 C.F.R. § 35.160(a), and will, when necessary, include the provision of appropriate Auxiliary Aids and Services, such as Qualified Interpreters. Effective Communication affords an inmate who is Deaf an opportunity to participate in, and enjoy the benefits of, VDOC's services, programs, or activities that is substantially equal to that enjoyed by a similarly situated inmate who is not Deaf.

5. "Effective Date" means October 13, 2010.

6. "Offsite Medical Care" means medical care that is provided at a location not owned or operated by VDOC.

7. "Onsite Medical Care" means medical care that is provided at a VDOC facility, including medical care provided by third parties in facilities owned or operated by VDOC.

EXHIBIT F

1

8. "Qualified Interpreter" means a person who is able to interpret effectively, accurately, and impartially, both receptively and expressively, with the individual Deaf inmate using any necessary specialized vocabulary. A Qualified Interpreter could include an ASL interpreter, a sign language interpreter using more English based signs, an oral interpreter, a cued speech transliterator or a tactile interpreter for a person who is Deaf/blind. For sign language interpreters, a Qualified Interpreter is one who holds one or more of the following current, valid certifications:

- Registry of Interpreters for the Deaf Certification as a CI/CT, CSC, MCSC, OTC, CDI or RSC;

- National Association of the Deaf (NAD) Certification Level 3, 4, or 5;

- NAD/RID National Interpreter Certification NIC, NIC Advanced or NIC Master

- A cued speech transliterator will be certified by the Cued Language Transliterator National Certification Examination.

A Qualified Interpreter may be provided by VDOC either in person, via video remote interpreting (VRI) or videoconferencing or other similar means.

The parties agree that future certifications that are the equivalent of these certifications will be considered valid minimum certification, so long as those certifications are kept current.

9. "TTYs" or "TDDs" means devices that are used with a telephone to communicate with persons who are Deaf or hard of hearing by typing and reading communications.

10. "VDOC employees," "VDOC staff," "VDOC personnel" include all employees, agents, and other staff of the Virginia Department of Corrections (VDOC) whose job responsibilities places them on a regular basis in contact with Deaf inmates, and the immediate supervisors of those employees, agents, or other staff.

11. "Video Remote Interpreting" (VRI) means video interpreting accomplished by use of video conference technology over high-speed internet lines.

12. "Videophone" means a telephone with a camera and screen for visual, real-time communications.

13. "VDDHH" means the Virginia Department of the Deaf and Hard of Hearing.

14. "VDOC" means Virginia Department of Corrections.

2

## II. GENERAL POLICIES

### A. Non-discrimination Based on Disability

VDOC will ensure that Deaf inmates in its custody in state correctional facilities or under post-release supervision by Community Corrections have full and equal enjoyment of its services, privileges, facilities, advantages, and accommodations as non-Deaf inmates similarly situated. VDOC shall provide Deaf inmates with access to services, privileges, facilities, advantages, and accommodations substantially equivalent to those offered to other non-Deaf inmates similarly situated who are in its custody in state correctional facilities or under post-release supervision by Community Corrections. VDOC retains the discretion to determine that certain activities present a Direct Threat of injury or death to Deaf inmates and may therefore choose not to provide such Deaf inmates substantially equal enjoyment of some of its services, privileges, facilities, advantages, and accommodations.

### B. ADA Coordinator and Auxiliary Aids and Services Designees

VDOC has designated an ADA Coordinator and will maintain the ADA Coordinator position as required by law. The VDOC agrees that the ADA Coordinator shall be trained and knowledgeable concerning the requirements of federal and state law regarding VDOC's obligations to provide full and equal enjoyment of its services, privileges, facilities, advantages, accommodations to Deaf inmates, and the contents of this Agreement.

VDOC will notify counsel for the plaintiffs of the ADA Coordinator designee. The name and contact information for the ADA Coordinator will be kept updated on the VDOC website. The ADA Coordinator's name and contact information will also be posted in a secure area in any housing unit in which Deaf inmates are held.

Within thirty days of the Effective Date of this Agreement, VDOC will designate individuals at each facility where Deaf inmates are held and at any Probation and Parole Office where any Deaf former inmate is actively on post-release supervision, who will be responsible for coordinating and overseeing Auxiliary Aids and Services for Deaf individuals and for implementing this Agreement. These designees will be familiar with and knowledgeable concerning the contents of this Agreement, and responsible for implementing this Agreement. These designees, who are located at a state correctional facility, with the assistance of a Qualified Interpreter, will aid in the initial intake of all Deaf inmates.

VDOC agrees to train all Watch Commanders on the procedures necessary to satisfy this Agreement.

VDOC agrees that Deaf inmates will be given the opportunity to meet with the Warden or Assistant Warden of Operations at least quarterly. At these meetings Deaf inmates will have the opportunity, with a Qualified Interpreter, to discuss issues of importance to their community.

3

### III. INITIAL CLASSIFICATION, ASSESSMENT, AND ASSIGNMENT

#### A.    General Policy

VDOC will provide a Deaf inmate at a Reception and Classification Center with access to Qualified Interpreters. The purpose of this interpreter is to assist the Deaf inmate with medical, psychological, and educational testing and evaluation, and to help provide an explanation of prison policies and procedures, to include DOP 861—Inmate Discipline, DOP 866—Offender Grievances, and how to utilize the TTY, Videophone and other Auxiliary Aids and Services.

For male inmates, the Reception and Classification Center is Powhatan Reception and Classification Center (PCC). For female inmates, the Reception and Classification Center is Fluvanna Reception and Classification Center (FCC).

#### B.    Hearing Assessment

As part of the Initial Classification, Medical staff will assess and if necessary test all inmates for Deafness or hearing impairments who demonstrate either during Initial Classification.

If Medical staff determines that an inmate is Deaf, Medical staff will note the disability in the inmate's institutional file.

#### C.    Auxiliary Aids and Services Assessment

After Medical staff determine that an inmate is Deaf, VDOC will presume that Auxiliary Aids and Services in the form of Qualified Interpreters, visual notifications, telecommunication devices, and other aids and services set forth in this Agreement are necessary to ensure substantially equal services, privileges, facilities, advantages, and accommodations.

If a Deaf inmate indicates that he or she does not require any or all of the Auxiliary Aids and Services set forth in this Agreement, he or she will sign a Waiver of Auxiliary Aids and Services and that document will be kept in the inmate's institutional file.

#### D.    Ensuring Staff Awareness Through Identification Cards

VDOC will take appropriate steps to ensure that all VDOC personnel having regular contact with a Deaf inmate are made aware of such person's need for Auxiliary Aids and Services so that Effective Communication with such person and the safety of the person will be ensured. Upon identifying an inmate as Deaf during Initial Classification, the inmate will receive a distinct identification (ID) card that clearly identifies him or her as Deaf. The ID card will signify to VDOC personnel that the inmate is Deaf, may not respond to oral commands, and may require Auxiliary Aids and Services. When staff take a Deaf inmate's ID card he or she will be given another indicator of their Deaf status.

4

All staff having regular contact with a Deaf inmate will be trained on the meaning of the distinct ID cards.

VDOC will post at the entrance to all facilities that house Deaf inmates, a notice clearly stating that the facility houses Deaf inmates and that the Deaf inmates carry an ID card with them. The Notice will include a picture of the ID card carried by deaf inmates. The Notice will also be posted outside each housing unit where Deaf inmates are held.

### E.      Interpretation of Written Materials

As of the Effective Date of this Agreement, and upon a Deaf inmate's filling out a Request for Auxiliary Aids and Services form at the facility where the requesting inmate is incarcerated, VDOC, will provide Deaf individuals written materials it provides to all inmates either, and at its discretion:

- in a recorded video sign language interpreted, or otherwise appropriately interpreted, format ("interpreted materials") (If VDOC chooses this option, VDOC would then provide the equipment necessary to view the interpreted materials);

- or by providing a Qualified Interpreter to permit the Deaf inmate to understand the contents of the written materials.

At the request of the Deaf inmate, VDOC will provide that Deaf inmate with the opportunity to meet with a VDOC staff member and a Qualified Interpreter to ask any questions regarding the written or interpreted materials.

### F.      Creation and Interpretation of Rights Materials

VDOC will provide each Deaf inmate with written materials outlining the rights of Deaf inmates, along with the services available to them as guaranteed by this Agreement, the ADA, and Section 504 of the Rehabilitation Act. All currently incarcerated Deaf inmates will also be offered these materials when VDOC begins using them. VDOC will create these written materials using language designed to be accessible to Deaf inmates. VDOC will provide these written materials to Deaf inmates with the orientation materials provided to all other inmates at Initial Classification.

VDOC will provide Deaf inmates with these written materials either:

- in a recorded video sign language interpreted, or otherwise appropriately interpreted, format ("interpreted materials") (If VDOC chooses this option, VDOC would then provide the equipment necessary to view the interpreted materials);

- or by providing a Qualified Interpreter to interpret these written materials to the Deaf inmate.

VDOC shall create the Rights Materials and begin using them within three months of the Effective Date of this Agreement.

### G. Continuation of Provision of Auxiliary Aids and Services

After conducting the Initial Classification and documenting an inmate's hearing and Auxiliary Aids and Services assessments in his or her institutional file, VDOC will continue to provide Auxiliary Aids and Services to a Deaf inmate consistent with this Agreement, unless the Deaf inmate affirmatively indicates he or she does not want such services.

### H. Subsequent Need for Accommodations

If an inmate is not found to have a hearing impairment at his or her Initial Classification, initially refuses, or does not request Auxiliary Aids and Services, but later believes that Auxiliary Aids and Services are necessary to ensure Effective Communication, he or she will fill out a Request for Auxiliary Aids and Services form. VDOC will provide the inmate who was initially not found to have a hearing impairment with a hearing assessment if so ordered by medical staff. If that individual is found to be Deaf, VDOC will follow the procedures as set forth in Section III.B-G of this Agreement.

## IV. HOUSING

### A. General Policy

VDOC has determined that it is in the best interests of VDOC and Deaf inmates to be incarcerated in one facility in order to provide them with the most effective Auxiliary Aids and Services. As of the date of this Agreement, VDOC has determined that Deaf male inmates will be housed at Powhatan Correctional Center,, and Deaf female inmates will be housed at Fluvanna Correctional Center. VDOC has the discretion to house Deaf inmates at whatever facility it deems appropriate.

At VDOC's discretion, if PCC or FCC is determined to be an unsafe or inappropriate facility for an inmate, that inmate will retain all rights as required by the ADA and this Agreement at any other facility where that inmate is housed.

### B. Schedule of Accommodations

When a Deaf inmate is incarcerated at PCC or FCC, personnel at those facilities shall provide the Deaf inmate with a schedule showing when Qualified Interpreters and/or other Auxiliary Aids and Services are available. This schedule will be provided to currently incarcerated inmates within 3 months of the Effective Date of this Agreement.

6

## V.   PROVISION OF AUXILIARY AIDS AND SERVICES

### A.      General Policy

In order to ensure substantial equality for Deaf inmates, VDOC will provide appropriate Auxiliary Aids and Services, as required by this Agreement, the U.S. Constitution, the ADA, and the Rehabilitation Act. Substantial equality shall also include programs or services to Deaf inmates provided by third party vendors, contractors, or state-funded entities such as community colleges.

- Appropriate Auxiliary Aids and Services, including Qualified Interpreters, shall be made available so that Deaf inmates may participate in all services, privileges, and programs offered to other inmates in VDOC's custody at Powhatan Correctional Center or Fluvanna Correctional Center, as the case may be.

- These shall include, but not be limited to: orientation, medical evaluations and treatments, disciplinary proceedings, and during any other programs including, but not limited to, rehabilitative, educational, or transitional programs offered to other similarly situated incarcerated individuals.

- In those instances where VDOC permits volunteers to provide activities to inmates at PCC or FCC, such as religious services and meetings, VDOC will make best efforts so that the volunteer organization or individual volunteer has an interpreter at those activities. The parties agree that the Interpreter at such volunteer activities need not be a "Qualified Interpreter" as defined in this Agreement.

- VDOC retains the discretion to determine that certain activities present a Direct Threat of injury or death to Deaf inmates and may therefore choose not to provide such Deaf inmates substantially equal enjoyment of some of its services, privileges, facilities, advantages, and accommodations.

- VDOC will provide written instructions for the use of all Auxiliary Aids and Services. These instructions will cover, though not necessarily be limited to, use of TTYs and Video Phones.

### B.      Medical Devices

All Auxiliary Aids and Services required by this Agreement, the ADA, and Section 504 of the Rehabilitation Act, which are deemed medically necessary, will be provided promptly upon request free of charge to Deaf inmates subject to a co-payment for that medical device, just as non-Deaf inmates are charged a co-payment for other medical appliances or devices. This co-pay shall not apply, however, to hearing aid batteries. In the case of a Deaf inmate who is deemed indigent pursuant to VDOC Policy 802.2, the Deaf inmate's account will be charged the appropriate co-pay for such device just as non-deaf inmates are charged.

7

## C.   Maintenance of Auxiliary Aids and Services

VDOC shall maintain all Auxiliary Aids and Services for Deaf inmates in its custody in a state correctional facility in working condition at all times.

## VI.  QUALIFIED SIGN LANGUAGE INTERPRETERS

### A.   Contracts

VDOC will enter into one or more written contracts with Interpreter Service Providers (IS Providers), or otherwise arrange to provide Qualified Interpreters at the events and intervals set forth in this Agreement. The contracts with the IS Providers must specifically state that only "Qualified Interpreters," as defined in this Agreement, will be used by VDOC and that the IS Providers agree to provide only such interpreters to VDOC. If VDOC is currently bound by an IS Provider contract it will add this requirement at the next opportunity.

### B.   General Policy

VDOC will maintain the current rate of providing an in-person Qualified Interpreter two days per week for seven hours per day at PCC. If there is a material change in the number or needs of Deaf inmates, VDOC will reevaluate the number and/or frequency of in-person Qualified Interpreters.

VDOC shall provide an in-person Qualified Interpreter at FCC and other facilities where Deaf inmates are incarcerated as circumstances warrant.

Examples of situations in which an in-person Qualified Interpreter is presumed to be needed include:

- communications concerning medical care and attention, including dental, vision, audiological, and mental health care;

- disciplinary hearings in which the Deaf inmate may be charged with a rule infraction;

- transfer and classification processes that impact on the Deaf inmate's status; and

- transitional programming.

Examples of situations in which a Qualified Interpreter is not presumed to be necessary but in which a Qualified Interpreter may become necessary at a Deaf inmate's request include:

- educational programming;

- work programming; and

8

- other communications that are complex or lengthy.

VDOC will be responsible for scheduling and overseeing the provision of Qualified Interpreters.

### C. Other Means of Communication

#### 1. *General policy*

VDOC agrees that at all times VDOC employees will continue to attempt to communicate with Deaf inmates for such purposes and to the same extent, as they would communicate with the individuals but for their disability, using all available means of communication. This provision in no way lessens VDOC's obligation to provide Qualified Interpreters in certain situations and in a timely manner.

