Expert Report of Jean Andrews
*Rogers v. Colorado Department of Corrections*
Civil Action No. 16-cv-02733-STV (D. Colo.)


Introduction

I was contacted by Amy Robertson, counsel for Plaintiffs in this matter, on August 20, 2018. It is my understanding that she had previously retained Dennis Cokely as an expert in this case. As we both had sadly learned, Prof. Cokely passed away on August 15, 2018. Ms. Robertson asked me to review Prof. Cokely's report and supporting documents to determine whether I agreed with Prof. Cokely's opinions and would be willing to serve as an expert in this case. I am very familiar with Prof. Cokely's work, as he was a widely-respected scholar in our field. Having reviewed his June 12, 2018 report as well as the documents listed starting on page 11 of this report, I concur in Prof. Cokely's report and opinions with the exception of the struck-through text in the copy of the report attached as Exhibit A hereto and, as amended, incorporate it herein by reference. The struck-through portions of Exhibit A relate either to (1) Prof. Cokely's personal credentials; or (2) his in-person interviews with the four Deaf plaintiffs. I did not interview any of the plaintiffs, although I have reviewed the educational records of the four Deaf plaintiffs and those of Bionca Rogers's mother (Theresa Jordan), who is also Deaf. As is clear from Exhibit A, the in-person interviews played a very small role in Prof. Cokely's opinions, and it is my expert opinion that I do not need to meet the plaintiffs to concur with Prof. Cokely's opinions. In addition, while I am very familiar with both the principles and the references on which Prof. Cokely relied, I attempted to gather all of the sources to review them

EXHIBIT 2

in connection with this report.  I was unable to locate four of his 59 references;[1] these are struck through both in text and in the "References" section starting on page 42 of Exhibit A.  In each case, these references were part of a string cite and were not essential to the opinions he expressed and that I endorse here.

A complete statement of my opinions is set forth in this report and in Exhibit A.  This report is based on my professional, academic, and personal experience as well as a review of the documents listed below.  I have been involved with d/Deaf individuals on personal and professional levels for 44 years. I have a Masters in Deaf Education from McDaniel College and a Ph.D. in Speech and Hearing Sciences from the University of Illinois, Urbana, Illinois.  From 1983 to 2015, I prepared teachers of deaf students at the undergraduate, masters, and doctoral level, including serving on dissertation committees on topics of deaf individuals in the criminal justice system, reading, and ASL linguistics. A copy of my *curriculum vitae* is attached as Exhibit B hereto; it includes a list of all publications I have authored in the past 10 years.

During the past four years, I have provided testimony in the following cases: *United States v. Heyer*, Docket No. 5:08-HC-2183-BO (E.D. N.C.); *Sonnier v. Magic Circle Corp.*, Civil Action. No. 6:13-cv-00246 (W.D. La); and *VanValkenburg v. Oregon Department of Corrections*, Case No 3:14-cv-00916-MO (D.Or.).

I am being paid for my work on this case at the rate of $150/hour.

---

[1] A sixth reference, Padden and Humphries, 1989, was listed in the "References" section but not cited in the report.

<u>Summary of Opinions</u>

1.      In order to enable d/Deaf and hard of hearing prisoners to communicate effectively with others outside of CDOC facilities, CDOC must provide d/Deaf and hard of hearing prisoners with access to videophones, Video Relay Services (VRS), and, if linguistically functionally appropriate for the individual, a TTY and/or a CapTel phone. A videophone would enable d/Deaf and hard of hearing inmates to communicate directly with other deaf individuals using sign language and permit real-time interpretation through the free VRS, enabling them to communicate with individuals who do not know sign language. CDOC must also have policies in place that ensure that the availability of appropriate telecommunications devices for d/Deaf and hard of hearing prisoners is equivalent to telephone access for prisoners who are not d/Deaf or hard of hearing.

2.      CDOC must review all of its telephone policies and procedures to ensure that d/Deaf and hard of hearing prisoners are not systematically disadvantaged relative to prisoners who are not d/Deaf or hard of hearing.

3.      The meaning of deafness is best understood when viewed as a social, cultural, communicative and linguistic phenomenon rather than simply as a physical disability.

4.      Deafness should not be defined only in relation to the physical disability of a hearing loss as measured in decibels (*i.e.*, 75 db loss or above).

5.      The class of people who are deaf cannot hear and cannot understand speech for communication purposes with or without auditory technology.

6.      Within the class of people who are deaf, there are two subsets: those who are deaf from birth/early childhood before language was acquired; and those who become late-deafened, after language was acquired.

7.     Although each subset is deaf and relies upon visual communication, their life experiences have been very different.

8.     Deaf people are unable to rely upon their hearing and speech as an effective and primary means of relating to the world and interacting with the hearing and speaking majority even with auditory technology as hearing aids and cochlear implants.

9.     Members of the American Deaf Community have their own visual language: American Sign Language (ASL).

10.     Deaf people are a linguistic and cultural minority that is communicatively disadvantaged by the hearing and speaking majority.

11.     ASL is central to determining membership in and defining the American Deaf Community.

12.     ASL is the only means of communication that enables effective, efficient and reliable communication for members of the American Deaf Community.

13.     Those with little or no knowledge of d/Deaf people or ASL make numerous unfounded, stereotypic assumptions about d/Deaf people, their means of communication, and their signed language.

14.     The most significant factor uniting members of the American Deaf Community is the use of ASL.

15.     ASL is neither a manual form nor a derivative form of English, and thus there is not a one-to-one correspondence between ASL signs and English words.

16.     The grammatical and syntactic structure of ASL is fundamentally different from the grammatical and syntactic structure of English.

17.     Facial expressions, head tilts and nods, eyebrow raises are important elements that encode the grammar of ASL. These linguistic elements are not found in English nor can they be conveyed in writing notes or in a TTY text conversation.

18.     There is no conventional written form of ASL.

19.     As a group, Deaf people face severe challenges in acquiring competence in spoken or written English, and most Deaf people rarely attain competence in spoken or written English.

20.     The average literacy level of the American Deaf Community is at the fourth grade reading level, which, is significantly lower than it is for the population as a whole.

21.     Lip-reading is so unreliable that it cannot be used to ensure comprehension and effective communication in any group setting or in any "high stakes" one-on-one setting (*i.e.*, interactions related to health, safety, discipline and the like).

22.     The use of speech for the vast majority of Deaf people is so ineffective that it cannot be relied upon to ensure accurate expression and effective communication.

23.     Late-deafened adults who have reasonably good lip-reading and speech skills, because of their previous exposure to spoken English, are often thought to be feigning deafness.

24.     The only way for Deaf people and for deaf people who have learned sign language to participate meaningfully and effectively in all group interactions and in all "high stakes" one-to-one interactions is to provide a qualified sign language interpreter.

25.     Competence in ASL and English is a necessary, but not sufficient, condition to become a qualified sign language interpreter.

26.     The cognitive processes involved in interpretation are extremely complex and require the ability to determine meaning and intent.

27.     For non-social communicative interactions between Deaf people and those who are not d/Deaf and who cannot sign fluently, consecutive or simultaneous interpretation provided by a qualified interpreter is the only viable option to ensure that Deaf people have effective communication access and have reliable opportunities for participation.

28.     Certification of interpreters at a national level provides a readily identifiable measure of assurance that the certificate holder possesses the knowledge and communicative flexibility necessary to interpret successfully for groups of diverse Deaf people that embody naturally occurring sociolinguistic variation.

29.     Late-deafened adults who have learned to sign benefit from and rely upon the services of qualified sign language interpreters.

30.     Provision of a videophone and access to VRS is necessary to provide equivalent and effective telephonic services to d/Deaf and hard of hearing prisoners who are able to communicate in ASL, regardless of level of intelligible speech or level of literacy.

31.     Provision of CapTel is necessary when d/Deaf and hard of hearing prisoners have intelligible speech, a level of literacy sufficient to use CapTel effectively and do not know ASL and when they are involved in the determination of what constitutes effective telephonic access for them.

32.     For telecommunications, the TTY and TDD technologies are now obsolete with few persons owning them, which makes it impossible for d/Deaf inmates to communicate with friends and family outside of the jail or prison in the same manner as hearing inmates have in using telephone communication.

33.     Because TTY technology is antiquated, there are few staff in the criminal justice system who are trained to maintain and repair them so this creates unfair delays in d/Deaf inmates' opportunities to communicate with family and friends.

34.     Neither writing notes nor using the TTY provides effective communication nor is a reasonable accommodation for d/Deaf individuals whose primary language is ASL and who are learning English as a second language.

35.     Using the TTY is not functionally appropriate for d/Deaf persons who have low literacy levels in English.

36.     The majority of d/Deaf adult individuals are reading and writing at the fourth grade or below reading grade level, thus, writing in notes or typing text on the TTY do not constitute effective communication nor are these devices reasonable accommodations for them.

37.     Oftentimes, the TTY signals are garbled and result in a series of unidentified typed characters and the d/Deaf recipient does not know if these signals are from an interference or a scrambled version of the other person's communication exchange, thus rendering the TTY useless as effective communication.

38.     Typing on a TTY takes longer for d/Deaf individuals whose primary language is ASL and who have low English literacy abilities and this results in their writing briefer messages and this curtails their ability to express their thoughts and feelings and communicate in the same manner as hearing inmate do when using the telephone.

39.     Using TTY communication as well as note writing hamper d/Deaf persons in their communication as each party must complete their turn before the other party can respond.  Thus, unlike telephone or videophone conversations, clarifying questions or requests for additional information cannot occur spontaneously and in real time.

40.     TTY and note written conversations do not allow the d/Deaf person to convey emotional reactions or responses using stress, intonation, and tone in the same manner as hearing persons can do through spoken telephone conversations. Instead, d/Deaf persons must convey these feelings through writing (or typing) words which makes conveying emotional responses challenging and often times impossible for d/Deaf persons who have limited literacy in English.

41.     TTY technology have been replaced by videophones, VRS, and videophone capabilities on cell phones, tablets, and computers which allow d/Deaf persons to use their primary language, ASL and to directly communicate with others.

42.     Videophone conversations allow d/Deaf inmates to directly converse in a language they are more comfortable and fluent in, neither encumbered by written English nor slowed by typing.

43.     Videophone conversations for d/Deaf inmates are analogous to spoken telephone conversations that are afforded to hearing inmates allowing them to convey their ideas, feelings and emotions directly.

44.     Videophones rather than TTYs provide effective communication and constitute a reasonable accommodation for d/Deaf individuals in society. For this reason, they have been adopted by numerous states' criminal justice systems.

45.     Based on the limitations of the TTY as discussed above, only a videophone can currently provide d/Deaf inmates an effective, equivalent and reasonable level of telephone access that is currently in use by hearing inmates using the telephone.

46.     If a party that the d/Deaf inmate is trying to call does not have a videophone, then the free VRS can be used to connect  a signing and speaking operator with a non-deaf, non-signing hearing person.

47.     The Federal Communications Commission (FCC), an independent agency of the United States government created by law to regulate interstate communications by radio, television, wire, satellite, and cable has encouraged correctional facilities to move beyond the out-of-date TTY and to use advanced forms of technology including the videophone and VRS in order to provide effective telephone services for d/Deaf inmates.

48.     A review of all CDOC telephone policies and procedures, with appropriate modifications where warranted, is necessary to ensure that d/Deaf and hard of hearing prisoners are not systematically disadvantaged relative to prisoners who are no d/Deaf or hard of hearing

49.     In order to combat audism or the systematic discrimination by criminal justice officials who neglect to provide visual access to telephones through the use of videophones and VRS, there is an urgent need for the training of all criminal justice staff who interact with d/Deaf inmates.  Such training can include topics about d/Deaf people and Deaf culture, the importance of sign language, the limitations of spoken language, lipreading, and auditory technology (i.e. hearing aids and cochlear implants), and the critical need for visual access that videophones and VRS provide to d/Deaf inmates which is equivalent to the telephone access of hearing inmates.

<u>List of materials reviewed</u>

Smith, Janet -- deposition transcript (4/9/18)
Jacobson, Adrienne -- deposition transcript (4/9/18)
Bradley, Amy -- deposition transcript (4/6/18)
AR 850-12 Telephone Regs March 2018
CDOC/Rogers-000052 - 52-54 - IA - DWCF - 0850-012_20170801
CDOC/Rogers-004409 - IA 850-12 08.23.17
2018-01-04 Defendant's Final Revised Responses to RFP – Supplement
2018-01-04 Defendant's Final Signed Responses to Interrogatories – Supplement
2018-01-17 Final Revised Responses to RFP – Supplement
2017-06-15 [34] THIRD AMENDED COMPLAINT
2017-09-29 [52] ORDER [37] Motion to Dismiss DENIED and [44] Motion to Stay DENIED AS MOOT SORENSON_000005
P_000300 - Documents from Illinois School for the Deaf
CDOC/Rogers-004391 - Trevithick, 16380-1
CDOC/Rogers-004389 - Atkins, 82587 – 1
CDOC/Rogers-004388 - Atkins TTY informal grievance
CDOC/Rogers-004384 - Atkins 34864 - 1
CDOC/Rogers-004385 - Atkins, 34864 – 2
CDOC/Rogers-004386 - Atkins 34864 – 3
CDOC/Rogers-004226 - Trevithick D-CT0910-398 S1
CDOC/Rogers-004228 - Trevithick D-CT0910-398 S2
CDOC/Rogers-004218 - Trevithick D-CT0910-270 S2
CDOC/Rogers-004220 - Trevithick D-CT0910-270 S2.1
CDOC/Rogers-004240 - Trevithick D-CT0910-435 S2.3
CDOC/Rogers-004216 - Trevithick D-CT0910-270
CDOC/Rogers-004234 - Trevithick D-CT0910-398 S3
CDOC/Rogers-003224 - Atkins Grievance
CDOC/Rogers-002163 - TTY Transcripts - Begano - Bates 2163 – 2164
CDOC/Rogers-002162 - list of qualified TTY users in 2016 at CTCF
CDOC/Rogers-002157 - VRS units at CTCF email
CDOC/Rogers-002155 - VRS providers in US 11-26-13
CDOC/Rogers-002154 - video pilot meeting follow up May 2015
CDOC/Rogers-002151 - requisitions for this project
CDOC/Rogers-002137 - Oregon DOC and CDOC conference call
CDOC/Rogers-002131 - OIT-EPPMO-Project Request Form
CDOC/Rogers-002129 - more correspondence on installation
CDOC/Rogers-002128 - meeting info 3-18-16
CDOC/Rogers-002125 - information on Purple from GTL
CDOC/Rogers-002119 - informational material
CDOC/Rogers-002118 - form for offenders for VRS
CDOC/Rogers-002114 - email correspondence regarding installation of units

CDOC/Rogers-002113 - email correspondence of my concerns
CDOC/Rogers-002111 - email correspondence between Julie and I
CDOC/Rogers-002108 - CTCF IA
CDOC/Rogers-002106 - correspondence from Cpt Stenzel
CDOC/Rogers-002105 - Calling Instructions
CDOC/Rogers-002101 - 3-21-14- follow up
CDOC/Rogers-001573 - Video Relay Form for offender
CDOC/Rogers 001865 - DWCF Trouble log
CDOC/Rogers-001909 - Saugause Offender Saugause 173905
CDOC/Rogers-001907 - Saugause Grievances-Saugause 173905
CDOC/Rogers-001904 - Saugause 173905 informal resolution
CDOC/Rogers-001902 - Saugause 173905 informal resolution attachment 1
CDOC/Rogers-001903 - Saugause 173905 informal resolution attachment 2
CDOC/Rogers-001892 - Rogers Offender Rogers 169704
CDOC/Rogers-001888 - Rogers Grievances-Rogers 169704
CDOC/Rogers-001882 - Begano Offender Begano 112149
CDOC/Rogers-001881 - Begano 112149 informal resolution
CDOC/Rogers-001880 - Begano 112149 informal resolution attachment 1
CDOC/Rogers-001876 - Begano Grievances-Begano 112149
CDOC/Rogers-001597 - Begano 112149 request 3
P_000251 Thomson R2-J - JBS Dox
P_000166 Poudre School District - JBS Dox
P_000164 Poudre Request – JBS
P_000158 Jeffco Public Schools - CAB Dox
P_000045 CSDB - JBS Dox
P_000495 - Atkins Step 1-3 Grievances & Responses
P_000499 - Begano TTY transcript
P_000500 - Trevithick informal grievance
CDOC/Rogers-004249 - Trevithick file part 3
CDOC/Rogers-004445 - Trevithick TTY transcript
CDOC/Rogers-004443 - Saugause TTY transcript
CDOC/Rogers-004446 - Rogers TTY transcript
CDOC/Rogers-004426 - Atkins TTY transcript
CDOC/Rogers-004425 - Atkins TTY transcript
CDOC/Rogers-004430 - Begano TTY transcript
CDOC/Rogers-001943 - Global Tel* Link contract amendment with CDOC


The foregoing and Exhibit A hereto constitute my opinions in this case.


Date: _____        _____

                             Jean Andrews

11

CDOC/Rogers-002113 - email correspondence of my concerns
CDOC/Rogers-002111 - email correspondence between Julie and I
CDOC/Rogers-002108 - CTCF IA
CDOC/Rogers-002106 - correspondence from Cpt Stenzel
CDOC/Rogers-002105 - Calling Instructions
CDOC/Rogers-002101 - 3-21-14- follow up
CDOC/Rogers-001573 - Video Relay Form for offender
CDOC/Rogers 001865 - DWCF Trouble log
CDOC/Rogers-001909 - Saugause Offender Saugause 173905
CDOC/Rogers-001907 - Saugause Grievances-Saugause 173905
CDOC/Rogers-001904 - Saugause 173905 informal resolution
CDOC/Rogers-001902 - Saugause 173905 informal resolution attachment 1
CDOC/Rogers-001903 - Saugause 173905 informal resolution attachment 2
CDOC/Rogers-001892 - Rogers Offender Rogers 169704
CDOC/Rogers-001888 - Rogers Grievances-Rogers 169704
CDOC/Rogers-001882 - Begano Offender Begano 112149
CDOC/Rogers-001881 - Begano 112149 informal resolution
CDOC/Rogers-001880 - Begano 112149 informal resolution attachment 1
CDOC/Rogers-001876 - Begano Grievances-Begano 112149
CDOC/Rogers-001597 - Begano 112149 request 3
P_000251 Thomson R2-J - JBS Dox
P_000166 Poudre School District - JBS Dox
P_000164 Poudre Request - JBS
P_000158 Jeffco Public Schools - CAB Dox
P_000045 CSDB - JBS Dox
P_000495 - Atkins Step 1-3 Grievances & Responses
P_000499 - Begano TTY transcript
P_000500 - Trevithick informal grievance
CDOC/Rogers-004249 - Trevithick file part 3
CDOC/Rogers-004445 - Trevithick TTY transcript
CDOC/Rogers-004443 - Saugause TTY transcript
CDOC/Rogers-004446 - Rogers TTY transcript
CDOC/Rogers-004426 - Atkins TTY transcript
CDOC/Rogers-004425 - Atkins TTY transcript
CDOC/Rogers-004430 - Begano TTY transcript
CDOC/Rogers-001943 - Global Tel* Link contract amendment with CDOC

The foregoing and Exhibit A hereto constitute my opinions in this case.

