**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Consolidated Civil Action No. 16-cv-02733-STV

BIONCA CHARMAINE ROGERS,
CATHY BEGANO,
ANDREW ATKINS, and
MARK TREVITHICK,

      Plaintiffs,

v.

COLORADO DEPARTMENT OF CORRECTIONS,
RICK RAEMISCH,
RYAN LONG, and
MIKE ROMERO,

      Defendants.

_____

Consolidated Civil Action No. 1:18-cv-02926-STV

LEONID RABINKOV,
CATHY BEGANO,
ANDREW ATKINS,
MARC TREVITHICK,
on behalf of themselves and others similarly situated,

      Plaintiffs,
v.

COLORADO DEPARTMENT OF CORRECTIONS,

      Defendant.

_____

**ORDER**
_____

Magistrate Judge Scott T. Varholak

      This matter comes before the Court on three motions: (1) Defendants' Motion to

Dismiss as Moot (the "Motion to Dismiss") [#143]; (2) Plaintiff Marc Trevithick's Motion for

Partial Summary Judgment ("Motion for PSJ") [#117]; and (3) Defendants' Motion for Summary Judgment ("Motion for Summary Judgment") [#133] (collectively, the "Motions"). The Motions are before the Court on the parties' consent to have a United States magistrate judge conduct all proceedings in this action and to order the entry of a final judgment. [##30, 31, 51] The Court held oral argument on the Motions on July 26, 2019 [##151, 157] and has carefully considered the Motions and related briefing, the entire case file, and the applicable case law. For the following reasons, the Motion to Dismiss [#143] is **DENIED**, Trevithick's Motion for PSJ [#117] is **GRANTED**, and Defendant's MSJ [#133] is **GRANTED IN PART and DENIED IN PART**.

# I.    BACKGROUND[1]

Plaintiffs are inmates incarcerated by Defendant Colorado Department of Corrections ("CDOC"). [#141-1, DSOF1] Plaintiffs Bionca Charmaine Rogers and Cathy Begano are housed at the Denver Women's Correctional Facility ("DWCF") and Plaintiffs Leonid Rabinkov, Andrew Atkins, and Marc Trevithick are housed at the Colorado Territorial Correctional Facility ("CTCF"). [*Id.* at PSOF1-2] Plaintiff Rabinkov also often

---

[1] For simplicity, and because the pending Motions are interrelated, in this section the Court refers to both its findings of jurisdictional fact for the purposes of the Motion to Dismiss, as well as the undisputed facts from the Motions for Summary Judgment. *See, e.g.*, *Sauceda v. Dailey*, No. 97-2278-JWL, 1998 WL 422811, at *2 n.2 (D. Kan. June 12, 1998).

When the moving party challenges the facts providing the basis for the Court's subject matter jurisdiction, the Court may not presume the truthfulness of the complaint's allegations. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). As a result, the Court must make its own findings of fact. *Id.* Plaintiffs have the burden of establishing subject matter jurisdiction because they are asserting jurisdiction. *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008). In order to make findings addressing disputed jurisdictional facts, the Court "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing." *Holt*, 46 F.3d at 1003. But relying on evidence outside the pleadings does not convert a motion to dismiss pursuant to Rule 12(b)(1) into a motion for summary judgment. *Id.* Regardless, because the Motion to Dismiss overlaps in part with issues raised in Defendants' Motion for Summary Judgment, and because the parties have had ample opportunity to address the materials submitted in support of all the pending motions, whether or not the Court converts the Motion to Dismiss to a motion for summary judgment would not impact the analysis. *See, e.g.*, *Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1212 n.6 (10th Cir. 2013).

The undisputed facts are drawn from the Separate Statement of Facts filed with Defendants' Motion for Summary Judgment ("Defendants' Statement of Facts") [#141-1 at 1-8], and Plaintiffs' Statement of Additional Material Facts ("Plaintiffs' Statement of Facts") [*id.* at 9-34], attached to and submitted in response to Defendants' Statement of Facts. The Court refers to the sequentially numbered facts set forth in Defendants' Statement of Facts as "DSOF#," and the facts set forth in Plaintiffs' Statement of Facts as "PSOF#." Because Plaintiffs' Statement of Facts is largely identical to the Separate Statement of Facts filed with Trevithick's Motion for PSJ ("Trevithick's Statement of Facts") [#124 at 12-30], the Court only refers to Trevithick's Statement of Facts ("TSOF") to the extent that Plaintiff Trevithick presents facts unique to him and to his Motion for PSJ. The Court occasionally cites directly to the exhibits or other filings cited by the parties to provide additional context.

goes to the Denver Reception and Diagnostic Center ("DRDC") for medical appointments. [*Id.* at PSOF3]  Plaintiffs Rabinkov, Begano, Atkins, and Trevithick (the "Deaf Plaintiffs"), are all deaf and use American Sign Language ("ASL") as their primary language and preferred mode of communication.  [*Id.* at PSOF4-5]  The Deaf Plaintiffs are thus individuals with disabilities as that term is used in the ADA and Rehabilitation Act.  [*Id.* at PSOF4]  Plaintiff Rogers is able to hear, but her mother is deaf, and Plaintiff communicates with her mother using ASL.  [*Id.* at PSOF4-6]

Videophones are telephones with a high-definition video display, capable of two-way interactive video and audio, for communication between individuals in real time over the internet.  [*Id.* at PSOF7]  Videophones enable individuals to communicate through ASL.  [*Id.* at PSOF8]  Global Tel*Link, the company that supplied videophones for a CDOC pilot program, provides videophone service to approximately 30 departments of corrections.  [*Id.* at PSOF45, 81]  While Plaintiffs Rogers and Begano were able to use videophones when they were detained in city and county facilities, the CDOC has repeatedly denied requests by Plaintiffs to use videophones to make calls to individuals outside CDOC facilities.  [*Id.* at PSOF9, 44]

Instead, until recently, deaf inmates in CDOC facilities, or inmates who wish to communicate with parties with hearing or speech disabilities, are afforded access to a teletypewriter ("TTY"), or comparable equipment, which allows communication through use of typed text messages.  [*Id.* at DSOF29-30]  In a TTY communication, both parties type and read responses using a teletypewriter device, and their typed conversation is transmitted back and forth across the standard telephone network through an operator. [*Id.* at DSOF30, PSOF17-18]  Because very few deaf people use TTYs, a three-step

process is required when a deaf CDOC inmate uses TTY to contact another deaf person outside the facility without a TTY: the deaf inmates types a message into the TTY; the TTY operator speaks the message to a video relay service ("VRS") operator; and the VRS operator signs the message to the recipient's videophone. [*Id.* at PSOF23] When the deaf recipient responds, the three-step process is repeated in reverse. [*Id.*] Plaintiffs Rogers, Trevithick, and Atkins have had to use this process, which has caused misunderstandings and mistranslations. [*Id.* at PSOF23-24] And CDOC's TTYs often freeze in the middle of calls, or produce garbled text or nonsense characters.[2] [*Id.* at PSOF29-30; #124, TSOF24] Plaintiff Rabinkov has not been able to communicate through TTY with his friends who use Russian Sign Language. [#141-1, POSF25] Plaintiff Rogers has had difficulty communicating effectively with her mother, the guardian for her children, including discussing sensitive family matters. [*Id.* at PSOF37, 42]

In addition to causing misunderstandings, TTY technology is 60 years old, causes delays because of the necessary relay through typing and sometimes an operator, and requires deaf inmates to communicate in English. [*Id.* at PSOF17, 23, 27] ASL is neither a manual form nor a derivative form of English, the grammatical and syntactic structure between ASL and English is fundamentally different, and English is not the native language of the Deaf Plaintiffs or Plaintiff Rogers' mother. [*Id.* at PSOF 4, 13-14] In contrast, videophones allow deaf people to communicate using ASL, use visual indicators such as facial expressions, head tilts and nods, and eyebrow raises, which encode the grammar of ASL and also enable the conveying of emotion, mood, tone, and affect in real

---

[2] While Defendants' deny this factual assertion, the exhibits cited by Defendants lend support to Plaintiffs' statement of fact. [*See, e.g.*, #133-5]

time.  [*Id.* at PSOF7, 27, 32-33]  When the Deaf Plaintiffs are able to communicate in ASL, they can express and understand a full range of meaning and emotion, and engage in fluent, complete, and meaningful communication.  [*Id.* at PSOF36]

CDOC investigated the possibility of offering videophone services as early as 2007, but ultimately did not.  [*Id.* at PSOF73]  In a December 2013 Project Request Form, Keith Nordell, who was CDOC's highest ranking attorney at the time, stated that "current TTY equipment is becoming antiquated, requires frequent maintenance from sources that are not familiar or trained on the use/repair of a TTY and creates unfair delays for offenders due to the limited number of TTY machines department wide when equipment is down."  [*Id.* at PSOF20]  Between 2013 and 2016, CDOC again evaluated videophone technology and considered implementing a pilot program to provide videophones to deaf inmates at CTCF.  [*Id.* at PSOF74]  Videophone units were installed at CTCF in 2015, but Adrienne Jacobson, Associate Director of Legal Services for the CDOC, had security concerns and ultimately decided not to move forward with videophone service.  [*Id.* at PSOF75-76; #143-1 at ¶¶ 5-6]  Specifically, Ms. Jacobson was concerned about the CDOC's lack of processes to limit the phone numbers that offenders could call over the videophone, restrict the duration of videophone calls, or charge offenders for those calls.  [#143-1 at ¶ 6]  In July 2016, the videophone pilot program was approved for CTCF, but within hours of the launch, the CDOC pulled the plug.  [#141-1, PSOF78-80]  The videophone pilot project was put on hold several times over the course of 2016.  [*Id.* at POSF80-82]  As of May 2017, there were no plans to install videophones in CDOC facilities.  [*Id.* at PSOF83]