#### 2. *Video Remote Interpreting (VRI)*

VDOC shall provide access to and have available for, emergency situations and as necessary, on-demand video remote interpreting which comports with the following standards at all facilities at which Deaf inmates are incarcerated:

- high quality, clear, delay-free full-motion video and audio over a high-speed Internet connection;

- a clear, sufficiently large, and sharply delineated picture of the interpreter's and the Deaf individual's heads, arms, hands, and fingers, regardless of the body position of the Deaf individual;

- voices being transmitted are clear and easily understood, and

- operation is uncomplicated and easily accomplished by non-technicians.

VDOC shall implement VRI within three months of the Effective Date of this Agreement.

#### 3. *Written Notes*

VDOC Employees will receive training with respect to communications difficulties Deaf inmates have. The training will include advising the VDOC Employees that note writing may be the only immediate form of communication available to a Deaf inmate, and that VDOC Employees are expected to respond to a Deaf inmate in writing where that is the best present means of communication, to the same extent they would make a verbal response in a similar situation involving a non-Deaf inmate. Where circumstances make a written response impractical at the time, training will instruct that the VDOC Employee should attempt to follow up with the Deaf inmate as time later permits.

9

### D.    Onsite Medical Care

#### 1.    *General Policy*

VDOC will provide Qualified Interpreters for all scheduled appointments between Deaf inmates and medical personnel at VDOC facilities, including, but not limited to, review of medical history, medical appointments, follow up meetings or appointments, and treatment meetings.

#### 2.    *Informing Appropriate Medical Staff*

The VDOC employee responsible for coordinating Auxiliary Aids and Services for Deaf inmates at the facility at which a Deaf inmate is incarcerated, will ensure that Medical staff is aware that the inmate is deaf, if such classification has not already been performed by the Medical Staff at that facility. For each Deaf inmate, the Medical staff will note on the medical file cover in bold marking and in the inmate's medical file, the inmate's disability.

#### 3.    *Scheduling Medical Appointments with Interpreters*

The Medical Director in conjunction with facility staff, will schedule all medical appointments requiring Qualified Interpreters and will contact the IS Providers to arrange for interpreting services as necessary. Appointments for Deaf inmates will be scheduled within the same time period from the initial request as those for other inmates.

#### 4.    *Emergency Events*

VDOC will provide a VRI Qualified Interpreter for use in unscheduled medical emergencies. If remote interpreting services are not appropriate in the situation, VDOC personnel will work in conjunction with medical staff to attempt to secure an in-person Qualified Interpreter as soon as possible. Life saving medical care should never be delayed because no interpretation services are available.

For the following categories of Deaf inmates, a VRI Qualified Interpreter may not provide effective communication, and an in-person Qualified Interpreter may be the most appropriate auxiliary aid or interpretive service:

- Deaf inmates who have limited ability to move their heads, hands, or arms; vision problems; cognitive or consciousness issues; or pain issues;

- Deaf inmates who must be moved to areas of the VDOC facility that do not have a designated high speed Internet line; and

- Deaf inmates who will be treated in rooms where space considerations mitigate against using the service.

10

E.    **Offsite Medical Care**

VDOC will inform all offsite medical providers that a Deaf inmate requiring a Qualified Interpreter or other Auxiliary Aid or Service will be seeking medical care offsite as soon as possible.

In the case of an emergency, VDOC will inform an offsite medical provider that a Deaf inmate requiring an in-person Qualified Interpreter or other Auxiliary Aid or Service is being transported to the offsite care provider. VDOC will notify the offsite medical care provider as soon as possible. Notification will include the estimated time of arrival.

F.    **Educational, Vocational and Rehabilitative Programming**

VDOC shall provide appropriate Auxiliary Aids and Services for all programs offered at VDOC facilities in which Deaf inmates are qualified, admitted into, and are actively participating in. When the Schedule of Accommodations referenced in Section IV.B changes, including when a Qualified Interpreter will be available, an updated Schedule of Accommodations will be given to all Deaf inmates.

The following appropriate Auxiliary Aids and Services will be provided:

1.    *VDCE Adult Basic Education*

The VDOC in conjunction with the Virginia Department of Correctional Education (VDCE) will provide Deaf inmates with written materials and open or closed-captioned educational materials where available. In addition, and as necessary, VDOC and VDCE will provide a Qualified Interpreter to interpret Adult Basic Education classes. The determination of what form of Auxiliary Aids and Services is appropriate will depend on a request by the Deaf inmate for such services and any input by the Instructor of the class.

2.    *VDCE Community College Courses*

The VDOC in conjunction with VDCE, will provide Deaf inmates with written materials and open or closed captioned educational materials where available. In addition, and as necessary, VDOC and VDCE will provide a Qualified Interpreter to interpret Community College classes. The determination of what form of Auxiliary Aids and Services is appropriate will depend on a request by the Deaf inmate for such services and any input by the Instructor of the class.

3.    *Vocational Programs*

VDOC, in conjunction with VDCE, will provide a Qualified Interpreter for Vocational Programs on an as needed basis.

4.    *VDOC Correctional Enterprises Programs*

VDOC will provide a Qualified Interpreter for Correctional Enterprises Programs and meetings on an as needed basis.

5.    *VDOC Rehabilitative Programs*

The VDOC will provide Deaf inmates with written materials and open or closed-captioned materials where available. In addition, and as necessary, VDOC will provide a Qualified Interpreter to interpret Rehabilitative programs. The determination to provide a Qualified Interpreter will depend on a request by the Deaf inmate for such services. Rehabilitative programs include such things as anger management classes, parenting classes, sex-offender classes, mandatory pre-release life skills classes, and other similar programs. The determination of what form of Auxiliary Aids and Services is appropriate will depend on a request by the Deaf inmate for such services and any input by the Instructor of the class.

VDOC will offer sign-language instruction to any inmate who becomes deaf after incarceration if such instruction is ordered by a medical professional or other expert employed or retained by VDOC.

**G.    Work Assignments**

VDOC will provide opportunities for institutional work assignments that are consistent with the opportunities for the same assignments given to similarly situated non-Deaf inmates. VDOC retains the discretion to determine that certain work assignments present a Direct Threat of injury or death to Deaf inmates and may therefore choose not to provide Deaf inmates substantially equal opportunities to those work assignments.

**H.    Religious Services**

VDOC shall allow and encourage outside volunteers to provide religious services accessible to Deaf inmates without regard to a volunteer's hearing ability as long as the volunteer meets the same security requirements that are imposed on all other outside volunteers.

No deaf offender will be required to attend a religious service where an interpreter is not provided in order to receive any religious meal, diet, or otherwise offered religious accommodation.

**I.    Transfer and Classification Matters**

VDOC will provide a Qualified Interpreter for any hearings or meetings relating to an inmate's transfer to another facility or change in security classification or any other classification hearing involving the exchange of information between the Deaf inmate and VDOC personnel that could affect the inmate's status.

J.    **Transitional Programming — Post-Release Supervision (Including Parole)**

VDOC will provide Effective Communication for all Community Corrections supervised post-release programs and activities.  For lengthy or important communications, Effective Communication requires an in person interpreter or VRI.

## VII. ADDITIONAL COMMUNICATIONS

VDOC will provide in person or VRI interpreting for any significant communication between inmates and staff that is not specifically discussed in this Agreement.  A significant communication includes a communication for which the inmate requests an interpreter, subject to approval by the designated person responsible for coordinating Auxiliary Aids and Services.

## VIII. DISCIPLINARY MATTERS

A.    **Qualified Interpreters For Disciplinary Proceedings**

VDOC must provide Deaf inmates with a Qualified Interpreter in any disciplinary proceedings in which that Deaf inmate is a suspect or charged, and which is carried out under Operating Procedure 861 (Offender Discipline) or any replacement or supplemental disciplinary policies and procedures now in force or subsequently adopted by VDOC. A Qualified Interpreter must be available to the Deaf Inmate at the following stages of the above-described disciplinary proceedings:

- Staff investigations involving the exchange of information between the Deaf Inmate suspect and VDOC personnel, prior to filing a Disciplinary Offense Report or equivalent;

- Investigative interviews that involve the exchange of information between a Deaf inmate and VDOC personnel (such as when an adverse party is interviewed);

- Preparation of the Disciplinary Offense Report by the Reporting Officer which involves the exchange of information between the Deaf Inmate suspect and VDOC personnel;

- Supervisory Review of the Disciplinary Offense Report which involves the exchange of information between the Deaf Inmate suspect and VDOC personnel;

- During the Advisement of Rights/Service of the Disciplinary Report/Waiver of Hearing/Penalty Offer Process or equivalent proceedings, which involves the exchange of information between the charged Deaf inmate and VDOC personnel;

- During the Hearing, or any Re-Hearing which involves the exchange of information between the charged Deaf inmate and VDOC personnel.

13

Inmate or staff advisors will be provided to charged Deaf inmates on the same terms as they are provided to charged hearing inmates. Access to an advisor shall be the same for charged Deaf inmates as charged non-Deaf inmates. To the extent that a Deaf inmate has access to his advisor, a Qualified interpreter shall be made available to the Deaf inmate for any exchange of information between the Deaf inmate and his advisor.

### B.    Disciplinary Offense Reports

If a Disciplinary Offense Report is filed regarding a Deaf inmate and no Qualified Interpreter was provided to the inmate at the time of the pre-Report investigation or incident that led to the Report, the Officer in Charge shall meet with the Deaf inmate in the presence of a Qualified Interpreter to discuss the Report no less than 24 hours prior to when a Disciplinary Hearing has been scheduled.

### C.    Miscellaneous

If a Deaf inmate is a witness at a disciplinary hearing, VDOC will provide a Qualified Interpreter at the hearing.

VDOC must hold disciplinary hearings for Deaf inmates within the same time frame as it holds disciplinary hearings for non-Deaf inmates.

Nothing precludes a Deaf Inmate who is a suspect or charged with a disciplinary offense, from voluntarily waiving his right to a Qualified Interpreter and to proceed through any stage of a disciplinary proceeding without the benefits of a Qualified Interpreter. Nor shall failure of the VDOC to provide a Qualified Interpreter in and of itself constitute a sufficient basis for the charged Deaf Inmate to reverse or overturn any disciplinary sanction. However, if a deaf offender did not waive his right to a Qualified Interpreter the disciplinary hearing must be re-heard at a time that an interpreter can be present.

## IX.  VISUAL ALERT NOTIFICATIONS

### A.    General Policy

Deaf inmates incarcerated at VDOC state correctional facilities should not miss announcements, alarms, or any other auditory information from VDOC staff to the general inmate population solely because of their disability.

### B.    Relaying Information

VDOC shall provide an effective visual notification system that will notify Deaf inmates of prison wide events and events specific to Deaf inmates. VDOC has the discretion as to which type of notification system it shall employ, and to change that system, as it deems necessary.

14

## C. Visual Alarms and Emergency Evacuation

VDOC will provide Deaf Inmates with an effective visual notification system which will advise them of an emergency evacuation or other emergency. VDOC has the discretion as to which type of notification system it shall employ, and to change that system, as it deems necessary.

VDOC personnel shall be responsible for the evacuation of Deaf inmates during an emergency.

## X. TELECOMMUNICATION DEVICES

### A. General Policy

VDOC will provide Deaf inmates in its custody with telecommunication devices so that they will have access to communication with people outside of VDOC that is substantially on the same basis as the access to telecommunication VDOC provides inmates who are not Deaf.

### B. Monitoring Communications

VDOC may provide for the monitoring of communications between Deaf inmates and individuals outside of VDOC to the same extent and with the same discretion applied to the monitoring of communications between non-Deaf inmates and those outside of VDOC.

### C. Additional Time for Communication

VDOC agrees that "equal access" may necessitate access that sometimes appears to be greater access. VDOC will implement a policy that allows Deaf inmates at least twice as many minutes to complete a TTY call as the number of minutes afforded other non-Deaf inmates to make regular phone calls.

### D. Technology VDOC Will Provide

VDOC will make the following communication technologies available at its facilities where Deaf inmates are incarcerated to facilitate communication between Deaf inmates and people outside of VDOC facilities.

This list of technological equipment is not exhaustive. VDOC agrees to keep abreast of evolving technology and to consider adding additional equipment to reflect technological advances, as it deems appropriate.

VDOC state correctional facilities housing Deaf inmates will share a list of communications equipment available to Deaf inmates upon their arrival at the facility.

15

1.    *TTY (teletypewriter)*

At every VDOC state correctional facility at which a Deaf inmate is incarcerated, VDOC shall provide at least one TTY in the telephone bank of each housing unit where any Deaf inmates are housed.  At each facility where a Deaf inmate is incarcerated, VDOC shall keep an additional portable TTY unit for use when the regular TTY is broken or otherwise unavailable.

2.    *Relay Services*

VDOC will enable all TTYs to access publicly available relay service phone numbers such as 711 and local 1 800 numbers.  Inmates will not be charged any more than they currently are for the use of relay services.

3.    *Videophones*

VDOC will allow Deaf inmates access to Videophone technology.  Access to the Videophone will be made available at times that VDOC will designate.  Those times may not be of equal length as access to the TTY.  Subject to security concerns such as institutional lockdowns, the videophone generally will be made available during normal business hours.  Normal business hours shall mean 8:30 a.m. – 5:00 p.m. Monday through Friday, excluding holidays.  VDOC will also accommodate requests by Deaf inmates to use the videophone during nights and weekends to the best of its ability.

VDOC will enable all Videophones to access publicly available relay service phone numbers such as 711 and local 1 800 numbers.  Videophones will allow voice carry-over relay.

On an annual basis, VDOC will reevaluate the hours during which access to the Videophones are permitted to determine whether, based on actual usage, weekday, weeknight, or weekend time should be modified.  VDOC will continue to investigate means by which Videophones will be made available during the same times as regular telephones.

### E.    Responsibility for Maintaining Equipment and Training Staff

VDOC shall ensure that the technology used to permit communication between Deaf inmates and people outside of VDOC facilities is in working order.  VDOC staff shall attempt to resolve complaints about any malfunctioning equipment within a reasonable time of receiving that complaint.  VDOC will also ensure that designated staff members are adequately trained in the operation of the technology.

## XI. MEDIA

VDOC will ensure that all audio-visual media purchased for inmate use in VDOC facilities housing Deaf inmates includes open or closed captioning.

16

Televisions which are purchased by VDOC for inmate use shall support open or closed captioning, and that captioning may be turned on at a Deaf inmate's request.

VDOC will permit Deaf inmates to purchase TV's which reliably support open or closed captioning with their own funds. In the event that the closed captioning feature contained on TVs purchased through the facility Commissary malfunctions, VDOC personnel will work with the Deaf inmate to address and resolve the problem.