Date:   9 - 6 - 18

Jean F. Andrews

Jean Andrews

11

**6/12/2018**

EXPERT REPORT OF DENNIS COKELY, Ph.D.

16-cv-02733-STV

ActiveUS 167348467v.2

**EXHIBIT A**

EXPERT REPORT OF DENNIS COKELY, Ph.D.

I.    EXPERT QUALIFICATIONS

I am currently a tenured Professor of American Sign Language (ASL) and Modern Languages at Northeastern University. I am the Director of the American Sign Language Program, former Director of the World Languages Center and the former Chair of the Department of Languages, Literatures and Cultures. I have been involved with Deaf people on a personal and professional level for 51 years. I hold a Master's in Applied Linguistics from American University and a Doctorate in Sociolinguistics from Georgetown University. I am a nationally certified Sign Language interpreter and have served two terms as President of the Registry of Interpreters for the Deaf (RID), the professional organization of and the national certifying body for interpreters. I have authored or coauthored 10 textbooks, five book chapters, and 35 articles or conference proceedings, and have directed and/or edited over 350 videotapes focusing on American Sign Language and ASL/English Interpretation. I also have produced published translations of over 80 videotapes. The 1980 series of five texts that I co-authored is still widely used in Sign Language programs and classes across the United States. My 1992 book, *A Sociolinguistic Model of the Interpretation Process*, is widely used in Interpreter Education Programs and has been translated into Italian and German and significant portions have been translated into Swedish and Japanese. I am currently the Principal Investigator for a $2 million grant from the U.S. Department of Education to establish the Center for Atypical Language Interpreting at Northeastern University.

Prior to coming to Northeastern, I spent 12 years working full-time as the President and co-owner of Sign Media, Inc., a video-production company specializing in producing print and video material focused on the American Deaf Community (Deaf Community or Community), American Sign Language, and ASL/English Interpretation. Prior to that I spent 13 years working

at Gallaudet University[1] in a number of capacities: a teacher of elementary, undergraduate, and graduate students; an administrator responsible for teaching and evaluating faculty and staff sign language competencies; and a Research Associate in the Linguistics Research Lab researching ASL/English interpretation. Attached as Exhibit A is my complete curriculum vitae, which also includes a listing of the other instances in which I have served as an expert witness.

During the last four years I have testified at trial on November 7, 2017 (*Heyer v. Federal Bureau of Prisons*, et al., No. 5:11-CT-3118-D, E.D.N.C.) and was deposed on December 13, 2017 (*Levy, et al. v. Louisiana Department of Public Safety and Corrections*, No. 3:16-cv-00542-JWD-EWD, M.D. La.) and on December 9, 2016 (*McBride, et al. v. Michigan Department of Corrections*, No. 2:15-cv-11222, E.D. Mich.). I have been retained by the Civil Rights Education and Enforcement Center at the rate of $125.00 per hour. In addition to being based on my knowledge and experience, my report is based on: (1) face-to-face meetings with d/Deaf[2] and hard of hearing plaintiffs at the Denver Women's Correctional Facility and at the Colorado Territorial Correctional Facility and (2) a review of materials provided to me by counsel and identified in Exhibit B.

## II.   EXECUTIVE SUMMARY

Members of the American Deaf Community are a linguistic and cultural minority. The language that binds them together and is the critical determinant for membership in the Deaf Community is American Sign Language. The vast majority of people who are not deaf have stereotypic misconceptions about d/Deaf people and American Sign Language. They often believe

---

[1] Gallaudet University is a federally chartered private university for the education of d/Deaf and hard of hearing people located in Washington, D.C.

[2] The use of the term d/Deaf is explained on page 8.

that d/Deaf people can lip-read with a degree of accuracy that will enable meaningful communication, when, in reality, the level of lip-reading accuracy for most d/Deaf and hard of hearing people is 25 – 30% at best. Those who are not d/Deaf often believe that d/Deaf people can read and write in fluent English when, in reality, the average Deaf person reads at approximately a fourth-grade reading level. Those who are not d/Deaf often fail to understand that effective communication with d/Deaf people requires that one communicate visually, such as by using visual signals and alarms and provision of sign language interpreters when needed. These erroneous, stereotypic beliefs about and attitudes toward d/Deaf people frequently result in systematic discrimination against d/Deaf people. Such discrimination, known as audism, occurs when those who are not d/Deaf assume that d/Deaf people are inferior because of their different hearing status and when access to environments, technology, institutions, and programs is predicated upon one's ability to hear. Simply put, the failure to provide visual access to aspects of society that are only auditorily accessible is audism.

Based on my experience ~~of over 50 years, my visits to Colorado Department of Corrections (CDOC) facilities and interviews with plaintiffs Cathy Begano, Jennifer Saugause, Andrew Atkins, and Marc Trevithick on April 26, 2018,~~ and my review of written documentation, it is my opinion that d/Deaf and hard of hearing prisoners in the CDOC have been denied effective and equivalent telephonic communication and access to the technology that make effective communication possible. It is my opinion that CDOC has restricted access to services, programs and communication in a way that denies meaningful and effective communicative access for CDOC d/Deaf and hard of hearing inmates. It is my opinion that the policies and procedures in place unfairly and unnecessarily treat d/Deaf and hard of hearing CDOC prisoners differently than non-deaf prisoners and deny them access to effective telephonic communication that is afforded

to non-deaf prisoners. It is also my opinion that the policies and procedures I have reviewed in documents provided to me and the treatment of d/Deaf and hard of hearing prisoners revealed during my interviews makes it clear to me that these issues are system-wide. In sum, I believe that CDOC engages in audist practices.

To ensure effective communication, as well as the physical safety of d/Deaf and hard of hearing prisoners, CDOC must, minimally, undertake the following major steps.

A.     In order to enable d/Deaf and hard of hearing prisoners to communicate effectively with others outside of CDOC facilities, CDOC must provide d/Deaf and hard of hearing prisoners with access to Videophones, Video Relay Services, and, if functionally appropriate for the individual, a TTY and/or a CapTel phone. A videophone would enable d/Deaf and hard of hearing inmates to communicate with other deaf individuals using sign language and permit real-time interpretation through the free Video Relay Service ("VRS"), enabling them to communicate with individuals who do not know sign language. CDOC must also have policies in place that ensure that the availability of appropriate telecommunications devices for d/Deaf and hard of hearing prisoners is equivalent to telephone access for prisoners who are not d/Deaf or hard of hearing.

B.     CDOC must review all of its telephone policies and procedures to ensure that d/Deaf and hard of hearing prisoners are not systematically disadvantaged relative to prisoners who are not d/Deaf or hard of hearing.

Finally, as additional information becomes available, I expect to examine that material and expand upon the opinions offered in this report.

III.    ANALYSIS

    A.    Defining Deafness

Although it is often the case that those seeking to define or discuss deafness do so from a medical or audiological perspective, such a singular perspective significantly misses the mark. The meaning of deafness is best understood "when it is viewed as a social phenomenon rather than as a physical disability. To say this is not to deny the usefulness of studying deafness medically but rather to point out that such an approach tends to overlook how their deafness influences deaf peoples' daily lives, how the disability of deafness becomes a handicap." (Schein, 1996).[3] Schein goes on to define deafness as "the common outcome of diverse causes resulting in an inability to hear and understand speech through the ear alone." The critical import of this definition is that it emphasizes communication – a quintessential function of human beings. This definition specifies that people who are deaf cannot hear and cannot understand speech; they may be able to hear speech but cannot understand it (i.e., cannot discriminate what is said). Even if they can hear loud noises and are aware that someone is talking, they are still deaf by this definition if they cannot understand the speech they hear. This functional definition then clearly and helpfully distinguishes the difference between those who are hard of hearing (those who have reduced hearing ability but can hear and understand speech) and those who are deaf (those who cannot hear and cannot understand speech).

The age at which one becomes deaf is critically important because this determines membership in one of two subsets within the larger class of deaf individuals. Childhood deafness

---

[3] All secondary sources referenced in my report are listed in their entirety at Section VI.

creates significant obstacles to acquiring spoken language and becoming literate in English and is generally associated with a tendency to seek out and socialize with other deaf people, thus becoming part of the American Deaf Community. Adult onset deafness, on the other hand, generally does not interfere with speech and those who become deaf as adults generally do not seek out members of the American Deaf Community (i.e., those early deafened) for companionship, nor do members of the American Deaf Community seek out late-deafened adults for companionship. This is because, although members of each subset are deaf (i.e., they cannot hear and cannot understand speech), and although members of each subset rely upon visual and not auditory means of communication, their life experiences have had different trajectories.

<u>Summary Of Opinions With Respect To Defining Deafness:</u>

- The meaning of deafness is best understood when viewed as a social and communicative phenomenon rather than simply as a physical disability.

- The class of people who are deaf cannot hear and cannot understand speech.

- Within the class of people who are deaf, there are two subsets: those who are deaf from childhood and those who become late-deafened.

- Although each subset is deaf and relies upon visual communication, their life experiences have been very different.

B.    <u>The American Deaf Community: A Linguistic And Cultural Minority</u>

There is an identifiable subset of deaf people in America that is unable to rely upon hearing and speech as an effective and primary means of relating to the world and interacting with those who are not d/Deaf. As children, some of these individuals, by virtue of parental decision or educational placement, are placed on a trajectory where they will spend their lives pursuing the goal of assimilating with the hearing and speaking majority of the population (i.e., trying to "pass") to the extent possible. Others, however, are placed on a very different trajectory because they have been given or choose to embrace a different "center" for their lives – a Deaf center. These deaf

individuals see themselves as Deaf. The written distinction between "deaf" and "Deaf," lower- and upper-case, has been used since 1972 to differentiate between those who are deaf and those who are deaf but who also identify as a member of a linguistic and cultural minority (Woodward, 1972).

Individuals who are Deaf use American Sign Language and are fundamentally a visual people, with their own visual language, social organizations, history, and mores. They see themselves as members of the Deaf-World. Indeed, a case has been made that members of the Deaf-World should be viewed as an ethnic group rather than a "disabled" group (Lane, Pillard & Hedberg, 2011). Contrary to the view held by most non-deaf people, Deaf people do not view their audiological condition as the primary reality that binds them together as a Community. Although society in general may view their audiological condition as a defining element for Deaf people, what binds Deaf people together is their use of American Sign Language. Deaf people are a linguistic and cultural minority that has been, and continues to be, communicatively disadvantaged by the hearing and speaking majority (e.g., Padden and Humphries 2005; Lane 1992; Jankowski, 1997; Wrigley, 1996; Baker and Battison, 1980). In short, these individuals, united by their use of American Sign Language, are members of the American Deaf Community.

The use of American Sign Language not only unites Deaf people but it also defines them as a linguistic minority. The primary reason for the central role of American Sign Language is that, unlike any other means of communication available to Deaf people, American Sign Language is the only means of communication that enables effective, efficient, and reliable communication.

While some late-deafened adults do try to learn to sign, they often do so to compensate for the deteriorating intelligibility of their speech, to communicate with family members or friends who are learning to sign or perhaps to communicate with Deaf people they have met. However,

learning to sign does not automatically mean that they wish to identify themselves as Deaf; late-deafened adults usually continue to identify themselves as deaf – unable to hear, sharing an audiological condition and the need for visual means of communication with Deaf people – but they do not see themselves as having a linguistic and cultural identity as a member of the Deaf Community.

Summary Of Opinions With Respect To The American Deaf Community:

- Deaf people are unable to rely upon their hearing and speech as an effective and primary means of relating to the world and interacting with the hearing and speaking majority.

- Members of the American Deaf Community have their own visual language: American Sign Language.

- Deaf people are a linguistic and cultural minority that is communicatively disadvantaged by the hearing and speaking majority.

- American Sign Language is central to determining membership in and defining the American Deaf Community.

- American Sign Language is the only means of communication that enables effective, efficient and reliable communication for members of the American Deaf Community.

C.    Deaf People As A Linguistic Community

Although the existence of an American Deaf Community is now undeniable, most people with little or no knowledge of or experience with d/Deaf people make a number of stereotypic and unfounded assumptions about d/Deaf people (Cokely, 2001; Spingarn, 2001). For example, they wrongly assume that "all deaf people can lip-read" or that "all deaf people can speak" or that "all deaf people are fully literate in English." While these are uninformed and naïve views of d/Deaf people, the long-standing and well-documented reality is that members of the American Deaf

Community, as a group, do not use their speech for communication, do not lip-read English well and, as a group, have extremely limited competence in English.

However, as noted above, the most significant factor uniting and identifying members of the American Deaf Community is not whether a Deaf person uses speech, the degree of hearing possessed by a Deaf person, or competence in English. Rather, it is whether a person uses American Sign Language (ASL) as his/her primary means of communication. The use of American Sign Language provides a means of determining acceptance into the Deaf Community, enables social interaction among members of the Deaf Community, and, through the use of ASL/English interpreters, provides a ready means of interacting with non-deaf people. The importance of American Sign Language derives from the fact that it is a visually clear and accessible means of communication that enables Deaf people to have effective and efficient communication with each other and, by employing the services of an ASL/English interpreter, with the hearing and speaking majority.

Because of the essential nature of American Sign Language in defining the American Deaf Community as a linguistic minority, it is important to address and dispel several misconceptions about ASL.

> 1.      American Sign Language

A primary misconception often held by those unfamiliar with American Sign Language is that they assume it is simply a manual form of, or a derivative form of, spoken English. They assume wrongly. The lexicon (i.e., the vocabulary) of a signed language refers, not to the words of a spoken language, but rather directly to the concept or meaning that Deaf people wish to convey (Baker-Shenk & Cokely, 1980; Valli, Lucas & Mulrooney, 2005). In American Sign Language,

signs refer not to English words, but rather to the concepts or meanings that its users wish to convey and exchange. For example, the American Sign Language sign refers to an object (e.g., a cat) and not to the English word for that object (just as the Japanese word "neko" refers, not to the English word "cat" but to the cat itself). American Sign Language has a lexicon and syntactic structure quite unlike that of spoken English. In simplest terms, there is not a one-to-one correspondence between American English words and the signs in American Sign Language, as is true of any two languages, spoken or signed. Instead, American Sign Language is a naturally evolved language used by members of the American Deaf Community and those non-Deaf people who have learned or acquired it. The linguistic evidence is clear and incontrovertible - American Sign Language is structurally different from English (Stokoe, 1965).

However, it is not only at the lexical level that American Sign Language and English differ. The grammar and syntax of the two languages differ considerably. In fact, the grammatical structure of ASL is closer to that of Chinese than English (Bellugi and Klima, 1979; Baker-Shenk & Cokely, 1980; Rutherford, 1992; Valli, Lucas & Mulrooney, 2005). For example, ASL is a "topic-comment" (also referred to as "given-new") language which means that modification or the addition of new information takes place after the topic has been stated. English, on the other hand, has a strong preference for modification or statement of new information before the topic has been stated. Unlike English, ASL uses distinct facial behaviors for grammatical and modification purposes. Distinct upper face non-manual signals are used to express conditions, negation, yes/no questions, relative clauses, and WH-questions. Distinctive lower face behaviors are used for adjectival and adverbial purposes. The use of non-manual behaviors is another significant way in which ASL differs from English.

Here it is also worth noting that the same types of variation that exist in English and all spoken languages (e.g., geographic, age, educational status) also exist in ASL and all other signed languages. Additionally, the same physical and cognitive conditions (e.g., strokes, accidents, aphasia) that negatively impact someone's use of English can also affect someone's use of ASL. ~~In fact, the current grant for which I am Principal Investigator is dedicated specifically to studying atypical signers – e.g., Deaf people with cognitive challenges, senior citizens with cerebral palsy. Depending on the severity of or stage of the condition, it is very often the case that a team of interpreters/practitioners (usually the team will include a Certified Deaf interpreter) is needed to ensure effective communication.~~

Another way in which ASL differs from English is that it does not have a conventionally accepted written form, i.e. an orthography. This is true of all of the signed languages and many of the spoken languages in the world. There have been several attempts at creating a notation system for recording signed languages, the most notable of which is Stokoe notation system (Stokoe, et al. 1965). However, like the International Phonetic Alphabet that is used to transcribe spoken languages, the use of Stokoe notation system has largely been restricted to linguists and is now being replaced by digital video recordings and computer programs that are used to record and analyze signed languages (e.g., Boston University's SignStream http://www.bu.edu/asllrp/SignStream/ and SportsTec's StudioCode application http://www.sportstecinternational.com/). A more widely used means of trying to record signs is "glossing" (e.g., Baker-Shenk & Cokely, 1980), in which an English word written in all capital letters is used to refer to a sign. Thus, the gloss "CAT" refers to the sign that is used to represent the concept "cat." Glossing has some severe limitations however. Unlike Stokoe notation, the reader of a glossed transcription must already know the sign being referred to in order to

approximate the articulation of the sign that was glossed. Also, the same gloss may refer to two different variants of the same sign, since glossing does not capture articulatory behaviors. Despite these limitations, it is not uncommon for Deaf people to use glosses when writing notes or when communicating with a teletypewriter (the acronym TTY is used). TTYs began as retrofitted, discarded Western Union teletype machines, hence the acronym TTY. Newer devices are also referred to by the acronym TDD - Telecommunication Device for the Deaf. TTYs/TDDs make it possible for Deaf people to type to each other over existing phone lines; but TTYs/TDDs are now practically obsolete because of the virtually ubiquitous presence of Videophones within the Deaf Community.

However, glossing is not a written form of American Sign Language, nor is it written English, even though the words may be English words. It is practically and linguistically inconceivable that a written two-dimensional form could reliably and easily capture three-dimensional moving, signed, conversational interactions. Analog and digital video recordings and the use of Videophones (essentially internet signed communication using video web-cams) not only have rapidly replaced TTYs and the need for a written form of American Sign Language, but also have provided a more accurate means of preserving and sharing signed interactions.