In January 2018, Janet Smith, an Americans with Disabilities Act ("ADA") Inmate Coordinator Designee with CDOC Legal Services, sent an email stating, "I would like to get started as soon as possible on the video[]phone project as CTCF's deaf population is being contacted by Attorney Amy Robertson.  (The same attorney representing the deaf women in the pending lawsuit regarding lack of videophones)."  [*Id.* at PSOF84; *see also* #143-2 at ¶ 2]  Around the same time, in early 2018, Ms. Jacobson revisited the option of providing videophone service, and organized a committee of CDOC officials to address security concerns.  [#143-1 at ¶ 10]

A videophone kiosk was installed at DWCF on December 11, 2018, and was available for use in one unit by December 22.  [*Id.* at ¶ 12; *see also* #141-1, DSOF36, PSOF86-87]  This marked the first time that CDOC provided deaf inmates with access to videophones.  [#141-1, PSOF85]  The unit has been used by inmates at DWCF ever since, including Plaintiffs Begano and Rogers, there have been no significant problems with the videophone unit, and DWCF staff have developed processes and procedures for inmates to use the unit.  [*Id.* at DSOF37; #143-1 at ¶ 12]

Videophone units were later installed at CTCF, and on June 4, 2019, Ms. Smith visited that facility to observe videophone use.  [#143-2 at ¶ 7; *see also* #143-1 at ¶ 13]  The installation of two of the three videophones had been completed, those videophones were operational, and Ms. Smith assisted and observed inmates making calls.  [#143-2 at ¶¶ 7-8]  Plaintiffs Rabinkov, Atkins, and Trevithick are all housed in units where videophones are available.  [*Id.* at ¶ 8]  Offenders housed in units where the videophones have not been installed are permitted to use a videophone from a different unit.  [*Id.*]  The

CDOC additionally plans to install one or more videophone units at the DRDC, and at other correctional facilities on an as-needed basis. [#143-1 at ¶ 13]

Ms. Jacobson indicates that it is CDOC's intent to maintain the videophone units permanently, and that the CDOC has no intention of terminating the units or discontinuing the accessibility of the units for offender use. [*Id.*] While Ms. Smith states that CTCF is in the process of amending its implementation adjustments to incorporate use of videophones into the facility's policy [#143-2 at ¶ 9], there are currently no administrative regulations or implementation adjustments that address videophones, and there is no CDOC videophone policy or draft policy [#141-1, PSOF100-01]. CDOC does not have a contract with the current vendor of its videophone services, and has not made any expenditures to install videophones. [*Id.* at PSOF102-04] CDOC canceled the previous videophone pilot program based on security concerns, and Ms. Jacobson continues to have similar concerns about the current system, including that it does not restrict the phone numbers prisoners can call. [*Id.* at PSOF105-06] Ms. Jacobson does not believe the ADA requires the CDOC to provide videophones to deaf and hard of hearing inmates, and the CDOC maintains that TTY is an effective form of communication for those individuals, sufficient to meet the CDOC's obligations under the ADA and the Rehabilitation Act. [*Id.* at PSOF107-08] The parties dispute whether TTY units remain available for meaningful use in CDOC facilities. [*Id.* at PSOF113; #143-1 at ¶ 13]

Plaintiffs collectively[3] claim that Defendants have violated their rights under Title II of the ADA, Section 504 of the Rehabilitation Act, and the First Amendment.[4]  [#66 at 13-19; #115 at 8-12]   Plaintiffs seek injunctive and declaratory relief, and compensatory damages.  [#66 at 20; #115 at 12]   Specifically, Plaintiffs seek an injunction ordering Defendants to cease violating their rights under the First Amendment, the ADA, and the Rehabilitation Act, and to stop discriminating against them on the basis of disability.  [*Id.*] In Civil Action No. 18-cv-02926-STV ("*Rabinkov*"), Plaintiffs explicitly ask that the CDOC be ordered to provide videophone services to deaf prisoners and to implement policies to ensure access to videophones.  [#115 at 12]

In the Motion to Dismiss, Defendants argue that Plaintiffs' claims are now moot because videophone technology has been made available to Plaintiffs.  [#143]  Plaintiffs have filed a response in opposition to the Motion to Dismiss [#147], Defendants have replied [#148], and both parties have filed supplemental briefs regarding the Motion to Dismiss and the other pending Motions [##152, 155].

Plaintiff Trevithick filed the Motion for PSJ on January 17, 2019, seeking summary judgment on his claims under Title II of the ADA and Section 504 of the Rehabilitation Act and arguing that it is undisputed that the CDOC does not provide videophone service to him, and the service that it does offer is ineffective and obsolete.  [#117]  The Motion for PSJ is fully briefed.  [##120, 124]  Finally, in Defendants' Motion for Summary Judgment,

---

[3] On December 20, 2018, this Court granted Plaintiffs' Motion to Consolidate, consolidating Civil Action No. 18-cv-02926-STV ("*Rabinkov*") with Civil Action No. 16-cv-02733 ("*Rogers*").  [#103]

[4] The First Amendment claim is asserted against Defendants CDOC, Rick Raemisch, Ryan Long, and Mike Romero in *Rogers*.  [#66 at 13-14]  Plaintiffs in both *Rogers* and *Rabinkov* allege that the CDOC has violated their rights under Title II of the ADA and Section 504 of the Rehabilitation Act.  [*Id.* at 14-19; #115 at 8-12]

Defendants contend that they are entitled to summary judgment on all of Plaintiffs' claims. [#133 at 7-19] Plaintiffs have filed a response [#140] and Defendants have replied [#141]. The Court first addresses the Motion to Dismiss because the Court must first determine whether it has subject matter jurisdiction to adjudicate this matter. The Court then discusses the Motion for PSJ and the Motion for Summary Judgment (collectively, the "Motions for Summary Judgment").

## II.   MOTION TO DISMISS

The Court first considers whether the CDOC's post-litigation efforts to provide videophone technology for deaf inmates moot Plaintiffs' claims. In the Motion to Dismiss, Defendants argue that because the instant litigation is premised on Defendants' failure to provide videophone access to Plaintiffs, the CDOC's implementation of videophone technology moots Plaintiffs' claims. [#143] More specifically, Defendants claim that as of December 22, 2018, a videophone unit has been available for use by offenders at the DWCF, which Plaintiffs Begano and Rogers have used. [*Id.* at 4-5] Defendants further note that Plaintiffs Rabinkov, Atkins, and Trevithick now have access to videophones in their units at CTCF. [*Id.* at 5] CDOC states that it intends to maintain videophone units permanently for use by deaf offenders [*id.* at 6] and argues that this Court accordingly lacks subject matter jurisdiction because the installation of videophones moots Plaintiffs' claims [*see generally* #143].

### A.  Standard of Review

Federal Rule of Civil Procedure 12(b)(1) empowers a court to dismiss a complaint for "lack of subject-matter jurisdiction." Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case, but only a determination that the court lacks authority

to adjudicate the matter. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so). A court lacking jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

The United States Constitution limits the jurisdiction of the federal courts to actual cases or controversies. U.S. Const. art. III, § 2, cl. 1. Mootness thus "is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996).

### B. Mootness

"A 'suit becomes moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Brown v. Buhman*, 822 F.3d 1151, 1165 (10th Cir. 2016) (quoting *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013)). "[T]he case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Id.* (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). "The crucial question is whether granting a present determination of the issues offered will have some effect in the real world." *Id.* at 1165-66 (quoting *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005)). "Put another way, a case becomes moot when a plaintiff no longer suffers actual injury that can be redressed by a favorable judicial decision." *Id.* at 1166 (quoting *Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1213 (10th Cir. 2015)).

"When prospective equitable relief is requested, the requesting party must show an ongoing, personal stake in the outcome of the controversy, a likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." *Rezaq v. Nalley*, 677 F.3d 1001, 1008 (10th Cir. 2012). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). In a declaratory relief action, "a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant." *Id.* (quoting *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011)).

Courts recognize two "exceptions" to the mootness doctrine. *See Brown,* 822 F.3d at 1166. Of relevance to the instant litigation is the exception for "voluntary cessation" of the defendant's conduct. *See id.*[5] "Under this exception, 'voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed.'" *Id.* (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)). Courts "view voluntary cessation 'with a critical eye,' lest defendants manipulate jurisdiction to 'insulate' their conduct from judicial review." *Id.* (quoting *Knox*, 567 U.S. at 307).

While viewed with a critical eye, voluntary cessation may moot a case "if the defendant carries 'the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *Already*, 568 U.S. at 91). Voluntary actions will moot litigation if two conditions are satisfied: "(1) it can

---

[5] The other exception involves disputes that are "capable of repetition, yet evading review." *Id.*

be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1115 (10th Cir. 2010) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). "The party asserting mootness bears the heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again." *Id.* at 1116 (quotations omitted).