## XII. HAND RESTRAINTS

### A.    Off-site Medical Care

VDOC will implement an operating procedure relating to the handcuffing of Deaf inmates that will, whenever possible, permit Deaf inmates to use their hands for effective communication. That procedure will permit VDOC personnel to consider the needs of a Deaf inmate to use his or her hands for Effective Communication purposes. That procedure will also permit VDOC to consider the use of alternative restraints, such as a stun-belt, in lieu of handcuffs that restrain the hands in a way that prevents Effective Communication. VDOC shall have the ultimate authority relating to decisions about the use/non-use of hand restraints, and whether to keep a Deaf inmate shackled or unshackled. VDOC will vest responsibility for safety and security determinations with a supervisor and not the escorting officer.

### B.    On-site Medical Care

If a Deaf inmate is permitted to see medical personnel, at a time when for behavioral reasons, his or her hands have been restrained, VDOC personnel will consider the needs of the Deaf inmate to use his or her hands for Effective Communication purposes. VDOC personnel will also consider the use of alternative restraints, such as a stun-belt, in lieu of handcuffs that restrain the hands in a way that prevents Effective Communication. VDOC shall have the ultimate authority relating to decisions about the use/non-use of hand restraints, and whether to keep a Deaf inmate shackled or unshackled. VDOC will vest responsibility for safety and security determinations with a supervisor and not the escorting officer.

### C.    On-site Other Circumstances

If a Deaf inmate is being moved about a facility for any other purpose, at a time when for behavioral reasons, his hands have been restrained, VDOC personnel will consider the needs of the Deaf inmate to use his or her hands for Effective Communication purposes. VDOC personnel will also consider the use of alternative restraints, such as a stun-belt, in lieu of handcuffs that restrain the hands in a way that prevents Effective Communication. VDOC shall have the ultimate authority relating to decisions about the use/non-use of hand restraints, and whether to keep a Deaf inmate shackled or unshackled. VDOC will vest responsibility for safety and security determinations with a supervisor.

17

## XIII.   MISCELLANEOUS AUXILIARY DEVICES

Where devices such as vibrating clocks and in-line amplifiers are not deemed medically necessary, VDOC agrees to consider on a case by case basis, whether it will allow a particular Deaf inmate the opportunity to purchase these devices at his or her own expense.  VDOC's decision in this regard will also consider whether these devices pose a security risk.  VDOC shall have the discretion to make the determination whether any of these devices, and the type of device, is permissible.  VDOC agrees to allow Deaf inmates to purchase headphones, in-line amplifiers/equalizers, and televisions that meet the particular needs of their disability from an approved vendor so long as the items do not pose a security risk.  VDOC retains the discretion to limit purchases to devices available through the Commissary.  Deaf inmates may submit a request in writing to the ADA Coordinator requesting devices not available from the Commissary.  VDOC will not deny a Deaf inmate the right to purchase these devices except where they present a documentable security risk.  The ADA Coordinator will maintain records of all Deaf inmate requests for these devices and the outcome of the request.

## XIV.   TRAINING

### A.   General Policy

VDOC, in conjunction with the VDDHH will provide training as defined in Section XIV.B below to all VDOC employees, as defined in this Agreement.  VDOC and VDDHH will begin providing this training within three months of the Effective Date of this Agreement, and no less than annually thereafter.  VDOC will incorporate this training into its regularly scheduled training for new and existing employees.  VDOC may provide this training using in-person training, or via recorded training.  VDOC will update the training materials as required by law. VDOC agrees to provide any materials that may be used for training to the Washington Lawyers' Committee for Civil Rights and Urban Affairs prior to the first training session for review and input.  All such input will be considered in good faith.

### B.   VDOC Employees

Within three months of the Effective Date of this Agreement, VDOC in conjunction with VDDHH will begin training VDOC employees as that term is defined in this Agreement. Training will include the following topics:

- best practices in communicating with Deaf individuals;

- the unique needs and problems encountered by Deaf and late-Deafened individuals;

- identification of communication needs of persons who are Deaf;

- the psychological implications of Deafness and its relationship to interaction with hearing corrections personnel;

18

- the proper use and role of Qualified Interpreters;

- directions about using TTYs, TDDs, Videophones and other equipment currently available at the facility, which facilitates communication with Deaf people; and

- disciplinary matters, described in Section VIII, and grievance proceedings, described in Section XV.

## XV. GRIEVANCES

The ADA Coordinator will review all grievances submitted by Deaf inmates, and responses given to Deaf inmates, whether the grievance is terminated favorably, or unfavorably to the Deaf inmate, to ensure compliance with this Agreement.

ADA Coordinator review under this section is not a part of the VDOC Inmate Grievance Procedure.

## XVI.   MONITORING AND COMPLIANCE

### A.      VDDHH Investigation

VDOC will permit, on a semi-annual basis, and for a five-year period following the execution of this Agreement, VDDHH access to each facility in which Deaf Inmates are housed, to conduct an investigation to determine VDOC personnel's treatment of Deaf inmates.  During this investigation, VDOC will permit VDDHH (1) access to Deaf inmates who are willing to meet with them; (2) access to any Grievances that a Deaf inmate made during the preceding twelve-months, provided the Deaf inmate consents to such disclosure; (3) access to any medical records made during the preceding twelve-months, provided the Deaf inmate consents to such disclosure; (4) access to any non-security logs or other business records which VDOC keeps in the regular course of its business relating to Deaf inmates generally or any given Deaf inmate in particular prepared during the prior twelve month period; and (5) access to equipment provided to or for use by Deaf inmates.

### B.      Plaintiffs' Counsel Investigation

To the extent Plaintiffs' Counsel maintains a current attorney-client relationship with any Deaf inmate, they shall be provided the same access to that client and to the records relating to that client, as any other attorney with a similar relationship to another non-Deaf VDOC inmate.

In addition, and regardless of whether an Attorney-Client relationship exists, on an annual basis for a two-year period following the execution of this Agreement, Plaintiffs' Counsel shall have access to each facility in which Deaf inmates are housed to conduct an investigation to determine VDOC personnel's treatment of Deaf inmates.  During this investigation, VDOC will permit Plaintiffs' Counsel (1) access to Deaf inmates who are willing to meet with them; (2) access to

any Grievances that a Deaf inmate made during the preceding twelve months, provided the Deaf inmate consents to such disclosure; (3) access to any medical records made during the preceding twelve-months, provided the Deaf inmate consents to such disclosure; (4) access to any non-security logs or other business records which VDOC keeps in the regular course of its business relating to Deaf inmates generally or any given Deaf inmate in particular prepared during the prior twelve month period; and (5) access to equipment provided to or for use by Deaf inmates.

## XVII. NOTICE TO CURRENT INMATES OF AGREEMENT.

Within 30 days of the Effective Date of this Agreement, VDOC will deliver a copy of this Agreement and a notice to each non-Plaintiff Deaf inmate in its custody. The notice will inform the Deaf inmate of his or her rights under this Agreement to accept a monetary payment as set out in this Agreement in exchange for a release as outlined in Section XVIII.A of this Agreement.

## XVIII. RELEASE AND SETTLEMENT OF CLAIMS

### A.    Release

In consideration of the representations, promises and agreements set forth herein, including the payments as set forth in this Agreement, the sufficiency of which is hereby acknowledged, the Plaintiffs, and any Deaf inmate who accepts a payment under this Agreement and executes a full and complete release, on their behalf and on behalf of their representatives, assignees, heirs, executors, family members, beneficiaries, administrators, successors, and anyone acting, or claiming to act on their behalf, hereby releases and forever discharges the Commonwealth of Virginia, its agencies, employees, agents, officials, and their representative, including but not limited to VDOC and VDCE, from any and all claims and causes of action, known and unknown, asserted and unasserted, direct and indirect, and of any kind, nature or description whatsoever, which they had on or before the date of the execution of this Agreement arising out of the facts set forth in the discrimination charge they filed with the U.S. District Court for the Eastern District of Virginia, Alexandria Division, except for the claim for an interpreter for weekly religious services at Powhatan Correctional Center brought by plaintiff Larry More.

### B.    Dismissal

The plaintiffs agree to dismiss with prejudice all claims of the Amended Complaint filed with the U.S. District Court, Eastern District of Virginia, Alexandria Division, Case Number 1:10-cv-96, except for the claim for an interpreter for weekly religious services at Powhatan Correctional Center brought by plaintiff Larry More, which the parties agree to dismiss without prejudice. The parties agree that, if a claim for an interpreter for weekly religious services at Powhatan Correctional Center is brought by Larry More in the future, the Defendants will not raise the defense of lack of exhaustion.

The parties agree that the Eastern District of Virginia shall retain jurisdiction over this settlement contract as set out in Subsection E of this Section.

### C.    Attorneys' Fees, Costs, Disbursements and Expenses

In settlement of all of Plaintiffs' claims arising out of their encounters with VDOC and VDCE up to and including the Effective Date, including any claims for attorney fees and costs, any disbursements and expenses, including experts fees incurred on behalf of Plaintiffs in this litigation, the parties agree that within sixty days of the Effective Date of this Agreement, VDOC shall pay plaintiffs' counsel $248,476.21.

Counsel who brings an enforcement action on behalf of a Deaf inmate pursuant to Subsection E in this Section, and who obtains a judgment against VDOC or VDCE, will only be entitled to attorneys fees starting from the date of the filing of the enforcement action, and only at an hourly rate limited to 150% of the hourly rate established under 18 U.S.C.S. § 3006A, regardless of jurisdiction of the suit.

### D.    Damages

Within sixty days of the Effective Date of this Agreement, VDOC shall pay each named plaintiff $750 in damages, provided each plaintiff shall execute a full and complete release of all claims. VDOC also agrees to pay within sixty days of the Effective Date of this Agreement all other Deaf inmates incarcerated in a VDOC facility, as of the date of this Agreement, the sum of $250 in damages, provided any Deaf inmate accepting this sum, executes a full and complete release as outlined in Section XVIII.A.  A list of currently incarcerated Deaf inmates is attached, and acknowledged by the parties to be full and complete.

### E.    Enforcement Powers

Only named Plaintiffs or Deaf inmates who are incarcerated in a VDOC facility as of the date of this Agreement, and who have received a payment for damages and executed a full and complete release of claims in this case, can maintain an action for breach of this Agreement, no other person shall be considered a third-party beneficiary of this Agreement.

1.      Pursuant to 18 U.S.C. §3626(c)(2), during the term of the Agreement, plaintiffs may move the court for reinstatement of the lawsuit, or may elect to proceed in state court and seek specific performance or institute an action for breach subject to notification as set forth in paragraph 2 of this Subsection.  An action to enforce this Agreement does not include any action for damages.  A Deaf inmate seeking to enforce this Agreement in state court can only seek to have a court order VDOC or VDCE to comply with the terms of this Agreement.

2.      The lawsuit may not be reinstated, nor a claim for breach or specific performance of this Agreement brought, before the Deaf inmate first notifies VDOC or VDCE of the nature of the alleged material non-compliance, and gives VDOC or VDCE 60 days to investigate and/or cure

21

the alleged breach.  The parties agree to non-binding mediation prior to any plaintiff moving to reinstate the lawsuit or filing an enforcement action in state court.

## XIX.   MISCELLANEOUS PROVISIONS

### A.     Non-Admission

It is understood and agreed that this Agreement is a compromise of a disputed claim, facts, and allegations.  Nothing in this Agreement constitutes an admission of any liability, wrongdoing, or violation of any law, or the admission of the validity of any defense.

### B.     Private Settlement Agreement

This Agreement is a private settlement agreement within the meaning of 18 U.S.C. § 3626.

### C.     Confidentiality

No part of this Agreement is or will be considered confidential by the parties.  This Agreement will be made available by request under the Freedom of Information Act.

### D.     Entire Agreement

This Agreement constitutes the entire Agreement between the parties.  There were no inducements or representations leading to the execution of this document, except as stated within the document itself.  The terms of this Agreement are contractual in nature.

### E.     Binding

This Agreement is final and binding on the Parties, and any Deaf inmate who receives payment for damages and executes a full and complete release, including all principals, agents, executors, administrators, representatives, successors in interest, beneficiaries, assigns, heirs, and legal representatives thereof.  Each Party has a duty to so inform any such successor in interest.

### F.     Non-Waiver

Failure by the plaintiffs or any Deaf inmate who receives payment for damages and executed a full and complete release to seek enforcement of this Agreement pursuant to its terms with respect to any instance or provision will not be construed as a waiver to such enforcement with regard to other instances or provisions.

### G.     Severability

In the event that a court determines that any provision of this Agreement is unenforceable, such provision will be severed from this Agreement and all other provisions will remain valid and enforceable, provided however that if the severance of any such provision materially alters the

22

rights or obligations of the Parties hereunder, the Parties will attempt, through reasonable, good faith negotiations, to agree upon such other amendments to this Agreement as may be necessary to restore the Parties as closely as possible to the relative rights and obligations initially intended by them hereunder.

**H.    Term of Agreement**

This Agreement shall remain in effect for 5 years from the Effective Date.