Deaf people as a group are unable to rely upon their hearing and speech as an effective and primary means of communication. Likewise, they also are unable to rely upon means of communication that are based on or derived from speech and hearing, such as written English, as an effective and primary means of communication. For Deaf people, the use of American Sign Language is not simply a matter of convenience or preference. American Sign Language provides the only effective and efficient means of linguistic communication for members of the Deaf Community.

2.     Limitations Of English Within The American Deaf Community

It is clear and undeniable that members of the American Deaf Community embrace and accept American Sign Language, and that its use is central to defining and understanding the Deaf Community. It is also clear that Deaf people in the United States exist as a linguistic minority within a society in which English is the dominant language. However, there are significant challenges that Deaf people, as a group, face in becoming fluent in English. Some of these challenges are the same as those for any second language learner, but other, more severe challenges exist for Deaf people. Nevertheless, one of the widely held misconceptions about Deaf people is that although they do sign, they can also read and write English fluently. As with other misconceptions about Deaf people, this has no basis in reality.

While it is a desirable goal for Deaf individuals to be competent in both ASL and English, the reality is that for the vast majority of Deaf people, competence in English is rarely attained. Certainly, the history of the education of Deaf students attests to the fact that, for the vast majority of Deaf people, acquiring competence in spoken English is virtually unattainable (e.g., Marschark & Spencer, 2003; Wrigley, 1996; Lane, 1992). Also, the majority of Deaf people do not attain competence in reading and writing English because those forms of communication are derived from spoken English. According to Karchmer and Mitchell (2003), study after study concludes with the same overriding concern: ". . . the average performance on tests of reading comprehension for deaf and hard of hearing students is roughly six grade equivalents lower than their hearing peers at age 15." (e.g., Allen, 1986; Traxler, 2000). The essential difficulty is that Deaf students are ". . . caught in a vicious circle: their impoverished vocabularies limit their reading comprehension and poor reading strategies and skills limit their ability to acquire adequate vocabulary knowledge from context." (deVilliers and Pomerantz 1992). Thus, the commonly held

misconception that Deaf people as a group can fluently read and write English is easily dismissed. The evidence is overwhelmingly clear – Deaf people, as a group, are not competent users of English.

Certainly, most Deaf people achieve what might be termed "survival" English. This means that, as a group, Deaf people have a level of literacy that enables them to interact with much of the routine written English language that they encounter in their daily lives. It is the repetitiveness, predictability and/or limited context within which this written English occurs that facilitates Deaf people's comprehension. For example, they read street signs, menus, subway directions, advertising posters and flyers and other basic printed material that is necessary or useful for them to live their lives on a daily basis. As a group, Deaf people might be described as marginal readers. That is, some Deaf people do subscribe to newspapers and magazines, although many seek out those portions of the publications supported by visual material (e.g., the comics page or advertising) or contain familiar arrays of numbers (e.g., the sports page). However, one should not mistake this level of responding to basic English print in routine day-to-day tasks with a level of literacy sufficient to rely upon printed material to gain non-recurring or important information or to read most books or magazines.

Deaf people also communicate via e-mail and TTY conversations, although those communications often read like written (i.e., glossed) versions of what they would sign. Further, Deaf people write notes to people who are not deaf, although their notes are frequently misunderstood. Just as in the non-deaf population as a whole, there is within the American Deaf Community a range of literacy. However, the critical point is that the average literacy level of members of the American Deaf Community is significantly lower than it is for the population as a whole.

According to the Gallaudet Research Institute, "For the 17-year-olds and the 18-year-olds in the deaf and hard of hearing student norming sample, the median Reading Comprehension subtest score corresponds to about a 4.0 grade level for hearing students. That means that half of the deaf and hard of hearing students at that age scored above the typical hearing student at the beginning of fourth grade, and half scored below." (http://gri.gallaudet.edu/Literacy/). Given this and given that literacy levels among the U.S. prison population are generally lower than those among the general population (Alaska Justice Forum 24(2): 2-4), one could reasonably conclude that the literacy levels among Deaf prisoners would be lower than the non-d/Deaf prisoner population. In fact, given that the generally accepted definition of functional illiteracy is a level of reading and writing skills that is insufficient to manage tasks of daily living and employment that require a level of reading and writing beyond a basic level, one would expect that a greater proportion of Deaf prisoners would be considered functionally illiterate than would be the case for the prisoner population as a whole.

The difficulties that a limited level of literacy present for Deaf people are clearly non-trivial. Consider, for example, that when one personality test was given to Deaf people using elementary English and again using ASL, the results were so different that the investigators concluded it was like giving two different tests (Lane, 1992). This author goes on to describe the difficulties in administering psychological tests to Deaf people:

> Since Deaf test takers in America frequently are not fluent in English, they not only fail to understand test instructions thoroughly, invalidating the results, but also fail to understand the test content itself, as most tests are presented in written English, and in rather high-level English at that.

> One authority estimates that a tenth grade knowledge of English is needed to take most personality tests meaningfully. Yet only one deaf student in ten reads at eighth-grade level or better, and the

> average deaf student on leaving school has only a third grade command of English.

Lane, 1992

Deaf people, like most immigrant populations in this country, do attain a level of English that enables them to accomplish basic, routine and reoccurring tasks that involve written English. This variety of English has been called "Deaf English" (Charrow, 1974; Charrow, 1975), which parallels, but is clearly not as proficient as, the English of those non-deaf people learning English as a second language.

It should be very clear that relying on standard written English as the primary or only means of communication with or for most Deaf people simply cannot be an effective means of communication. It is the unquestionable ineffectiveness of speech, lip-reading, and written English when communicating with Deaf people that makes the use of qualified sign language interpreters necessary for effective communication. The use of qualified sign language interpreters is also an important means of effective communication for those late-deafened deaf adults who have learned to sign.

> 3.    Limitations Of Lip-Reading And Speech Within The American Deaf Community

As challenging and ineffective as it is for Deaf people, as a group, to communicate in written English, it is even more challenging, ineffective, and impractical for them to communicate successfully via lip-reading (also called speech-reading). Given the challenges Deaf people have in acquiring competence in written English, this should not be surprising. Unlike the permanent presence of the printed word that makes possible repeated readings, the spoken word is ephemeral. Given that Deaf people struggle for accurate and complete comprehension with the stationary written word, one cannot expect any greater level of competence or effectiveness when Deaf

people try to comprehend the fleeting spoken word as it appears on the speaker's lips. As noted below, if one does not have proficiency in the spoken language, then lip-reading that language is even more difficult, if not impossible.

The common misconception that most non-d/Deaf people have is that all d/Deaf people can lip-read. They mistakenly believe that, lacking one of their senses, the ability to hear, d/Deaf people's visual sense – and hence their ability to lip-read – becomes more acute in order to compensate. Most non-d/Deaf people do not understand or appreciate the difficulties and limitations involved in trying to lip-read. It is extremely challenging to lip-read English because only a small fraction of the sounds used in the language are clearly visible. In fact, even someone who is fully fluent in and who has full auditory access to spoken English would struggle to lip-read English (non-d/Deaf people have only to turn their television set to a Chinese or Russian language program and turn off the volume to experience this frustration firsthand). Consider the difficulty in trying to lip-read accurately the spoken English phrase "white shoes." To a person trying to lip-read this phrase, it could be understood as "white shoes" or "why choose." When we consider the fact that many of the sounds in English look the same to a lip-reader, it should not be surprising that Deaf people's comprehension of spoken language is usually quite poor and is always even worse than their competence in written English.

One has only to look at oneself in a mirror and soundlessly mouth each of the following pairs of words to have a sense of the impossibility of lip-reading accurately. In each of these pairs

one of the words is listed on the Frye list[4] of the one hundred most commonly occurring words in English.

> to/you, in/thin, it/hit, he/she, on/don, are/car, with/width, his/is,
> i/eye, be/bee, or/ore, one/won, by/bye, but/butt, not/knot, your/door,
> an/ant, which/witch, do/due, their/there, out/shout, many/manny,
> then/ten, these/he's, so/sew, would/wood, like/lick, him/shim,
> time/thyme, two/too, more/moor, see/she, no/know, way/weigh,
> been/bin, oil/coil, day/say

According to Bernstein and Auer, Jr. (2003), "Estimates of the upper extremes for the accuracy of lip-reading words in sentences have been as low as 10-30% words correct." This is in keeping with earlier work (Liben, 1978) that also provides evidence that speech-readers understand only about one fourth of what is said in dyadic (one-to-one) conversations.

Of course, there are a number of other uncontrollable factors beside the phonetic structure of English that make it extremely difficult for d/Deaf people to lip-read with any consistent degree of accuracy, such as a person's facial bone structure, facial musculature, facial hair, lighting, rate of speech, etc. (Bernstein and Auer, Jr. 2003). Given the inherent linguistic difficulties in lip-reading and the additional complications that arise from external factors, it is no wonder that lip-readers' comprehension is so limited.

If speech-readers understand only approximately a quarter of what is said in dyadic (one-to-one) conversations, it should not be surprising that the level of comprehension in small and large group interactions is significantly less. One reason for this is simply physical distance – the further away one is from a speaker the more difficult it is to discern fine muscle movements of the

---

[4] The Frye list consists of the one hundred most common words used in English ranked in order of frequency (http://www.sightwords.com/sight-words/fry/#lists).

mouth necessary to lip-read. Another reason is because small group interactions in which a majority of the participants is not deaf generally rely upon turn-taking regulatory mechanisms that are auditorily determined, i.e., whoever talks first or loudest claims the floor. This places the d/Deaf lip-reader in an impossible position of trying to track who is speaking by waiting for others in the group to look at the person who is speaking. d/Deaf people trying to lip-read in small group interactions must constantly determine who is talking by trying to determine who other group members are looking at. By the time the d/Deaf person has determined who is speaking, the d/Deaf person has already missed the first several seconds of what the speaker has to say. This also means that it is difficult for the d/Deaf person to track who will next claim the floor and is often unable to claim a turn him/herself. Large groups pose even greater problems for the lip-reader: problems such as greater physical distance from the primary speaker, whether or not the primary speaker moves about while talking, variable lighting, and the impossibility of lip-reading questions or comments from anyone in the large group.

When interacting with d/Deaf people who rely on lip-reading to interact in a given situation, one must exercise extra caution to ensure that the deaf person has actually understood the interaction. This is because d/Deaf lip-readers will often nod their heads, which the non-d/Deaf interlocutor takes as a sign of comprehension. However, this is no different than second language users who engage in the same behavior. For example, students who are just learning American Sign Language will often and regularly engage in this behavior when communicating with d/Deaf people. They do this, and d/Deaf people do this, not to deceive the other person, but rather to "save face." That is, they do not want the other person to think they are "stupid" or incompetent. Their reasoning is that if they actually interrupt the other person each time they do not understand, that is precisely the impression they will be creating. Often, they would rather accept the consequences

of not comprehending than create an impression of incompetence. In addition to "saving face " they might want to avoid receiving a negative reaction.

Ideally, someone interacting with a d/Deaf person who is relying on lip-reading must be aware that head nodding may not always signal comprehension. Unfortunately, this is rarely the case. The result is that the two interlocutors leave the interaction with two different impressions of the interaction. The d/Deaf person leaves with "comprehension gaps" while the non-deaf person leaves thinking that the d/Deaf person has fully comprehended.

Given lip-readers' limited comprehension in one-to-one interactions and given the increased interactional complexities in small and large group interactions, lip-reading cannot be assumed to be an effective and meaningful communicative option for d/Deaf people in such settings.

Of course, even if d/Deaf people could lip-read with any reasonable level of accuracy, successful communication in those settings would also require that they then express themselves in intelligible spoken English, which aside from late-deafened adults, most d/Deaf people cannot do. Some Deaf people have speech that may be understood in limited contexts; most, however, do not. Despite years of speech training, most Deaf people are generally unable to regulate the volume, timbre or pitch of their speech and that, among other factors, makes their speech very difficult to understand. Deaf people, never having heard themselves speak, cannot monitor their speech in the way that non-d/Deaf people can. Simply put, Deaf people don't know how words are supposed to sound; without such an auditory target they can only approximate the vocal formulation of words. Thus, the speech of Deaf people has been described as guttural, animalistic, and unintelligible.

Clearly, Deaf people know that their speech is ineffective as a primary means of communication: they know that those unfamiliar with "Deaf speech" have great difficulty understanding their speech; they know not to trust their speech for important interactions; they know that their speech sounds unnatural; and they know that non-deaf people react negatively when they do use their speech. Thus, unlike late-deafened adults, most Deaf people choose not to use their speech for routine communicative interactions because they know it is unintelligible and therefore not an effective means of communication, or in many cases they simply cannot use their speech.

It is true that many late-deafened individuals can be rather skilled lip-readers in some very controlled conditions (although factors listed above will also negatively impact their lip-reading accuracy). This is because, unlike those with childhood onset deafness, they have adult competence in spoken English to assist in making educated guesses. Late-deafened adults are very likely to have intelligible speech and, because of their proficiency in English, may be able to lip-read with slightly better accuracy. This often leads people who are not deaf to assume that the late-deafened adult is "faking" their deafness and thus no special communication accommodations are needed or warranted. But, as noted above, late-deafened adults who retain reasonably intelligible speech present a false image to those who are not d/Deaf. They "sound normal" and so the conflation of speech and hearing becomes significant ("if you speak that well, I assume you must be able to hear as well"). That audist stereotype often leads to late-deafened adults being misunderstood and discriminated against because they cannot successfully engage in "normal" communication. That is, while they can express their thoughts in intelligible English, given the severe limitations of lip-reading and their lack of hearing, they are unlikely to understand what is said to them in response to their ideas.

For d/Deaf people as a group, then, lip-reading and speech cannot be assumed to provide a reliable and accurate means of communication in most interactions. It is certainly true that in some context-specific social interactions a variable combination of speech, lip-reading, written words, and gestures may enable a rudimentary level of low stakes, social communication (e.g., "change the TV channel," "pass the salt," "lights out"). However, a variable combination of speech, lip-reading, written words, and gestures would definitely not ensure effective communication in what would be termed "high stakes" interactions. "High stakes" interactions are those in which the risks of miscommunication or misunderstanding are high and the consequences of miscommunications have significant, and possibly severe, negative repercussions for the d/Deaf individual.

Any list of "high stakes" interactions would certainly have to include disciplinary and/or investigative proceedings, medical appointments, mental health appointments (both individual and group counseling sessions), psychological evaluations, any formal evaluation (e.g., behavioral, educational, occupational), education sessions (e.g., specific training sessions, general educational opportunities), religious activities, and instructions concerning health and safety. What these "high stakes" interactions have in common is that discussions, suggestions, courses of action, and reliable decisions simply cannot be considered valid unless one can ensure that any communication between parties was conducted in a manner that was accurately conveyed and understood. Given the unreliability of lip-reading, speech, and written communication that exists for d/Deaf people, one simply cannot conclude that relying solely on one or more of those forms of communication can result in accurate and effective communication in "high stakes" interactions.

The clear reality is that the only practical way for Deaf people and for many deaf people to participate effectively in these types of "high stakes" one-to-one interactions, and in any small or large group interaction, is to employ the services of a qualified sign language interpreter.

Because of the importance of qualified sign language interpreters in ensuring access and participation, the next section will examine several aspects of sign language interpretation and misconceptions about the nature of sign language interpreting.

Summary Of Opinions With Respect To Deaf People As A Linguistic Community:

- Those with little or no knowledge of d/Deaf people or American Sign Language make numerous unfounded, stereotypic assumptions about d/Deaf people, their means of communication, and their signed language.

- The most significant factor uniting members of the American Deaf Community is the use of American Sign Language (ASL).

- American Sign Language is neither a manual form nor a derivative form of English, and thus there is not a one-to-one correspondence between American Sign Language signs and English words.

- The grammatical and syntactic structure of American Sign Language is quite different from the grammatical and syntactic structure of English.

- There is no conventional written form of American Sign Language.

- As a group, Deaf people face severe challenges in acquiring competence in spoken or written English, and most Deaf people rarely attain competence in spoken or written English.

- The average literacy level of the American Deaf Community is significantly lower than it is for the population as a whole.

- Lip-reading is so unreliable that it cannot be used to ensure comprehension and effective communication in any group setting or in any "high stakes" one-on-one setting (i.e., interactions related to health, safety, discipline and the like).

- The use of speech for the vast majority of Deaf people is so ineffective that it cannot be relied upon to ensure accurate expression and effective communication.

- Late-deafened adults who have reasonably good lip-reading and speech skills, because of their previous exposure to spoken English, are often thought to be feigning deafness.

- The only way for Deaf people and for deaf people who have learned sign language to participate meaningfully and effectively in all group interactions and in all "high stakes" one-to-one interactions is to provide a qualified sign language interpreter.

D.   Sign Language Interpretation: Misconceptions And Certifications

Given the passage of federal laws beginning in the early 1970s, including the Rehabilitation Act of 1973, it is probably safe to say that most non-deaf people have, at one time or another, seen a sign language interpreter. However, as with other aspects of the lives of d/Deaf people, there are several misconceptions and naïve assumptions surrounding sign language interpreters.

The first is the belief that anyone who can sign can be a qualified sign language interpreter. The fact is that competence in American Sign Language is a necessary, but not sufficient, condition to become a qualified sign language interpreter. This necessary, but not sufficient, condition of bilingualism is true for all interpreters whether of spoken or signed languages, and the literature is quite clear on this point. (e.g., ~~Seleskovitch, 1978~~; Frishberg, 1986; Wadensjö, 1998; Cokely, 1992; Stewart et al, 1998; Janzen, 2005).

Another common misconception held by those who are not d/Deaf is that American Sign Language is easy to learn and thus one can rather quickly become a qualified sign language interpreter. However, the fact is that learning American Sign Language is as challenging as learning any spoken language; in fact, given the modality differences, many non-d/Deaf students find it more challenging to learn American Sign Language than to learn a spoken language (Peterson, 1999).

Another misconception about sign language interpreting, also discussed above, is that signs exist in a one-to-one relationship with English words; that is, for every word there is a sign that conveys that word. Were this true, it would mean that interpreting would consist simply of learning the matched signs for the words one already knows and the rather mechanical process of producing the linked signs for the words one hears and, conversely, the spoken words for the signs one sees.