In practice, however, this "heavy burden frequently has not prevented governmental officials from discontinuing challenged practices and mooting a case." *Id.* "[T]he withdrawal or alteration of administrative policies can moot an attack on those policies." *Id.* at 1117 (quotations omitted). Indeed, "the 'mere possibility' that an agency might rescind amendments to its actions or regulations does not enliven a moot controversy." *Id.* (quoting *Ala. Hosp. Ass'n v. Beasley*, 702 F.2d 955, 961 (11th Cir. 1983)). Rather, "[a] case cease[s] to be a live controversy if the possibility of recurrence of the challenged conduct is only a speculative contingency." *Id.* (quotations omitted).

### C. Analysis

The Court concludes that this litigation is not moot. Defendants have not met their heavy burden of demonstrating that there is no reasonable expectation that the alleged violations will recur, for three reasons: (1) there is no CDOC policy ensuring access to videophones; (2) Defendants provided videophones at least partially in response to the

instant litigation; and (3) Defendants continue to contend that videophones are not required by the ADA.[6]

In general, courts have held that if there is no barrier to defendants reverting to previous actions causing the alleged violations, including no official or binding policy in place, then a case is not moot. *See, e.g.*, *Hill v. Williams*, No. 16-cv-02627-CMA, 2016 WL 8667798, at *7 (D. Colo. Nov. 4, 2016) (finding case challenging enforcement of state statute was not moot where prosecutors had indicated intent not to prosecute, "but there was no evidence that they ha[d] adopted a formal policy to that effect"); *see also Freedom From Religion Found., Inc. v. Concord Cmty. Sch.*, 885 F.3d 1038, 1051 (7th Cir. 2018) (noting former holding that a "school failed to establish mootness because it did not adopt a policy formally prohibiting the use of churches for graduation"); *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015) ("[W]hile a statutory change is usually enough to render a case moot, an executive action that is not governed by any clear or codified procedures cannot moot a claim." (quotation omitted)); *Ybanez v. Raemisch*, No. 14-cv-02704-PAB-MLC, 2018 WL 2994416, at *3 (D. Colo. June 14, 2018) (finding challenge to CDOC policy was not moot where "Defendants ha[d] not pointed to any legal or practical barrier to their reinstatement of the previous versions of the policy" (quotation omitted)).[7]

---

[6] While the Court focuses on Plaintiffs' requests for injunctive and declaratory relief, Defendants' provision of videophones also does not moot Plaintiffs' damages requests, as Defendants acknowledged at oral argument [#157 at 7:4-11]. *See e.g.*, *Brown v. Bhuman*, 822 F.3d 1151, 1169 (10th Cir. 2016) ("Voluntary cessation cannot moot an action seeking damages because damages compensate a party for past conduct, not ongoing or future conduct.").

[7] Some courts have held that even implemented policy changes do not necessarily moot a case. *See, e.g.*, *Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003) ("[A]s the promulgation of work rules appears to be solely within the discretion of the [Department of Corrections ("DOC")], there is no guarantee that [the DOC] will not change back to its older, stricter Rule as soon as this action terminates."); *Sefick v. Gardner*, 164 F.3d 370,

On the other hand, in the ADA context, there is generally no reasonable expectation that a violation will occur when there are "changes that are permanent in nature and that foreclose a reasonable change of recurrence of the challenged conduct," *Tandy v. City of Wichita*, 380 F.3d 1277, 1291 (10th Cir. 2004), including, for example, when the defendant has expended time and money to come into compliance with the ADA, *Kelley v. Sparrer*, No. 2:17-cv-00688, 2018 WL 2768660, at *3 (D. Utah June 8, 2018). *See also White v. Lee*, 227 F.3d 1214, 1242-43 (9th Cir. 2000) (finding a new policy mooted plaintiffs' claims, where the policy was "entrenched" and "permanent," because it was circulated by memorandum, announced by press release, incorporated into a federal agency field book, had been renewed on an annual basis, and directly addressed violations alleged by plaintiffs).

The Tenth Circuit recently found that a suit challenging the enforcement of a bigamy statute was mooted when the County Attorney's office promulgated an official policy indicating that bigamy crimes would only be prosecuted if the person violating the statute was also engaged in some form of abuse, violence, or fraud. *Brown v. Bhuman*, 822 F.3d 1151, 1159 (10th Cir. 2016). The County Attorney himself indicated in a sworn affidavit that his office had concluded its investigations of plaintiffs, found that they were not engaged in any other prosecutable crimes related to bigamy, and that the case was closed and no charges would be filed, unless new evidence was discovered in line with

---

372 (7th Cir. 1998) ("[T]he current . . . policy, adopted after the commencement of this suit, is not implemented by statute or regulation and could be changed again, so this voluntary cessation of the challenged conduct does not eliminate the controversy."); *McBride v. Mich. Dep't of Corr.*, 294 F. Supp. 3d 695, 720 (E.D. Mich. 2018) ("[I]n the context of prison litigation, courts are particularly suspicious of non-binding policy changes by correctional institutions party to the litigation." (citing cases)).

the new policy. *Id.* Therefore, the only way plaintiffs could have faced the prosecution they sought to enjoin would be for the County Attorney to reverse an official written policy in contravention of his sworn statement.

Here, in contrast, there is no CDOC policy, or even draft policy, addressing videophones, nor any administrative regulations or implementation adjustments that address or require videophones. [#141-1, PSOF100-01] The CDOC's cancellation of the 2013-2016 videophone pilot program underscores this point. [*Id.* at PSOF74-76; #143-1 at ¶¶ 5-6] In short, there is no practical barrier to Defendants removing videophones from CDOC facilities. Nor is there any policy addressing solutions in the event of a videophone unit breaking or malfunctioning, or how promptly videophone service would be restored. The Court acknowledges Ms. Jacobson's sworn statement that the CDOC intends to maintain the videophone units permanently. [#143-1 at ¶ 13] But that statement does not carry the same weight as the clearly definitive statement in *Brown*, because it is not backed by any policy, and because the removal of the videophones would not directly contradict Ms. Jacobson's statement, as the CDOC's intent could simply change. *Cf. Brown*, 822 F.3d at 1171, 1178 (weighing County Attorney's statement in light of the policy change, the history of prior prosecutions, which indicated that the County Attorney's position was not mere posturing, and the fact that acting in contravention to that statement would expose the county attorney to prosecution for perjury or contempt). Moreover, CDOC has not made the type of resources expenditures that would suggest that it would not remove the videophones. CDOC does not have a contract with the current vendor of its videophone services, has not made any expenditure to install videophones, and it

costs nothing for the CDOC to provide videophone service at DWCF. [#141-1, PSOF102-04]

Second, there is undisputed evidence that Defendants installed the videophones at the CDOC facilities at least in partial response to the instant litigation. In general, self-correction by a government entity "provides a secure foundation for mootness so long as it seems genuine." *Brown*, 822 F.3d at 1167-68 (quotation omitted). But courts "are more likely to find that cessation moots a case when cessation is motivated by a defendant's genuine change of heart rather than his desire to avoid liability." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1186 (11th Cir. 2007) (collecting cases); *see also Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 220 (4th Cir. 2017) (holding sworn declaration of prison chaplain that accommodations for deaf prisoners would be provided could not "be viewed as a statement of current policy, but must instead be understood as a mid-litigation change of course"); *McCormack*, 788 F.3d at 1025 ("A presumption of good faith . . . cannot overcome a court's wariness of applying mootness under 'protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption.'" (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 n.5 (1953))); *McBride v. Mich. Dep't of Corr.*, 294 F. Supp. 3d 695, 720 (E.D. Mich. 2018) (noting "greater skepticism is warranted where such remedial action 'only appears to have occurred in response to the present litigation, which shows a greater likelihood that it could be resumed'" (quoting *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 342-43 (6th Cir. 2007))).

Here, Janet Smith, an ADA Inmate Coordinator Designee with CDOC Legal Services, sent an email stating that she would like to implement the videophone project

as soon as possible "as CTCF's deaf population is being contacted by Attorney Amy Robertson. (The same attorney representing the deaf women in the pending lawsuit regarding lack of videophones)." [#141-1, PSOF84] Ms. Smith sent that email in January 2018 [*see id.*], approximately eight months after Attorney Robertson had entered her appearance on behalf of Plaintiff Rogers in Civil Action No. 16-cv-02733-STV ("*Rogers*") [#29], and two months after Ms. Robertson had filed a complaint on behalf of Plaintiffs in *Rabinkov* [Civil Action No. 18-cv-02926-STV, #1]. Around the same time of the January 2018 email, Ms. Jacobson revisited the option of providing videophone services in CDOC facilities in early 2018. [#143-1 at ¶ 10] Accordingly, the Court has some reason to doubt that Defendants' installation of videophones was entirely genuine, and finds that the change was motivated at least in part by the instant litigation.[8] *See Sheely*, 505 F.3d at 1186 (finding case was not moot, in part because the timing of defendant's new policy "came almost nine months into th[e] lawsuit, . . . and appears to have coincided with a change in counsel").