Signed:

_____
Virginia Department of Corrections
_____10/18/10_____
Date

see page 23b
_____
Tony Branch
_____
Date

_____
Ronald Roman
_____10/13/10_____
Date

_____
Delonte Tinsley
____10/13/10____
Date

_____
Attorney for Plaintiffs
_____10/26/2010_____
Date

_____
Gary Minnis
_____10/13/10_____
Date

_____
David Richardson
_____10-13-10_____
Date

_____
Larry Moore
_____10/13/10_____
Date

23

Vernon Buggs
Printed Name

Vernon Buggs
Signature

10/13/10
Date
************************************

Michael F. Branham
Printed Name

Michael Branham
Signature

10/13/10
Date
************************************

Russell Grimsley
Printed Name

Russell Grimsley
Signature

10/13/10
Date
************************************

Derrick R. White
Printed Name

Derrick R. White
Signature

Date 10·13·10
************************************

John C Farley
Printed Name

John C. Farley
Signature

Oct 13, 10
Date
************************************

Francis K. Cuffy
Printed Name

Francis K. Cuffy
Signature

10.13.10
Date
************************************

23a

Jason Paul Smith #1008180
Printed Name

Printed Name   Anthony Neal Person

_Jason P Smith_
Signature

_Anthony Neal Person_
Signature

10/13/10
Date
*****************************

10/13/10
Date
*****************************

Wesley Whal Jr
Printed Name

Daniel Otten #1403242
Printed Name

_Wesley Whal_
Signature

Signature

10.13.10
Date
*****************************

10-13-10
Date
*****************************

JERRY OWENS
Printed Name

Tony Branch
Printed Name

_Jerry Owens_
Signature

_Tony Branch_
Signature

10-13-10
Date
*****************************

Oct-18-10
Date
*****************************

23b

# Table of Contents

I.     DEFINITIONS ................................................................................................................. 1

II.    GENERAL POLICIES ........................................................................................................ 3

    A.   Non-discrimination Based on Disability ............................................................. 3
    B.   ADA Coordinator and Auxiliary Aids and Services Designees ............................ 3

III.   INITIAL CLASSIFICATION, ASSESSMENT, AND ASSIGNMENT ...................................... 4

    A.   General Policy .................................................................................................... 4
    B.   Hearing Assessment .......................................................................................... 4
    C.   Auxiliary Aids and Services Assessment ............................................................. 4
    D.   Ensuring Staff Awareness Through Identification Cards ..................................... 4
    E.   Interpretation of Written Materials ................................................................... 5
    F.   Creation and Interpretation of Rights Materials ............................................... 5
    G.   Continuation of Provision of Auxiliary Aids and Services ................................... 6
    H.   Subsequent Need for Accommodations ............................................................. 6

IV.    HOUSING ....................................................................................................................... 6

    A.   General Policy .................................................................................................... 6
    B.   Schedule of Accommodations ............................................................................ 6

V.     PROVISION OF AUXILIARY AIDS AND SERVICES ........................................................... 7

    A.   General Policy .................................................................................................... 7
    B.   Medical Devices ................................................................................................. 7
    C.   Maintenance of Auxiliary Aids and Services ....................................................... 8

VI.    QUALIFIED SIGN LANGUAGE INTERPRETERS ............................................................... 8

    A.   Contracts ........................................................................................................... 8
    B.   General Policy .................................................................................................... 8
    C.   Other Means of Communication ........................................................................ 9
        1.   General policy ............................................................................................. 9
        2.   Video Remote Interpreting (VRI) ............................................................... 9
        3.   Written Notes ............................................................................................. 9
    D.   Onsite Medical Care .......................................................................................... 10
        1.   General Policy ............................................................................................. 10
        2.   Informing Appropriate Medical Staff ......................................................... 10
        3.   Scheduling Medical Appointments with Interpreters ................................. 10
        4.   Emergency Events ...................................................................................... 10
    E.   Offsite Medical Care .......................................................................................... 11
    F.   Educational, Vocational and Rehabilitative Programming .................................. 11
        1.   VDCE Adult Basic Education ....................................................................... 11
        2.   VDCE Community College Courses ............................................................. 11
        3.   Vocational Programs ................................................................................... 11
        4.   VDOC Correctional Enterprises Programs .................................................. 12
        5.   VDOC Rehabilitative Programs ................................................................... 12
    G.   Work Assignments ............................................................................................. 12
    H.   Religious Services ............................................................................................... 12

| | | |
|---|---|---|
| I. | TRANSFER AND CLASSIFICATION MATTERS | 12 |
| J. | TRANSITIONAL PROGRAMMING — POST-RELEASE SUPERVISION (INCLUDING PAROLE) | 13 |
| **VII.** | **ADDITIONAL COMMUNICATIONS** | **13** |
| **VIII.** | **DISCIPLINARY MATTERS** | **13** |
| A. | QUALIFIED INTERPRETERS FOR DISCIPLINARY PROCEEDINGS | 13 |
| B. | DISCIPLINARY OFFENSE REPORTS | 14 |
| C. | MISCELLANEOUS | 14 |
| **IX.** | **VISUAL ALERT NOTIFICATIONS** | **14** |
| A. | GENERAL POLICY | 14 |
| B. | RELAYING INFORMATION | 14 |
| C. | VISUAL ALARMS AND EMERGENCY EVACUATION | 15 |
| **X.** | **TELECOMMUNICATION DEVICES** | **15** |
| A. | GENERAL POLICY | 15 |
| B. | MONITORING COMMUNICATIONS | 15 |
| C. | ADDITIONAL TIME FOR COMMUNICATION | 15 |
| D. | TECHNOLOGY VDOC WILL PROVIDE | 15 |
| 1. | TTY (teletypewriter) | 16 |
| 2. | Relay Services | 16 |
| 3. | Videophones | 16 |
| E. | RESPONSIBILITY FOR MAINTAINING EQUIPMENT AND TRAINING STAFF | 16 |
| **XI.** | **MEDIA** | **16** |
| **XII.** | **HAND RESTRAINTS** | **17** |
| A. | OFF-SITE MEDICAL CARE | 17 |
| B. | ON-SITE MEDICAL CARE | 17 |
| C. | ON-SITE OTHER CIRCUMSTANCES | 17 |
| **XIII.** | **MISCELLANEOUS AUXILIARY DEVICES** | **18** |
| **XIV.** | **TRAINING** | **18** |
| A. | GENERAL POLICY | 18 |
| B. | VDOC EMPLOYEES | 18 |
| **XV.** | **GRIEVANCES** | **19** |
| **XVI.** | **MONITORING AND COMPLIANCE** | **19** |
| A. | VDDHH INVESTIGATION | 19 |
| B. | PLAINTIFFS' COUNSEL INVESTIGATION | 19 |
| **XVII.** | **NOTICE TO CURRENT INMATES OF AGREEMENT** | **20** |
| **XVIII.** | **RELEASE AND SETTLEMENT OF CLAIMS** | **20** |
| A. | RELEASE | 20 |
| B. | DISMISSAL | 20 |
| C. | ATTORNEYS' FEES, COSTS, DISBURSEMENTS AND EXPENSES | 21 |
| D. | DAMAGES | 21 |

25

E.   ENFORCEMENT POWERS ................................................................................................................... 21

XIX.  **MISCELLANEOUS PROVISIONS** ............................................................................................. **22**

A.   NON-ADMISSION ...................................................................................................................... 22
B.   PRIVATE SETTLEMENT AGREEMENT .............................................................................................. 22
C.   CONFIDENTIALITY ..................................................................................................................... 22
D.   ENTIRE AGREEMENT .................................................................................................................. 22
E.   BINDING ................................................................................................................................. 22
F.   NON-WAIVER ........................................................................................................................... 22
G.   SEVERABILITY ........................................................................................................................... 22
H.   TERM OF AGREEMENT ................................................................................................................ 23

**Settlement Agreement**

## I. DEFINITIONS

1. "Auxiliary Aids and Services" include, but are not limited to, "Qualified Interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments," 42 U.S.C. § 12103, such as hearing aids, computer-aided transcription services, assistive listening systems, closed caption decoders, open and close captioning, TDDs, TTYs, videotext displays, written materials, 28 C.F.R. § 35.104, as well as Videophones, access to telephone relay services, and visual alert or alarm systems. For purposes of this agreement, Auxiliary Aids and Services does not include vibrating clocks or in-line amplifiers meaning VDOC will not automatically provide or pay for such devices.

2. "Deaf" persons means individuals who are unable to hear well enough to rely on their hearing as a means of processing information and who rely on Auxiliary Aids and Services to Effectively Communicate and who qualify as individuals with disabilities under the Americans with Disabilities Act as amended by the ADA Amendments Act of 2008. *See* 42 U.S.C. § 12102(4); P.L. 110-325. All inmates listed in Ex. A are Deaf persons. Inmates whose hearing is corrected by hearing aids so that they can understand the spoken word and communicate orally are not covered by this Agreement.

3. "Direct Threat" means a significant risk to the health or safety of the Deaf Inmate or others that cannot be reduced or eliminated by reasonable accommodation. A finding of Direct Threat must be based on and supported by objective evidence.

4. "Effective Communication" means communication with Deaf inmates that is substantially as effective as communication with the general inmate population, 28 C.F.R. § 35.160(a), and will, when necessary, include the provision of appropriate Auxiliary Aids and Services, such as Qualified Interpreters. Effective Communication affords an inmate who is Deaf an opportunity to participate in, and enjoy the benefits of, VDOC's services, programs, or activities that is substantially equal to that enjoyed by a similarly situated inmate who is not Deaf.

5. "Effective Date" means October 13, 2010.

6. "Offsite Medical Care" means medical care that is provided at a location not owned or operated by VDOC.

7. "Onsite Medical Care" means medical care that is provided at a VDOC facility, including medical care provided by third parties in facilities owned or operated by VDOC.

1



EXHIBIT F

8. "Qualified Interpreter" means a person who is able to interpret effectively, accurately, and impartially, both receptively and expressively, with the individual Deaf inmate using any necessary specialized vocabulary. A Qualified Interpreter could include an ASL interpreter, a sign language interpreter using more English based signs, an oral interpreter, a cued speech transliterator or a tactile interpreter for a person who is Deaf/blind. For sign language interpreters, a Qualified Interpreter is one who holds one or more of the following current, valid certifications:

- Registry of Interpreters for the Deaf Certification as a CI/CT, CSC, MCSC, OTC, CDI or RSC;

- National Association of the Deaf (NAD) Certification Level 3, 4, or 5;

- NAD/RID National Interpreter Certification NIC, NIC Advanced or NIC Master

- A cued speech transliterator will be certified by the Cued Language Transliterator National Certification Examination.

A Qualified Interpreter may be provided by VDOC either in person, via video remote interpreting (VRI) or videoconferencing or other similar means.

The parties agree that future certifications that are the equivalent of these certifications will be considered valid minimum certification, so long as those certifications are kept current.

9. "TTYs" or "TDDs" means devices that are used with a telephone to communicate with persons who are Deaf or hard of hearing by typing and reading communications.

10. "VDOC employees," "VDOC staff," "VDOC personnel" include all employees, agents, and other staff of the Virginia Department of Corrections (VDOC) whose job responsibilities places them on a regular basis in contact with Deaf inmates, and the immediate supervisors of those employees, agents, or other staff.

11. "Video Remote Interpreting" (VRI) means video interpreting accomplished by use of video conference technology over high-speed internet lines.

12. "Videophone" means a telephone with a camera and screen for visual, real-time communications.

13. "VDDHH" means the Virginia Department of the Deaf and Hard of Hearing.

14. "VDOC" means Virginia Department of Corrections.

2

## II.   GENERAL POLICIES

### A.   Non-discrimination Based on Disability

VDOC will ensure that Deaf inmates in its custody in state correctional facilities or under post-release supervision by Community Corrections have full and equal enjoyment of its services, privileges, facilities, advantages, and accommodations as non-Deaf inmates similarly situated. VDOC shall provide Deaf inmates with access to services, privileges, facilities, advantages, and accommodations substantially equivalent to those offered to other non-Deaf inmates similarly situated who are in its custody in state correctional facilities or under post-release supervision by Community Corrections. VDOC retains the discretion to determine that certain activities present a Direct Threat of injury or death to Deaf inmates and may therefore choose not to provide such Deaf inmates substantially equal enjoyment of some of its services, privileges, facilities, advantages, and accommodations.

### B.   ADA Coordinator and Auxiliary Aids and Services Designees

VDOC has designated an ADA Coordinator and will maintain the ADA Coordinator position as required by law. The VDOC agrees that the ADA Coordinator shall be trained and knowledgeable concerning the requirements of federal and state law regarding VDOC's obligations to provide full and equal enjoyment of its services, privileges, facilities, advantages, accommodations to Deaf inmates, and the contents of this Agreement.

VDOC will notify counsel for the plaintiffs of the ADA Coordinator designee. The name and contact information for the ADA Coordinator will be kept updated on the VDOC website. The ADA Coordinator's name and contact information will also be posted in a secure area in any housing unit in which Deaf inmates are held.

Within thirty days of the Effective Date of this Agreement, VDOC will designate individuals at each facility where Deaf inmates are held and at any Probation and Parole Office where any Deaf former inmate is actively on post-release supervision, who will be responsible for coordinating and overseeing Auxiliary Aids and Services for Deaf individuals and for implementing this Agreement. These designees will be familiar with and knowledgeable concerning the contents of this Agreement, and responsible for implementing this Agreement. These designees, who are located at a state correctional facility, with the assistance of a Qualified Interpreter, will aid in the initial intake of all Deaf inmates.

VDOC agrees to train all Watch Commanders on the procedures necessary to satisfy this Agreement.

VDOC agrees that Deaf inmates will be given the opportunity to meet with the Warden or Assistant Warden of Operations at least quarterly. At these meetings Deaf inmates will have the opportunity, with a Qualified Interpreter, to discuss issues of importance to their community.

3

## III.  INITIAL CLASSIFICATION, ASSESSMENT, AND ASSIGNMENT

### A.    General Policy

VDOC will provide a Deaf inmate at a Reception and Classification Center with access to Qualified Interpreters. The purpose of this interpreter is to assist the Deaf inmate with medical, psychological, and educational testing and evaluation, and to help provide an explanation of prison policies and procedures, to include DOP 861—Inmate Discipline, DOP 866—Offender Grievances, and how to utilize the TTY, Videophone and other Auxiliary Aids and Services.

For male inmates, the Reception and Classification Center is Powhatan Reception and Classification Center (PCC). For female inmates, the Reception and Classification Center is Fluvanna Reception and Classification Center (FCC).

### B.    Hearing Assessment

As part of the Initial Classification, Medical staff will assess and if necessary test all inmates for Deafness or hearing impairments who demonstrate either during Initial Classification.

If Medical staff determines that an inmate is Deaf, Medical staff will note the disability in the inmate's institutional file.

### C.    Auxiliary Aids and Services Assessment

After Medical staff determine that an inmate is Deaf, VDOC will presume that Auxiliary Aids and Services in the form of Qualified Interpreters, visual notifications, telecommunication devices, and other aids and services set forth in this Agreement are necessary to ensure substantially equal services, privileges, facilities, advantages, and accommodations.

If a Deaf inmate indicates that he or she does not require any or all of the Auxiliary Aids and Services set forth in this Agreement, he or she will sign a Waiver of Auxiliary Aids and Services and that document will be kept in the inmate's institutional file.

### D.    Ensuring Staff Awareness Through Identification Cards

VDOC will take appropriate steps to ensure that all VDOC personnel having regular contact with a Deaf inmate are made aware of such person's need for Auxiliary Aids and Services so that Effective Communication with such person and the safety of the person will be ensured. Upon identifying an inmate as Deaf during Initial Classification, the inmate will receive a distinct identification (ID) card that clearly identifies him or her as Deaf. The ID card will signify to VDOC personnel that the inmate is Deaf, may not respond to oral commands, and may require Auxiliary Aids and Services. When staff take a Deaf inmate's ID card he or she will be given another indicator of their Deaf status.

4

All staff having regular contact with a Deaf inmate will be trained on the meaning of the distinct ID cards.

VDOC will post at the entrance to all facilities that house Deaf inmates, a notice clearly stating that the facility houses Deaf inmates and that the Deaf inmates carry an ID card with them. The Notice will include a picture of the ID card carried by deaf inmates. The Notice will also be posted outside each housing unit where Deaf inmates are held.

### E.    Interpretation of Written Materials

As of the Effective Date of this Agreement, and upon a Deaf inmate's filling out a Request for Auxiliary Aids and Services form at the facility where the requesting inmate is incarcerated, VDOC, will provide Deaf individuals written materials it provides to all inmates either, and at its discretion:

- in a recorded video sign language interpreted, or otherwise appropriately interpreted, format ("interpreted materials") (If VDOC chooses this option, VDOC would then provide the equipment necessary to view the interpreted materials);

- or by providing a Qualified Interpreter to permit the Deaf inmate to understand the contents of the written materials.