However, anyone who has studied another language knows that the vocabularies of any two languages do not map in a one-to-one relationship; this is a cross-cultural and linguistic reality well supported by the literature.[5] Likewise, anyone who has studied American Sign Language knows that ASL and English do not map to each other in a one-to-one relationship, a realization also well supported by the literature.[6]

To begin to understand the cognitive challenges and complexities of interpretation, and why competence in ASL is a necessary, but not sufficient, prerequisite to qualify as an interpreter, it is helpful to have a clear understanding of what interpretation is. The following definition provides such a starting point:

> Interpretation is the competent and coherent use of one naturally evolved language to express the meanings and intentions conveyed in another naturally evolved language for the purpose of negotiating an opportunity for a successful communicative interaction in real time within a triad involving two principal individuals or groups who are incapable of using, or who prefer not to use, the language of the other individual or group.

Cokely, 2001

This is a general definition of interpretation that applies to signed and spoken language interpretation, and one that is well supported in the literature. (e.g., Robinson, 1997; Wadensjö, 1998; Larson, 1998; Stewart et al, 1998; Pöchhacker, 2004; Janzen, 2005). This definition places in proper context the necessary, but insufficient, condition of bilingualism needed to interpret. Indeed, it is the ability to determine and then express meaning and intention that is at the heart of interpretation.

---

[5] E.g., Larson 1998; Lyons, 1977; Lyons, 1995; Duranti, 1997; Crystal, 1997; Hatim and Mason, 1997; Weaver, 1997.

[6] E.g., Stokoe, 1965; Cokely, 1992; Cokely, 2001; McIntire (ed) 1986; Mindess, 1999.

~~The cognitive processes by which meanings and intentions are determined and then expressed in a different language are quite complex. It has only been in the last quarter of a century that we have begun to understand the process of interpretation; demands of which are such that interpretation has been called "... probably the most complex type of event yet produced in the evolution of the cosmos." (Richards, 1953). While some may say this is hyperbole, it is undeniable that interpretation is an extremely complex cognitive task.~~ In the past three decades, various models of the cognitive process have emerged that have helped shape and guide our understanding of interpretation, research into interpretation, and the training of interpreters (e.g., Moser-Mercer, 1978; ~~Chernov, 1978~~; Cokely, 1992; ~~González et al, 1991~~). Examining any of these models makes clear the fact that excellent skill in both languages is unquestionably a necessary, but not sufficient, prerequisite for interpreters. In fact, in the case of qualified sign language interpreters, national certification by the Registry of Interpreters for the Deaf evolved, in part, to differentiate between those who could sign and those who could interpret (Cokely, 2005).

Interpretation generally takes one of two forms – consecutive or simultaneous. Consecutive interpretation often happens in one-to-one interactions such as doctor's appointments, supervisor meetings, and in some legal settings. In diplomatic situations, it may be used when delegates or diplomats deliver speeches. In consecutive interpretation, one of the participants speaks or signs and, at a logical semantic or syntactic point, pauses. The interpreter, who may have been taking notes, then begins to interpret what was just said or signed. When the interpreter is done, the speaker continues until the next pause at which time the interpreter begins. This alternating pattern continues until the speaker is finished. In general, interpreters and participants agree beforehand that the interpretation will proceed consecutively. In one-to-one interactions, the logical pause points may, for instance, be the conclusion of one of the participant's turns (e.g., asking a question).

Simultaneous interpretation happens without benefit of regular and planned pauses. In simultaneous interpretation the interpretation is delivered in the same general time frame as the original. The term "simultaneous" interpretation is actually a misnomer. No interpretation is delivered perfectly synchronously with the delivery of the original message. Because the interpreter's goal is to render the meaning and intent of the original, that means that the interpreter must first comprehend the original message. To do so requires that the interpreter wait to receive enough of the original message so that the interpreter is confident in the intended meaning of the speaker or signer. Thus, there is always a small temporal discrepancy between the production of the original message and the production of its interpretation because interpreters must necessarily chunk information that is coming to them. This temporal difference is called lag time (or sometimes by the French term décalage).

For at least the last five decades, it has been widely accepted within the Deaf Community and among those who work with Deaf people, including interpreters, that for non-social communicative interactions between Deaf people and those who are not d/Deaf and who cannot sign fluently, consecutive or simultaneous interpretation is the only viable option to ensure that Deaf people have effective communicative access and reliable opportunities for participation. No other reasonable accommodation at the present time can successfully enable Deaf people and those deaf people who can sign to participate in and benefit from small and large group interactions in real time. One has only to look at the prevalence of interpreters in the education, business, religious, entertainment, and social service segments of American society to realize the widespread recognition and acceptance of the reality that interpreters are the only viable option for Deaf people in such settings. For example, the presence of on-camera interpreters during Mayor Michael Bloomberg's regular broadcasts to citizens of New York City during Hurricane Sandy and the

growing national discussion about provision of interpreting services during emergency situations are clear indications of the recognition of the importance of interpreters for effective communication for d/Deaf people. At the other end of the spectrum, there was international attention given to the failure to provide effective interpreting services because of the use of a faux interpreter at the funeral services for Nelson Mandela.

Late-deafened adults who have learned to sign also benefit from and rely upon the services of qualified sign language interpreters. Such individuals often rely upon the combination of the interpreter's signs and lip-reading the interpreter or the speaker in order to have effective and reliable communicative access, both in small or large group and one-on-one settings. This augmented communication is necessary given the fragmentary nature of lip-reading and the likely fragmentary comprehension of signs by someone who is late-deafened. These sources of information work together in a complementary fashion to ensure a greater level of comprehensibility than either one does alone. Moreover, when acquiring a second language, the norm is that one's comprehension of that language always outpaces one's production of that language (think of young children who can always understand more than they can express). Accordingly, late-deafened adults who learn sign language generally comprehend the signs of qualified sign language interpreters better than (and faster than) the adult can produce the signs themselves. Thus, provision of competent interpreters is often necessary to provide communicative rights and access to someone who is late-deafened.

The national professional organization for qualified sign language interpreters in the United States is the Registry of Interpreters for the Deaf (http://www.rid.org). Founded in 1964, the Registry of Interpreters for the Deaf (RID) currently has over 14,000 members nationwide. In 1972, the RID implemented a national evaluation and certification system that would provide a

ready means of identifying those individuals deemed qualified to interpret. As mentioned previously, the certification system was motivated, in large part, by an expressed need to differentiate between those who could sign and those who could interpret (Cokely, 2005). For the past 44 years, the assessment procedures have been implemented, revised and monitored using acceptable psychometric procedures to ensure their validity and reliability (http://www.rid.org).

The Registry of Interpreters for the Deaf also certifies interpreters to work in legal settings. According to the RID's 2007 Standard Practice Paper on Legal Interpreting:

> Legal interpreting encompasses a range of settings in which the deaf person interacts with various parts of the justice system. Legal interpreting naturally includes court interpreting; however, a legal interpreter's work is not restricted to the courtroom. Rather, legal interpreting occurs during attorney-client conferences, investigations by law enforcement, depositions, witness interviews, real estate settlements, court-ordered treatment and education programs and administrative or legislative hearings. Legal interpreting requires highly skilled and trained specialists because of the significant consequences to the people involved in the event of a failed communication.
>
> RID, 2007

National assessment and certification of interpreters is a significant factor in ensuring that an individual possesses the range of competences and capabilities needed to render effective interpretation. All languages exhibit sociolinguistic variation. Sociolinguistic variation will include, for example, age variation (senior citizens and teenagers may use different vocabulary items), gender variation (men and women may use different vocabulary items and grammatical structures), and geographic variation (people from different parts of the country may have distinct accents and/or linguistic patterns). Despite such natural variation, teenagers still communicate with senior citizens, men communicate with women, and people from different parts of the country

communicate with each other. The critical point is that naturally occurring sociolinguistic variation does not impede communication among different members of a linguistic community.

American Sign Language, as is true of all signed and spoken languages, also exhibits natural sociolinguistic variation (e.g., Woodward, 1994; Lucas, 2001). This means, for example, that older d/Deaf people may sign slightly differently than younger d/Deaf people, Deaf people from the North may sign slightly differently than Deaf people from the South, and d/Deaf people from various educational backgrounds may sign slightly differently from each other. Nevertheless, just as with spoken English, such naturally occurring linguistic variation does not in any way preclude Deaf people from communicating with each other. Certification of interpreters at a national level provides a readily identifiable measure of assurance that the certificate holder possesses the knowledge and communicative flexibility necessary to interpret successfully for groups of diverse d/Deaf people that embody naturally occurring sociolinguistic variation.

### Summary Of Opinions With Respect To Sign Language Interpretation:

- Competence in American Sign Language and English is a necessary, but not sufficient, condition to become a qualified sign language interpreter.

- The cognitive processes involved in interpretation are extremely complex and require the ability to determine meaning and intent.

- For non-social communicative interactions between Deaf people and those who are not d/Deaf and who cannot sign fluently, consecutive or simultaneous interpretation provided by a qualified interpreter is the only viable option to ensure that Deaf people have effective communication access and have reliable opportunities for participation.

- Certification of interpreters at a national level provides a readily identifiable measure of assurance that the certificate holder possesses the knowledge and communicative flexibility necessary to interpret successfully for groups of diverse Deaf people that embody naturally occurring sociolinguistic variation.

- Late-deafened adults who have learned to sign benefit from and rely upon the services of qualified sign language interpreters.

IV.   **d/Deaf And Hard Of Hearing Prisoners At Colorado Department Of Corrections (CDOC)**

~~Between October 2017 and June 2018~~, I reviewed a number of documents provided to me by counsel ~~(see Appendix B). On April 26, 2018, I met individually with plaintiffs Cathy Begano, Jennifer Saugause, Andrew Atkins, and Marc Trevithick at the Denver Women's Correctional Facility and at the Colorado Territorial Correctional Facility~~. It is clear to me, based on educational background ~~and linguistic fluency~~, that each of these prisoners is a member of the Deaf Community.  Based on my extensive experience relating to the d/Deaf community, I also believe these prisoners likely reflect a representative sample of all CDOC d/Deaf and hard of hearing prisoners. ~~During these interviews I was able to identify difficulties that have arisen for CDOC d/Deaf and hard of hearing prisoners due to a lack of effective telephonic communicative access~~.

Based on my ~~fifty-one years of~~ experience~~, my separate meetings with prisoners,~~ and my review of documents provided to me ~~(see Appendix B)~~, I believe that CDOC d/Deaf and hard of hearing prisoners clearly do not have an equivalent level of telephonic access as non-deaf prisoners and furthermore, the type of telephonic access they are currently provided is clearly not effective.

**CDOC's Provision Of Telecommunications Access Is Problematic And Ineffective.**

Based on my experience and knowledge, my review of documents, ~~and my interviews with d/Deaf and hard of hearing prisoners~~, I believe that CDOC's current practices and procedures provide d/Deaf and hard of hearing prisoners with significantly less equivalent and far less effective telecommunication access than prisoners who are not d/Deaf or hard of hearing. In particular, d/Deaf and hard of hearing prisoners in CDOC facilities are only provided access to TTYs to communicate telephonically with friends and family. Further, access to TTYs is limited relative to the access other prisoners have to regular telephones (e.g. in some units, they have to

request portable TTY machines (Bradley Tr. pg. 55); hearing inmates are able to make calls from their tablets in their cells, while TTYs are affixed to the walls in the common areas).

During the past 10 to 15 years, Deaf people have eagerly and quickly replaced TTYs with Videophones (VPs) for two very understandable reasons. First, TTYs require communication in typed English (the second language for most d/Deaf and hard of hearing people and a language in which, as noted above, they rarely attain any significant level of fluency). Second, because TTY conversations are typed, those conversations take significantly longer and thus when d/Deaf or hard of hearing people use TTYs they tend to keep conversations very brief (e.g. to make arrangements to meet in person). VPs, by contrast, enable d/Deaf and hard of hearing people to communicate using American Sign Language, a language in which they are much more comfortable and fluent. Thus, their VP conversations are not encumbered by written English nor slowed by having to type. Signed VP conversations are analogous to spoken telephone conversations.

Because TTYs are essentially obsolete, a fact acknowledged by CDOC (see below), it is increasingly unlikely and improbable that those with whom CDOC d/Deaf and hard of hearing prisoners wish to communicate will even own a TTY or have access to one. For example, consider the 2013 Emergency Access Advisory Committee report on TTY transition (https://apps.fcc.gov/edocs_public/attachmatch/DOC-319386A1.pdf) which states that "Newer technologies outperform the TTY functionality in many ways" (pg. 8) and that only 18 million TTY calls were placed per year compared to 150 million Videophone calls (pg. 13). Videophones enable d/Deaf and hard of hearing people to communicate using American Sign Language, a language in which they are much more comfortable and fluent. Thus, their Videophone conversations are not encumbered by written English nor slowed by having to type

asynchronously. Signed Videophone conversations are exactly analogous to spoken telephone conversations afforded to all CDOC prisoners who are not d/Deaf or hard of hearing.

~~All of the prisoners I interviewed reported that none of their family members or d/Deaf friends owns a TTY or has access to a TTY, thus making direct telephonic communication with their families and friends impossible. Three prisoners report that as a result, they can no longer communicate with their d/Deaf friends because those friends no longer own TTYs and instead only use Videophones. All of the prisoners also report that the CDOC TTY units are frequently broken (current units installed prior to 2010 (Bradley Tr. pg. 48)) and generally take up to one to two weeks to repair resulting in significant disruption to telephonic access for d/Deaf and hard of hearing prisoners.~~ This fact has also been acknowledged by CDOC: "The current TTY equipment is becoming antiquated, requires frequent maintenance from sources that are not familiar or trained on the use/repair of a TTY and creates unfair delays for offenders due to the limited number of TTY machines department wide when equipment is down. (CDOC/Rogers 002131 - OIT-EPPMO-Project Request Form pg. 2)." ~~At least one prisoner reported that when the TTY machine in their unit is broken, they are expressly prohibited from going to another unit to use that unit's TTY, further disadvantaging that prisoner vis-à-vis prisoners who are not d/Deaf or hard of hearing.~~

Additionally, there are several other limitations to TTYs by virtue of the equipment alone. One limitation is that direct point-to-point TTY communication requires that both parties have TTYs. Although TTYs are free, under some circumstances, and federally mandated TTY relay services have, in the past, provided a level of communication access for d/Deaf and hard of hearing people, the fact is that TTY technology has essentially become obsolete. This fact is clearly acknowledged by CDOC: "TTY machines are no longer "main stream" equipment. The general public, specifically hearing impaired persons, do not widely utilize TTY equipment as VRS has

become the more common place technology for communication between people who utilize sign language interpreter relay services and/or telephonic communication with other hearing impaired persons" (CDOCRogers 002131 - OIT-EPPMO-Project Request Form pg. 2)Also, because a TTY conversation is typed, TTY conversations always take more time than if the conversation had been spoken or signed.

Here it is worth analyzing the ways in which a TTY communication exchange is different from a telephone or Videophone conversation:

First, TTY communication exchanges are asynchronous. This means that each party must complete their turn before the other party can respond (in fact a TTY user must type GA ("Go Ahead") to indicate to the other person that it is their turn to type). Thus, unlike telephone or Videophone conversations, clarifying questions or requests for additional information cannot occur spontaneously or in real time (and no artificial mechanism for signaling turn-taking is necessary). In addition, normal back channel responses are not possible. Back channel responses are those signals that are provided by the recipient (e.g. head nods, "uh huh", "I see") to indicate to the other party that they should continue and that no additional or clarifying information is needed at this point in the conversation.

Second, normal conversational features used to indicate emotional reactions or responses (e.g. stress, intonation, tone) are not possible using written/typed communication exchanges. In a written/typed communication exchange, emotional reactions or responses must be conveyed lexically which makes conveying emotions particularly challenging, if not impossible, for those who have limited literacy in the language of the interaction.

Third, it is quite common for TTY signals to be garbled which results in a string of unidentifiable typed characters. The garbled signals often look like the following: "'XX''X''XXX''??##'''XXX''X'XXP'EX''XX" (e.g. Begano CDOC/Rogers 002163). Thus, the recipient does not know if those garbled signals are the result of interference on the telephone line or a scrambled version of the other person's communication exchange. This also makes the communication much more challenging and ineffective than a telephone or Videophone conversation.

Fourth, even if one dismisses the points noted above, to make the claim that TTYs are an effective means of communication and are a reasonable equivalent to the telephonic communication enjoyed by prisoners who are not d/Deaf or hard of hearing assumes that those trying to communicate using a TTY have fluency in English (or whatever language they will be typing). In order to use a TTY effectively, the user must be proficient in written English. However, as described above, many d/Deaf and hard of hearing prisoners do not communicate effectively in English. As noted above, the average literacy level for d/Deaf people is third grade. As also noted above, the average literacy level of those who are incarcerated is below the average level of the population as a whole. Thus, for d/Deaf and hard of hearing prisoners, a TTY does not provide telecommunications access that is as effective nor as reasonably equivalent to the level of access available to non-d/Deaf and hard of hearing prisoners.

As a thought exercise, consider the prisoner outrage that would result from a CDOC policy change that would prohibit all prisoners from using telephones to communicate with family and friends and would require all prisoners to communicate with friends and family only by using fax machines. Communication via fax machines is quite parallel to TTY communication – the communication is asynchronous, you send your communication, wait for a response, hope it is not

garbled and hope you have not been misunderstood. If CDOC replaced all telephones with fax machines the general prisoner population response would likely include "no one I know has a fax machine", "this is too cumbersome", the fax machine is often broken" and "I can't communicate effectively in writing" — precisely the responses d/Deaf and hard of hearing prisoners have when CDOC forces them to use TTYs instead of providing them with Videophone access.

In sum, requiring d/Deaf and hard of hearing prisoners to communicate with friends and family in written/typed form via TTYs is clearly not equivalent to nor effective as permitting those prisoners who are not d/Deaf or hard of hearing with the means to communicate telephonically using spoken language(s).

Clearly, only a Videophone can currently provide d/Deaf and hard of hearing prisoners an equivalent and reasonable level of telephonic access as that enjoyed by prisoners who are not d/Deaf or hard of hearing. If each party has a Videophone, then they can communicate directly; however, if only one party has a Videophone then communication with the party who does not have a Videophone is possible using a free Video Relay Service (VRS), which utilizes the same hardware/software as the Videophone. Either party can initiate communication by connecting with a VRS provider and a VRS interpreter will facilitate the call, communicating via Videophone with the d/Deaf or hard of hearing caller and via voice with the non-deaf caller. If calling someone who does not have a Videophone, d/Deaf and hard of hearing prisoners would use the Videophone to call a VRS center where a qualified ASL interpreter will answer. The d/Deaf or hard of hearing prisoner then provides the phone number the prisoner wishes to call and the ASL interpreter places the call. The d/Deaf or hard of hearing prisoner signs to the interpreter who then interprets into spoken English for the non-deaf person on the other end of the phone line, and also interprets that person's spoken English into ASL for the d/Deaf or hard of hearing prisoner.