Third, when a defendant continues to assert the validity of its actions, "a controversy between the parties over the legality of those actions remains." *Sheely*, 505 F.3d at 1187; *see also W.T. Grant*, 345 U.S. at 632 (noting that the "public interest in having the legality of the practices settled[] militates against a mootness conclusion"); *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 43 (1944) (holding controversy remained where defendant "ha[d] consistently urged the validity of the [practice] and

---

[8] The Court recognizes that the CDOC has considered implementing various types of technology to accommodate deaf inmates in the past [*see, e.g.*, #143-1 at ¶¶ 5-10], but nevertheless, no programs have been actually or successfully implemented, and no videophones made available, until after the initiation of the instant litigation.

would presumably be free to resume [it] were not some effective restraint made"); *United States v. Gov't of the Virgin Islands*, 363 F.3d 276, 286 (3d Cir. 2004) (finding defendant's continued defense of its position "does not bespeak of a genuine belief that the [allegedly unlawful behavior] was of a type that would not be contemplated again"). *But see Brown*, 822 F.3d at 1176 (declining to adopt holding that a prosecutor's promise not to bring charges is credible only if he believes enforcement would be unconstitutional). The Tenth Circuit has explained that "the failure of a governmental agency to acknowledge the impropriety of its former, challenged course of conduct" is a relevant, though non-dispositive, factor in the voluntary cessation analysis. *Rio Grande Silvery Minnow*, 601 F.3d at 1118 n.17. For example, this District held that claims the CDOC had violated the First Amendment by censoring inmate mail were not moot, in part because even though a new regulation had been implemented addressing the censorship, the CDOC "did not concede that the earlier regulation violated the plaintiffs' First Amendment privileges," and in light of "that position, there [wa]s nothing to assure that the officials responsible for the mail policy recognize[d] the need to consider" the inmates' First Amendment rights. *Young v. Raemisch*, No. 13-cv-01744-RPM, 2015 WL 4607679, at *1 (D. Colo. Aug. 3, 2015); *see also Hill*, 2016 WL 8667798, at *7 (noting indicia of reluctant cessation counsel against a decision to moot a suit, and "interpret[ing] the Defendants' steadfast commitment to the constitutionality of the underlying statute, in spite of their averments disclaiming prosecution, as evidence of reluctant cessation").

Similarly here, Ms. Jacobson does not believe the ADA requires the CDOC to provide videophones to deaf and hard of hearing inmates, and the CDOC maintains that TTY is an effective form of communication, sufficient to meet the CDOC's obligations

under the ADA and the Rehabilitation Act. [#141-1, PSOF107-08] And, unlike *Young* and as discussed above, the CDOC does not even have a videophone policy in place. Moreover, the CDOC canceled the previous videophone pilot program based on perceived security risks, and Ms. Jacobson continues to have similar concerns about the current system, though the CDOC has determined how to work with those concerns. [*Id.* at PSOF105-06] *See, e.g.*, *Fulbright v. Jones*, Nos. CIV-03-99-W, CIV-03-125-W, CIV-03-1465-W, 2006 WL 222807, at *1 n.1 (W.D. Okla. Jan. 26, 2006) (finding case was not moot, despite change in DOC policy that required providing kosher diets to Orthodox Jewish inmates, and statement of DOC director that he intended to follow that policy, in light of the former infringing policy and the DOC's history of resisting providing kosher diets). *Cf. Brown*, 822 F.3d at 1176 (noting the court's finding that the case was moot was bolstered by the fact that the new prosecution policy was consistent with the County Attorney's history and "longstanding de facto policy of non-prosecution").

In light of the CDOC's lack of any policy requiring videophones, the fact that the installation of the videophones corresponded with the instant litigation, the CDOC's representations that it does not believe videophones are required by the ADA or the Rehabilitation Act, and its history of canceling videophone implementation based on security concerns that persist today, Defendants have not satisfied their heavy burden of showing that it is absolutely clear that their allegedly wrongful behavior could not reasonably be expected to recur. Because Defendants have not satisfied the first prong of the analysis, the Court need not determine whether "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Rio Grande*

*Silvery Minnow*, 601 F.3d at 1115.  For the foregoing reasons, Defendants' Motion to Dismiss as Moot [#143] is **DENIED**.

In their Motion for Summary Judgment [#133], Defendants also argue that they are entitled to summary judgment on Plaintiffs Rogers and Begano's claims for injunctive relief because those claims are moot.  [*Id.* at 18-19]  As in their Motion to Dismiss, Defendants contend that because Plaintiffs Rogers and Begano were provided with videophones, any determination the Court could make as to whether TTY technology alone provides them with a reasonable means of communication would be without effect. For the same reasons the Court denies Defendants' Motion to Dismiss, Defendants' Motion for Summary Judgment [#133] is also **DENIED** to the extent it seeks summary judgment on the grounds that Plaintiffs Rogers and Begano's claims for injunctive relief are moot.[9]

## III.    MOTIONS FOR SUMMARY JUDGMENT

The Court next turns to Defendants' Motion for Summary Judgment [#133] and Plaintiff Trevithick's Motion for PSJ [#117].  In the Motion for Summary Judgment, Defendants contend that they are entitled to summary judgment on all of Plaintiffs' claims. [#133 at 7-19]  Specifically, Defendants contend that Plaintiffs Begano, Atkins, and Trevithick failed to exhaust their administrative remedies [*id.* at 7-10], that summary judgment should be entered in favor of Defendants as to Plaintiffs' claims asserted under the ADA and the Rehabilitation Act [*id.* at 12-16] and under the First Amendment [*id.* at 10-12], and that Plaintiffs are not entitled to compensatory damages [*id.* at 16-17].  In the

---

[9] As discussed below, Plaintiff Begano's claims nevertheless must be dismissed for the separate reason that Plaintiff Begano did not properly exhaust her administrative remedies.

Motion for PSJ, Plaintiff Trevithick moves for summary judgment on his ADA and Rehabilitation Act claims, arguing that it is undisputed that the CDOC does not provide him with meaningful access to its inmate phone program. [*See generally* #117]

### A. Standard of Review

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co.,* 41 F.3d 567, 569 (10th Cir. 1994). Where, as here, the Court is presented with cross-motions for summary judgment, the Court "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 907 (10th Cir. 2016) (internal quotations omitted).

When the moving party bears the burden of persuasion at trial, "the moving party must establish, as a matter of law, all essential elements of the [claim on which summary judgment is sought] before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). In other words, the moving party "must support its motion with credible evidence showing that, if uncontroverted, the moving party would be entitled to a directed verdict." *Rodell v. Objective Interface Sys., Inc.*, No. 14-CV-01667-MSK-MJW, 2015 WL 5728770, at *3 (D. Colo. Sept. 30, 2015) (citing *Celotex Corp.*, 477 U.S. at 331). "The burden then shifts to the non-moving party to produce evidence demonstrating the existence of a genuine factual issue for trial." *Id.*

When the moving party does not bear the burden of persuasion at trial, the movant may satisfy its initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact "simply by pointing out to the court a lack of evidence . . . on an essential element of the nonmovant's claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir.1998). If the movant carries this initial burden, the burden then shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial." *Id.* at 671 (quotation omitted).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury. *See Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Serv.,* 812 F.2d 621, 623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson,* 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*citing First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## B. Analysis

First, the Court addresses the exhaustion argument raised in Defendants' Motion for Summary Judgment, and also discussed in the briefing on Plaintiff Trevithick's Motion for PSJ. [*See* #133 at 7-10; *see also* #120 at 3-6; #124 at 2-4]  Second, the Court discusses whether Defendants or Plaintiff Trevithick are entitled to summary judgment on Plaintiffs' ADA and Rehabilitation Act claims. [*See* #133 at 12-16; *see generally* #117] Third, the Court determines whether Defendants are entitled to summary judgment on Plaintiffs' requests for compensatory damages. [*See* #133 at 16-17]  Finally, the Court considers whether Defendants are entitled to summary judgment on Plaintiffs' First Amendment claim. [*See id.* at 10-12]  Where the motions for summary judgment overlap, the Court addresses the legal arguments together. *See Azzun v. Kan. Dep't of Health & Env't*, No. 09-4144-SAC, 2010 WL 4975557, at *1 (D. Kan. Dec. 2, 2010).

### i. Exhaustion

The Prison Litigation Reform Act of 1995 ("PLRA") directs that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a). The exhaustion requirement is mandatory, *see Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016), and applies to each plaintiff separately, *McGoldrick v. Werholtz*, 185 F. App'x 741, 744 (10th Cir. 2006).  The PLRA's mandatory exhaustion requirement, however, requires only the exhaustion of "available" remedies.  *See Ross*, 136 S. Ct. at 1858-60; *Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010).  An administrative procedure is unavailable when "it operates as a simple dead end—with officers unable or consistently unwilling to

provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859. Similarly, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy might be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Because exhaustion is an affirmative defense, Defendants "bear the burden of asserting and proving that the plaintiff did not utilize administrative remedies." *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011). "Once a defendant proves that a plaintiff failed to exhaust, however, the onus falls on the plaintiff to show that remedies were unavailable to him." *Id.*

In order to properly exhaust available administrative remedies, inmates must follow the grievance procedure set forth by the regulations of the facility in which they are housed. *Jones v. Bock*, 549 U.S. 199, 218 (2007). Under the CDOC's procedures for administrative remedies, there is first an informal opportunity to engage in constructive dialogue. [#141-1, DSOF2-3] Thereafter, inmates must follow a formalized three-step grievance process set forth by Administrative Regulation ("AR") 850-04. [*Id.* at DSOF4] AR 850-04 requires inmates to file a document known as a Step 1 grievance within 30 days of discovering the complaint, which must affect the offender personally. [*Id.* at DSOF5-6] A CDOC official then responds to the Step 1 grievance in writing. [*Id.* at DSOF5] Within five days of receiving that response, if the inmate is unsatisfied, the inmate must then file a Step 2 grievance. [*Id.* at DSOF7] If the inmate is still unsatisfied with the response to the Step 2 grievance, he or she then must proceed to file a Step 3 grievance within 5 days of receiving the written response to the Step 2 grievance. [*Id.* at

DSOF8]  The Step 3 grievance is the final step in the CDOC grievance process.  [*Id.* at DSOF9]

Here, Defendants argue that because Plaintiffs Trevithick, Begano, and Atkins did not initiate or complete the administrative grievance process prior to the filing of *Rogers*, these Plaintiffs have failed to properly exhaust their claims and Defendants are thus entitled to summary judgment.  [#133 at 10]  While the Court agrees that the plain language of the PLRA requires exhaustion prior to the filing of a § 1983 action, 42 U.S.C. § 1997e(a), failure to properly exhaust requires dismissal without prejudice.  *See Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009).  For that reason, dismissal of Plaintiffs' claims in *Rogers* for failure to exhaust would have had no practical effect here.  The Court concludes that dismissing Plaintiffs' claims in *Rogers* without prejudice for failure to exhaust, only to allow Plaintiffs to proceed in *Rabinkov*, as they have already done, would be a waste of time and resources for both the parties and the Court at this juncture, and would serve little purpose other than the sake of formality.  *See Georgacarakos v. Wiley*, No. 07-cv-01712-MSK-MEH, 2010 WL 1291833, at *23-*24 (D. Colo. Mar. 30, 2010) (finding that dismissing the suit and requiring plaintiff to refile would be inefficient, where plaintiff's final appeal in the grievance process had not yet been denied, but plaintiff had otherwise completed the grievance process).