At the request of the Deaf inmate, VDOC will provide that Deaf inmate with the opportunity to meet with a VDOC staff member and a Qualified Interpreter to ask any questions regarding the written or interpreted materials.

### F.    Creation and Interpretation of Rights Materials

VDOC will provide each Deaf inmate with written materials outlining the rights of Deaf inmates, along with the services available to them as guaranteed by this Agreement, the ADA, and Section 504 of the Rehabilitation Act. All currently incarcerated Deaf inmates will also be offered these materials when VDOC begins using them. VDOC will create these written materials using language designed to be accessible to Deaf inmates. VDOC will provide these written materials to Deaf inmates with the orientation materials provided to all other inmates at Initial Classification.

VDOC will provide Deaf inmates with these written materials either:

- in a recorded video sign language interpreted, or otherwise appropriately interpreted, format ("interpreted materials") (If VDOC chooses this option, VDOC would then provide the equipment necessary to view the interpreted materials);

- or by providing a Qualified Interpreter to interpret these written materials to the Deaf inmate.

5

VDOC shall create the Rights Materials and begin using them within three months of the Effective Date of this Agreement.

### G. Continuation of Provision of Auxiliary Aids and Services

After conducting the Initial Classification and documenting an inmate's hearing and Auxiliary Aids and Services assessments in his or her institutional file, VDOC will continue to provide Auxiliary Aids and Services to a Deaf inmate consistent with this Agreement, unless the Deaf inmate affirmatively indicates he or she does not want such services.

### H. Subsequent Need for Accommodations

If an inmate is not found to have a hearing impairment at his or her Initial Classification, initially refuses, or does not request Auxiliary Aids and Services, but later believes that Auxiliary Aids and Services are necessary to ensure Effective Communication, he or she will fill out a Request for Auxiliary Aids and Services form. VDOC will provide the inmate who was initially not found to have a hearing impairment with a hearing assessment if so ordered by medical staff. If that individual is found to be Deaf, VDOC will follow the procedures as set forth in Section III.B-G of this Agreement.

## IV. HOUSING

### A. General Policy

VDOC has determined that it is in the best interests of VDOC and Deaf inmates to be incarcerated in one facility in order to provide them with the most effective Auxiliary Aids and Services. As of the date of this Agreement, VDOC has determined that Deaf male inmates will be housed at Powhatan Correctional Center,, and Deaf female inmates will be housed at Fluvanna Correctional Center. VDOC has the discretion to house Deaf inmates at whatever facility it deems appropriate.

At VDOC's discretion, if PCC or FCC is determined to be an unsafe or inappropriate facility for an inmate, that inmate will retain all rights as required by the ADA and this Agreement at any other facility where that inmate is housed.

### B. Schedule of Accommodations

When a Deaf inmate is incarcerated at PCC or FCC, personnel at those facilities shall provide the Deaf inmate with a schedule showing when Qualified Interpreters and/or other Auxiliary Aids and Services are available. This schedule will be provided to currently incarcerated inmates within 3 months of the Effective Date of this Agreement.

6

## V. PROVISION OF AUXILIARY AIDS AND SERVICES

### A. General Policy

In order to ensure substantial equality for Deaf inmates, VDOC will provide appropriate Auxiliary Aids and Services, as required by this Agreement, the U.S. Constitution, the ADA, and the Rehabilitation Act. Substantial equality shall also include programs or services to Deaf inmates provided by third party vendors, contractors, or state-funded entities such as community colleges.

- Appropriate Auxiliary Aids and Services, including Qualified Interpreters, shall be made available so that Deaf inmates may participate in all services, privileges, and programs offered to other inmates in VDOC's custody at Powhatan Correctional Center or Fluvanna Correctional Center, as the case may be.

- These shall include, but not be limited to: orientation, medical evaluations and treatments, disciplinary proceedings, and during any other programs including, but not limited to, rehabilitative, educational, or transitional programs offered to other similarly situated incarcerated individuals.

- In those instances where VDOC permits volunteers to provide activities to inmates at PCC or FCC, such as religious services and meetings, VDOC will make best efforts so that the volunteer organization or individual volunteer has an interpreter at those activities. The parties agree that the Interpreter at such volunteer activities need not be a "Qualified Interpreter" as defined in this Agreement.

- VDOC retains the discretion to determine that certain activities present a Direct Threat of injury or death to Deaf inmates and may therefore choose not to provide such Deaf inmates substantially equal enjoyment of some of its services, privileges, facilities, advantages, and accommodations.

- VDOC will provide written instructions for the use of all Auxiliary Aids and Services. These instructions will cover, though not necessarily be limited to, use of TTYs and Video Phones.

### B. Medical Devices

All Auxiliary Aids and Services required by this Agreement, the ADA, and Section 504 of the Rehabilitation Act, which are deemed medically necessary, will be provided promptly upon request free of charge to Deaf inmates subject to a co-payment for that medical device, just as non-Deaf inmates are charged a co-payment for other medical appliances or devices. This co-pay shall not apply, however, to hearing aid batteries. In the case of a Deaf inmate who is deemed indigent pursuant to VDOC Policy 802.2, the Deaf inmate's account will be charged the appropriate co-pay for such device just as non-deaf inmates are charged.

### C.   Maintenance of Auxiliary Aids and Services

VDOC shall maintain all Auxiliary Aids and Services for Deaf inmates in its custody in a state correctional facility in working condition at all times.

## VI.  QUALIFIED SIGN LANGUAGE INTERPRETERS

### A.   Contracts

VDOC will enter into one or more written contracts with Interpreter Service Providers (IS Providers), or otherwise arrange to provide Qualified Interpreters at the events and intervals set forth in this Agreement. The contracts with the IS Providers must specifically state that only "Qualified Interpreters," as defined in this Agreement, will be used by VDOC and that the IS Providers agree to provide only such interpreters to VDOC. If VDOC is currently bound by an IS Provider contract it will add this requirement at the next opportunity.

### B.   General Policy

VDOC will maintain the current rate of providing an in-person Qualified Interpreter two days per week for seven hours per day at PCC. If there is a material change in the number or needs of Deaf inmates, VDOC will reevaluate the number and/or frequency of in-person Qualified Interpreters.

VDOC shall provide an in-person Qualified Interpreter at FCC and other facilities where Deaf inmates are incarcerated as circumstances warrant.

Examples of situations in which an in-person Qualified Interpreter is presumed to be needed include:

- communications concerning medical care and attention, including dental, vision, audiological, and mental health care;

- disciplinary hearings in which the Deaf inmate may be charged with a rule infraction;

- transfer and classification processes that impact on the Deaf inmate's status; and

- transitional programming.

Examples of situations in which a Qualified Interpreter is not presumed to be necessary but in which a Qualified Interpreter may become necessary at a Deaf inmate's request include:

- educational programming;

- work programming; and

8

- other communications that are complex or lengthy.

VDOC will be responsible for scheduling and overseeing the provision of Qualified Interpreters.

## C. Other Means of Communication

### 1. General policy

VDOC agrees that at all times VDOC employees will continue to attempt to communicate with Deaf inmates for such purposes and to the same extent, as they would communicate with the individuals but for their disability, using all available means of communication. This provision in no way lessens VDOC's obligation to provide Qualified Interpreters in certain situations and in a timely manner.

### 2. Video Remote Interpreting (VRI)

VDOC shall provide access to and have available for, emergency situations and as necessary, on-demand video remote interpreting which comports with the following standards at all facilities at which Deaf inmates are incarcerated:

- high quality, clear, delay-free full-motion video and audio over a high-speed Internet connection;

- a clear, sufficiently large, and sharply delineated picture of the interpreter's and the Deaf individual's heads, arms, hands, and fingers, regardless of the body position of the Deaf individual;

- voices being transmitted are clear and easily understood, and

- operation is uncomplicated and easily accomplished by non-technicians.

VDOC shall implement VRI within three months of the Effective Date of this Agreement.

### 3. Written Notes

VDOC Employees will receive training with respect to communications difficulties Deaf inmates have. The training will include advising the VDOC Employees that note writing may be the only immediate form of communication available to a Deaf inmate, and that VDOC Employees are expected to respond to a Deaf inmate in writing where that is the best present means of communication, to the same extent they would make a verbal response in a similar situation involving a non-Deaf inmate. Where circumstances make a written response impractical at the time, training will instruct that the VDOC Employee should attempt to follow up with the Deaf inmate as time later permits.

9

### D.   Onsite Medical Care

1.   *General Policy*

VDOC will provide Qualified Interpreters for all scheduled appointments between Deaf inmates and medical personnel at VDOC facilities, including, but not limited to, review of medical history, medical appointments, follow up meetings or appointments, and treatment meetings.

2.   *Informing Appropriate Medical Staff*

The VDOC employee responsible for coordinating Auxiliary Aids and Services for Deaf inmates at the facility at which a Deaf inmate is incarcerated, will ensure that Medical staff is aware that the inmate is deaf, if such classification has not already been performed by the Medical Staff at that facility. For each Deaf inmate, the Medical staff will note on the medical file cover in bold marking and in the inmate's medical file, the inmate's disability.

3.   *Scheduling Medical Appointments with Interpreters*

The Medical Director in conjunction with facility staff, will schedule all medical appointments requiring Qualified Interpreters and will contact the IS Providers to arrange for interpreting services as necessary. Appointments for Deaf inmates will be scheduled within the same time period from the initial request as those for other inmates.

4.   *Emergency Events*

VDOC will provide a VRI Qualified Interpreter for use in unscheduled medical emergencies. If remote interpreting services are not appropriate in the situation, VDOC personnel will work in conjunction with medical staff to attempt to secure an in-person Qualified Interpreter as soon as possible. Life saving medical care should never be delayed because no interpretation services are available.

For the following categories of Deaf inmates, a VRI Qualified Interpreter may not provide effective communication, and an in-person Qualified Interpreter may be the most appropriate auxiliary aid or interpretive service:

- Deaf inmates who have limited ability to move their heads, hands, or arms; vision problems; cognitive or consciousness issues; or pain issues;

- Deaf inmates who must be moved to areas of the VDOC facility that do not have a designated high speed Internet line; and

- Deaf inmates who will be treated in rooms where space considerations mitigate against using the service.

10

### E.     Offsite Medical Care

VDOC will inform all offsite medical providers that a Deaf inmate requiring a Qualified Interpreter or other Auxiliary Aid or Service will be seeking medical care offsite as soon as possible.

In the case of an emergency, VDOC will inform an offsite medical provider that a Deaf inmate requiring an in-person Qualified Interpreter or other Auxiliary Aid or Service is being transported to the offsite care provider. VDOC will notify the offsite medical care provider as soon as possible. Notification will include the estimated time of arrival.

### F.     Educational, Vocational and Rehabilitative Programming

VDOC shall provide appropriate Auxiliary Aids and Services for all programs offered at VDOC facilities in which Deaf inmates are qualified, admitted into, and are actively participating in. When the Schedule of Accommodations referenced in Section IV.B changes, including when a Qualified Interpreter will be available, an updated Schedule of Accommodations will be given to all Deaf inmates.

The following appropriate Auxiliary Aids and Services will be provided:

1.     *VDCE Adult Basic Education*

The VDOC in conjunction with the Virginia Department of Correctional Education (VDCE) will provide Deaf inmates with written materials and open or closed-captioned educational materials where available. In addition, and as necessary, VDOC and VDCE will provide a Qualified Interpreter to interpret Adult Basic Education classes. The determination of what form of Auxiliary Aids and Services is appropriate will depend on a request by the Deaf inmate for such services and any input by the Instructor of the class.

2.     *VDCE Community College Courses*

The VDOC in conjunction with VDCE, will provide Deaf inmates with written materials and open or closed captioned educational materials where available. In addition, and as necessary, VDOC and VDCE will provide a Qualified Interpreter to interpret Community College classes. The determination of what form of Auxiliary Aids and Services is appropriate will depend on a request by the Deaf inmate for such services and any input by the Instructor of the class.

3.     *Vocational Programs*

VDOC, in conjunction with VDCE, will provide a Qualified Interpreter for Vocational Programs on an as needed basis.

11

4. *VDOC Correctional Enterprises Programs*

VDOC will provide a Qualified Interpreter for Correctional Enterprises Programs and meetings on an as needed basis.

5. *VDOC Rehabilitative Programs*

The VDOC will provide Deaf inmates with written materials and open or closed-captioned materials where available. In addition, and as necessary, VDOC will provide a Qualified Interpreter to interpret Rehabilitative programs. The determination to provide a Qualified Interpreter will depend on a request by the Deaf inmate for such services. Rehabilitative programs include such things as anger management classes, parenting classes, sex-offender classes, mandatory pre-release life skills classes, and other similar programs. The determination of what form of Auxiliary Aids and Services is appropriate will depend on a request by the Deaf inmate for such services and any input by the Instructor of the class.

VDOC will offer sign-language instruction to any inmate who becomes deaf after incarceration if such instruction is ordered by a medical professional or other expert employed or retained by VDOC.

**G.    Work Assignments**

VDOC will provide opportunities for institutional work assignments that are consistent with the opportunities for the same assignments given to similarly situated non-Deaf inmates. VDOC retains the discretion to determine that certain work assignments present a Direct Threat of injury or death to Deaf inmates and may therefore choose not to provide Deaf inmates substantially equal opportunities to those work assignments.

**H.    Religious Services**

VDOC shall allow and encourage outside volunteers to provide religious services accessible to Deaf inmates without regard to a volunteer's hearing ability as long as the volunteer meets the same security requirements that are imposed on all other outside volunteers.

No deaf offender will be required to attend a religious service where an interpreter is not provided in order to receive any religious meal, diet, or otherwise offered religious accommodation.

**I.    Transfer and Classification Matters**

VDOC will provide a Qualified Interpreter for any hearings or meetings relating to an inmate's transfer to another facility or change in security classification or any other classification hearing involving the exchange of information between the Deaf inmate and VDOC personnel that could affect the inmate's status.

12

**J.**     **Transitional Programming — Post-Release Supervision (Including Parole)**

VDOC will provide Effective Communication for all Community Corrections supervised post-release programs and activities. For lengthy or important communications, Effective Communication requires an in person interpreter or VRI.

## VII. ADDITIONAL COMMUNICATIONS

VDOC will provide in person or VRI interpreting for any significant communication between inmates and staff that is not specifically discussed in this Agreement. A significant communication includes a communication for which the inmate requests an interpreter, subject to approval by the designated person responsible for coordinating Auxiliary Aids and Services.