There is no cost to the individual for using VRS other than the cost of internet connectivity. The Federal Communications Commission (FCC) established the Telecommunications Relay Fund to fund the costs of Telecommunication Relay Services (established under Title IV of the Americans with Disabilities Act). Funding comes from rate adjustments or surcharges on local telephone bills that are set annually by the FCC. Companies that offer Video Relay Services (VRS) are paid from the TRS fund and those companies provide free Videophone equipment to d/Deaf individuals and companies/entities with d/Deaf employees. In addition to the fact that the only cost for a Videophone is the internet connection, a major advantage is that Videophones allow Deaf people to communicate directly in ASL. A secure Videophone that is as accessible to d/Deaf and hard of hearing prisoners as telephones are to non-deaf prisoners is necessary to provide them an equivalent level of telephonic access as is provided to non-deaf prisoners.

The FCC has also encouraged correctional facilities to move beyond the use of antiquated TTYs:

> Access to more advanced forms of TRS, including VRS, IP Relay, CTS, and IP CTS, may be necessary to ensure equally effective telephone services for these prisoners. We recognize that some facilities have already begun providing access to alternative forms of TRS, often as the result of litigation brought under these other statutes. We strongly encourage other facilities to continue this trend voluntarily, without the need for further litigation. (FCC, 2015)

It is my opinion that in each facility housing d/Deaf and hard of hearing prisoners, CDOC must provide ready access to Videophones which would then provide Videophone to Videophone access and would provide access to Video Relay Service (VRS) providers. This would provide d/Deaf and hard of hearing prisoners with telephonic services and benefits that are equivalent to and as effective as those afforded non-deaf prisoners. Provision of a Videophone would also help

reduce the communicative isolation of some d/Deaf or hard of hearing prisoners because they would be able to communicate directly with other d/Deaf people and/or with ASL fluent interpreters. The appropriateness and effectiveness of providing Videophone access was recognized and acknowledged by CDOC (see CDOCRogers 002131). This was also endorsed by Ms. Bradley "As a communication point from CIPS, I don't see – I do see it could be a very positive aspect for them along with the kiosk for now to have both. I would be in support of it, yes." (Bradley Tr. pg. 89; see also pg. 101) when it proposed a pilot program in 2013, had all necessary equipment installed and then cancelled the program just before it was to begin (Bradley Tr. pg 96). None of the documents I reviewed presented any reason(s) why, over the past five years, any potential issues with the pilot program have not been addressed or resolved.

I believe that CDOC must provide d/Deaf or hard of hearing prisoners with access to Videophones which will allow them the same level of telephonic freedom experienced by non-d/Deaf prisoners by enabling them to place approved calls directly to those who also have a Videophone or, using the free FCC-funded VRS interpreters, to place calls to friends, family, and other individuals with whom they may wish to have contact who are not d/Deaf or do not have a Videophone. Again, it is critical to involve the d/Deaf or hard of hearing prisoner in decisions about what equipment will provide them with effective telecommunication.

V.    CONCLUSIONS WITH RESPECT TO TREATMENT OF D/DEAF OR HARD OF HEARING PRISONERS IN CDOC FACILITIES.

Telecommunications access:

- Provision of a Videophone and access to a Video Relay Service is necessary to provide equivalent and effective telephonic services to d/Deaf and hard of hearing prisoners who are able to communicate in ASL, regardless of level of intelligible speech or level of literacy.

- Provision of CapTel is necessary when d/Deaf and hard of hearing prisoners have intelligible speech, a level of literacy sufficient to use CapTel effectively and do not know ASL and when they are involved in the determination of what constitutes effective telephonic access for them.

- Provision of TTYs is acceptable only when d/Deaf and hard of hearing prisoners have a level of literacy sufficient to use the TTY effectively and who do not know ASL and when they are involved in the determination of what constitutes effective telephonic access for them.

CDOC policies and procedures:

- A review of all CDOC telephone policies and procedures, with appropriate modifications where warranted, is necessary to ensure that d/Deaf and hard of hearing prisoners are not systematically disadvantaged relative to prisoners who are no d/Deaf or hard of hearing.

VI.    SUMMARY

Members of the American Deaf Community are a linguistic and cultural minority. The language that binds them together and is the critical determinant for membership in the Deaf Community is American Sign Language. Many people who are not deaf have stereotypical and audist misconceptions about Deaf people and American Sign Language. They believe that d/Deaf people can lip-read with a degree of accuracy that will enable meaningful communication, when in reality the level of accuracy for most d/Deaf people is 30% at best. Those who are not d/Deaf believe that d/Deaf people can read and write English fluently when in reality the average Deaf person reads at approximately a fourth-grade reading level. Those who are not d/Deaf fail to understand that in order for communication with d/Deaf prisoners to be effective and efficient it must be visually clear and unambiguous.

Based on my 51 years' experience with the Deaf Community and my review of the record, I believe that CDOC has denied d/Deaf and hard of hearing prisoners access to effective communication by requiring that all telephonic communication take place via TTYs. Based on my

experience, I believe that d/Deaf and hard of hearing prisoners housed in CDOC facilities are the victims of audism.

I believe that CDOC must regularly review all of its policies and procedures related to telephonic communication and revise them where necessary to ensure that d/Deaf and hard of hearing prisoners are not systematically oppressed and discriminated against d/Deaf and hard of hearing prisoners.

This opinion is based on the materials I have reviewed thus far. I reserve the right to supplement this Declaration should new material become available to me.

I understand that a false statement in this Declaration will subject me to penalties for perjury. I declare under penalty of perjury that the foregoing is true and correct

_____
        Dennis Cokely                                                    Date:  June 12, 2018

VII.    <u>REFERENCES</u>

<u>Publications</u>

1. Allen,1986. T.E. "Patterns of academic achievement among hearing impaired students: 1974 and 1983". A.N. Schildroth, M.A. Karchmer (Eds.), *Deaf Children in America*, College-Hill Press, San Diego, CA

2. Alaska Justice Forum 24(2): 2-4. National Assessment of Adult Literacy and Literacy Among Prison Prisoners. Justice Center, University of Alaska Anchorage. (Summer 2007).

3. Baker, Charlotte and Robbin Battison (eds.). 1980. Sign Language and the Deaf Community: Essays in Honor of William C. Stokoe. Silver Spring, MD: National Association of the Deaf.

4. Baker-Shenk, Charlotte and Dennis Cokely. 1980. American Sign Language: A Teacher's Resource Text on Grammar and Culture. Washington, DC: Gallaudet University Press.

5. Bernstein, Lynne and Edward Auer, Jr. 2003. "Speech Perception and Spoken Word Recognition." In Marschark and Spencer (eds.) Deaf Studies, Language, and Education. New York: Oxford University Press.

6. Charrow, Veda. 1974. Deaf English: An Investigation of the Written English Competence of Deaf Adolescents. Unpublished dissertation. Stanford University.

7. Charrow, Veda. 1975. "A Psycholinguistic Analysis of 'Deaf English'. Sign Language Studies 4:7 pg.139-149.

8. ~~Chernov, Ghelly. 1978. Inference and Anticipation in Simultaneous Interpreting. Philadelphia, PA: John Benjamins.~~

9. Cokely, Dennis. 2005. "Shifting Positionality: a Critical Examination of the Turning Point in the Relationship of Interpreters and the Deaf Community." In: Marschark, Peterson, and Winston, (eds): Sign language Interpreting and Interpreter Education: Directions for Research and Practice. Oxford: Oxford University Press.

10. Cokely, Dennis. 1992. Interpretation: A Sociolinguistic Mode of the Interpretation Process. Burtonsville, MD: Linstok Press

11. Cokely, Dennis. 2001 "Interpreting Culturally Rich Realities: Research Implications for Successful Interpretation." Journal of Interpretation: Millennial Edition 1-46.

12. Crystal, David. 1997. The Cambridge Encyclopedia of Language. Cambridge, UK: Cambridge University Press.

13. deVilliers, P. and S. Pomerantz. 1992. "English Literacy Development in Deaf Children: Directions for Research and Intervention." in J. Miller (ed.) Research on child Language Disorders: A Decade of Progress. Austin, TX: Pro-Ed.

14. Duranti, Alessandro.1977. Linguistic Anthropology. Cambridge, UK: Cambridge University Press.

15. Federal Communications Commission. 2015. FCC 15-136. Second Report and Order and Third Further Notice of Proposed Rulemaking.

16. Frishberg, Nancy. 1986. Interpreting: An Introduction. Silver Spring, MD: RID Publications.

17. Gates, George and John Mills. 2005. "Presbycusis." The Lancet: 366(9491), 1111-1120

18. ~~González R.D., V.F. Vásquez and H. Mikkelson. 1991. Fundamentals of Court Interpretation: Theory, Policy and Practice. Durham, NC: Academic Press.~~

19. Hatim, Basil and Ian Mason. 1997. The Translator as Communicator. New York: Routledge.

20. Jankowski, Katherine. 2002. Deaf Empowerment: Emergence, Struggle, and Rhetoric. Washington, DC: Gallaudet University Press.

21. Janzen, Terry (ed.). 2005. Topics in signed Language Interpreting. Philadelphia, PA: John Benjamins.

22. Karchmer, Michael A. and Ross E. Mitchell. 2003. "Demographic and Achievement Characteristics of Deaf and Hard-of Hearing Students." in Marschark and Spencer (eds.) Deaf Studies, Language, and Education. New York: Oxford University Press.

23. Klare, G.R. (1974). "Assessing readability." Reading Research Quarterly: 10(1), 62-102.

24. Klare, George R. "Readability." Handbook of Reading Research. P. David Pearson, et al. (eds.) New York: Longman, 1984. 681-744.

25. Klima, Edward and Ursula Bellugi 1979. The Signs of Language. Cambridge, MA: Harvard University Press.

26. Lane, Harlan. 1984. When the Mind Hears: A History of the Deaf. New York: Random House.

27. Lane, Harlan. 1992. Mask of Benevolence: Disabling the Deaf Community. New York: Knopf.

28. Lane, Harlan, Richard Pillard and Ulf Hedberg. 2011. The People of the Eye: Deaf Ethnicity and Ancestry. New York: Oxford University Press

29. Larson, Mildred. 1998. Meaning-Based Translation: a Guide to Cross-Cultural Equivalence. Lanham, MD: University Press of America.

30. Liben, Lynn. 1978. Deaf Children: Developmental Perspectives. New York: Academic Press.

31. Lucas, Ceil. 2001. The Sociolinguistics of the Deaf Community. Cambridge, UK. Cambridge University Press.

32. Lyons, John. 1977. Semantics. Cambridge, UK: Cambridge University Press.

33. Lyons, John. 1995. Linguistic Semantics: An Introduction. Cambridge, UK: Cambridge University Press.

34. Marschark, Marc and Patricia Elizabeth Spencer (eds.). 2003. Deaf Studies, Language, and Education. New York: Oxford University Press.

35. McIntire, Marina (ed.). 1986. Interpreting: The Art of Cross-Cultural Mediation. Silver Spring, MD: RID Publications.

36. Mindess, Anna. 1999. Reading Between the Signs: Intercultural Communication for Sign Language Interpreters. Yarmouth, ME: Intercultural Press.

37. Moser-Mercer, Barbara. 1978. "Simultaneous Interpretation: A Hypothetical Model and Its Practical Application." In Gerver & Sinaiko (eds.). Language Interpretation and Communication. New York: Plenum Press.

38. Nickerson, Raymond. 1998. "Confirmation Bias: A Ubiquitous Phenomenon in Many Guises." Review of General Psychology (Vol. 2, No. 2): 175-220.

39. Padden, Carol and Tom Humphries. 1989. Deaf in America: Voices from a Culture. Cambridge, MA: Harvard University Press.

40. Padden, Carol and Tom Humphries. 2005. Inside Deaf Culture. Cambridge, MA: Harvard University Press.

41. Peterson, Rico. 1999. The Perceptions of Deafness and Language Learning of Incoming ASL Students. Unpublished dissertation. University of California, Riverside.

42. Pöchhacker, Franz. 2004. Introducing Interpreting Studies. London: Routledge.

43. Registry of Interpreters for the Deaf. 2007. Interpreting in Legal Settings

44. Richards, I. 1953. "Towards a Theory of translating" American Anthropological Association, Studies in Chinese Thought 55 (Memoir 75): 247-262.

45. Robinson, Douglas. 1997. Becoming a Translator. New York: Routledge.

46. Rutherford, Susan. 1992. A Study of American Deaf Folklore. Burtonsville, MD: Linstok Press.

47. Seleskovitch, Danica. 1978. Interpreting for International Conferences. Washington, DC: Pen and Booth.

48. Schein, Jerome. 1996. "The Demography of Deafness" in Higgins and Nash (eds) Understanding Deafness Socially. Springfield, IL: Charles C. Thomas.

49. Spingarn, Tracie. 2001 "Knowledge of Deaf Community-Related Words, Symbols and Acronyms among Hearing People: Implications for the Production of an Equivalent Interpretation. Journal of Interpretation: Millennial Edition 69-84.

50. Stewart, Davis, Jerome Schein and Brenda Cartwright. 1998. Sign Language Interpreting: Exploring Its Art and Science. Needham Heights, MA: Allyn Bacon.

51. Stokoe, William, Dorothy Casterline and Carl Croneberg. 1965. A Dictionary of American Sign Language on Linguistic Principles. Washington, DC: Gallaudet University Press.

52. Traxler, C. B. (2000). "The Stanford Achievement Test, 9th. Edition: National norming and performance standards for deaf and hard-of-hearing students". *Journal of Deaf Studies and Deaf Education*, 5(4), 337–348. 8.

53. Valli, Clayton, Ceil Lucas and Kristin Mulrooney. 2005. Linguistics of American Sign Language. Washington, DC: Gallaudet University Press.

54. Wadensjö, Cecilia. 1998. Interpreting as Interaction. New York. Addison Wesley Longman.

55. Weaver, Gary. 1997. Culture, Communication and Conflict: Readings in Intercultural Relations. Boston, MA: Pearson Publishing.

56. Woodward, James C. 1972. "Implications for Sociolinguistic Research among the Deaf." Sign Language Studies 1:1-7.

57. Woodward, James. 1978. "Historical Bases of American Sign Language." in P. Siple (ed) Understanding Language Through Sign Language Research. New York: Academic Press.

58. Woodward, James C. 1994. Describing Variation in American Sign Language: Implicational Lects on the Deaf Diglossic Continuum. Silver Spring, MD: Linstok Press.

59. Wrigley, Owen. 1996. The Politics of Deafness. Washington, DC: Gallaudet University Press.

<u>Websites</u>

1. Frye list http://www.sightwords.com/sight-words/fry/#lists

2. Video Analysis Software
   - http://www.bu.edu/asllrp/SignStream/
   - http://www.sportstecinternational.com/

3. Registry of Interpreters for the Deaf
   - http://www.rid.org
   - http://www.rid.org/ethics/code/index.cfm

4. Americans with Disabilities Act Technical Assistance Manual
   - http://www.ada.gov/taman3.htm

5. Readability Tests
   - https://readable.io/text/

6. Emergency Access Advisory Committee (EAAC) Report on TTY Transition
   - https://apps.fcc.gov/edocs_public/attachmatch/DOC-319386A1.pdf

Revised: 7 23 18

VITA
Jean F. Andrews
1255 19<sup>th</sup>St.
Beaumont, Texas 77706
Cell phone : 409-351-5216
email: jean.andrews@lamar.edu
jandrews47@aol.com

**Education**

| 1973 B.A. | Catholic University of America, Washington, D.C. English Language and Literature |

| 1977 M.Ed. | Western Maryland College, Westminster, MD  Deaf Education Thesis Chair: Dr. McCay Vernon |

| 1983 Ph.D. | University of Illinois, Champaign, IL:  Speech and Hearing Sciences, minor in Linguistics Dissertation Chair: Dr. Jana M. Mason |

Dissertation: *The Letter, Word and Story Reading Abilities of Deaf Children in three Residential Schools: A Longitudinal Study.* University of Illinois, Champaign Urbana. 1983.

**Professional Experience**

1975-1978
Teacher, Junior High Department, Reading/Language Arts, Maryland School for the Deaf, Frederick, MD.

1978-1980
Research Assistant, story writer for linguistically controlled reading series for deaf children, University of Illinois.

1980-1981

Teaching Assistant, Manual Communication, University of Illinois.

1981-1982

Graduate Researcher, conducted a longitudinal reading acquisition study at North Carolina School for Deaf and implemented year-long prereading instructional program.

1983 (Spring)
Visiting Assistant Professor, Eastern Kentucky University, teaching methods courses at B.S. and . A. level.



EXHIBIT B

1983

Assistant Professor, Eastern Kentucky University, teaching methods courses, conducting research, advising students, project director for Interpreter training program.

1987

Promoted to Associate Professor,, Project Director for Training Personnel to teach deaf children (Bachelors and Masters level), Project Director for Training of Educational Interpreters, conduct research, teach undergraduate an graduate courses, advise students.

1987

Visiting instructor to Western Maryland College, Westminster,  MD, taught Psychology of Deafness class (graduate level) at the West Virginia School for the Deaf, Romney, West Virginia.

1988

Awarded Tenure at Associate Professor level, Eastern Kentucky University.

1988

Associate Professor, Lamar University, Beaumont, Texas.

1989

Acting director, Speech and Hearing Clinic, Lamar University.

1990

Project Director for U.S. Department of Education Training grant to prepare Black and Asian Communication Disorder specialists.

1991

Tenured at Lamar University.

1995

Promoted to full professor at Lamar University

1995-2015

Director of Graduate Programs in Deaf Education (30 Masters level and 15 Doctoral (Ed.D) level).

January 14, 2014 to Spring 2015
Department of Deaf Studies/Deaf Education Interim Chair

May 2015 to present, retired Distinguished Professor Emerita

Summer, 2017: Adjunct Professor, Lamar University

***Professional Societies***
Texas Association of the Deaf (TAD)
National Association of the Deaf (NAD)
Association of College Educators of the
Deaf  (ACEDHH)

3

**Licenses (all inactive)**
K-12 Texas Teachers Certificate
TX Reading Specialist
Council of Educators of the Deaf (CED)
(As I retired in 2015, I did not renew these licenses.