While the precise factual scenario before the Court appears to be largely unchartered territory, the Court notes that at least one federal district court has taken a similar approach.  In *Mitchell v. Dodrill*, the plaintiff filed the original action before he had exhausted his administrative remedies, but later filed a separate complaint in a new action, at which point he had properly exhausted.  696 F. Supp. 2d 454, 465 (M.D. Pa.

2010). The United States District Court for the Middle District of Pennsylvania consolidated the two actions and directed the plaintiff to file a single, "all-inclusive amended complaint," and then used the date the amended complaint was filed as the operative date for exhaustion under the PLRA. *Id.* The court concluded that plaintiff had properly exhausted prior to the filing of the amended complaint. *Id.*; *see also Jackson v. Fong*, 870 F.3d 928, 937-38 (9th Cir. 2017) (McCalla, J., concurring) (citing *Mitchell*, 696 F. Supp. 2d at 465). *Cf. Gambino v. Warden, FCI-Schuylkill*, Nos. 3:18-2241, 19-0249, 2019 WL 2005627, at *2 (M.D. Pa. May 7, 2019) (finding dismissal warranted where plaintiff did not exhaust administrative remedies prior to filing either action, which he sought to be consolidated).

Accordingly, the Court looks to the date that *Rabinkov* was filed for the purposes of the exhaustion analysis, and concludes that whether Plaintiffs properly exhausted prior to filing the *Rogers* action has no impact on whether exhaustion was proper prior to *Rabinkov*.[10] The Court thus turns to the separate question of whether Plaintiffs Trevithick, Begano, and Atkins each properly exhausted their administrative remedies prior to the filing of the *Rabinkov* action.

### a. Plaintiff Trevithick

Defendants admit that Plaintiff Trevithick properly exhausted his claims through the grievance process prior to filing in the *Rabinkov* matter. [#124 at 28; #133 at 10] Because the Court concludes that the operative date for exhaustion was the filing of *Rabinkov* in November 2018, Plaintiff Trevithick has properly exhausted his claims and

---

[10] Regardless, for the reasons discussed below, the Court finds that Plaintiff Atkins properly exhausted his administrative remedies in 2015, long before both the *Rogers* and *Rabinkov* matters were filed.

Defendants' Motion for Summary Judgment [#133] is **DENIED** to the extent Defendants seek summary judgment on Plaintiff Trevithick's claims.

### b. Plaintiff Begano

As to Plaintiff Begano, it is undisputed that she did not file a timely Step 2 grievance, and as a result, her Step 3 grievance was denied as untimely.[11] [#141-1, DSOF15-16, 18, PSOF52; *see also* #141-2] Nevertheless, Plaintiffs argue that by responding to Plaintiff Begano's Step 2 grievance substantively, Defendants waived any timeliness arguments at Step 3, and thus Plaintiff Begano properly exhausted her administrative remedies. [#140 at 13-14]

The Tenth Circuit has held that "[i]f a prison accepts a belated filing, and considers it on the merits, that step makes the filing proper for purposes of state law and avoids exhaustion, default, and timeliness hurdles in federal court." *Ross v. Cty. of Bernalillo*, 365 F.3d 1181, 1186 (10th Cir. 2004), *abrogated on other grounds by Jones*, 549 U.S. 199. But courts in this District have interpreted that holding to apply only where defendants never raised a timeliness defense at *any* point of the grievance process. *See, e.g.*, *Eller v. Tonche*, No. 15-cv-02693-REB-MEH, 2018 WL 1316978, at *7 (D. Colo. Mar. 14, 2018) (finding timeliness objection waived where defendants never stated that the grievances were untimely at any step of the three-step grievance process); *Jewkes v.*

---

[11] Although Plaintiffs dispute when Plaintiff Begano was provided with a response to her Step 1 grievance, and thus dispute the deadline for filing her Step 2 grievance, Defendants have presented evidence in the form of a sworn statement by CDOC Step 3 Officer Anthony DeCesaro, and records from the Offender Portal, that Plaintiff Begano was provided with a response to the Step 1 grievance on July 13, 2017. [#133-1 at 3; #141-2 at 1] Plaintiff Begano has not rebutted this evidence. According to CDOC procedures, Plaintiff Begano's Step 2 grievance had to be filed five days after receipt of the Step 1 response—by July 18, 2017. Plaintiff Begano did not file her Step 2 grievance until July 21, 2017. [#141-1, DSOF16]

*Shackleton*, No. 11-cv-00112-REB-RNB, 2012 WL 3028054, at *3 (D. Colo. July 23, 2012) (noting that the CDOC had waived any timeliness objections to one inmate's grievance by "respond[ing] fully and substantively to [the] grievance without raising the timeliness issue at any stage," but finding defense preserved as to a second inmate where the CDOC, "although initially addressing [her] case substantively, chose to raise the timeliness issue and reject her grievance"); *see also Wilkerson v. Eldridge*, No. 2:14-CV-586 DAK, 2017 WL 1136951, at *4 (D. Utah Mar. 27, 2017) (distinguishing cases from this District, where courts held that timeliness had been waived because "the institutions did not raise timeliness at any stage of the grievance process") (collecting cases)), *appeal dismissed*, No. 17-4053, 2017 WL 4621190 (10th Cir. July 25, 2017); *Gonzalez v. Joey*, No. 12-834 RB/GBW, 2014 WL 12788055, at *4 (D.N.M. Sept. 5, 2014) ("Generally, if a prison considers an inmate's grievances on the merits *throughout all steps of the grievance process*, the inmate has exhausted his administrative remedies." (emphasis added)), *report and recommendation adopted in part, held in abeyance on other grounds*, 2014 WL 12787952 (D.N.M. Sept. 25, 2014). In contrast here, Plaintiff Begano's grievance was rejected as untimely at Step 3, while the grievance process was still under way. Accordingly, Plaintiff Begano did not properly exhaust her administrative remedies prior to the filing of *Rabinkov*.

Alternatively, Plaintiffs argue that videophones were not an available remedy, and thus the CDOC has not satisfied its burden to prove that "administrative remedies were, in fact, available." [#140 at 15 (quoting *Purkey v. CCA Det. Ctr.*, 263 F. App'x 723, 726 (10th Cir. 2008))] The Court disagrees. "[A]n administrative procedure is not unavailable because it fails to provide the specific relief that an inmate demands." *Burnett v. Okla.*

*Dep't of Corr.*, 737 F. App'x 368, 372 (10th Cir. 2018). "Rather, . . . 'an inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues.'" *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001)). On the other hand, "prisoners need not engage in entirely fruitless exercises when no form of relief is available at all"—there must be at least the possibility of some kind of relief. *Ross*, 365 F.3d at 1187 (citing *Booth*, 532 U.S. at 736 n.4, 738).

Here, Plaintiffs do not argue that the CDOC administration was unable to implement videophones, but rather that at the time of Plaintiff Begano's grievances, the CDOC was unwilling to do so. But the inability to prevail on an administrative challenge is not equivalent to the unavailability of the remedy sought. *See United States v. Contreras-Cabrera*, 766 F. App'x 674, 676 n.2 (10th Cir. 2019); *see also Beaudry v. Corr. Corp. of Am.*, 331 F.3d 1164, 1167 (10th Cir. 2003) (finding "Plaintiffs' demands for weapons training for corrections officers, medical care, and decontamination [we]re all matters which the prison administration could affect," and even though some of the matters were "'non-grievable' under prison policy, the fact that prison authorities did have the power to render some of the relief requested" made administrative remedies available). CDOC officials have authority to install videophones, as evidenced by the CDOC's response to Plaintiff Atkins and Trevithick's grievances that it had explored the adoption of videophones, and the CDOC's subsequent installation of videophones in 2018, and thus there was at least some possibility of relief when Plaintiff Begano filed her grievances. [#141-1, DSOF36, PSOF71, 86-87]

Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** to the extent it seeks summary judgment on Plaintiff Begano's claims for failure to properly

30

exhaust administrative remedies and Plaintiff Begano's claims are **DISMISSED WITHOUT PREJUDICE**. *See Gallagher*, 587 F.3d at 1068.