## VIII. DISCIPLINARY MATTERS

**A.**     **Qualified Interpreters For Disciplinary Proceedings**

VDOC must provide Deaf inmates with a Qualified Interpreter in any disciplinary proceedings in which that Deaf inmate is a suspect or charged, and which is carried out under Operating Procedure 861 (Offender Discipline) or any replacement or supplemental disciplinary policies and procedures now in force or subsequently adopted by VDOC. A Qualified Interpreter must be available to the Deaf Inmate at the following stages of the above-described disciplinary proceedings:

- Staff investigations involving the exchange of information between the Deaf Inmate suspect and VDOC personnel, prior to filing a Disciplinary Offense Report or equivalent;

- Investigative interviews that involve the exchange of information between a Deaf inmate and VDOC personnel (such as when an adverse party is interviewed);

- Preparation of the Disciplinary Offense Report by the Reporting Officer which involves the exchange of information between the Deaf Inmate suspect and VDOC personnel;

- Supervisory Review of the Disciplinary Offense Report which involves the exchange of information between the Deaf Inmate suspect and VDOC personnel;

- During the Advisement of Rights/Service of the Disciplinary Report/Waiver of Hearing/Penalty Offer Process or equivalent proceedings, which involves the exchange of information between the charged Deaf inmate and VDOC personnel;

- During the Hearing, or any Re-Hearing which involves the exchange of information between the charged Deaf inmate and VDOC personnel.

13

Inmate or staff advisors will be provided to charged Deaf inmates on the same terms as they are provided to charged hearing inmates. Access to an advisor shall be the same for charged Deaf inmates as charged non-Deaf inmates. To the extent that a Deaf inmate has access to his advisor, a Qualified interpreter shall be made available to the Deaf inmate for any exchange of information between the Deaf inmate and his advisor.

### B. Disciplinary Offense Reports

If a Disciplinary Offense Report is filed regarding a Deaf inmate and no Qualified Interpreter was provided to the inmate at the time of the pre-Report investigation or incident that led to the Report, the Officer in Charge shall meet with the Deaf inmate in the presence of a Qualified Interpreter to discuss the Report no less than 24 hours prior to when a Disciplinary Hearing has been scheduled.

### C. Miscellaneous

If a Deaf inmate is a witness at a disciplinary hearing, VDOC will provide a Qualified Interpreter at the hearing.

VDOC must hold disciplinary hearings for Deaf inmates within the same time frame as it holds disciplinary hearings for non-Deaf inmates.

Nothing precludes a Deaf Inmate who is a suspect or charged with a disciplinary offense, from voluntarily waiving his right to a Qualified Interpreter and to proceed through any stage of a disciplinary proceeding without the benefits of a Qualified Interpreter. Nor shall failure of the VDOC to provide a Qualified Interpreter in and of itself constitute a sufficient basis for the charged Deaf Inmate to reverse or overturn any disciplinary sanction. However, if a deaf offender did not waive his right to a Qualified Interpreter the disciplinary hearing must be re-heard at a time that an interpreter can be present.

## IX. VISUAL ALERT NOTIFICATIONS

### A. General Policy

Deaf inmates incarcerated at VDOC state correctional facilities should not miss announcements, alarms, or any other auditory information from VDOC staff to the general inmate population solely because of their disability.

### B. Relaying Information

VDOC shall provide an effective visual notification system that will notify Deaf inmates of prison wide events and events specific to Deaf inmates. VDOC has the discretion as to which type of notification system it shall employ, and to change that system, as it deems necessary.

14

### C.   Visual Alarms and Emergency Evacuation

VDOC will provide Deaf Inmates with an effective visual notification system which will advise them of an emergency evacuation or other emergency. VDOC has the discretion as to which type of notification system it shall employ, and to change that system, as it deems necessary.

VDOC personnel shall be responsible for the evacuation of Deaf inmates during an emergency.

## X.   TELECOMMUNICATION DEVICES

### A.   General Policy

VDOC will provide Deaf inmates in its custody with telecommunication devices so that they will have access to communication with people outside of VDOC that is substantially on the same basis as the access to telecommunication VDOC provides inmates who are not Deaf.

### B.   Monitoring Communications

VDOC may provide for the monitoring of communications between Deaf inmates and individuals outside of VDOC to the same extent and with the same discretion applied to the monitoring of communications between non-Deaf inmates and those outside of VDOC.

### C.   Additional Time for Communication

VDOC agrees that "equal access" may necessitate access that sometimes appears to be greater access. VDOC will implement a policy that allows Deaf inmates at least twice as many minutes to complete a TTY call as the number of minutes afforded other non-Deaf inmates to make regular phone calls.

### D.   Technology VDOC Will Provide

VDOC will make the following communication technologies available at its facilities where Deaf inmates are incarcerated to facilitate communication between Deaf inmates and people outside of VDOC facilities.

This list of technological equipment is not exhaustive. VDOC agrees to keep abreast of evolving technology and to consider adding additional equipment to reflect technological advances, as it deems appropriate.

VDOC state correctional facilities housing Deaf inmates will share a list of communications equipment available to Deaf inmates upon their arrival at the facility.

15

1.   *TTY (teletypewriter)*

At every VDOC state correctional facility at which a Deaf inmate is incarcerated, VDOC shall provide at least one TTY in the telephone bank of each housing unit where any Deaf inmates are housed. At each facility where a Deaf inmate is incarcerated, VDOC shall keep an additional portable TTY unit for use when the regular TTY is broken or otherwise unavailable.

2.   *Relay Services*

VDOC will enable all TTYs to access publicly available relay service phone numbers such as 711 and local 1 800 numbers. Inmates will not be charged any more than they currently are for the use of relay services.

3.   *Videophones*

VDOC will allow Deaf inmates access to Videophone technology. Access to the Videophone will be made available at times that VDOC will designate. Those times may not be of equal length as access to the TTY. Subject to security concerns such as institutional lockdowns, the videophone generally will be made available during normal business hours. Normal business hours shall mean 8:30 a.m. – 5:00 p.m. Monday through Friday, excluding holidays. VDOC will also accommodate requests by Deaf inmates to use the videophone during nights and weekends to the best of its ability.

VDOC will enable all Videophones to access publicly available relay service phone numbers such as 711 and local 1 800 numbers. Videophones will allow voice carry-over relay.

On an annual basis, VDOC will reevaluate the hours during which access to the Videophones are permitted to determine whether, based on actual usage, weekday, weeknight, or weekend time should be modified. VDOC will continue to investigate means by which Videophones will be made available during the same times as regular telephones.

E.   **Responsibility for Maintaining Equipment and Training Staff**

VDOC shall ensure that the technology used to permit communication between Deaf inmates and people outside of VDOC facilities is in working order. VDOC staff shall attempt to resolve complaints about any malfunctioning equipment within a reasonable time of receiving that complaint. VDOC will also ensure that designated staff members are adequately trained in the operation of the technology.

## XI. MEDIA

VDOC will ensure that all audio-visual media purchased for inmate use in VDOC facilities housing Deaf inmates includes open or closed captioning.

16

Televisions which are purchased by VDOC for inmate use shall support open or closed captioning, and that captioning may be turned on at a Deaf inmate's request.

VDOC will permit Deaf inmates to purchase TV's which reliably support open or closed captioning with their own funds. In the event that the closed captioning feature contained on TVs purchased through the facility Commissary malfunctions, VDOC personnel will work with the Deaf inmate to address and resolve the problem.

## XII. HAND RESTRAINTS

### A.    Off-site Medical Care

VDOC will implement an operating procedure relating to the handcuffing of Deaf inmates that will, whenever possible, permit Deaf inmates to use their hands for effective communication. That procedure will permit VDOC personnel to consider the needs of a Deaf inmate to use his or her hands for Effective Communication purposes. That procedure will also permit VDOC to consider the use of alternative restraints, such as a stun-belt, in lieu of handcuffs that restrain the hands in a way that prevents Effective Communication. VDOC shall have the ultimate authority relating to decisions about the use/non-use of hand restraints, and whether to keep a Deaf inmate shackled or unshackled. VDOC will vest responsibility for safety and security determinations with a supervisor and not the escorting officer.

### B.    On-site Medical Care

If a Deaf inmate is permitted to see medical personnel, at a time when for behavioral reasons, his or her hands have been restrained, VDOC personnel will consider the needs of the Deaf inmate to use his or her hands for Effective Communication purposes. VDOC personnel will also consider the use of alternative restraints, such as a stun-belt, in lieu of handcuffs that restrain the hands in a way that prevents Effective Communication. VDOC shall have the ultimate authority relating to decisions about the use/non-use of hand restraints, and whether to keep a Deaf inmate shackled or unshackled. VDOC will vest responsibility for safety and security determinations with a supervisor and not the escorting officer.

### C.    On-site Other Circumstances

If a Deaf inmate is being moved about a facility for any other purpose, at a time when for behavioral reasons, his hands have been restrained, VDOC personnel will consider the needs of the Deaf inmate to use his or her hands for Effective Communication purposes. VDOC personnel will also consider the use of alternative restraints, such as a stun-belt, in lieu of handcuffs that restrain the hands in a way that prevents Effective Communication. VDOC shall have the ultimate authority relating to decisions about the use/non-use of hand restraints, and whether to keep a Deaf inmate shackled or unshackled. VDOC will vest responsibility for safety and security determinations with a supervisor.

17

### XIII.   MISCELLANEOUS AUXILIARY DEVICES

Where devices such as vibrating clocks and in-line amplifiers are not deemed medically necessary, VDOC agrees to consider on a case by case basis, whether it will allow a particular Deaf inmate the opportunity to purchase these devices at his or her own expense. VDOC's decision in this regard will also consider whether these devices pose a security risk. VDOC shall have the discretion to make the determination whether any of these devices, and the type of device, is permissible. VDOC agrees to allow Deaf inmates to purchase headphones, in-line amplifiers/equalizers, and televisions that meet the particular needs of their disability from an approved vendor so long as the items do not pose a security risk. VDOC retains the discretion to limit purchases to devices available through the Commissary. Deaf inmates may submit a request in writing to the ADA Coordinator requesting devices not available from the Commissary. VDOC will not deny a Deaf inmate the right to purchase these devices except where they present a documentable security risk. The ADA Coordinator will maintain records of all Deaf inmate requests for these devices and the outcome of the request.

### XIV.   TRAINING

#### A.      General Policy

VDOC, in conjunction with the VDDHH will provide training as defined in Section XIV.B below to all VDOC employees, as defined in this Agreement. VDOC and VDDHH will begin providing this training within three months of the Effective Date of this Agreement, and no less than annually thereafter. VDOC will incorporate this training into its regularly scheduled training for new and existing employees. VDOC may provide this training using in-person training, or via recorded training. VDOC will update the training materials as required by law. VDOC agrees to provide any materials that may be used for training to the Washington Lawyers' Committee for Civil Rights and Urban Affairs prior to the first training session for review and input. All such input will be considered in good faith.

#### B.      VDOC Employees

Within three months of the Effective Date of this Agreement, VDOC in conjunction with VDDHH will begin training VDOC employees as that term is defined in this Agreement. Training will include the following topics:

- best practices in communicating with Deaf individuals;

- the unique needs and problems encountered by Deaf and late-Deafened individuals;

- identification of communication needs of persons who are Deaf;

- the psychological implications of Deafness and its relationship to interaction with hearing corrections personnel;

18

- the proper use and role of Qualified Interpreters;

- directions about using TTYs, TDDs, Videophones and other equipment currently available at the facility, which facilitates communication with Deaf people; and

- disciplinary matters, described in Section VIII, and grievance proceedings, described in Section XV.

## XV.  GRIEVANCES

The ADA Coordinator will review all grievances submitted by Deaf inmates, and responses given to Deaf inmates, whether the grievance is terminated favorably, or unfavorably to the Deaf inmate, to ensure compliance with this Agreement.

ADA Coordinator review under this section is not a part of the VDOC Inmate Grievance Procedure.

## XVI.  MONITORING AND COMPLIANCE

### A.     VDDHH Investigation

VDOC will permit, on a semi-annual basis, and for a five-year period following the execution of this Agreement, VDDHH access to each facility in which Deaf Inmates are housed, to conduct an investigation to determine VDOC personnel's treatment of Deaf inmates.  During this investigation, VDOC will permit VDDHH (1) access to Deaf inmates who are willing to meet with them; (2) access to any Grievances that a Deaf inmate made during the preceding twelve-months, provided the Deaf inmate consents to such disclosure; (3) access to any medical records made during the preceding twelve-months, provided the Deaf inmate consents to such disclosure; (4) access to any non-security logs or other business records which VDOC keeps in the regular course of its business relating to Deaf inmates generally or any given Deaf inmate in particular prepared during the prior twelve month period; and (5) access to equipment provided to or for use by Deaf inmates.

### B.     Plaintiffs' Counsel Investigation

To the extent Plaintiffs' Counsel maintains a current attorney-client relationship with any Deaf inmate, they shall be provided the same access to that client and to the records relating to that client, as any other attorney with a similar relationship to another non-Deaf VDOC inmate.

In addition, and regardless of whether an Attorney-Client relationship exists, on an annual basis for a two-year period following the execution of this Agreement, Plaintiffs' Counsel shall have access to each facility in which Deaf inmates are housed to conduct an investigation to determine VDOC personnel's treatment of Deaf inmates.  During this investigation, VDOC will permit Plaintiffs' Counsel (1) access to Deaf inmates who are willing to meet with them; (2) access to

any Grievances that a Deaf inmate made during the preceding twelve months, provided the Deaf inmate consents to such disclosure; (3) access to any medical records made during the preceding twelve-months, provided the Deaf inmate consents to such disclosure; (4) access to any non-security logs or other business records which VDOC keeps in the regular course of its business relating to Deaf inmates generally or any given Deaf inmate in particular prepared during the prior twelve month period; and (5) access to equipment provided to or for use by Deaf inmates.

## XVII.  NOTICE TO CURRENT INMATES OF AGREEMENT.

Within 30 days of the Effective Date of this Agreement, VDOC will deliver a copy of this Agreement and a notice to each non-Plaintiff Deaf inmate in its custody. The notice will inform the Deaf inmate of his or her rights under this Agreement to accept a monetary payment as set out in this Agreement in exchange for a release as outlined in Section XVIII.A of this Agreement.

## XVIII. RELEASE AND SETTLEMENT OF CLAIMS

### A.    Release

In consideration of the representations, promises and agreements set forth herein, including the payments as set forth in this Agreement, the sufficiency of which is hereby acknowledged, the Plaintiffs, and any Deaf inmate who accepts a payment under this Agreement and executes a full and complete release, on their behalf and on behalf of their representatives, assignees, heirs, executors, family members, beneficiaries, administrators, successors, and anyone acting, or claiming to act on their behalf, hereby releases and forever discharges the Commonwealth of Virginia, its agencies, employees, agents, officials, and their representative, including but not limited to VDOC and VDCE, from any and all claims and causes of action, known and unknown, asserted and unasserted, direct and indirect, and of any kind, nature or description whatsoever, which they had on or before the date of the execution of this Agreement arising out of the facts set forth in the discrimination charge they filed with the U.S. District Court for the Eastern District of Virginia, Alexandria Division, except for the claim for an interpreter for weekly religious services at Powhatan Correctional Center brought by plaintiff Larry More.