**Editorial Board**
*American Annals of the Deaf*, 1986 to the present.
Co-editor: *Deaf In Prison* Blog (www.deafinprison.com)
Book Reviewer for Journal of Deaf Studies and Deaf Education, CHOICE

**Governing Board**
*Member of the Governing Board of Texas School for the Deaf, 2004-2015 (retired in 2015)*

*President of the Governing Board of the Texas School for the Deaf, Austin, TX. (2006 to 2008)*

**Awards**

Recognized by Kentucky Association of the Deaf in summer annual meeting June, 1989 for setting up interpreter training program at Eastern Kentucky University, Richmond, Kentucky.

Recognized by Lamar University f or outstanding college teaching award of $2,000. bonus for academic year of 1993-94.

1996 Received Lamar Distinguished Faculty of the Year Award

1998  Received Lamar Faculty Researcher of the Year Award

2000 Received Lamar University Board of Regents' Professor of the Year Award,

2001 McDaniel College (formerly Western Maryland College) Bailor Alumni of the Year Award,

2001 Texas Association of the Deaf, Educator of the Year Award.

2004 Minnie Piper Teaching Award

2008 Board of Regents of the Texas State University System (TSUS) Foundation Regent's Professor Award

2013 Presidential Award, Texas Association for the Deaf, Galveston, TX. August 2, 2013.

2016 Lifetime Achievement Award. Given at the Association of College Educators of the Deaf and Hard of Hearing, NewYork.

**Paper Presentations**

Andrews, J., and Mason, J. *A descriptive study of the letter, word, and story  reading abilities of deaf residential children: some preliminary findings.*  Paper presented at the American Education Research Association, Montreal, Canada, April 12, 1983.

4

Andrews, J., Quinley, D. and Whelan, C. *A descriptive analysis of the sign conversations of 3 hearing-impaired children from rural Kentucky.* Paper presented at 1983 State Conference on Programs for Exceptional Children, Louisville, Kentucky, October 21, 1983.

Andrews, J. *A manual prereading knowledge test -Assessing prereading abilities in young deaf children.* Paper presented at Tenth Annual Southwestern Regional Conference of the International Reading Association in Lexington, Kentucky, November 7, 1984.

Andrews, J. F, *Childhood deafness and the acquisition of Print concepts* Invited presentation at the International Reading Association, Preconvention Institute at New Orleans, LA, May 1985.

Andrews, J. F., *The acquisition of prereading skills using the reciprocal teaching-procedure—A demonstration.* Paper presented at the Council of American Instructors of the Deaf, St. Augustine, Florida, June 22, 1985.

Andrews, J. and Denny, C. *Special Needs of Special Students in Postsecondary Education.* Paper presented at the Kentucky Council of Exceptional Children (KCEC) Louisville, Kentucky, March 21, 1986.

Andrews, J. *Training deaf and hearing teachers at the hearing impaired in rural Kentucky.* Paper presented at Council of Exceptional Children meeting in New Orleans, LA, April 3, 1986.

Andrews, J. and Mason, J. *Reading expository texts: Deaf youths*, Paper presented at American Educational Research Association Meeting in San Francisco, CA., April 16, 1986.

Andrews, J., Haas, D., and Waller, J. *Literary Lessons on the Micro-computer for Deaf Multi handicapped Students.* Paper presented to the Kentucky State Council of the International Reading Association in Frankfort, Kentucky, September 26, 1986.

Andrews, J., and Taylor, N. (1986) *From sign to print  Picture  book "reading" between mother and child.* Paper presented at American Educational Research Association (AERA) in Washington, D.C., April 21, 1987.

Andrews, J. F., and Jaussi, K. (1988) *A three-year project to train teachers of the deaf in rural Kentucky.* Paper presented at Kentucky Council of Exceptional Children, Annual Convention, March 11, 1988.

Andrews, J. F., and Sultana, Q. (1988) *Establishment  Educational Interpreter Training Programs in Appalachia.* Paper presented at Kentucky Council of Exceptional Children, Annual Convention, March 11, 1988.

Andrews, J., and Wilson, H. (1989) *Communicating with the Perlingually Deaf Individual in a Nursing home.* Paper presented at Texas Speech-Language-Hearing Association, El Paso, Texas, April 2, 1989.

5

Andrews, J., Winograd, P., DeVille, G. (1989) *Deaf children reading fables: An intervention procedure using ASL summaries.* Paper presented at Council of American Instructors for Deaf (CAID), San Diego, CA, June, 1989.

Andrews, J. (May 21, 1990). *Teaching reading to deaf children.* Workshop at Harrisburg Deaf Co-op, Harrisburg, Pa.

Andrews, J. and Gonzales, K. (1990) *How literacy develops in social contexts: Guided instruction with deaf children.* Paper represented at the international Congress on Education of the Deaf, Rochester, New York, July 30, 1990.

Andrews, J. (1990) *Teaching reading comprehension to deaf students*, Statewide Conference on Education for the Deaf, August 15, 1990, Houston, Texas.

Moulton, R-, Andrews, J. and Martin, G. (1990) *Programs for the deaf in -developing nations: Jordan, China, Mexico and Central America,* Statewide Conference on Education for the Deaf, August 15, 1990, Houston, Texas.

Olson, P. and Andrews, J. (1990) *Mathematics methods and materials use in classrooms for Deaf Students in Texas.* Paper presented at Statewide Conference on Education for the Deaf, August 17, 1990.

Andrews, J. F. (March 1991) *Reading ideas for parents Of Hispanic deaf children.* Quinta Conferencia Annual de Fin de Semana pa ra familias Hispanas Con Jijos Sordos, California School for the Deaf, Fremont, California.

Andrews, J. (June, 1991). Semnario sobre Diagnostico y Tratamiento de la Alteracion de la Audicion y el Lenguage. Workshop for teachers, psychologists, and speech-language pathologists in Saltillo, Mexico.

Andrews, J., Gonzales, R., and Alcazar, S. (1991) *Recruiting training and retaining Hispanic- Black and Asian Communication Disorder Specialists at the University level.* Paper presented at: Texas Speech an Hearing Association (TSHA) April 5, 1991, Houston, Texas; at Seventh Annual Minority Recruitment and Retention Conference, Austin, Texas, April, 1991. (Paper was also presented by Gonzales & Alcazar at CAID in New Orleans, June, 1991).

Andrews, J. F. (Oct. 20, 1991). Reading and writing with deaf children. *Kansas Educators of the Hearing Impaired. Kansas School for* the Deaf, Olathe, Kansas.

Andrews, J.F. (Oct, 17-21, 1991). Writer's workshop for deaf children at the Kansas School for the Deaf, Olathe, Kansas.

Andrews, J. F. (Oct. 26, 1991). Reading and the deaf child. Southeast Regional Teachers Conference, McAllen, Texas.

Andrews, J. (March, 1992). Teaching reading to young deaf and hard-of-hearing children. At S.J. Welch Middle School, Lake Charles, La.

Andrews, J. (Jan. 1993). Whole language and deaf readers. Workshop presented for East Harris Deaf Co-op at Hancock Elementary School, Houston, Texas.

Andrews, J. F. (July 2, 1992).  *Deaf teachers:  Removing barriers in deaf education.*  National Association of the Deaf, Denver, Colorado.  Also presented at Statewide Conference for Teachers of the Deaf, Austin, Texas in August, 1992.

Andrews , J. F . (with Dr . Tane Akamatsu) . *Breaking the sound barrier:Vygotskian perspective in deaf education*.  Paper presented at the American Educational Association (AERA) in Atlanta, Ga. on April 16, 1993.

Andrews, J. F. *Reading comprehension techniques for deaf children:*  Invited paper presented at the International Reading Association in San Antonio, TX on April 30, 1993.

 Andrews, J.F.,  Sandell, I. & Covell, J. *Deaf  teachers in Texas:  Training issues*.   Panel presentation at the Texas Association for the Deaf in Galveston, Texas on June 11, 1993.

Andrews, J.F. (with Dr. Don Jordan), *Deaf and Minority-deaf Professionals:  How many and where are they?*   Paper presented at the Convention of American of the Deaf (CAID) in Baltimore, Md. on June 30, 1993.

Andrews, J. & Jordan, D. *Demonstration of CD-ROM stories for Hispanic Deaf Children*. Dept of Education, Cross-Projects Meeting, Jan. 27, 1997.

Andrews, J. & Jordan, D. *Stories for Hispanic Deaf Children on CD-ROMs*.  Council of Exceptional Children, Technology and Media.  Silicone Valley, California, February 13, 1997.

Andrews, J. & Jordan, D.  *Hispanic Literacy with Multimedia*.  Convention of American Instructors of the Deaf, June 30, 1997.

Andrews, J. (March 7, 1998).  *Deaf Culture Values through Children's Literature*.  Illinois Teachers of hard of hearing and deaf individual's annual conference.  Springfield, IL.

Andrews, J., Plue, C. & Lummer, L. (July 1998).   *"Opening Pandora's Box: The Case against using ASL in the classroom."*  Paper presented at the Texas Conference for teachers of the Deaf in Arlington, TX.  July 31, 1998.

Andrews, J. *Meet the Math Wiz:  Math multimedia word problems in three languages.*  Paper presented at Convention of American Instructors of the Deaf, CAID, Los Angeles, CA:  July, 1999 and Council for Exceptional Children Annual Meeting, Charlotte, NC:  April, 1999.

*Andrews, J. & Nichols, P.* Project Invest:  Innovative non-vocal Educational Use of technology for deaf students.  *Paper presented at the Texas Association of the Deaf, Kerrville, TX, Sept. 14, 2001.*

Andrews, J. & Plue, C. *Opening Pandora's Box: The Case against ASL in the Schools.*  Paper presented at the Texas Association of the Deaf, Kerrville, TX, Sept. 14, 2001

Andrews, J. *ASL/English Bilingualism:  A Way to Literacy for Deaf Students.*  Alliance for Language and Literacy for Deaf Children, San Diego, CA. Feb. 8, 2002.

Andrews, J. & Plue, C. *Deaf, minority, and deaf-minority teachers and doctoral level leaders in Deaf Education*, Dept of Education, Office of Special Education, Project Directors Meeting, Feb. 20, 2002. Crystal City, VA.

Andrews, J. & Cammack, J. (Fall, 2002). *Project Homework Helper: A Demonstration to the Department of Education,* Steppingstones Division. Washington, D.C. Sept. 19, 2002.

Andrews, J. *ASL/English bilingual reading lessons for deaf students.* Paper presented at the Association of College Educators of Deaf and Hard of Hearing. San Antonio, Texas. Feb. 21, 2003.

Nover, S., Andrews, J. & Baker, S. *The No Child Left Behind Act and the ASL/English Bilingual Project (1997-2002): Curriculum, Technology, Teacher and Student Outcomes.* Convention of Educational Administrators for the Deaf (CEASD), Sioux Falls, South Dakota, April 5, 2003.

Andrews, J. & Smith, A. *Deaf Culture, ASL and Fingerspelling for Hearing Students in High School.* Paper presented at the 48th Annual Convention of the International Reading Association, Orlando, Florida, May 6, 2003.

Andrews, J. *Understanding Deaf Culture Through Work of Deaf Artists***,** Texas Association of the Deaf, Cozumel, Mexico. June 27, 2003.

Andrews, J. & Covell, J. (2004). *Teacher and Doctoral Leadership Preparation in Deaf Education*: *Today's Challenges*. Paper presented at the National Deaf Academy, Mt. Dora, Florida, August 2, 2004.

Simms, L. & Andrews, J. (2005). *Bilingual Education for Preservice Teachers*. Paper presented at the CAEBER (Center for American Sign Language and English Bilingual Education Research and Education) Conference at Gallaudet University, March 9, 2005.

Andrews, J., Gentry, M. & Utzman, C. (2005). Assessment, *Reading Fluency and Reading Errors of Deaf students.*   Presented at the International Reading Association (IRA), May 2, 2005, San Antonio, TX.

Andrews, J. *Deaf Cultural Values Through Children's Literature*. Presented at the Texas Association of Instructors of the Deaf (TAIR), Oct. 28, 2006.

Andrews, J., Martin, T. & Velasquez, J. (2006). *The Need for Additional Latino Professionals in Deaf Education.* Deaf Texas Latino Association Conference, Oct. 2006, Austin, TX.

Simms, L., Andrews, J. & DeLana, M. (Feb, 2007) . *Diversity in Deaf Education.* American Association of College Educators of the Deaf (ACEDHH), Pittsburgh, PA.

Andrews, J. & Cocke, D. (2007). *Project EET: Exploring Enabling Technologies.* Annual Meeting of the National Science Foundation, Washington, D.C. August 13, 2007.

Andrews, J. & Dionne, V. (2008). *How signs support deaf children with cochlear implants.* Paper presented at the Texas Statewide Conference for Teachers for the Deaf, July, 22, 2008.

*Andrews, J.  (2008).* Mistakes Made in the Legal System with Deaf Suspects. *Presentation at the Legal Aid Task Force at the Florida Corrections Accreditation Commission, Inc., 3504 Lake Lynda Drive, Suite 380, Orlando, Florida 32817. August 15, 2008.*

Brubaker, J. & Andrews, J. (2008). *Preparing the Deaf Writer (K-8): Using Digital Technologies*. Colorado Symposium on Deafness, Language and Learning, Nov. 13, 2008, Cheyenne Mountain Conference Center, Colorado Springs, CO.

Andrews, J. (March 9, 2010). *Using sign language to improve deaf and hard of hearing children's reading comprehension*. Taichung Deaf School, Taiwan. March 10, 2010, Tainan Deaf School, Taiwan.

Andrews, J. (March 14, 2010). *Principles in teaching reading to deaf students*. Kaohsiung Normal University, Taiwan.

Andrews, J. (March 11, 2010). *The Advantages, Disadvantages, Necesssity and Efficacy in Bilingual Education for Deaf Students*. Tainan University, Taiwan.

Andrews, J. (2010). *Reading and Deaf Adults in the Criminal Justice System*. EPALL Conference. Adult Reading Conference, El Paso, TX, Oct. 2010.

Andrews, J. & Lomas, G. (2011). *The School to Prison Pipeline: Literacy, Mental Health and Criminal Justice Issues*. Paper presented at the Association of College Educators of the Deaf and Hard of Hearing. Feb. 17, 2011, Fort Worth, TX.

Andrews, J., Gentry, M. & Dacres, K. (2012). *Early Literacy Intervention for Signing Deaf Children.* Paper presented at the Association for College Educators of the Deaf, Feb. 18, 2012, Jacksonville, FL.

Liu, H. T., Liu, C. J., & Andrews, J. (2012, Feb 16-18). *Reading instruction for deaf children in Taiwan and the US: A comparison*. Poster session at the Association of College Educators—Deaf and Hard of Hearing (ACE-DHH) 38th Annual Conference. Jacksonville, FL. (NSC100-2918-I-040-00)

Andrews, J., Liu Hsiu-Tan, Liu Chun Jung, Dacres, K. & Gentry, M. (2013)."*Adapted Little Books": An Emergent Literacy Intervention for Signing Deaf Children*. Paper Presented at the ACEDHH Conference in Santa Fe, New Mexico, February 22, 2013.

Andrews, J. & Paris, D. (2013). *Starting with Story: Adapted Little Books and Emergent Literacy for Signing Deaf Children*. ASL & English Bilingual Consortium For ECE.Summit IV. March 23, 2013. Austin, Texas.

Andrews, J., Gentry, M. Dacres, K. Smith, Z, & Byrne, A. (2013). *Adapted Little Books for Signing Deaf Children. International Reading Association*. San Antonio, Texas. April 21, 2013.

Andrews, J., Liu, H. T., Liu C. J., Dacres, K., Gentry, M. (2013, April 19-22). *"Adapted Little Books": An Emergent Literacy Intervention for Signing Deaf Children.* International Reading Association 58th Annual Conference, San Antonio, TX.

Liu, H. T., Liu, C. J., & Andrews, J.( 2013, January). *Literacy Learning and Deaf Students In Taiwan: Issues, Practices and Directions for Future Research*. Oral presentation at the 3rd International Conference on Sign Linguistics and Deaf Education in Asia. Hong Kong.

Liu, H. T., Liu, C. J., & Andrews, J.( 2013, January). *Measuring Readability of Picture Books for Reading Instruction for Children Who Are Deaf or Hard of Hearing*. Poster presentation at the 3rd International Conference on Sign Linguistics and Deaf Education in Asia. Hong Kong.

Andrews, J. *High Tides, Low Tides: A Biography of Leroy Colombo*. Paper presented at the Texas Association of the Deaf Biannual Meeting, Galveston, TX. August 2, 2013 And Langton Review Weekend, September 5, 2013, Granbury, TX.

Musyoka, M., Andrews, J., Clark, M. & Gentry, M. *Early Reading and Signing Deaf Children.* ACEDHH, St. Louis, MO. February 11, 2015.

Liu, H. T., Andrews, J. F., & Liu, C. J. (2014, Feb. 20-22). *How Iconicity effects the learning of Taiwanese Sign Language (TSL) for L2 sign language learners*. Poster session at the Association of College Educators—Deaf and Hard of Hearing (ACE-DHH) 40th Annual Conference. Washington, DC (Gallaudet University). (NSC101-2410-H-040-013-MY3)

Liu, C. J., Liu, H. J., & Andrews, J. F. (2014, Feb. 20-22). *The effectiveness of two storybook reading techniques using shared book reading, picture books and Taiwanese Sign Language (TSL) on reading skills of young deaf Taiwanese*

*readers.* Poster session at the Association of College Educators—Deaf and Hard of Hearing (ACE-DHH) 40th Annual Conference. Washington, DC (Gallaudet University). (NSC102-2410-H-040-007)

Liu, H. T., Andrews, J. F., & Liu, C. J. (2015, Jul. 6-9). *The effectiveness of Taiwan Sign Language/Chinese bilingual reading project in an inclusive elementary classroom.* Poster session at the 22nd International Congress on the Education of the Deaf. Athens, Greece (Athenaeum InterContinental).

Cannon, J., Guardino, C., Pizzo, L, Baker, S., Scott, J., Luckner, J. **Andrews, J.,,** Wang, Q. *How Do We Prepare Qualified Professionals To Work With Students With Diverse Needs?: A Panel Discussion of Future Directions When Working With Students Who Are Deaf and Hard of Hearing Multilingual Learners (DML).* Panel Discussion at Association of College Educators of the Deaf, New York City, NY: February 13, 2016.