### c. Plaintiff Atkins

Plaintiff Atkins originally filed a Step 1 grievance in October 2015, regarding hearing issues and complaints about TTY machines. [#141-1, DSOF19] Specifically, Plaintiff Atkins noted that the TTY was often broken, and he requested that the CDOC install videophones instead. [*Id.* at PSOF66] In response to his Step 1 grievance, Plaintiff Atkins was told that the CDOC was preparing to launch a pilot program for video relay phones at CTCF, that the program would run for approximately six months, and then the CDOC would determine what technology would be installed and used. [*Id.* at PSOF69] The CDOC did not deny the grievance at Step 1 [*id.* at PSOF70], and Plaintiff Atkins therefore did not proceed beyond Step 1 regarding these complaints [*id.* at DSOF20]. When the CDOC never implemented the pilot project, Plaintiff Atkins filed a new grievance in 2018 about the TTY machines and requested use of videophones. [*Id.* at DSOF21] That request was denied at Step 3 as duplicative of Plaintiff Atkins' original grievance in 2015. [*Id.* at DSOF23, PSOF65] Defendants argue that Plaintiff Akins thus failed to properly and timely exhaust. [#133 at 10]

In order to exhaust administrative remedies, the inmate must "go beyond the first step [and seek] intermediate or final administrative review after the prison authority denie[s] relief." *Booth*, 532 U.S. at 735 (emphasis added). But "[a]n inmate has no obligation to appeal from a grant of relief, or a partial grant that satisfies him, in order to exhaust his administrative remedies." *Harvey v. Jordan*, 605 F.3d 681, 685 (9th Cir. 2010). For example, in *Malone v. Franklin*, the Tenth Circuit held that the plaintiff had

exhausted his administrative remedies when he requested to be classified as an indigent inmate, and that relief was granted. 113 F. App'x 364, 366 (10th Cir. 2004). Afterward, the plaintiff was denied certain items by a prison official because he was not in fact on the indigent list. *Id.* at 365. The plaintiff then appealed the grievance, but did not properly complete the appeal process. *Id.* at 366. The Tenth Circuit found that plaintiff was not "required to appeal or to institute a new grievance to obtain the same relief." *Id.*; *see also Ross*, 365 F.3d at 1187 (finding after plaintiff's success in the first stage of the process, he was not obligated to proceed to the second stage, "and nothing in the record suggest[e]d that there was any further relief whatsoever available"); *Allen v. Reynolds*, No. 09-cv-02605-WJM-MJW, 2011 WL 2174427, at *6-*7 (D. Colo. Apr. 28, 2011) (finding plaintiff properly exhausted his administrative remedies where plaintiff's grievance was granted in part at Step 1, and he did not have an obligation to proceed, though plaintiff went through the grievance process a second time after not receiving a response from defendants), *report and recommendation adopted*, 2011 WL 2174424 (D. Colo. June 3, 2011). "Nor is it the prisoner's responsibility to ensure that prison officials actually provide the relief that they have promised." *Harvey*, 605 F.3d at 685 (citing *Abney v. McGinnis*, 380 F.3d 663, 669 (2d Cir. 2004) ("A prisoner who has not received promised relief is not required to file a new grievance where doing so may result in a never-ending cycle of exhaustion.")).

Applied here, Plaintiff Atkins was not required to proceed to Step 2 in his 2015 grievance because he had requested that videophones be installed, and the CDOC responded that it was preparing to install videophones at his facility as part of a pilot program. [#141-1, PSOF69] Because the CDOC did not deny the grievance at Step 1

[*id.* at PSOF70], Plaintiff Atkins had no obligation to proceed to Step 2, and thus properly exhausted his administrative remedies in 2015. He was not required to repeat the process in 2018. Accordingly, Defendants' Motion for Summary Judgment [#133] is **DENIED** to the extent it seeks summary judgment on Plaintiff Atkins' claims for failure to properly exhaust administrative remedies.

In summary, Defendants' Motion for Summary Judgment [#133] is **DENIED** to the extent it seeks summary judgment on Plaintiffs Trevithick and Atkins' claims for failure to properly exhaust, but **GRANTED** to the extent it seeks summary judgment on Plaintiff Begano's claims. Plaintiff Begano's claims are **DISMISSED WITHOUT PREJUDICE**.

### ii. ADA and Rehabilitation Act Claims

The Court next addresses the parties' arguments in the Motions for Summary Judgment with respect to Plaintiffs' ADA and Rehabilitation Act claims. "Analysis of a claim under Title II of the ADA is identical to an analysis under the Rehabilitation Act." *Kimble v. Douglas Cty. Sch. Dist. RE-1*, 925 F. Supp. 2d 1176, 1182 (D. Colo. 2013) (citing *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 608 n.7 (10th Cir. 1998); *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1102 (10th Cir. 1998)); *see also Anderson v. Colo. Dep't of Corr.*, 848 F. Supp. 2d 1291, 1300 n.2 (D. Colo. 2012) ("The Rehabilitation Act is materially identical to and the model for the ADA[—]the elements are the same except the Rehabilitation Act requires that defendant receive federal funds." (quotations omitted)). Accordingly, and as requested by the parties, the Court will apply the same analysis to Plaintiffs' ADA and Rehabilitation Act claims.

Title II of the ADA states, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied

the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This provision applies to prisoners. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). To state a claim under Title II, the plaintiff must allege that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability."[12] *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007).

At the heart of the instant Motions for Summary Judgment is the parties' disagreement with respect to the reasonableness of the accommodations already in place at CDOC facilities under the second prong. Specifically, whether TTY technology satisfies the CDOC's burden under the ADA to provide deaf inmates with the ability to communicate with individuals outside CDOC facilities. [*See* #117 at 14-16; #133 at 12-16; #140 at 4-9] As the Tenth Circuit has instructed, the ADA "requires more than physical access to public entities: it requires public entities to provide *meaningful* access to their programs and services." *Robertson*, 500 F.3d at 1195 (emphasis in original) (quotations omitted). To effectuate Title II's mandate, Department of Justice "regulations require

---

[12] When a non-disabled plaintiff, like Plaintiff Rogers, is asserting an ADA claim on the basis of her relationship to a disabled individual, the plaintiff must allege: "(1) a logical and significant association with an individual with disabilities; (2) that a public entity knew of that association; (3) that the public entity discriminated against them because of that association; and (4) they suffered a direct injury as a result of the discrimination." *Schneider v. County of Will*, 190 F. Supp. 2d 1082, 1091 (N.D. Ill. 2002) (citing 28 C.F.R. § 35.130(g) ("A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.")).

public entities to 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.'" *Id.* (quoting 28 C.F.R. § 35.130(b)(7)). As to hearing disabilities specifically, public entities must "take appropriate steps to ensure that communications with . . . participants . . . with disabilities are *as effective as* communications with others," 28 C.F.R. § 35.160(a)(1) (emphasis added), and to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity," *id.* § 35.160(b)(1). In order to be "effective," "auxiliary aids and services must be provided in accessible formats [and] in a timely manner." *Id.* § 35.160(b)(2). "In determining what types of auxiliary aids and services are necessary," the public entity must "give primary consideration to the requests of individuals with disabilities." *Id.*

Here, Plaintiffs have factually established that they cannot communicate effectively without videophones. First, Plaintiffs have established that TTY technology does not ensure that they are able to communicate as effectively as inmates with access to conventional telephones. Plaintiffs have demonstrated that TTY is 60 years old and becoming obsolete. [#141-1, PSOF 17, 27] Plaintiffs' expert Jean Andrews opined that requiring deaf prisoners to communicate by TTY is analogous to requiring hearing prisoners to communicate by fax machine. [*Id.* at PSOF19] Dr. Andrews specifically stated that "[t]he communication is asynchronous, you send your communication, wait for a response, hope it is not garbled and hope you have not been misunderstood. [*Id.*] Though Defendants deny these facts, Defendants have presented no expert evidence to rebut Dr. Andrews' opinions, or any of the factual assertions on which those opinions rest.

*See McBride*, 294 F. Supp. 3d at 709.  Defendants also admit that Keith Nordell, formerly the highest ranking attorney for the CDOC, stated nearly six years ago that the "current TTY equipment is becoming antiquated, requires frequent maintenance from sources that are not familiar or trained on the use/repair of a TTY and creates unfair delays for offenders due to the limited number of TTY machines department wide when equipment is down."  [#141-1, PSOF20]

The parties agree that as TTY technology has become obsolete, deaf people have replaced TTYs with videophones.  [*Id.* at PSOF23, 27]  As a result, a deaf inmate in a CDOC facility using TTY must use a three-step communication process to contact another deaf person outside the facility who uses a videophone.  [*Id.* at PSOF23]  The deaf inmate types a message into the TTY, the TTY operator speaks the message to a VRS operator, and the VRS operator signs the message to the recipient's videophone.  [*Id.*]  When the recipient responds, the three-step process is repeated in reverse.  [*Id.*]  Defendants admit that the three-step process "causes many opportunities for misunderstanding and mistranslation."  [*Id.* at PSOF24]  Plaintiffs also demonstrate that CDOC's TTYs often produce garbled text or nonsense characters.  [*Id.* at PSOF29-30]  Although Defendants deny this factual assertion, the exhibits cited by Defendants support this fact.  [*See, e.g.*, #133-5]  Defendants also admit that the TTY process is even more difficult for Plaintiff Rabinkov when he communicates in Russian Sign Language, and he has not been able to communicate by phone with friends speaking Russian Sign Language.  [#141-1, PSOF25]

Defendants also do not dispute that TTY requires deaf inmates to communicate in written English.  [*Id.* at PSOF17, 27]  English is not the native language of the Deaf

Plaintiffs or Plaintiff Rogers' mother, and ASL is neither a manual nor derivative form of English. [*Id.* at PSOF13-14] As Plaintiffs' expert explained, the grammatical and syntactic structure between ASL and English is fundamentally different, and using a TTY results in briefer messages, and curtails the ability to express thoughts and feelings in the same manner as hearing inmates using a telephone. [*Id.*; #140-4 at 7] In sum, unlike hearing inmates using conventional telephones, inmates using TTYs cannot communicate in real time, must rely on an operator, which is cumbersome and time-consuming, are forced to decipher garbled text and messages, and are required to communicate outside of their native language, with major barriers to expressing tone and emotion. Plaintiffs have thus "presented ample evidence that TTYs are not a practical or effective communication tool for deaf and hard of hearing persons." *McBride*, 294 F. Supp. 3d at 707.