### B.    Dismissal

The plaintiffs agree to dismiss with prejudice all claims of the Amended Complaint filed with the U.S. District Court, Eastern District of Virginia, Alexandria Division, Case Number 1:10-cv-96, except for the claim for an interpreter for weekly religious services at Powhatan Correctional Center brought by plaintiff Larry More, which the parties agree to dismiss without prejudice. The parties agree that, if a claim for an interpreter for weekly religious services at Powhatan Correctional Center is brought by Larry More in the future, the Defendants will not raise the defense of lack of exhaustion.

20

The parties agree that the Eastern District of Virginia shall retain jurisdiction over this settlement contract as set out in Subsection E of this Section.

### C.   Attorneys' Fees, Costs, Disbursements and Expenses

In settlement of all of Plaintiffs' claims arising out of their encounters with VDOC and VDCE up to and including the Effective Date, including any claims for attorney fees and costs, any disbursements and expenses, including experts fees incurred on behalf of Plaintiffs in this litigation, the parties agree that within sixty days of the Effective Date of this Agreement, VDOC shall pay plaintiffs' counsel $248,476.21.

Counsel who brings an enforcement action on behalf of a Deaf inmate pursuant to Subsection E in this Section, and who obtains a judgment against VDOC or VDCE, will only be entitled to attorneys fees starting from the date of the filing of the enforcement action, and only at an hourly rate limited to 150% of the hourly rate established under 18 U.S.C.S. § 3006A, regardless of jurisdiction of the suit.

### D.   Damages

Within sixty days of the Effective Date of this Agreement, VDOC shall pay each named plaintiff $750 in damages, provided each plaintiff shall execute a full and complete release of all claims. VDOC also agrees to pay within sixty days of the Effective Date of this Agreement all other Deaf inmates incarcerated in a VDOC facility, as of the date of this Agreement, the sum of $250 in damages, provided any Deaf inmate accepting this sum, executes a full and complete release as outlined in Section XVIII.A. A list of currently incarcerated Deaf inmates is attached, and acknowledged by the parties to be full and complete.

### E.   Enforcement Powers

Only named Plaintiffs or Deaf inmates who are incarcerated in a VDOC facility as of the date of this Agreement, and who have received a payment for damages and executed a full and complete release of claims in this case, can maintain an action for breach of this Agreement, no other person shall be considered a third-party beneficiary of this Agreement.

1.      Pursuant to 18 U.S.C. §3626(c)(2), during the term of the Agreement, plaintiffs may move the court for reinstatement of the lawsuit, or may elect to proceed in state court and seek specific performance or institute an action for breach subject to notification as set forth in paragraph 2 of this Subsection. An action to enforce this Agreement does not include any action for damages. A Deaf inmate seeking to enforce this Agreement in state court can only seek to have a court order VDOC or VDCE to comply with the terms of this Agreement.

2.      The lawsuit may not be reinstated, nor a claim for breach or specific performance of this Agreement brought, before the Deaf inmate first notifies VDOC or VDCE of the nature of the alleged material non-compliance, and gives VDOC or VDCE 60 days to investigate and/or cure

21

the alleged breach. The parties agree to non-binding mediation prior to any plaintiff moving to reinstate the lawsuit or filing an enforcement action in state court.

## XIX.  MISCELLANEOUS PROVISIONS

### A.  Non-Admission

It is understood and agreed that this Agreement is a compromise of a disputed claim, facts, and allegations. Nothing in this Agreement constitutes an admission of any liability, wrongdoing, or violation of any law, or the admission of the validity of any defense.

### B.  Private Settlement Agreement

This Agreement is a private settlement agreement within the meaning of 18 U.S.C. § 3626.

### C.  Confidentiality

No part of this Agreement is or will be considered confidential by the parties. This Agreement will be made available by request under the Freedom of Information Act.

### D.  Entire Agreement

This Agreement constitutes the entire Agreement between the parties. There were no inducements or representations leading to the execution of this document, except as stated within the document itself. The terms of this Agreement are contractual in nature.

### E.  Binding

This Agreement is final and binding on the Parties, and any Deaf inmate who receives payment for damages and executes a full and complete release, including all principals, agents, executors, administrators, representatives, successors in interest, beneficiaries, assigns, heirs, and legal representatives thereof. Each Party has a duty to so inform any such successor in interest.

### F.  Non-Waiver

Failure by the plaintiffs or any Deaf inmate who receives payment for damages and executed a full and complete release to seek enforcement of this Agreement pursuant to its terms with respect to any instance or provision will not be construed as a waiver to such enforcement with regard to other instances or provisions.

### G.  Severability

In the event that a court determines that any provision of this Agreement is unenforceable, such provision will be severed from this Agreement and all other provisions will remain valid and enforceable, provided however that if the severance of any such provision materially alters the

22

rights or obligations of the Parties hereunder, the Parties will attempt, through reasonable, good faith negotiations, to agree upon such other amendments to this Agreement as may be necessary to restore the Parties as closely as possible to the relative rights and obligations initially intended by them hereunder.

**H.     Term of Agreement**

This Agreement shall remain in effect for 5 years from the Effective Date.

Signed:

_____
Virginia Department of Corrections

10-18-10
_____
Date

see page 23b
_____
Tony Branch

_____
Date

_____
Ronald Roman

10/13/10
_____
Date

_____
Delonte Tinsley

10/13/10
_____
Date

_____
Attorney for Plaintiffs

10/26/10
_____
Date

_____
Gary Minnis

10/13/10
_____
Date

_____
David Richardson

10-13-10
_____
Date

_____
Larry Moore

10/13/10
_____
Date

23

Vernon Buggs
Printed Name

Vernon Buggs
Signature

10/13/10
Date

*****************************************

Michael F. Branham
Printed Name

Michael Branham
Signature

10/13/10
Date

*****************************************

Russell Grimsley
Printed Name

Russell Grims Jr
Signature

10/13/10
Date

*****************************************

Derrick R. White
Printed Name

Derrick R. White
Signature

Date 10·13·10

*****************************************

John C Farley
Printed Name

John C. Farley
Signature

Oct 13, 10
Date

*****************************************

FRANCIS K. CUFFY
Printed Name

Francis K. Cuffy
Signature

10·13·10
Date

*****************************************

23a

JASON PAUL Smith #1008180
Printed Name

Printed Name  Anthony Neal Porson

Jason P Smith
Signature

Anthony Neal Porson
Signature

10/13/10
Date
*********************************

10/13/10
Date
*********************************

Wesley Chase Jr
Printed Name

DANIEL OTTEN #1403242
Printed Name

Wesley Chase
Signature

Signature

10.13.10
Date
*********************************

10-13-10
Date
*********************************

JERRY OWENS
Printed Name

Tony Branch
Printed Name

Jerry Owens
Signature

Tony Branch
Signature

10-13-10
Date
*********************************

Oct-18-10
Date
*********************************

23b

# Table of Contents

I.    DEFINITIONS ........................................................................................................... 1

II.   GENERAL POLICIES ................................................................................................. 3
   A.   Non-discrimination Based on Disability ........................................................ 3
   B.   ADA Coordinator and Auxiliary Aids and Services Designees ........................ 3

III.  INITIAL CLASSIFICATION, ASSESSMENT, AND ASSIGNMENT ................................ 4
   A.   General Policy ............................................................................................... 4
   B.   Hearing Assessment ...................................................................................... 4
   C.   Auxiliary Aids and Services Assessment ........................................................ 4
   D.   Ensuring Staff Awareness Through Identification Cards ................................ 4
   E.   Interpretation of Written Materials .............................................................. 5
   F.   Creation and Interpretation of Rights Materials ........................................... 5
   G.   Continuation of Provision of Auxiliary Aids and Services ............................... 6
   H.   Subsequent Need for Accommodations ......................................................... 6

IV.   HOUSING .............................................................................................................. 6
   A.   General Policy ............................................................................................... 6
   B.   Schedule of Accommodations ....................................................................... 6

V.    PROVISION OF AUXILIARY AIDS AND SERVICES ..................................................... 7
   A.   General Policy ............................................................................................... 7
   B.   Medical Devices ............................................................................................ 7
   C.   Maintenance of Auxiliary Aids and Services .................................................. 8

VI.   QUALIFIED SIGN LANGUAGE INTERPRETERS ......................................................... 8
   A.   Contracts ...................................................................................................... 8
   B.   General Policy ............................................................................................... 8
   C.   Other Means of Communication .................................................................... 9
       1.   General policy ......................................................................................... 9
       2.   Video Remote Interpreting (VRI) ............................................................ 9
       3.   Written Notes ......................................................................................... 9
   D.   Onsite Medical Care ...................................................................................... 10
       1.   General Policy ......................................................................................... 10
       2.   Informing Appropriate Medical Staff ..................................................... 10
       3.   Scheduling Medical Appointments with Interpreters ............................. 10
       4.   Emergency Events ................................................................................... 10
   E.   Offsite Medical Care ..................................................................................... 11
   F.   Educational, Vocational and Rehabilitative Programming ............................. 11
       1.   VDCE Adult Basic Education ..................................................................... 11
       2.   VDCE Community College Courses ........................................................... 11
       3.   Vocational Programs ............................................................................... 11
       4.   VDOC Correctional Enterprises Programs ................................................ 12
       5.   VDOC Rehabilitative Programs ................................................................ 12
   G.   Work Assignments ......................................................................................... 12
   H.   Religious Services .......................................................................................... 12

| | | |
|---|---|---|
| I. | TRANSFER AND CLASSIFICATION MATTERS | 12 |
| J. | TRANSITIONAL PROGRAMMING — POST-RELEASE SUPERVISION (INCLUDING PAROLE) | 13 |
| **VII.** | **ADDITIONAL COMMUNICATIONS** | **13** |
| **VIII.** | **DISCIPLINARY MATTERS** | **13** |
| A. | QUALIFIED INTERPRETERS FOR DISCIPLINARY PROCEEDINGS | 13 |
| B. | DISCIPLINARY OFFENSE REPORTS | 14 |
| C. | MISCELLANEOUS | 14 |
| **IX.** | **VISUAL ALERT NOTIFICATIONS** | **14** |
| A. | GENERAL POLICY | 14 |
| B. | RELAYING INFORMATION | 14 |
| C. | VISUAL ALARMS AND EMERGENCY EVACUATION | 15 |
| **X.** | **TELECOMMUNICATION DEVICES** | **15** |
| A. | GENERAL POLICY | 15 |
| B. | MONITORING COMMUNICATIONS | 15 |
| C. | ADDITIONAL TIME FOR COMMUNICATION | 15 |
| D. | TECHNOLOGY VDOC WILL PROVIDE | 15 |
| 1. | TTY (teletypewriter) | 16 |
| 2. | Relay Services | 16 |
| 3. | Videophones | 16 |
| E. | RESPONSIBILITY FOR MAINTAINING EQUIPMENT AND TRAINING STAFF | 16 |
| **XI.** | **MEDIA** | **16** |
| **XII.** | **HAND RESTRAINTS** | **17** |
| A. | OFF-SITE MEDICAL CARE | 17 |
| B. | ON-SITE MEDICAL CARE | 17 |
| C. | ON-SITE OTHER CIRCUMSTANCES | 17 |
| **XIII.** | **MISCELLANEOUS AUXILIARY DEVICES** | **18** |
| **XIV.** | **TRAINING** | **18** |
| A. | GENERAL POLICY | 18 |
| B. | VDOC EMPLOYEES | 18 |
| **XV.** | **GRIEVANCES** | **19** |
| **XVI.** | **MONITORING AND COMPLIANCE** | **19** |
| A. | VDDHH INVESTIGATION | 19 |
| B. | PLAINTIFFS' COUNSEL INVESTIGATION | 19 |
| **XVII.** | **NOTICE TO CURRENT INMATES OF AGREEMENT** | **20** |
| **XVIII.** | **RELEASE AND SETTLEMENT OF CLAIMS** | **20** |
| A. | RELEASE | 20 |
| B. | DISMISSAL | 20 |
| C. | ATTORNEYS' FEES, COSTS, DISBURSEMENTS AND EXPENSES | 21 |
| D. | DAMAGES | 21 |

25

|  | E. | Enforcement Powers ............................................................................................ | 21 |
| **XIX.** | | **MISCELLANEOUS PROVISIONS** ........................................................................ | **22** |
|  | A. | Non-Admission ................................................................................................... | 22 |
|  | B. | Private Settlement Agreement .......................................................................... | 22 |
|  | C. | Confidentiality .................................................................................................... | 22 |
|  | D. | Entire Agreement ............................................................................................... | 22 |
|  | E. | Binding ................................................................................................................. | 22 |
|  | F. | Non-Waiver ......................................................................................................... | 22 |
|  | G. | Severability ......................................................................................................... | 22 |
|  | H. | Term of Agreement ............................................................................................ | 23 |

26

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Mary Ann McBride et al.,

      Plaintiffs,

v.                           Case No. 15-11222

Michigan Department of
Corrections, et al.,           Sean F. Cox
                             United States District Court Judge

      Defendants.
_____/

**<u>OPINION AND ORDER ADOPTING 2/8/18 REPORT AND RECOMMENDATION</u>**

      In this class action, named Plaintiffs Mary McBride and Ralph Williams represent a class

of deaf or hard of hearing individuals in the custody of the Michigan Department of Corrections

who require hearing-related accommodations for various reasons. They have filed suit against

the MDOC and various agency administrators and prison wardens, asserting violations of the

American Disabilities Act, 42 U.S.C. § 12101*, et seq.*; the Rehabilitation Act, 29 U.S.C. § 794, *et*

*seq.*; The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq.*; and

the Free Exercise and Free Speech Clauses of the First and Fourteenth Amendment. They seek

only declaratory and injunctive relief to remedy these alleged violations.

      The Court referred this matter to Magistrate Judge David R. Grand for a report and

recommendation under 28 U.S.C. § 636(b)(1)(B) (Doc. # 37), after which the parties filed cross-

motions for summary judgment (Doc. # 74, 76).

      On February 8, 2018, Magistrate Judge Grand issued a Report and Recommendation

(R&R) (Doc. # 96) wherein he recommends that the Court grant in part and deny in part

1



Plaintiffs' Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment. Defendants timely objected to the R&R on February 22, 2018 (Doc. # 97). Plaintiffs have not objected to the R&R and the time for them to do so has passed.

For the reasons below, the Court finds Defendants' objections to be without merit. Thus, the Court shall overrule the objections and adopt the R&R.

## STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 72(b), a party objecting to the recommended disposition of a matter by a Magistrate Judge must filed objections to the R&R within fourteen days after being served with a copy of the R&R. The objecting party must do more than merely restate the arguments set forth in its summary judgment motion. *Senneff v. Colvin*, 2017 WL 710651 at * 2 (E.D. Mich 2017). "The district judge to whom the case is assigned shall make a *de novo* determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made." Fed. R. Civ. P. 72(b)(3).

## ANALYSIS

Defendants raise three objections to the R&R: (1) that questions of fact exist as to whether prisoners housed within the MDOC have been denied meaningful access to telecommunications devices; (2) the Magistrate Judge improperly applied an optimal accommodation standard instead of a reasonable accommodation standard when assessing their purported denial of interpreter services for essential programs; and (3) the Magistrate Judge improperly recommended that a formal training be required in a Consent Judgment. The Court shall address each in turn.