Wolsey, J. A., Knight, T., Lee, C, Gentry, M. A., Smith, Z. Y., Musyoka, M. M., Clark, M. D., & **Andrews, J. F.** (2016, February). *A mixed method picture of early reading in signing deaf children: Book reading, book retelling, and drawings.* Poster presentation at the annual meeting of the Association for College Educators-Deaf and Hard-of-Hearing (ACE-DHH), New York, NY.

Wang, Q. & Andrews, J. (February 6, 2016). *Literacy Instruction in Primary Grade Deaf Education in China.* Poster presentation at the annual meeting of the Association for College Educators/Deaf and Hard of Hearing (ACEDHH), San Antonio, Texas.

Andrews, J. Liu, Atan, Liu, Achun, Lin, L. & Ku, F. (February 6, 2017). *Early Literacy and Taiwanese Deaf Children: A Panel Discussion.* Annual meeting of the Association for College Educators/Deaf and Hard of Hearing (ACEDHH), San Antonio, Texas.

Andrews, J. & Wang, Q. (2018). *Global Perspectives of Literacy Education for Deaf Students.* Poster presented at the ACEDHI, Feb. 16, 2018, Tucson, AZ

### *Publications*

### Books

Vernon, M. and Andrews, J. (1990) *The Psychology of Deafness: Understanding Deaf and Hard-of Hearing People.* Longman, White Plains, New York.

Andrews, J.,, I. & Weiner, M. (2004). *Deaf People: Challenging Perspectives from Psychology, Education and Sociology.* Boston, MA*:* Allyn & Bacon.

Andrews, J. (2013). *High Tides, Low Tides: The Story of Leroy Colombo: Deaf Lifeguard of Galveston, Texas.* Lamar University Press, Beaumont, TX.

Leigh, I., Andrews, J. & Harris, R. (2018). *Deaf Culture: Exploring Deaf Communities in American Deaf Communities.* Plural Publishing. Date of publication, Summer, 2016

11

Leigh, I., & Andrews, J. (2017). *Deaf people and society: Psychological, sociological, and educational perspective.* 2nd Edition.  New York: Routledge.

**Book in Progress**
Wang, Q. & Andrews, J. (Eds.) (In Progress). *Multiple Paths to Become Literate: International Perspectives in Deaf Education.* To be published by Gallaudet University Press.

**Book chapters**

Andrews, J. and Mason, J.  (1986). Childhood deafness and the acquisition of early print concepts*, Metalinguistic awareness and beginning literacy: Conceptualizing what it means to read and write*: D. Yaden, Jr. and  W. Templeton (Eds.)  Heinemann (Eds.)HinemanEducation Books, Exeter, New Hampshire: Heinemann.

Mather, S., Rodriguez, Y. & Andrews, J. & Rodriguez, J. (2006). Sight Triangles: *Conversations of Deaf Parents and Hearing Toddlers in Puerto Rico.* Book chapter. C. Lucas (Ed.) Multilingualism and Sign Languages From the Great Plains to Australia, Vol. 12. Gallaudet Press: Washington, D.C.

Mather, S. & Andrews, J. (2007). Eyes over Ears:  The Development of Visual Strategies by KODAs--Hearing Children of Deaf Parents. Book Chapter. C. Lucas (Ed.) Gallaudet University Press, Washington, D.C.

Andrews, J., Shaw, P. & Lomas, G. (2011). Chapter 19: Deaf and Hard of Hearing Students. *In the Handbook of Special Education*. pp. 233-246. James M. Kauffman and Daniel Hallahan (Eds.).  New York: Routledge.

Lomas, G., Andrews, J., & Shaw, P. (2017). Chapter 19: Deaf and Hard of Hearing Students. *In the Handbook of Special Education. Second Edition.* (pp. 338-357). James M. Kauffman, Daniel Hallahan and Paige C. Pullen (Eds.).  New York: Routledge.

**In Progress**
Liu, Chun Jung, Liu, Hsiu Tan, & Andrews, J. (in press). *Deaf Education in Taiwan: History, Policies, Practices and Outcomes.*  In Deaf Education in Asia. Oxford University Press.

**CD/DVD Rom Educational Materials**

Andrews, J. & Jordan, D. (2000) *Meet the Math Wiz.*  A set of five CD-ROMs in three languages: American Sign Language, English and Spanish (voice & text).  The set holds about 150 math word problems from math grade levels 1.5 to 6.5. Curriculum Publications, Western Illinois University, Macomb, IL.

Andrews, J. & Jordan, D. (2000). Hispanic Stories in three languages: ASL, English, Spanish. *The Tracks and the Wise Stones.  The Burro and the Wisemen, The Bilingual Cat, The Parrot That could Speak two Languages, The Ram in the Chili Patch.* Curriculum Publications, Western Illinois University, Macomb, IL.

12

Andrews, J. & Vitopol, C. (2007). *Tomados de la Mano (Hand in Hand). Hispanic Folktales*. Lamar University with Institute for Disabilities Research and Training, Inc.

## Journal Articles

McLaughlin, J. and Andrews, J. The reading habits of deaf adults in Baltimore. *American Annals of the Deaf* 1975, *120,* 497-501.

Andrews, J. *Ed's off Day,* Maryland: National Association of the Deaf, 1976. (an instructional comic book),

Andrews, J. and Dexheimer, A. Jaws in the Classroom. *Teaching  Exceptional Children.* 1976, 21 10-11

Andrews J. What do deaf adults read? *Journal of Rehabilitation of the Deaf,* 1978, Fall.

Andrews I J. and Conley, J. Beer, pot and shoplifting: teenage abuses. *American Annals of the Deaf*, 1978.

Andrews, J. Our eyes are always on T.V.—Deaf teens survey peers. *American Annals of the Deaf.* 1980, *125*, 1082-1085.

Andrews, J. and Mason, J. *How do deaf children learn to read?  An instructional model based on deaf children's emergent reading behaviors,* Technical Report No. 329 Center for the Study of Reading.  University of Illinois, Champaign-Urbana,, December, 1984.

Andrews, J. F, and Denny, C. Special needs of special students in post-secondary education. *EKU Teaching*, August, 1985.

Andrews, J. F., How deaf multi handicapped youth benefit from the microcomputer, *Closing the Gap. April*/May 1986.

Andrews, J.  F. and Mason, J. M. (1986) How do Deaf Children Learn about Prereading? *American Annals of the Deaf,* 131, 210-217.

Andrews, J. F. and Taylor, N. (1987) From sign to print: Picture book "reading" between mother and child.  *Sign Language Studies*  Fall, (56), 261-274.

Andrews, J. and Brame, M. (1987) Adults learn from children. *Teaching Exceptional children* 20. (1), 58-60.

Andrews, J., Haas D. and Waller, J. (1987) How to use the microcomputer with multi handicapped hearing impaired students: Teaching suggestions and software selections. *Perspectives for teachers  of the Hearing Impaired*. Jan. -Feb., 5, (3)f 15-19.

Andrews, J. (1988).  Deaf Children's Acquisition of Prereading Skills Using the Reciprocal Teaching Procedure. *Exceptional Children*, 54, (4), 349-355.

Andrews, J. and Sinclair, J. (1989) Software with graphics: A language motivator for high school students who are deaf.  *Teaching* , 21, (3), 16-18.

Andrews, J. and Wilson, H. (Nov.-Dec., 1991).  The deaf adult in the nursing home. *Geriatric* , 12, (6),  279-283.

Andrews, J. F., and Mason, J. M.,  Strategy Use among deaf and hearing readers. *Exceptional Children*, 1991.57, (6), 536-545.

Andrews, J. & Gonzales, K. (1992).  Free writing of deaf children in kindergarten. *Sign Language Studies*, 74, 63-78. Andrews, J. (1992).  Equal Access for Deaf Teachers in Texas.  *A Deaf American Monograph s*. 42, 13-18.

Andrews, J. & Akamatsu, T. (1993).  Building blocks for literacy: Getting the signs right.
*Perspectives and Deafness*, II, (3), 5-9.

Akamatsu,T.&Andrews,J.(1993). It takes two to be literate: Literacy interactions between parent and child, *Sign Language Studies*, 81, 330-360.

Andrews, J. & Covell, J. (1993).  Magnet schools: Future bilingual day schools for deaf students, *Deaf American Monograph,* 43, 109.

Andrews, J. & Jaussi, K. (1993).  Teacher education in deafness in Appalachian Kentucky, *Special Education Quarterly*, 12, (4), 8-21.

Andrews,, J. & Jordan, D. (1993).  Minority and minority-deaf professionals: How many and where are they?  *American Annals of the Deaf*, 138, (5), 388-396.

Andrews, J. , Moulton, R. & Pederson, 0. (Fall/Winter 1993-94) Texas and its progress toward the academic acceptance of ASL in colleges and universities. *Teacher Education and Practice*, 9 .(2), 13-21.

Andrews, J., Winograd, P. & DeVille, G. (July, 1994).  Deaf children reading fables: Using ASL summaries to improve reading comprehension. *American Annals of the Deaf, 139(3),* 378-386.

Gentry,M.&Andrews,J.(1994). The women's movement and the deaf social movement. *A deaf  American Monograph*, 44, 53-58.

Andrews, J. , Winograd, P., & DeVille, G. (1996).  Using sign language summaries during rereading lessons. *Teaching Exceptional Children*.  28(3), 30-33..

Moulton, R., Andrews, J. & Smith, M. (1997).  The Deaf World. *In Beyond Basic Care: Special Education and Community Rehabilitation in Low Income Countries.* (Eds.).  R. Brown, D. Bains, and A. Newfeldt.  Captus Press, York, Ontario, Canada.

Andrews, J. & Zmijewski, G. (1997).  How parents support home literacy with deaf children. *Early Child Development and Care*, Vol. 127-128, 131-139.

Andrews, J., Ferguson, C., Roberts, S. & Hodges, P. (March, 1997). What's up Billy Jo?: Deaf  children and bilingual-bicultural instruction in east-central Texas. *American Annals of the Deaf*. 142(1), 16-25.

Andrews, J. & Franklin, T.C. (March 1997). Why hire deaf teachers? Texas *Journal of Speech and Hearing (TEJAS)*, XXII(1), p. 12013. (ERIC document:ED 425 600)

Andrews, J. & Jordan, D. (1998).  Multimedia stories for deaf children. *Teaching Exceptional Children,* 30(5).. 28-33.

Andrews, J. & Martin, T. (1998). Hopwood, Affirmative Action and Deaf Education. *American Annals of the Deaf*, 143(4), 305-313.

14

Nover, S. & Andrews, J. (1998, 1999, 2000, 2001, 2002). *Critical Pedagogy in Deaf Education:  Bilingual methodology and staff development.* Year 1, 2, 3, and 5 Reports. USDLC Star Schools Project, US Dept of Education, First Year report. New Mexico School for the Deaf, Santa Fe, NM.(www.starschools.org/nmsd)

Andrews, J. (November, 2002).  Bilingual Language Approaches for Deaf Students. *Speech and Hearing Review,* 3, 277-310.

Andrews, J. & Karlin, A. (2002). Reading behaviors of deaf bilingual college students. *ADARA, 36(1), 28-44.*

Plue, C. & Andrews, J. (2002).  Deaf Youths of Asian/Pacific Islander Ancestry: Home, Language, and Cultural Identities. *Speech and Hearing Review. 3, 311-359.*

*Andrews, J. (2003).  Ed.D. Doctoral Graduates in Deaf Education: Benefits Survey.* American Annals of the Deaf. *148(3), 259-266.*

Andrews, J. & Cocke, D. (2005). Accessible Science for Deaf and Hearing Bilingual Students in Elementary School, 28(5), 8-10, 24. *NABE News* (National Association of Bilingual Educators).

Gonzales, H., Covell, J. & Andrews, J. (2005). Language Acquisition: Where is the Sign Language Assessment on my son's IEP? *Endeavor,* Vol. 2, pp. 18-19, 20-21.

Simms, L., Andrews, J. & Smith, A. (2005). A Balanced Approach to Literacy Instruction for Deaf Signing Students.  *Balanced Reading Instruction*, 12, 39-54.

Andrews, J. (2006). Deaf Culture Values Through Children's Literature. *Multicultural Review*, 5(1), 25-36.

Andrews, J., Vernon, M. & LaVigne, M. (2006). The Deaf Suspect/Defendant and the Bill of Rights. *RID Views,* May, 2006, pp. 1, 7-13.

Andrews, J., Gentry, M., DeLana, M. & Cocke, D. (2006). Bilingual Students—Deaf and Hearing: Learn about Science: Using Visual Strategies, Technology and Culture. *The Language Learner*, 2(2), 5-7, 10.

Andrews, J., Martin, T., Velasquez, J. (April 23, 2007). The Need for Additional Latino Professionals in Deaf Education. *The Hispanic Outlook in Higher Education*, 17(14), 40-43.

Andrews, J. & Covell, J. (2006).  Preparing Future Teachers and Doctoral Level Leaders in Deaf Education: Meeting the Challenge. *American Annals of the Deaf*, 151(6), 464-475.

Delana, M., Gentry, M. & Andrews, J. (2007). The efficacy of ASL/English bilingual education: Considering Public Schools. *American Annals of the Deaf*, 152(1), 73-87.

Andrews, J., Vernon, M. & LaVigne, M. (2006). The Deaf Suspect/Defendant and the Bill of Rights. *RID VIEWS*. May, 2006. pp 1, 7-10.

Andrews, J., Vernon, M. & LaVigne, M. (2007). The Bill of Rights, Due Process and the Deaf Suspect/Defendant. *Journal of Interpretation*. Summer 2007, pp. 9-38.

Andrews, J., Logan, R. & Phelan, J. (January 14, 2008). Language Milestones for Speech, Hearing and ASL. *ADVANCE for Speech-Language Pathologists & Audiologists*. Vol. 18(2), 16-20.

Andrews, J. & Dionne, V. (2008). Audiology & Deaf Education. Preparing the Next Generation of Professionals. *ADVANCE for Speech-Language Pathologists & Audiologists*. Vol 18(18), pp. 10-13.

Simms, L., Rusher, M., Andrews, J. & Coryell, J. (2008). Apartheid in Deaf Education: Diversifying the Workforce, *American Annals of the Deaf*, 153(4), 384-355.

Kilpatrick, B. & Andrews, J. (2009). Accessibility to Theater for Deaf and Deaf-Blind People: Legal, Language and Artistic Considerations. *International Journal of Interpreter Education.* Vol. 1, 77-94.

Seaborn, B., Andrews, J. & Martin, G. (2010). Deaf adults and the Comprehension of the Miranda. *Journal of Forensic Psychology and Practice, 10: 107-132*.

Ingraham, C. & Andrews, J. (2010). The Hands and Reading: What DeafBlind Adult Readers Tell Us. *British Journal of Visual Impairment*. 28(2), 130-138.

Andrews, J. (2010). LeRoy Colombo: The Deaf Lifeguard of Galveston Island. Part I: The Early Years (1905-1943). *East Texas Historical Journal*. Vol. XLVIII (2), 85-109

Andrews, J. F., & Rusher, M. (2010). Codeswitching techniques: Evidence-based instructional practices for the ASL/English bilingual classroom. *American Annals of the Deaf*, *155*(4), 407-424.

Andrews, J. & Lokensgard, L. (2010). The Visual Language of Art, ASL, and English. *Multicultural Review,* 19(3), 37-44.

Andrews, J. (2011).  LeRoy Colombo:  The Deaf Lifeguard of Galveston Island. Part II The Later Years (1943-1974). *East Texas Historical Journal*. Vol. XLIX (1), 9-34.

Vernon, M. & Andrews, J. (2011). Basic Legal Issues in Handling Cases of Defendants who are Deaf. *The Champion,* Vol. X
XXV No. 2, 30-37.

Andrews, J. (2011). Deaf Inmates: Cultural and Linguistic Challenges and Comprehending the Inmate Handbook. *Corrections Compendium*, 36(1), 1-6, 14-16.

Andrews, J. & Dionne, V. (2011) ""Down the Language Rabbit Hole with Alice": A Case Study of a Deaf Girl with a Cochlear Implant," *International Journal of Otolaryngology*, vol. 2011, Article ID 326379, 8 pages, 2011. doi:10.1155/2011/326379.

Andrews, J. (2012). Deaf Professors in Higher Education: Please Apply. *The Deaf Texan*, 97(1), 16-19.

Vernon, M. & Andrews, J. (2012, July). Individuals With Disabilities and the Issue of False Confessions. *The Champion*, Vol. XXXVI. No. 6, 34-42.

Andrews, J. (2012). Reading to Deaf Children Who Sign: A Response to Williams (2012) and Suggestions For Future Research. *American Annals of the Deaf*,  157(3), 307-319.

Smith, A., Andrews, J. , Ausbrooks, M., Gentry, M. & Jacobowitz, E. L. (2013). A Metalinguistic Awareness Test for ASL/English Bilingual Deaf Children: The TASLA-R. *Journal of Language Teaching and Research*, 4(4), 885-899.

Andrews, J. (2013). Enjoying Reading: Start With Stories. *The Deaf Texan*, 98(3), 25-26. Karlin,

A., Andrews, J., Smith, Z., Bumstead, S. & Meidl. (2013) *Picture books with deaf characters: A*

*comparison of Reader's responses with resource for teachers and students.Vol.6.*

http://www.csulb.edu/misc/l-sr/ejournal/ejournal.html.

Andrews, J. F. (2013). Assessment and reading paradigms: A response to John Luckner (Letter to the Editor). *American Annals of the Deaf,* 158(4), 399-404.

Liu, H. T., Liu, C. J., & Andrews, J. F. (2014). Literacy and deaf students in Taiwan: Issues, practices and directions for future research: Part I. *Deafness and Education International*, 16(1), 2-22.

Liu, H. T., Liu, C. J., & Andrews, J. F. (2014). Literacy and deaf students in Taiwan: Issues, practices and directions for future research: Part II. *Deafness and Education International*, 16(1), 23-36

Wang, Y. & Andrews, J. (2014). Reading and deaf individuals: Perspectives on the qualitative similarity hypothesis. *American Annals of the Deaf*, 159(4), 319-322.

Andrews, J. & Wang, Y. (2015). The qualitative similarity hypothesis (QSH): Research synthesis and future directions. *American Annals of the Deaf* 159(5), 468-483.