In contrast, Plaintiffs' expert opined that "[s]igned videophone conversations are analogous to spoken telephone conversations." [#141-1, PSOF27] Defendants deny this assertion but have not set forth any facts or evidence to the contrary, and Defendants admit that like conventional telephones, videophones enable two-way communication in real time. [*Id.* at PSOF7] Videophones also allow deaf individuals to communicate through their native ASL, unencumbered by delays in typing, and to use visual indicators such as facial expression, head tilts and nods, and eyebrow raises, which encode the grammar of ASL and convey emotion, mood, tone, and affect. [*Id.* at PSOF27, 32-33] Defendants admit that emotion, mood, tone, and affect cannot be conveyed or perceived using TTY, and further do not dispute that when Plaintiffs are able to communicate in ASL, they can express and understand a full range of meaning and emotion, and engage in fluent, complete, and meaningful communication. [*Id.* at PSOF33, 36]

Like the defendants in *McBride*, an analogous case where the Eastern District of Michigan granted summary judgment to deaf inmates seeking access to videophones instead of TTY technology, the CDOC here presents no expert evidence to rebut Plaintiffs' expert opinions, or any of the factual assertions on which those opinions rest. 294 F. Supp. 3d at 709. Instead, the CDOC simply argues that "Plaintiffs claim that it would be better for them and more effective and efficient for them to communicate with family and friends using videophones." [#133 at 14; #120 at 11] The CDOC contends that despite any issues with TTYs, those devices still provide Plaintiffs with meaningful access to communication with family and friends. [#133 at 15] But, as in *McBride*, Plaintiffs' expert has not simply opined that videophones are "better" than TTYs, but rather that videophones are *necessary* to enable deaf prisoners to communicate effectively with individuals outside of CDOC facilities. [#141-1, PSOF34] While Defendants continue to disagree with that conclusion, they nevertheless admit that videophones allow deaf inmates to communicate in their native language, in real time, and to express and understand a full range of meaning and emotion by using visual indicators to indicate grammar, emotion, mood, tone and affect—just as hearing inmates are able to do in a spoken conversation over a conventional telephone. And again as in *McBride*, the fact that TTYs retain some functionality does not equate to meaningful access, especially given the undisputed evidence of the many issues with TTYs. 294 F. Supp. 3d at 710.

Finally, the Court is not persuaded by the authority cited by Defendants.[13] The only case cited from this Circuit held that TTY access was meaningful where plaintiff was

---

[13] Nor do Defendants assert a fundamental alteration/undue burden defense to the ADA and Rehabilitation Act violations. Pursuant to 28 C.F.R. § 35.164, a public entity is not required "to take any action that it can demonstrate would result in a fundamental

allowed two 30-minute calls per week, but sought unlimited access.  *Spurlock v. Simmons*, 88 F. Supp. 2d 1189, 1196 (D. Kan. 2000).  Videophones were not at issue.  *See id.*; *see also Douglas v. Gusman*, 567 F. Supp. 2d 877, 889-90 (E.D. La. 2008) (finding TTYs provided meaningful access where plaintif was not seeking videophone use, but rather unlimited TTY and television access).  The other cases cited by Defendants are similarly distinguishable.  *See Arce v. Louisiana*, 226 F. Supp. 3d 643, 651 (E.D. La. 2016) (granting motion to dismiss where the complaint did not allege that the TTY machine failed to function or that the plaintiff could not effectively communicate using the TTY machine); *Rosenthal v. Mo. Dep't of Corr.*, No. 2:13-cv-04150, 2016 WL 705219, at *10 (W.D. Mo. Feb. 19, 2016) (noting previous decisions finding that TTYs provided "meaningful access" under the ADA and Rehabilitation Act, but not addressing any evidence on TTY versus videophone technology, other than intervenor's arguments that video technology had been offered in other facilities).

    For these reasons, Plaintiffs have demonstrated that "TTYs do not enable them to communicate effectively with persons outside of prison, much less provide them with telecommunications access equal to that provided to hearing prisoners," and that videophones are necessary for deaf inmates to have meaningful access to CDOC telephone services.  *McBride*, 294 F. Supp. 3d at 713.  Accordingly, Defendants' Motion for Summary Judgment [#133] is **DENIED** to the extent it seeks summary judgment on Plaintiffs' ADA and Rehabilitation Act claims, and Plaintiff Trevithick's Motion for Partial

---

alteration in the nature of a service, program, or activity or in undue financial and administrative burdens."

Summary Judgment [#117] is **GRANTED** to the extent it seeks summary judgment on his ADA and Rehabilitation Act claims.

Although the remaining Plaintiffs did not specifically move for summary judgment on those claims, in response to Defendants' Motion for Summary Judgment, Plaintiffs contend that there are no disputed issues of fact that would allow Defendants to succeed on these claims. [#140 at 4] The record has been fully developed in the context of Defendants' Motion for Summary Judgment and Plaintiff Trevithick's Motion for Partial Summary Judgment, to which Defendants fully responded, and the Court agrees that there is no dispute of material fact on Plaintiffs' ADA and Rehabilitation Act claims. Thus, because the CDOC has had an adequate opportunity to develop facts necessary to oppose summary judgment, the Court also sua sponte enters summary judgment on the ADA and Rehabilitation Act claims in favor of Plaintiffs Rogers, Atkins, and Rabinkov. *See Holmes v. Utah Dep't of Workforce Servs.*, 483 F.3d 1057, 1067 (10th Cir. 2007) ("[A] district court has the power to enter summary judgment sua sponte, provided that the losing party was on notice that she had to come forward with all of her evidence."); *David v. City & Cty. of Denver*, 101 F.3d 1344, 1359 (10th Cir. 1996) (finding a court may sua sponte enter summary judgment on a claim when: "(1) there is no dispute of material fact; (2) the losing party has had an adequate opportunity to address the issues involved, including an adequate time to develop any facts necessary to oppose summary judgment").

### iii. Compensatory Damages

Defendants next contend that the evidence does not support a finding of deliberate indifference or intentional discrimination, and thus Defendants claim they are entitled to

summary judgment to the extent Plaintiffs seek compensatory damages under the ADA or the Rehabilitation Act. [#133 at 16-17] "[T]o recover compensatory damages under § 504, a plaintiff must establish that the agency's discrimination was intentional."[14] *Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1263 (10th Cir. 2018) (quotation omitted). "[I]ntentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Id.* at 1264 (quotation omitted). Specifically, a plaintiff must make two showings: (1) that the defendant knew that harm to a federally protected right was substantially likely, and (2) that the defendant failed to act upon that likelihood. *Id.*

For example, in *McCullum v. Orlando Regional Healthcare System, Inc.*, the Eleventh Circuit held that the defendant hospital did not have the requisite knowledge of plaintiff's need for a sign language interpreter, where hospital staff believed they were effectively communicating because plaintiff nodded and verbalized his understanding, and where there was no evidence that plaintiff or his family members ever requested an interpreter, or told staff that they were struggling to translate questions and statements from doctors and nurses. 768 F.3d 1135, 1148 (11th Cir. 2014). *Cf. Sunderland v. Bethesda Hosp., Inc.*, 686 F. App'x 807, 817 (11th Cir. 2017) (finding defendant had requisite knowledge that plaintiff needed additional interpretive aids, where plaintiff had requested an in-person interpreter but instead was provided with a video remote interpreting device, which defendant knew was ineffective because it was blurry and frequently froze). As to the second prong, this District held that issues of fact remained

---

[14] The Tenth Circuit has applied the same analysis in determining whether a plaintiff may recover compensatory damages under Title II of the ADA. *See Hans v. Bd. of Shawnee Cty. Comm'rs*, 775 F. App'x 953, 956 (10th Cir. 2019).

as to whether the City and County of Denver failed to accommodate deaf inmates, where there appeared to be "gaps in deputies' knowledge of how best to communicate with deaf inmates as well as how and under what circumstances to obtain an interpreter." *Ulibarri v. City & Cty. of Denver*, 742 F. Supp. 2d 1192, 1217 (D. Colo. 2010). Assistive devices were available, but "they [we]re of questionable value if inmates ha[d] no way to learn of them or if they [we]re inoperable." *Id.*; *see also Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1229 (10th Cir. 2009) (noting under the second prong, "a public entity does not 'act' by proffering just any accommodation: it must consider the particular individual's need when conducting its investigation into what accommodations are reasonable" (quotation omitted)). *Cf. Ferguson v. City of Phoenix*, 157 F.3d 668, 675-76 (9th Cir. 1998) (finding city did not fail to act in response to complaints by hearing impaired users of its telecommunication device because the city conducted investigations in response to the complaints, "followed by diligent effort . . . to upgrade" its telecommunication service).