**Objection 1: Meaningful Access to Telecommunications Devices**

Defendants' first objection pertains to Plaintiffs' ADA and Rehabilitation Act claims that the "MDOC has failed to take the necessary steps to ensure that deaf and hard of hearing prisoners' communications are as effective *as* those of hearing prisoners, and to provide appropriate auxiliary aids to permit communication and participation on an equal basis." Doc. # 76 at 23. On this claim, Magistrate Judge Grand concluded that the MDOC's existing practices fail to provide Plaintiffs "with telecommunications access equal to that provided to hearing prisoners." R&R at 20. Thus, he determined that Plaintiffs are entitled to summary judgment on this aspect of their ADA and Rehabilitation Acts claims.

Defendants object that there is at least a question of fact as to whether Plaintiffs' rights have been violated. Their reasoning is two-fold; they contend that Magistrate Judge Grand erred by failing to accord them the deference due to a correctional facility's safety judgments, *see Bell v. Wolfish*, 441 U.S. 520, 546, and that he impermissibly required them to provide optimal, rather than reasonable, accommodations. The Court finds neither of these arguments, both of which were raised and considered by the Magistrate Judge, persuasive.

First, Magistrate Jude Grand did give Defendants the required deference. He expressly recognized the "substantial deference" due to Defendants, *see Brown v. Johnson*, 743 F.2d 408, 410 (6th Cir. 1984), and considered and addressed their safety and control concerns. Defendants cannot create a question of fact merely by referring to possible safety concerns. And the Court agrees with Magistrate Judge Grand's analysis and conclusion that the safety concerns articulated by Defendants do not preclude summary judgment. Indeed, even in their objections Defendants have still failed to explain why the safety policies applied to telephone conversations

3

"would not be as effective at addressing risks associated with video transmissions." R&R at 19.

Second, the Magistrate Judge's report did not shift the standard as Defendants claim.  To "reasonably accommodate" individuals with disabilities, public entities like the MDOC must "take appropriate steps to ensure that communications with applicants, participants, and members of the public, and companions with disabilities *are as effective* as communications with others." 28 C.F.R. § 35.160(a)(1) (emphasis added). After carefully examining the record, Magistrate Judge Grand found that the MDOC's existing system–providing prisoners with access to teletypewriters–fails to provide *reasonable* accommodations.  He did not, as Defendants assert, require optimal accommodations to be provided.  Indeed, one of Defendants' own witnesses likened the MDOC's existing system to "sending someone a fax to their homes versus an email to communicate." R&R at 13 n. 5. Again, the Court agrees with the Magistrate Judge's analysis and conclusion that "Plaintiffs have shown that, *in reality*, [teletypewriters] do not enable them to communicate effectively with persons outside of prison, much less provide them with telecommunications access equal to that of hearing prisoners. Thus, the Court shall overrule Defendants' first objection.

### Objection 2: Denial of Interpreter Services for Essential Programs

The second objection relates to "whether the MDOC provides deaf and hard of hearing inmates with access to sign language interpreters that enables them to communicate and participate in programs and activities inside the prison to the same extent as hearing prisoners." R&R at 21. Magistrate Judge Grand concluded that Plaintiffs are entitled to summary judgment on this aspect of their ADA and Rehabilitation Act claims as well, finding that absent appropriate injunctive relief, the MDOC's deaf and hard of hearing inmates face a real risk of

Case 1:16-cv-02733-STV-NRN   Document 87-2   Filed 10/29/18   USDC Colorado   Page 105 of
2:15-cv-11222-SFC-DRG   Doc # 99   Filed 03/09/18   Pg 5 of 7   Pg ID 4094
111

not timely receiving necessary accommodations. R&R at 25.

Defendants' objection to this portion of the R&R is brief; they again argue that the Magistrate Judge erred by applying an optimal accommodation standard. This is not so. The MDOC is required to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).  And although the Magistrate Judge did not find that there has been a systemic denial of interpreting services, he did find that the evidence shows both that Defendants have continued to fail to furnish appropriate auxiliary aids by way of an interpreter and that there is a tangible risk that this failure will continue to occur. This finding supported Magistrate Judge Grand's ultimate conclusion: that Defendants' accommodations were not reasonable.  The Court agrees with the Magistrate Judge's analysis on this issue, which did not employ an optimal accommodation standard. Thus, the Court shall overrule Defendants' second objection.

### Objection 3: Recommendation to Include a Reasonable Training Provision

Finally, while denying Plaintiffs' summary judgment on their claim relating to the MDOC's training practices, Magistrate Judge Grand stated that it would nevertheless "be an appropriate exercise of the Court's remedial powers and discretion to include in any Consent Order a provision requiring MDOC correctional officers and staff to receive some form of reasonable training on how to identify and appropriately interact with deaf and hard of hearing prisoners." R&R at 32-33. Defendants cursorily object to this recommendation, stating only that it is improper.

Having reviewed the R&R, the Court agrees with Magistrate Judge Grand that including

5

a training provision in any consent order would be an appropriate discretionary exercise of the

Court's remedial powers. Indeed, the R&R details the MDOC's history of failing to adequately

respond to the needs of deaf and hard of hearing prisoners and its continuing failure to address

the issues that Plaintiffs have raised.  *See e.g.,* R&R at 26 ("[D]espite the prior problems, and the

pendency of this litigation, the MDOC has not taken any steps to monitor or verify whether its

facilities are complying with the McKee Memo's directives."). And because the Court shall

grant Plaintiffs' Motion for Summary Judgment in part, the MDOC will likely be faced with

implementing new policies or procedures to ensure ADA compliance. Under the circumstances,

the Court agrees with the Magistrate Judge that a reasonable training requirement is appropriate.

Thus, the Court shall overrule Defendants' third objection.

## CONCLUSION

For the reasons above, the Court OVERRULES Defendants' objections and ADOPTS the

Magistrate Judge's February 8, 2018 Report and Recommendation.  IT IS ORDERED that

Plaintiffs' Motion for Summary Judgment (Doc. # 76) shall be GRANTED IN PART AND

DENIED IN PART and that Defendant's Motion for Summary Judgment (Doc. # 74) shall be

DENIED. Specifically, the Court GRANTS Plaintiff's Motion for Summary Judgment as to

Counts I and II of the complaint and denies their motion as to the remaining counts.

IT IS FURTHER ORDERED THAT:

1) The MDOC shall:

a) Make videophones available to all deaf and hard of hearing prisoners;

b) Provide necessary auxiliary aids for all deaf and hard of hearing prisoners to

participate equally in prison programs and services, including consistent access to

6

ASL interpreters for all "high-stakes" interactions and programs, *see* R&R at 21,

including religious services;

c) Institute mandatory training for MDOC's correctional officers and staff on how

to identify and appropriately interact with deaf and hard of hearing prisoners;

d) Adopt effective and comprehensive policies and procedures in each of the

above areas, including for appropriate compliance monitoring;

2) The parties shall meet and confer in an attempt to resolve any aspects of Plaintiffs'

claims not disposed of by this order, and to agree on an appropriate consent order

implementing the relief specified in Paragraph 1 above, and any other relief necessary to

bring this action to a close.

3) Within 60 days of this order, the parties shall either file a proposed consent order for

the Court's review and approval or file a joint status report regarding any outstanding

issues preventing the parties from agreeing on a consent order.

IT IS SO ORDERED.


s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  March 9, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on
March 9, 2018, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager

7

**Video Technologies in
Federal Bureau of Prisons and State Department of Corrections**

**Alabama**
Alabama Department of Corrections – Administrative Regulations Number 705
http://www.doc.state.al.us/docs/AdminRegs/AR705.pdf

**Arizona**
David Bryant v. BOP
Larry Berke v. BOP

**California**
California Department of Corrections and Rehabilitation (CDCR)
How Technology Is Changing Deaf Inmates' Ability to Connect With the Outside World
https://morningconsult.com/opinions/technology-changing-deaf-inmates-ability-connect-outside-world/

**Colorado**
Jefferson County Sheriff's Office Detention Facility Inmate Handbook, 2014
jeffco.us/sheriff/documents/community-documents/inmate-handbook/

Department of Justice and the City of Englewood, Colorado – Settlement Agreement, Complaint Nos._ 204-13-311
https://www.ada.gov/englewood.htm

**Connecticut**
State of Connecticut Department of Correction, Administrative Directive 10.19
http://www.ct.gov/doc/LIB/doc/PDF/AD/ad1019.pdf

Department of Justice and the City of New Haven, Connecticut - Settlement Agreement, Complaint Nos. 204-14-143/204-14-144
https://www.ada.gov/new-haven/new-haven-sa.htm

Avid Prison Project, Accommodations in Communication
http://avidprisonproject.org/Making-Hard-Time-Harder/accomodations-in-communication.html

**Florida**
Disability Rights Florida vs Julie Jones, Florida Department of Corrections
July 7, 2017
http://www.disabilityrightsflorida.org/newsroom/story/disability_rights_florida_settles_landmark_lawsuit_against_florida_departme

Florida agrees to make prisons more accessible for inmates with disabilities, July 8, 2017
http://www.miamiherald.com/news/state/article160305754.html

**Idaho**



Randolph Smith v. Idaho Department of Correction
Case No. CV-12-00030-S-CWD

**Illinois**

Illinois DOC Sued to Accommodate
https://www.prisonlegalnews.org/news/2011/dec/15/illinois-doc-sued-to-accommodate-hearing-impaired-prisoners/Hearing Impaired Prisoners

http://www.equipforequality.org/wp-content/uploads/2015/10/Holmes-v-Godinez-Complaint-Final-5-4-11.pdf

Judge: Class-action status allowed in deaf inmates' lawsuit
http://www.telegraphherald.com/news/iowa-illinois-wisconsin/article_3c9ae3ef-3400-5d14-ba77-768a407ac505.html

**Kentucky**
Deaf inmates sue Ky. prisons over accommodations
http://m.gazette.com/deaf-inmates-sue-ky.-prisons-over-accommodations/article/feed/75579
https://morningconsult.com/opinions/technology-changing-deaf-inmates-ability-connect-outside-world/

Landmark Settlements Reached In Maryland and Kentucky for Deaf Prisoners
https://www.nad.org/2015/06/08/landmark-settlements-reached-in-maryland-and-kentucky-for-deaf-prisoners/

Oscar Adams and Michael Knights
https://www.clearinghouse.net/chDocs/public/DR-KY-0001-0007.pdf

**Louisiana**
https://nad.org/news/2015/6/landmark-settlements-reached-maryland-and-kentucky-deaf-prisoners

**Maryland**
Deaf inmates sue Ky. prisons over accommodations
http://m.gazette.com/deaf-inmates-sue-ky.-prisons-over-accommodations/article/feed/75579

How Technology Is Changing Deaf Inmates' Ability to Connect With the Outside World
https://morningconsult.com/opinions/technology-changing-deaf-inmates-ability-connect-outside-world/

Landmark Settlements Reached In Maryland and Kentucky for Deaf Prisoners
https://www.nad.org/2015/06/08/landmark-settlements-reached-in-maryland-and-kentucky-for-deaf-prisoners/

**Michigan**
Department of Justice v. Rochester Police Department – Settlement Agreement

https://www.ada.gov/rochester_pd_sa.html

https://www.mpas.org/newsroom/deaf-and-hard-hearing-prisoners-win-class-action-lawsuit-against-mdoc

**Missouri**
Rosenthal v. Missouri Department of Corrections
http://www.leagle.com/decision/In%20FDCO%2020160222940/ROSENTHAL%20v.%20MISSOURI%20DEPARTMENT%20OF%20CORRECTIONS

**Montana**
Lawsuit Over Accommodations for Disabled Inmates Settled
The state Department of Corrections and ACLU Montana have reached a settlement in a lawsuit over accommodations for Montana State Prison inmates with disabilities.
https://www.usnews.com/news/best-states/montana/articles/2017-03-02/lawsuit-over-accommodations-for-disabled-inmates-settled

**Nevada**
Department of Justice v. the City of Henderson, Nevada
https://www.ada.gov/henderson-nv-sa/henderson-nv-sa.htm

**New Jersey**
Essex County Correctional Facility (ECCF)
http://www.state.nj.us/humanservices/ddhh/newsletters/communicator/current/mc_april_11.doc

**New York**
Department of Justice v. Erie County, New York – Settlement Agreement
Erie County Holding Center and Correctional Facility
https://www.ada.gov/erie_county/erie_county_sa.htm

Department of Justice v. New York City Department of Corrections - Correspondence
https://www.ada.gov/briefs/rmsc_lof.pdf

**North Carolina**
In progress
https://dockets.justia.com/docket/circuit-courts/ca4/15-6826

**Oregon**
Deaf Prisoner Receives Settlement in Milestone Discrimination Suit Against Oregon Department of Corrections
http://www.prweb.com/releases/2014/02/prweb11545995.htm

How Technology Is Changing Deaf Inmates' Ability to Connect With the Outside World
https://morningconsult.com/opinions/technology-changing-deaf-inmates-ability-connect-outside-world/

**Pennsylvania**
Department of Justice v. City of Philadelphia Police Department - Correspondence
https://www.ada.gov/briefs/philadelphia_pd_lof.pdf

**South Carolina**
Department of Justice v. The City of Columbia, South Carolina - Settlement
https://www.ada.gov/columbia_pd/columbia_pd_sa.html

**Texas**
Texas Department of Criminal Justice, Parole Division - Policy
https://www.tdcj.state.tx.us/documents/parole/03.02.16_parole_policy.pdf

**Vermont**
*In the Matter of Rates for Interstate Inmate Calling Servs.*, 30 F.C.C. Rcd. 12763, 12876-77 (2015) (stating "Vermont, Virginia, and Wisconsin" are equipped with videophones)

**Virginia**
How Technology Is Changing Deaf Inmates' Ability to Connect With the Outside World

https://morningconsult.com/opinions/technology-changing-deaf-inmates-ability-connect-outside-world/

*In the Matter of Rates for Interstate Inmate Calling Servs.*, 30 F.C.C. Rcd. 12763, 12876-77 (2015) (stating "Vermont, Virginia, and Wisconsin" are equipped with videophones)

Powhatan prison first to have videophone for deaf
http://callcenterinfo.tmcnet.com/news/2010/11/18/5146457.htm

Video Relay Service Replaces TTY for Deaf Inmates in Fairfax County Adult Detention Center
http://www.fairfaxcounty.gov/sheriff/news/2016/video-relay-service-adult-detention-center.htm

**Wisconsin**
*In the Matter of Rates for Interstate Inmate Calling Servs.*, 30 F.C.C. Rcd. 12763, 12876-77 (2015) (stating "Vermont, Virginia, and Wisconsin" are equipped with videophones)

**Other**
http://hearinghealthmatters.org/hearingnewswatch/2014/ada-offers-hearing-impaired-inmates-protection-discrimination/

**Total 25**