Andrews, J., Byrne, A. & Clark, M.D. (2015). Deaf scholars on reading: A historical review of 40 years of dissertation research (1973-2013): Implications for research and practice. *American Annals of the Deaf*, 159(5), 393-418.

Smith, D. H., & Andrews, J. F. (2015). Deaf and hard of hearing faculty in higher education: enhancing access, equity, policy, and practice. *Disability & Society*, *30*(10), 1521-1536.

Wang, Q., Andrews, J., Liu, H. T., & Liu, C. J. (2016). Case Studies of Multilingual/Multicultural Asian Deaf Adults: Strategies for Success. *American Annals of the Deaf*, *161*(1), 67-88.

Andrews, J., Hamilton, B., Misener-Dunn, K., & Clark, M. D. (2016). Early reading for  young deaf and hard of hearing children: Alternative frameworks. *Psychology, 7(4), 510-522.*  Http://www.scirp.org/journal/psyh.

Andrews, J., Liu, H., Liu, C., Gentry, M. & Smith, Z. (2017). Increasing early reading skills in young deaf children using shared book reading: A feasibility study. *Early Child Development and Care,* 187(3-4), 583-599, Also appeared in book Title: *Research in Young Children's Literacy and Language Development* (Routledge, 2018) ISBN: 978-1-138-09109-2
Planned Publication Date: 1/03/2018
Webpage: https://www.routledge.com/products/9781138091092

Hoffman, D., Wolsey, J. L., Andrews, J., & Clark, D. (2017). Translanguaging Supports Reading with Deaf Adult Bilinguals: A Qualitative Approach. *The Qualitative Report*, *22*(7), 1925-1944.

Wang, Q. & Andrews, J.F. (2017). Literacy instruction in primary level deaf education in China: *Deafness & Education International*. 19(2), 63-74.

Wolsey, J. L. A., Clark, M. D., & Andrews, J. F. (2018). ASL and English bilingual Shared Book Reading: An exploratory intervention for signing deaf children. *Bilingual Research Journal*, 1-17.

**Language & Literacy Materials for Teachers**

Andrews, J. (with Debbie Burnaman) (Nov/Dec 1998). Teachers Guide to World Around You. Gallaudet University, Washington, D.C.

Andrews, J. (1999).  Teachers Guide to *World Around You*. Gallaudet University, Washington, DC.

Andrews, J. (with Cindy Plue).  (January/February, 2000).  Teachers Guide to *World Around You*. Geography, Mermaids, Hurricanes, Rowing, and Sea Words.  Gallaudet University, Washington, DC.

Andrews, J. (March/April, 2000).  *World Around You: Teachers Edition*.  From Bite to  Boat, Salary to Salt: All about Sailing, Navigation, and Shipwrecks.

Andrews, J., Majocha, T. & Kimball, S. (1999).  ASL to English:  Lessons in how each language expresses the past time concept.  *Perspectives in Education and Deafness,* 18 (1),6-9,13.

Nover, S. & Andrews, J. (March, 2000).  Bilingual-Bicultural Education for My Deaf Child:  What about it? : Questions Parents Ask. *Silent News*.

Nover, S. & Andrews, J. (May, 2000).  Questions Parents Ask about the Bilingual-Bicultural Approach: Language Issues. *Silent News*. Pp. 15-16.

Andrews, J. & Jordan, D. (May 19, 2000).  Lamar Professors Offer ESL and Math CD- ROMs for Deaf and Hearing Students. *Hispanic Outlook in Higher Education*, 18(17), 19-21.

Andrews, J. (2011) Adapted Little Books. Translating Little Books by McCormick & Mason (1990) into ASL. Lamar University, Beaumont, TX.

Andrews, J. & Mason, J. (2118). ASL and English Bilingual Stories (The Great Egrets Family), Reading Lessons, and Speech and Listening Lessons.

http://www.redeafiningacademiccollaboration.com/vlogblog

**Grants Awarded**
*Preparation of Special Education: Bachelor and Masters Level Training for Teachers of the Hearing Impaired in Rural Kentucky*.  U.S. Department. 1984-1986 $116,000

In-house grant f or study: *A study of the comprehension strategies of deaf readers in high school*. I  Division of Institutional Research, Eastern Kentucky University (funding for one research

assistant and materials $304.47, Spring 1984.

In-house grant to study: *Relations between parent signing skills and book sharing behaviors to deaf preschoolers print knowledge*. Division of Institutional Research,' Eastern Kentucky

University (funding request for one research assistant,, travel materials $682.00). Submitted July, 1984.  Accepted September 1984.

*Computer-aided-instruction for deaf multi handicapped youth in rural Kentucky*.  Apple Education Foundation.  A complete Apple 2e system with printer, 2 disk drives, an modem ($2700). Awarded in June, 1985.

In-house grant: *Computer-aided instruction for deaf multi handicapped youth in rural Kentucky*.  Division of Institutional Research, Eastern Kentucky University (funding requested for educational supplies and software to complement Apple grant award for computer hardware, $983.21). Submitted September, 1985.  Accepted October, 1985.

*Training of Interpreters for Deaf Individuals in Appalachian Kentucky*.  Submitted to U.S. Department of Education, Washington, D.C. in November, 1985. (A 3-year grant to establish an interpreter training program at EKU, funding $160,000).  Notified acceptance, March 1986.

In-house grant: *Computer-aided instruction for deaf multi handicapped youth in rural Kentucky - Year 2* (Software and Supplies $767.46) Funded, October 24, 1986.

In-house grant: with Haas, Do *The effects of sign language laboratory instruction on the sign competencies of college students at Eastern Kentucky University*.  Approved January 29, 1987. ($572.25).

In-house grant: with Gonzales, R. *The sign, letter, word, and story abilities of a 5-year old - Hispanic deaf boy - A Case Study*.  Lamar University, Fall 1988. ($500.00).

*Training Black and Asian Communication Disorder Specialists f or Minority Children in Texas and Louisiana* with R. Moulton.  Funded for $375,000. (1990-1993) Begins August, 1990.

In-house grant: with Wilson, H. *Deaf Children's Conceptualization of Stories*.  Organized Research grant, Lamar University ($5000).

*Training deaf and hearing teachers of the deaf inTexas and Louisiana*(1991-1996).  With Dr.R. Moulton.  U.S. Dept of Education, funded for $488,065.  Starting July, 1991.

*Training of educational interpreters for minority deaf persons.  (1993-1998).* (With Dr. Gabriel Martin).  U.S. Dept. of Education, funded for $450,000.

*Training Hispanic teachers of the Deaf (*with Dr. Robert Moulton) (1993-1997).  U.S. Dept. of Education, funded for $500,000. starting July 1, 1993.

*Training doctoral level leaders in deaf education* (with Dr. Olen Pederson).  U.S. Dept. of Education, funded for $525,000. starting September 1, 1993.

*Increasing English literacy skills with multimedia and Hispanic culture (*with Dr. Don Jordan).  U.S. Dept.  Of Education, funded for $416,000.  (1995 - 1998).

*Training deaf and hearing teachers of the deaf in Texas and Louisiana* (with R. Moulton) Jan. 1997 - June 2000. $400,000.

Andrews, J. & Jordan, D. (Oct. 1997). *Multimedia and Math word Problems for deaf students.* US Department of Education (Oct 1997-Oct 1999). $400,000.

Student-Initiated Research Grant with Zanthia Smith. (1996). *A study of four African-American Families Reading to their Young Deaf Children.* U.S. Department of Education. $18,000.

Student-Initiated Research Grant with Cindy Plue. *A Study of Asian-Deaf Children*. US. Dept of Education, $19,000. (Dec. 1, 1997 – Dec. 1, 1998).

*Training of Deaf and Minority Doctoral Level Leaders in Deaf Education.* (with Dr. Robert Moulton). US Dept of Education, Sept. 1998-2002. $800,000.

Student-Initiated Research Grant with Scott Whitney. *Using virtual reality and traditional multimedia to teach vocabulary to deaf students.* $19,000. (Dec. 1, 1998-Dec.1, 1999).

*Project INVEST (Innovative Non-Vocal Education Specialization in Technology.* (With Dr. Paula Nichols). *TIF (Texas Infrastructure Fund), Texas Education Agency. $850,000.*

*Project Homework Helper: Using web and videoconferencing to develop homework lessons for deaf students.* With Dr. Don Jordan. Dept of Education, $400,000 (2001-2003).

Student-Initiated Research Grant with Adonia Smith. *A Teacher-Friendly ASL Test for deaf students.* $19,000. (Dec. 1, 2002-Dec. 1, 2003). US. Dept of Education. Training Hispanic Teachers of the Deaf (with Dr. Tony Martin). US Dept of Education, 1.5 million dollars. (2002-2007)

*Training Doctoral Level Leaders in Deaf Education*. (with Dr. Tony Martin) U.S. Dept of Education, 2005-08. $800,000.

*Project ACE: Using Bilingual/ESL Reading Comprehension Strategies to Teach Science to Deaf and Hearing Students at the K-8 Levels. National Science Foundation*, $100,000. (with Dr. David Cocke and Dr. Brenda Nichols), 2004-2005.

Project Exploring Enabling Technologies, Best Practices Science Pedagogy, and Bilingual/ESL Strategies for Teaching of Science to Elementary Deaf and Hearing Bilingual students. (with Dr. David Cocke and Dr. Brenda Nichols). *National Science Foundation*. $97,676. (2005-06).

Andrews, J. & Lokensgard, L. (2007). *Deaf Artists in Visual Arts.* National Endowment of the Arts *(NEA)* Funded for $9,000. April, 2007.

Andrews, J. Martin, G. & Rusher, M. *Shaping the River: Training Doctoral Level Leaders in Deaf Education*. US Dept of Education: 2009-2012. $800,000.

### Creative Fiction

Andrews, J. F. (1988) *The Flying Fingers Club* Juvenile novel for 9-12 yrs. age group featuring handicapped children) Gallaudet University Press, Washington, D.C.

Andrews, J. F. (1990) *Secret in the Dorm Attic* Gallaudet University Press, Washington, D.C., May, 1990.

Andrews, J. F., 1991 (1991) *Hasta Luego- San Diego* Gallaudet University Press, Washington, D.C. March, 1991.

Andrews, J. *The ghost of Tomahawk Creek*. Published by Northern State University Press, Aberdeen, South Dakota, Fall, 1993.

Andrews, J. (1986) Jumping through her ABC's *Primary Treasure* October, 1986. Andrews, J.

(1986) Let your fingers do the spelling. *Highlights for Children* (accepted November, 1986).

Andrews, J. (1989) Teach yourself to read and use finger spelling *Highlights for Children* (puzzle book feature) (accepted Fall, 1989).

Andrews, J. (2001) *The Mystery of the Totems*. Butte Publications. Salem, Oregon.

### Teaching

Since 1983 I have taught at the undergraduate and graduate level to preservice teachers in areas such as literacy, ASL and English bilingual theory and methods, psychology of deaf people, teaching methods, ASL linguistics, Deaf culture, practicum, student teaching, deaf with special needs, assessment, and ASL/English bilingualism, law and deaf people.

When the doctoral (Ed.D.) program was added in 1994, I began teaching doctoral level courses. Areas of academic teaching were: Literacy (across lifespan) for deaf individuals, psychology of deafness, cognition and psychosocial development, psycholinguisitics, ASL and English bilingual education, literacy, Deaf History, research methods, ASL literature, and law/forensics and deaf offenders.

### Masters Theses and Doctoral Dissertations (1988 to present)

A key component of LU's masters and doctoral level programs in Deaf Studies and Deaf Education is to develop Deaf (including minority/Deaf) and minority hearing scholars as well as teachers and educational leaders to support ASL/English bilingualism in Deaf Education as teachers, administrators, and educational leaders in community colleges, universities and in Deaf organizations. Another characteristic of LU's Deaf Studies/Deaf Education graduate programs is to train preprofessionals from different countries such as South America (Chile, Colombia), Saudi Arabia, Jordan, China, and Mexico. This international outreach is challenging because students are typically English as a second language learners. But the efforts are well worth it as they bring this training back to their countries to impact Deaf Education internationally.

Since 1990 to 2015, I have chaired 4 masters theses and served on 4 committees of theses. The

masters theses is an option and not a requirement so the majority of students opt to take written comprehensive exams.

From 1997 to 2015, I have chaired 27 doctoral dissertations and served on additional 22 dissertations as a committee member. Of these total of 49 dissertations, 29 (59%) were completed by deaf or minority/deaf doctoral scholars. A total of 10 (21%) were by minority hearing scholars.

**Dissertations: 2016 - present**
Currently as a professor emerita standing, I am serving as a committee member on five dissertations:

Kathy Weldon. Acculteration: Examining perception of self identity of deaf and hard of hearing college students (2017).

Ghithan Alamri. Teachers Beliefs and Attitudes about Saudi Sign Language. (2017).

Farraj Alqarni. Hearing parents of deaf children in Saudi Arabia: Communication modes and challenges (2017).

Abdulhadi Alamri. Saudi Interpreters' Attitudes Toward Professional Sign Language Interpretation (2017).

Ahmed Alzahrani. Attitudes of Saudi Arabian Deaf Students Regarding Their Assimilation Experiences While Studying in the United States (2017).


**Consulting, Community Service and Forensic Work**

Reading consultant for Nebraska Reading Project, University of Nebraska, Lincoln, Nebraska, 1978.

Consultant for proposed computer-aided instruction for residential schools, General Physics Corporation, Columbia, Maryland, 1981.

Review of language texts and tests, American Annals of Deaf, 1983, Longman Co. 1990- present.

Reading and language consultant for deaf multi handicapped classroom at Madison Central High School, Richmond, Kentucky, 1983-present.

Current Editorial Advisory Boards (1983-present) American Annals of the Deaf.

Reviewer for CHOICE Book Reviews

Language/Reading workshop for teachers of the hearing-impaired in Fayette County, Lexington, Kentucky.  November, 1986.

U.S. Department of Education-Grant proposal reader for projects in interpreting and educational psychology related to Deafness, Washington, D.C., November 1986.

Planning Board Member - Southeastern Institute in Deafness, Lexington, Kentucky.

November, 1986.

Hosted an Interpreters Workshop in Richmond, Kentucky at Eastern Kentucky University for educational interpreters and vocational rehabilitation counselors, April 30, 1988.

Member of the Hearing Impaired Programming Committee to review recommendations of the Kentucky Commission for the Deaf and Hearing Impaired is to improve instructional programming for deaf children and youth - Spring, 1988.

Member of Task Force f or Texas Education Agency to review test items for EXCET, write review manual and make videotape.  Fall, Spring, Summer 1988-89, and Fall 1991.

Reading Workshop.  Beaumont Deaf Cooperative Schools, Fall, 1989. Grant

Reader for U.S. Dept, of Education grants, April, 1992.

Panel Leader for American Educational Research Association (AERA) annual meeting, Special Interest Group: Deafness and literacy, April, 1992, San Francisco, CA.

Member of Texas Association of Deaf (TAD) subcommittee group to work on TASP bill issue and Bill of Rights for Deaf Children, October, 1992.

Grant reader for U.S. Department of Education, Fall, 1993.
Reading workshop for teachers and parents for Bryan Independent School District.
February, 1995.

Reading workshop at University of New Orleans, LA. In July 1995.

On panel advisory board for Texas Education Agency to set up standards for evaluation of American Sign Language (ASL) teachers for the public schools (1996- present).

Advisory board and curriculum writer for Star Schools project (1997-2002) and Star on line project (2000-2005).

Gallaudet University Education Department. Fall, 2000.  Bilingual Teacher Education.

Consultant for ASL/English Bilingual Language Project (1997 to 2002) New Mexico School for the Deaf, Santa Fe, NM.

Communication/Language/Reading Evaluator for Deaf Clients for Advocacy, Inc. Austin, TX, the Texas Education Agency and the National Association for the Deaf, and other disabilities organizations: 1995 to present.

Co-Editor of Special Issues on Literacy, *American Annals of the Deaf*. (2014 to 2015).

Served as forensic expert witness and conducted reading and literacy evaluations for approximately 20 cases since 1995 with Federal, state, and private attorneys related to Deaf persons involved in the criminal justice system.

Consultant to Gallaudet University Ph.D. Doctoral program in Deaf Education, March 9-10, 2017.

**International Teaching & Consulting**

Monterrey, Mexico.  Five day workshop in "Total Communication in Mexican Schools for the Deaf" (with Lamar faculty) June, 1989.

United Nations Project to set up interpreter-training program in Amman, Jordan. December, 1989 (with R. Moulton).

United Nations Project - Teacher and consultant for interpreter training and deaf education programs in Amman, Jordan May 27 to June 16, 1990.

U.S. AID project to establish teacher-training program in deaf education in Gaza Strip. Taught Literacy & Deafness course in Gaza Strip, Dec. 8 - 31, 1995.

Three reading workshops related to reading and deafness at Kaohsiung Normal University, Tainan University and Tainan Deaf School and Taichung Deaf School in Taiwan, March 9,11, 14, 2010.

Two invited presentations at Baylor University to 100 undergraduate students and faculty on March 27, 2015: *The Role of Sign Language and Fingerspelling in Literacy of Deaf Individuals: Two Studies* (reviews a metanalyses of 40 years of dissertation research by Deaf scholars of reading) and an early reading study using ASL/English bilingual books at two schools for the deaf (ongoing).
 *ASL in Academic Settings* (reviews the past, present and future of ASL studies in higher education including descriptions of five research labs in the country focused on ASL studies)

Invited workshops in Rabat, Morocco on May 3 to 5th, 2016. Workshops about deaf education issues including literacy to 40 teachers of the deaf and Moroccan Special Education directors. (Invited by IDRT (Institute of Disabilities Research and Training).

 Invited presentation at Universidade Federal Fluminense, Rio de Janeiro, Brazil. *Teaching Science to Deaf  Students: Language and Literacy Considerations*, August 18, 2017.

Andrews, J. (2018, May 1). *Literacy and deaf students*. Experts working group: Literacy and learning for students with disabilities: Panel discussion. USAID and World Bank, 1225 Connecticut Ave., NW, Washington, DC, 20036.

Andrews, J. F. (2018, June 5). *Bilingual/Bicultural Deaf Education in US and Taiwan*. Presentation at the Taiwan Normal University, Taipei, Taiwan.

Andrews, J. F. (2018, June 6). *Teaching literacy to signing deaf students: How to do it*. Presentation at the Taipei Deaf School, Taipei, Taiwan.