Here, Plaintiffs have presented sufficient evidence from which a reasonable factfinder could conclude that Defendants' discrimination was intentional. As to knowledge that harm to a protected right was substantially likely, Defendants were clearly on notice of the shortcomings of TTY technology and the need for videophones from Plaintiffs' repeated grievances. Plaintiff Atkins first complained about problems with TTYs and requested installation of videophones in October 2015. [#141-1, DSOF19, PSOF66] Plaintiff Trevithick also filed a grievance related to issues with the relay system in the chapel in February 2012. [*Id.* at DSOF24; *see also* #133-1 at 29] Moreover, in a December 2013 Project Request Form, Keith Nordell, who was CDOC's highest ranking attorney at the time, stated that "current TTY equipment is becoming antiquated, requires

42

frequent maintenance from sources that are not familiar or trained on the use/repair of a TTY and creates unfair delays for offenders due to the limited number of TTY machines department wide when equipment is down." [#141-1, PSOF20]

As to the second prong, issues of fact remain as to Defendants' failure to act. Between 2013 and 2016, the CDOC considered implementing a videophone pilot program, but that plan never came to fruition, and by May 2017, the CDOC had no plans to install videophones. [*Id.* at PSOF74-76, 80-83] A factfinder could determine that Defendants intentionally discriminated against Plaintiffs by recognizing that TTY technology was ineffective, but refusing to provide any other assistive devices.[15] *See, e.g.*, *Sunderland*, 686 F. App'x at 816-18; *Ulibarri*, 742 F. Supp. 2d at 1217. For these reasons, Defendants' Motion for Summary Judgment [#133] is **DENIED** to the extent it seeks summary judgment on Plaintiffs' requests for compensatory damages.

### iv. First Amendment Claim

In their Motion for Summary Judgment, Defendants further argue that they are entitled to summary judgment on Plaintiffs' First Amendment claim because "Plaintiffs have not asserted any facts tending to show that the choice between TTY" and related technology "over videophones [is] not related to legitimate penological interests." [#133 at 12] Defendants also contend that Plaintiffs have alternative means of communication through TTY and written correspondence. [*Id.*]

---

[15] Alternatively, a factfinder could decide that efforts to install videophones were legitimate attempts to implement videophone technology that did not constitute a failure to act. But "[w]here different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment." *Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984).

In the First Amendment context, the Supreme Court has acknowledged that "federal courts must take cognizance of the valid constitutional claims of prison inmates. Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987) (citation omitted).  The Supreme Court has also recognized, however, that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Id.* (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)).  As a result, prison officials may restrict prisoners' First Amendment rights in ways that "would raise grave First Amendment concerns outside the prison context."  *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). Accordingly, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

In making this determination, the Supreme Court has directed lower courts to consider the following factors: (1) whether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether "alternative means of exercising the right [exist] that remain open to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there was an "absence of ready alternatives" to the regulation in question.  *Id.* at 89-90 (quotation omitted).  For example, in *Heyer v. United States Bureau of Prisons*, the Fourth Circuit reversed the lower court's granting of summary judgment in favor of the defendant where questions of fact remained as to the reasonableness of a videophone ban by the Bureau of Prisons ("BOP").  849 F.3d at 214-19.  The Fourth Circuit determined

that plaintiff's limited proficiency in written English would allow a factfinder to conclude that no other effective means of communication were available to him other than a videophone, the evidence demonstrated that videophones could be installed at a minimal expense and with little change in staffing needs, and there was nothing in the record to "suggest[] that the security risks posed by videophones [we]re so qualitatively different that they c[ould] only be managed by banning videophones." *Id.* at 215-17.

Here, Plaintiffs have set forth evidence from which a reasonable factfinder could conclude that the CDOC's regulations, which only afford deaf inmates access to TTYs [*see* #141-1, DSOF29], impinge on Plaintiffs' First Amendment rights. As discussed at length above, Plaintiffs have demonstrated that when they use TTYs, they cannot communicate in real time, they often rely on an operator, which is cumbersome, time-consuming, and can result in mistranslations, they must decipher distorted messages, and they are required to communicate outside of their native language, with major barriers to expressing tone and emotion. [*Id.* at PSOF13-14, 19, 23-24, 29-30, 33] Because the evidence establishes that Plaintiffs cannot communicate effectively through the TTY device, and because CDOC policy only provides for that technology, a rational jury could find that the CDOC policy impinges on Plaintiffs' First Amendment rights to communicate with individuals outside CDOC facilities. *See Heyer*, 849 F.3d at 214.

Under the *Turner* analysis, questions of material fact remain as to whether the CDOC's policy to only provide TTYs to deaf inmates is reasonably related to a legitimate penological interest. As to the first factor, whether there is a valid connection between the regulation and a legitimate government interest, it is undisputed that previous videophone pilot programs were canceled based on security concerns, including the

inability to limit the phone numbers that prisoners could call, or to charge prisoners for the calls. [#141-1, PSOF105] While prison security is a legitimate government interest, Defendants admit that they have worked through their videophone security concerns. [*Id.* at PSOF106] And prisoners at DWCF must rely on CDOC staff to dial phone numbers for them, so presumably staff members could limit phone numbers called through this process. [*Id.* at PSOF92] Moreover, it is undisputed that videophones are available at other correctional facilities, including the El Paso County Jail, and that Global Tel*Link, a videophone service provider, has installed videophone services for approximately 30 departments of correction. [*Id.* at PSOF44-45] Accordingly, while Defendants may have legitimate security concerns, questions remain as to the connection between those concerns and the policy of only providing TTYs.

Under the second factor, as discussed above, Plaintiffs have set forth substantial evidence that they cannot communicate as effectively through TTY technology as with videophones, and thus a factfinder could find that Plaintiffs do not have alternative means of exercising their First Amendment rights. *See Heyer*, 849 F.3d at 216. With respect to the third factor—the impact on guards, other inmates, and the allocation of prison resources—it is undisputed that the "CDOC has not made any expenditure to install videophones and it does not cost them anything to provide the service at DWCF." [#141-1, PSOF104] And at least at CTCF, the videophones have been installed in a public area, which could support a finding that the videophones are located where there is already guard staffing. [#147-3 at ¶ 5; #147-4 at ¶ 6] Otherwise, there is no evidence with respect to the impact a videophone policy would have on staffing needs or other inmates and therefore questions of fact remain regarding whether a videophone policy would create

staffing and security problems. *See Tanney v. Boles*, 400 F. Supp. 2d 1027, 1044 (E.D. Mich. 2005) (denying summary judgment where there was conflicting evidence of the staffing needed to monitor calls). For the same reasons, a reasonable factfinder could conclude that the refusal to implement a videophone policy is an exaggerated response to perceived security concerns, where Plaintiffs have presented evidence that the videophones cost nothing, and where Defendants admit that security concerns have already been addressed. *See Heyer*, 849 F.3d at 218; *see also Turner*, 482 U.S. at 91 ("[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.").

Because questions of fact remain as to whether the CDOC's policy, limited to providing TTYs, impinges on Plaintiffs' First Amendment rights, and whether that policy is reasonably related to a legitimate penological interest, Defendants' Motion for Summary Judgment [#133] is **DENIED** on Plaintiffs' First Amendment claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss as Moot [#143] is **DENIED**, Plaintiff Trevithick's Motion for Partial Summary Judgment [#117] is **GRANTED**, and Defendants' Motion for Summary Judgment ("MSJ") [#133] is **GRANTED in part and DENIED in part**. More specifically, the Court holds as follows:

(1)    Defendants' MSJ is **DENIED** to the extent it seeks summary judgment on Plaintiffs Rogers and Begano's claims for injunctive relief as moot.

(2)    Defendants' MSJ is **DENIED** to the extent it seeks summary judgment on Plaintiffs Trevithick and Atkins' claims for failure to exhaust, but **GRANTED** to the extent

it seeks dismissal of Plaintiff Begano's claims for failure to exhaust.  Plaintiff Begano's claims are **DISMISSED WITHOUT PREJUDICE**.

(3)     Defendants' MSJ is **DENIED** to the extent the CDOC seeks summary judgment on Plaintiffs' ADA and Rehabilitation Act claims, and Plaintiff Trevithick's Motion for PSJ [#117] is **GRANTED** to the extent it seeks summary judgment on those claims. Summary judgment is entered in favor of Plaintiffs Trevithick, Rogers, Atkins, and Rabinkov, and against CDOC, on the ADA and Rehabilitation Act claims.

(4)     Defendants' MSJ is **DENIED** to the extent it seeks summary judgment on Plaintiffs' requests for compensatory damages.

(5)     Defendants' MSJ is **DENIED** to the extent it seeks summary judgment on Plaintiffs' First Amendment claims.

**IT IS FURTHER ORDERED** that the CDOC SHALL:

(1)     Make videophones available to all deaf and hard of hearing inmates;

(2)     Make videophones available to all inmates communicating with deaf and hard of hearing friends, family members, or other individuals.

(3)     Adopt effective and comprehensive polices and procedures regarding the use and implementation of videophones, including for appropriate compliance monitoring and videophone maintenance and repair.


DATED:  September 18, 2019                    BY THE COURT:

                                              s/Scott T. Varholak
                                              United States Magistrate Judge